UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

LINDA RYLOTT-ROONEY,

                Plaintiff,

       - against -

ALITALIA – LINEE AEREE ITALIANE –
SOCIETA PER AZIONI,

            Defendant.

------------------------------------------------

**Index No. 07 CV 11091 (JSR)**

**ECF CASE**

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
<u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)</u>**

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ................................................................................ 1

STATEMENT OF FACTS ................................................................................... 2

    A.    Procedural History ............................................................................... 2

    B.    Allegations in the Complaint ................................................................. 2

ARGUMENT .................................................................................................... 2

STANDARDS ON A MOTION TO DISMISS................................................................ 2

POINT I     PLAINTIFF'S CLAIMS BROUGHT UNDER THE  NYCHRL AND NYSHRL MUST BE DISMISSED .................................................... 3

    A.    The Impact of Defendant's Conduct Was Outside New York State ................... 3

    B.    The Impact of Defendant's Conduct Was Outside New York City..................... 5

POINT II    PLAINTIFF'S CLAIMS FOR AIDING AND ABETTING MUST BE DISMISSED ................................................................................... 7

POINT III   PLAINTIFF HAS CONSENTED TO DISMISS THE FIFTH CAUSE OF ACTION IN ITS ENTIRETY.............................................................. 7

CONCLUSION................................................................................................. 8

i

# TABLE OF AUTHORITIES

**Page**

## CASES

Chosun Intern., Inc. v. Chrisa Creations, LTD., 413 F.3d 324 (2d Cir. 2005) .............................. 3

DeWitt v. Lieberman, 48 F.Supp.2d 280 (S.D.N.Y. 1999) ........................................... 7

Duffy v. Drake Beam Morin, Harcourt Gen., Inc., 1998 U.S. Dist. LEXIS 7215
 (S.D.N.Y. 1998) ................................................................................................. 4, 5-6

Int'l. Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC,
 470 F.Supp.2d 345 (S.D.N.Y. 2007) .................................................................... 4, 6

Kull v. Davidoff of Geneva, 2004 U.S. Dist. LEXIS 11575 (S.D.N.Y. 1997) ............................. 4

Lightfoot v. Union Carbide Corp., 1994 U.S. Dist. LEXIS 6191 (S.D.N.Y. 1994),
 aff'd, 110 F.3d 898 (2d Cir. 1997) ............................................................................ 6

Lucas v. Pathfinder's Pers., Inc., 2002 U.S. Dist. LEXIS 8529 (S.D.N.Y. 2002) ........................ 3

Miller v. Citicorp., 1997 U.S. Dist. LEXIS 2395 (S.D.N.Y. 1997) .................................. 5

Murphy v. ERA United Realty, 674 N.Y.S.2d 415 (2d Dept. 1998) ................................. 7

Pearce v. Manhattan Ensemble Theater, Inc., 2007 U.S. Dist. LEXIS 16487
 (S.D.N.Y. 2007) ............................................................................................... 3-4, 5

Pisiani v. Westchester County Health Care Corp., 424 F.Supp.2d 710 (S.D.N.Y. 2006) .............. 2

Plaza Marine Inc. v. Exxon Corp., 814 F.Supp. 334 (S.D.N.Y. 1993) ...................................... 2-3

Salvatore v. KLM Royal Dutch Airlines, 1999 U.S. Dist. LEXIS 15551 (S.D.N.Y. 1999) ....... 6, 7

Sherwood v. Olin Corp., 772 F.Supp. 1418 (S.D.N.Y. 1991) ........................................ 4

Wahlstrom v. Metro-North Commuter R.R., 89 F.Supp.2d 506 (S.D.N.Y. 2000) .................... 5-6

## STATUTES

New York City Human Rights Law (City Administrative Code § 8-107) ........................... passim

New York State Human Rights Law (Executive Law § 296) ............................................... passim

## RULES

Federal Rule of Civil Procedure 12(b)(6) .................................................................. 1, 3

NEWYORK/#190511.9

Defendant Alitalia Linee Aeree Italiane, S.p.A. ("Defendant" or "Alitalia"), by its attorneys Vedder Price P.C., submits this Memorandum of Law in support of its Motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss all five Causes of Action in the complaint ("Complaint") of Plaintiff Linda Rylott-Rooney ("Plaintiff" or "Rylott-Rooney") in their entirety for failure to state a claim upon which relief can be granted.  A copy of the Complaint, filed with the Clerk of Court on December 7, 2007 and served upon Alitalia via the Secretary of State of New York on December 21, 2007, is attached to the accompanying Notice of Motion as Exhibit A.  A copy of Defendant's Answer, filed and served on January 10, 2008, is attached as Exhibit B.

## <u>SUMMARY OF ARGUMENT</u>

Plaintiff asserts five Causes of Action, none of which successfully states a claim upon which relief may be granted.

Plaintiff's First, Second, Third and Fourth Causes of Action allege discrimination under the New York State Human Rights Law (Executive Law § 296) ("NYSHRL"), and the New York City Human Rights Law (City Administrative Code § 8-107) ("NYCHRL") (Cplt. ¶¶ 37-52).  However, because Plaintiff is a citizen of Minnesota and resident of Minneapolis who worked out of Alitalia's Minneapolis office, Plaintiff's employment is not covered by either the NYSHRL or the NYCHRL.  (See Points I(A) and I(B), *infra*.)

Plaintiff's Second and Fourth Causes of Action allege that Alitalia aided and abetted its own discriminatory conduct.  As a matter of law, it is impossible for an employer to do so.  (See Point II, *infra*.)

Plaintiff's Fifth Cause of Action is for negligent and intentional infliction of emotional distress (Cplt. ¶¶ 53-57).  Plaintiff has consented to dismiss this claim.

## STATEMENT OF FACTS

**A.    Procedural History**

On or about December 7, 2007, Plaintiff filed the instant Complaint, containing five causes of action.  The Complaint was served on Alitalia via the Secretary of State on or about December 21, 2007.  Plaintiff invoked this Court's jurisdiction on the basis of diversity of citizenship (Cplt. ¶ 4).  Defendant filed and served its Answer to the Complaint on January 10, 2008.

**B.    Allegations in the Complaint**

Alitalia is an Italian corporation licensed to do business in New York (Cplt. ¶¶ 7-8).  Beginning in 1981, Plaintiff was employed by Alitalia in various capacities until her position as Manager, National and Corporate Accounts was eliminated on December 8, 2004 (Cplt. ¶¶ 9-10, 17-18).  During the relevant time period, she was based in Minneapolis, Minnesota (Cplt. ¶ 11).  Plaintiff is a resident of Minneapolis and a citizen of Minnesota (Cplt ¶¶ 4, 6).

Mr. Marco D'Ilario was the Senior Director of Sales for the USA and Mexico in 2004 (Cplt. ¶ 17).  While she was on a business trip to New York, Plaintiff was informed by D'Ilario on December 8, 2004 that her position was being eliminated, and that no other positions were available (Cplt. ¶¶ 17-19).

## ARGUMENT

## STANDARDS ON A MOTION TO DISMISS

"On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the issue is whether the claimant is entitled to offer evidence to support the claims."  *Pisiani v. Westchester County Health Care Corp.*, 424 F.Supp.2d 710, 714 (S.D.N.Y. 2006).  "In resolving a motion to dismiss pursuant [to] FRCP 12(b)(6), the Court must accept as true all well-pleaded facts in the . . . complaint" and should "not dismiss the . . . complaint unless it appears beyond a doubt that

2

plaintiff can prove no set of facts in support of [her] claim entitling her to relief." *Plaza Marine Inc. v. Exxon Corp.*, 814 F.Supp. 334 (S.D.N.Y. 1993). At this stage, the Court's role is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Chosun Intern., Inc. v. Chrisa Creations, LTD.*, 413 F.3d 324 (2d Cir. 2005), *citation omitted*.

## POINT I

### PLAINTIFF'S CLAIMS BROUGHT UNDER THE NYCHRL AND NYSHRL MUST BE DISMISSED

### (FIRST, SECOND, THIRD AND FOURTH CAUSES)

**A.    The Impact of Defendant's Conduct Was Outside New York State**

Plaintiff is a resident and citizen of Minneapolis, Minnesota (Cplt. ¶¶ 4, 6). During the relevant time of her employment with Alitalia, she worked out of Minneapolis (Cplt. ¶ 11). She invokes the NYSHRL to plead three theories of discrimination: age, national origin and citizenship (Count I, Cplt. ¶¶ 45-49). In addition, she alleges a claim under the NYSHRL for aiding and abetting discriminatory conduct (Count II, Cplt. ¶¶ 50-52). All of these claims must be dismissed because Plaintiff, a non-resident of New York, was terminated from a job she performed outside of New York State.

> [T]he NYSHRL 'does not provide a non-resident with a private cause of action for discriminatory conduct committed outside of New York by a New York corporation.' Thus, in order for Plaintiff to establish a NYSHRL violation, she must allege that Defendant's discriminatory conduct occurred in New York. . . . [H]owever, the fact that the decision to terminate Plaintiff was made in New York State is not sufficient to establish a violation of the NYSHRL.

*Lucas v. Pathfinder's Pers., Inc.*, 2002 U.S. Dist. LEXIS 8529, *4 (S.D.N.Y. 2002) (citations omitted, attached hereto as Exhibit A). The jurisdiction of the NYSHRL does not extend to a non-resident employee of a business operating in New York because "the State Human Rights

3

Laws require Plaintiff to show Defendant's discriminatory actions had an actual impact in New York." *Pearce v. Manhattan Ensemble Theater, Inc.*, 2007 U.S. Dist. LEXIS 16487, *25 (S.D.N.Y. 2007) (attached hereto as Exhibit B).

Consistently, courts have held that, when an employee is terminated, the actual impact is felt at the employee's workplace. *See*, *e.g.*, *Int'l. Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC*, 470 F.Supp.2d 345, 362 (S.D.N.Y. 2007) ("An out-of-state employer's discriminatory conduct falls within Section 296 if it affects the 'terms, conditions, or privileges of employment . . . within New York,'" ellipsis in original, quoting *Sherwood v. Olin Corp.*, 772 F.Supp. 1418, 1426 (S.D.N.Y. 1991)); *Duffy v. Drake Beam Morin, Harcourt Gen., Inc.*, 1998 U.S. Dist. LEXIS 7215, *37-38 (S.D.N.Y. 1998) (dismissal appropriate where, even if decision to fire plaintiff was made in New York office, plaintiff's residence and workplace were in New Jersey, attached hereto as Exhibit C). Consequently, because Plaintiff is not a resident of New York, and because the impact of Defendant's allegedly discriminatory conduct was in Minnesota, Counts I and II of the Complaint must be dismissed in their entirety.

Plaintiff's allegations that she made occasional business trips to New York (Cplt. ¶ 11) are insufficient to sustain a claim under the NYSHRL. *See*, *e.g.*, *Kull v. Davidoff of Geneva*:

> That Kull performed some of his duties at the New York retail store does not exempt him from this rule. Since at least 1989 . . . he has been a resident of the state of Connecticut. Kull's office is in Connecticut, and the decision to terminate him was effected by a Swiss corporation in either Basel, Switzerland, where the decision was made, or Stamford, Connecticut, where the termination actually occurred.

2004 U.S. Dist. LEXIS 11575, *20 (S.D.N.Y. 2004) (attached hereto as Exhibit D). *See*, *also*, *Miller v. Citicorp.*, 1997 U.S. Dist. LEXIS 2395 (S.D.N.Y. 1997) (Florida resident and employee not entitled to relief under NYSHRL, even when he had previously been a resident of New York, had worked out of the New York office, and was terminated with the approval of the New York

4

office, attached hereto as Exhibit E). Similarly, because Plaintiff is a non-resident who was terminated from a job based in Minneapolis, Minnesota, she has no basis upon which to avail herself of the NYSHRL.

Accordingly, Counts I and II of Plaintiff's Complaint, brought under the New York State Human Rights Law, must be dismissed.

**B.      The Impact of Defendant's Conduct Was Outside New York City**

Plaintiff invokes the NYCHRL to plead three theories of discrimination: age, national origin and citizenship (Count III, Cplt. ¶¶ 45-49). In addition, she alleges a claim under the NYCHRL for aiding and abetting discriminatory conduct (Count IV, Cplt. ¶¶ 50-52). All of these claims must be dismissed because the actual impact of the alleged discriminatory decision was in Minneapolis, Minnesota, Plaintiff's residence and workplace, and not within New York City.

Courts have held with great consistency that the jurisdiction of the NYCHRL does not extend beyond the city's five boroughs. The mere fact that Plaintiff, a resident of Minneapolis, Minnesota, was informed of the decision to terminate her employment while she was in New York is insufficient to invoke the Human Rights Law. "[C]ourts interpreting the City Human Rights Law have consistently required that the discriminatory act or acts have had an *impact* in New York City." *Pearce v. Manhattan Ensemble Theater, Inc.*, 2007 U.S. Dist. LEXIS 16487, at *25 (emphasis in original, citations omitted). In the employment context, this means that the employee's work place must be within New York City, and the fact that the alleged discriminatory decision was communicated in New York is of no legal significance.

> [T]he NYCHRL only applies where the actual impact of the discriminatory conduct or decision is felt within the five boroughs, even if a discriminatory decision is made by an employer's New York City office. *See Duffy v. Drake Beam Morin, Harcourt Gen., Inc.*, 1998 U.S. Dist. LEXIS 7215, *36 (S.D.N.Y. 1998) ("To hold

5

> otherwise would be to expand the [NYCHRL] to cover any employee who is fired pursuant to a decision handed down by an employer from its New York City headquarters, no matter where the employee in question actually works."); *Lightfoot v. Union Carbide Corp.*, 1994 U.S. Dist. LEXIS 6191, *5 (S.D.N.Y. 1994) (dismissing NYCHRL claim where the employer's early retirement plan was "approved at a meeting in New York City," because "its impact on [plaintiff] . . . occurred while he was employed in Connecticut"), aff'd, 110 F.3d 898 (2d Cir. 1997).

*Wahlstrom v. Metro-North Commuter R.R.*, 89 F.Supp.2d 506, 527-528 (S.D.N.Y. 2000).

Plaintiff's allegation that she "worked out of Minneapolis, Minnesota, but reported to the New York City office of Alitalia" is not sufficient to establish that she may plead causes of action under the NYCHRL (Cplt. ¶ 11). The fact that an employee's job responsibilities may bring her within the five boroughs is insufficient to establish that the employee is entitled to invoke the City's Human Rights Law because "it is the site of the impact, not the place of origination, that determines where discriminatory acts occur." *Int'l. Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC*, 470 F.Supp.2d 345, 362 (S.D.N.Y. 2007) (allowing plaintiff to proceed with NYCHRL claim when she maintained a home office in New York City but worked for a Chicago-based employer). *See*, *also*, *Salvatore v. KLM Royal Dutch Airlines*, 1999 U.S. Dist. LEXIS 15551, *53 (S.D.N.Y. 1999) ("plaintiffs were not discriminated against within the boundaries of New York City because the impact of the conduct, if any, was felt on their employment in Westchester County. Plaintiffs' tangential contacts with New York City, even if within the scope of their employment, cannot support claims under the City HRL," attached hereto as Exhibit F).

Accordingly, as the pleadings unambiguously state that Plaintiff was and remains a resident of Minneapolis and a citizen of the State of Minnesota, and was an Alitalia employee in Minneapolis at the time of the alleged discriminatory conduct, Counts III and IV of the Complaint, brought under the New York City Human Rights Law, must be dismissed.

6

## POINT II

### PLAINTIFF'S CLAIMS FOR AIDING AND ABETTING MUST BE DISMISSED

### (SECOND and FOURTH CAUSES)

Even if the reach of New York's City and State Human Rights Laws were to extend to a terminated employee in Minneapolis, Minnesota, Claims II and IV of Plaintiff's Complaint nevertheless would fail to state a claim upon which relief could be granted for aiding and abetting because, as a matter of law, it is impossible for an employer to aid and abet its own alleged violations of discrimination laws. *See*, *e.g.*, *Salvatore*, 1999 U.S. Dist. LEXIS 15551, at *22 ("Claims for discrimination brought under the Human Rights Law may be directed at either 1) employers or 2) persons who aid and abet an employer's violation of the statute"); *DeWitt v. Lieberman*, 48 F.Supp.2d 280, 293 (S.D.N.Y. 1999) ("It is the employer's participation in the discriminatory practice which serves as the predicate for the imposition of liability *on others* for aiding and abetting") (emphasis added, quoting *Murphy v. ERA United Realty*, 674 N.Y.S.2d 415, 417 (2d Dept. 1998)).  As Plaintiff identifies no accessory to Alitalia's alleged discriminatory conduct, but alleges only that Alitalia alone discriminated against her in its capacity as her employer, a claim of aiding and abetting is entirely misplaced in this suit. Consequently, Counts II and IV of the Complaint must be dismissed for this reason as well.

## POINT III

### PLAINTIFF HAS CONSENTED TO DISMISS
### THE FIFTH CAUSE OF ACTION IN ITS ENTIRETY

### (FIFTH CAUSE)

Plaintiff has consented to dismissal of her claims for negligent and intentional infliction of emotional distress in their entirety.  Accordingly, it should be dismissed with prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Alitalia Linee Aeree Italiane, S.p.A. respectfully requests that all five causes of action in the Complaint be dismissed in their entirety, and that it be granted such other and further relief as the Court may deem just and proper.

Dated:  New York, New York          VEDDER PRICE P.C.
        February 7, 2008

                                     By: ____/S/_____
                                         Alan M. Koral (AK 1503)
                                         Daniel C. Green (DG 0059)

                                         Attorneys for Defendant
                                         *Alitalia Linee Aeree Italiane SpA*
                                         1633 Broadway – 47th Floor
                                         New York, NY  10019
                                         (212) 407-7700

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------

LINDA RYLOTT-ROONEY,

                Plaintiff,

        -against-

ALITALIA – LINEE AEREE ITALIANE –
SOCIETA PER AZIONI,,

                Defendants.

---------------------------------------------------

**Index No.: 07 CV 11091**


**ECF CASE**


        I, Alan M. Koral, hereby declare, pursuant to 28 U.S.C. 1746, under penalty of perjury, that on February 7, 2008, I caused a copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** to be served by electronically filing same, thereby ensuring that the following party, who registered to receive e-notices in this case, received a copy of same:

        Fausto E. Zapata, Jr., Esq. (FZ 4957)
        Law Office of Fausto E. Zapata, Jr.
        305 Broadway
        Suite 1101
        New York, NY 10007

                *Attorney for Plaintiff*
                *Linda Rylott-Rooney*


DATED:  New York, New York       s/  Alan M. Koral_____
        February 7, 2008          Alan M. Koral

# Exhibit A

LEXSEE



Caution
As of: Feb 05, 2008

**PAMELA LUCAS, Plaintiff, v. PATHFINDER'S PERSONNEL, INC., JS PARTNER GROUP, SHANE HOWELL, and JONATHAN SCHWARTZ, Defendants. PAMELA LUCAS, Plaintiff, v. PATHFINDER'S PERSONNEL, INC., JS PARTNER GROUP, Defendants.**

**01 Civ. 2252 (BSJ), 02 Civ. 1743 (BSJ)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2002 U.S. Dist. LEXIS 8529; 89 Fair Empl. Prac. Cas. (BNA) 29**

**May 9, 2002, Decided
May 13, 2002, Filed**

**DISPOSITION:**    [*1] Plaintiff's state law claims dismissed. Plaintiff's complaint regarding those claims dismissed.

**CORE TERMS:** discriminatory conduct, decision to terminate, pregnancy, discriminatory, discriminated

**COUNSEL:** For PAMELA LUCAS, plaintiff (01-CV-2252): Craig R. Benson, Rains & Pogrebin, P.C., Mineola, NY.

For PATHFINDER'S PERSONNEL, INC., defendant (01-CV-2252): David L. Weissman, Reed, Smith, L.L.P., New York, NY.

For PAMELA LUCAS, plaintiff (02-CV-1743): James P. Clark, Rains & Pogrebin, P.C., Mineola, NY.

For PATHFINDER'S PERSONNEL, INC., defendant (02-CV-1743): David L. Weissman, Reed, Smith, L.L.P., New York, NY.

**JUDGES:** BARBARA S. JONES, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** BARBARA S. JONES

**OPINION**

**MEMORANDUM ORDER**

**BARBARA S. JONES**

**UNITED STATES DISTRICT JUDGE**

Plaintiff filed the above captioned actions alleging that Defendants unlawfully discriminated against Plaintiff based on her pregnancy. In 01 CV 2252, filed on March 16, 2002, Plaintiff asserts that Defendants Pathfinder's Personnel, Inc., JS Partner Group, Shane Howell and Jonathan Schwartz intentionally discriminated against Plaintiff on the basis of her pregnancy in violation of the New York State Human Rights Law (NYSHRL) and the New York City Human Rights Law (NYCHRL). In [*2]  02 CV 1743, Plaintiff alleges that Defendants Pathfinder's Personnel, Inc. and JS Partner Group's discriminatory conduct violates Title VII. Defendants Pathfinder's Personnel, Inc., JS Partner Group, Shane Howell and Jonathan Schwartz (collectively, "Defendants") have moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiff's claims under the NYSHRL and NYCHRL. For the following reasons, Defendants' motion is granted.

Plaintiff alleges that Defendants violated the NYCHRL and NYSHRL by (1) terminating Plaintiff's employment based on her pregnancy, and (2) rehiring Plaintiff but then materially altering the terms and conditions of her employment such that once again she effectively was terminated. Turning first to Plaintiff's NYCHRL claim, the NYCHRL prohibits employers

Case 1:07-cv-11091-JSR    Document 12-2    Filed 02/07/2008    Page 3 of 80

2002 U.S. Dist. LEXIS 8529, *; 89 Fair Empl. Prac. Cas. (BNA) 29

from engaging in certain types of discrimination against its employees. The NYCHRL, however, applies only to acts occurring within the boundaries of New York City. *See, e.g., Duffy v. Drake Beam Morin, Harcourt General, Inc., 1998 U.S. Dist. LEXIS 7215, 1998 WL 252063*, *11 (S.D.N.Y. 1998). While Plaintiff concedes that at the time of the alleged discrimination she was a Massachusetts resident working as [*3] Managing Recruiter in Pathfinder's Boston office, Plaintiff argues that the NYCHRL nonetheless applies because the decision to terminate Plaintiff's employment was made in New York City, where Defendants Pathfinder's and JS Partner Group maintain their principal places of business. The court disagrees. The allegation that the decision to terminate Plaintiff was made in New York City, even when taken as true (as this court must on a motion to dismiss), is insufficient to establish a violation of the NYCHRL where, as here, the impact of that decision occurred outside of New York City. *1998 U.S. Dist. LEXIS 7215*. at *12 (fact that decision to fire plaintiffs was made in New York City office was insufficient to establish a violation of the NYCHRL when the affected employees did not work in New York City); *see also Wahlstrom v. Metro-North Commuter Railroad Co., 89 F. Supp.2d 506, 527-28 (S.D.N.Y. 2000)* ("[The] NYCHRL only applies where the actual impact of the discriminatory conduct or decision is felt within the five boroughs, even if a discriminatory decision is made by an employer's New York City office."); *Salvatore v. KLM Royal Dutch Airlines, 1999 U.S. Dist. LEXIS 15551, 1999 WL 796172*, *16 (S.D.N.Y. 1999) [*4] ("To determine the location of the discrimination [under the NYCHRL], courts have looked to the location of the impact of the offensive conduct."); *Lightfoot v. Union Carbide Corp., 1994 U.S. Dist. LEXIS 6191, 1994 WL 184670*, *5 (S.D.N.Y. 1994).

For essentially the same reason, Plaintiff's claim under the NYSHRL must also be dismissed. Like the NYCHRL, the NYSHRL "does not provide a non-resident with a private cause of action for discriminatory conduct committed outside of New York by a New York corporation." *See Thomas v. Texaco, Inc., 998 F. Supp. 368, 371 (S.D.N.Y. 1998)* (quotations and citations omitted). Thus, in order for Plaintiff to establish a NYSHRL violation, she must allege that Defendants' discriminatory conduct occurred in New York. As discussed above, however, the fact that the decision to terminate Plaintiff was made in New York State is not sufficient to establish a violation of the NYSHRL. *See Duffy, 1998 U.S. Dist. LEXIS 7215, 1998 WL 252063* at *12-13.

Accordingly, Plaintiff's claims under both the NYCHRL and NYSHRL must be dismissed.

*Conclusion*

For the reasons stated above, Plaintiff's claims under the NYCHRL and NYSHRL are dismissed. Because these [*5] are the only claims asserted in 01 CV 2252, Plaintiff's Complaint in that action is dismissed in its entirety and the Clerk of Court is directed to close that case. The parties are directed to submit a joint pre-trial order regarding 02 CV 1743 no later than June 10, 2002.

**SO ORDERED:**

**BARBARA S. JONES**

**UNITED STATES DISTRICT JUDGE**

Dated: New York, New York

May 9, 2002

# Exhibit B

LEXSEE



Cited
As of: Feb 05, 2008

**ANNA PEARCE, professionally known as Patty Duke, Plaintiff, -against-
MANHATTAN ENSEMBLE THEATER, INC., GOLDA TOUR I, L.P., DAVID
FISHELSON, and FISHELSON PRODUCTIONS, INC., Defendants.**

**06 Civ. 1535 (KMW)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**2007 U.S. Dist. LEXIS 16487; 19 Am. Disabilities Cas. (BNA) 22**

**March 6, 2007, Decided
March 7, 2007, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff actor alleged
claims against defendants for (1) breach of contract; (2)
breach of the implied covenant of good faith and fair
dealing; (3) promissory estoppel; (4) invasion of privacy,
pursuant to § 51 of the New York Civil Rights Law; (5)
unjust enrichment; and (6) employment discrimination,
pursuant to the New York City and State Human Rights
Laws. Defendants moved to dismiss pursuant to Fed. R.
Civ. P. 12(b)(6).

**OVERVIEW:** The actor alleged the parties agreed she
would receive no fewer than 15 weeks of full salary
(even if the show closed). Given this allegation, the actor
could be able to prove that the parties contemplated ter-
mination and agreed that defendants would have the right
to terminate the arrangement even before the 15-week
mark. Such an express provision would remove the
agreement from the ambit of the Statute of Frauds. The
breach of the implied covenant of good faith and fair
dealing claims were duplicative of the breach of contract
claim. The actor alleged the elements of promissory es-
toppel and unconscionability was not a required element
as promissory estoppel was invoked to prevent injustice
stemming from reliance on a gratuitous promise. As de-
fendants' alleged activities were undertaken for advertis-
ing purposes or for the purposes of trade, the actor's in-
vasion-of-privacy claim could not be dismissed pursuant
to the newsworthiness exception. N.Y. Civ. Rights Law

§§ 50 and 51 provided the exclusive remedy for unjust
enrichment claim, so the claim failed. As the actor did
not allege any discriminatory impact in New York, the
employment discrimination claims failed.

**OUTCOME:** Defendants' motion was granted in part
and denied in part. The breach of contract, promissory
estoppel, and invasion of privacy claims were sustained.
The breach of the implied covenant of good faith and fair
dealing, unjust enrichment, and employment discrimina-
tion claims were dismissed.

**CORE TERMS:** promissory estoppel, discriminatory,
newsworthy, likeness, draft agreement, covenant of good
faith, fair dealing, breach of contract, newsworthiness,
advertising, theater, unjust enrichment, press releases,
quotation marks omitted, oral agreement, unauthorized
use, invasion-of-privacy, disability, privacy, employment
discrimination, decision to terminate, unconscionability,
unconscionable, negotiation, enforceable, termination,
unambiguous, circulation, photograph, motivation

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Failures to State Claims*
[HN1]A defendant may move to dismiss a claim under
Fed. R. Civ. P. 12(b)(6) for failure to state a claim on
which relief can be granted. In weighing a motion to

2007 U.S. Dist. LEXIS 16487, *; 19 Am. Disabilities Cas. (BNA) 22

dismiss, the court must accept as true the factual allegations in the complaint and draw all inferences in the plaintiff's favor. A complaint may not be dismissed under the Rule unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts entitling her to relief.

**Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss**
[HN2]On a motion to dismiss, a court may consider a document other than an exhibit to a complaint only if it is one on which the plaintiff solely relies and which is integral to the complaint. The United States Court of Appeals for the Second Circuit has emphasized that a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion.

**Civil Procedure > Summary Judgment > Evidence**
[HN3]Parties are entitled to a reasonable opportunity to present material pertinent to a summary judgment motion.

**Contracts Law > Types of Contracts > Oral Agreements**
[HN4]Under New York law, oral agreements are binding and enforceable absent a clear expression of the parties' intent to be bound only by a writing. Factors to which courts look in evaluating the parties' intent to be bound include (1) any explicit statement that only a writing shall be binding; (2) partial performance; (3) complete negotiation of all terms; and (4) whether the subject matter of the contract is one that normally requires a written agreement.

**Contracts Law > Statutes of Frauds > General Overview**
[HN5]See N.Y. Gen. Oblig. Law § 5-701(a)(1) (2007).

**Contracts Law > Statutes of Frauds > Requirements > General Overview**
[HN6]New York courts interpret the Statute of Frauds narrowly. The Statute encompasses only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year however unexpected, unlikely, or even improbable that such performance will occur during that time frame. In particular, an agreement does not fall afoul of the Statute of Frauds if it contains an express option to terminate within one year, because rightful termination is one means of completing performance. By contrast, a contract is not to be performed within a year if it is terminable within that time only upon the breach of one of the parties.

**Contracts Law > Contract Interpretation > Good Faith & Fair Dealing**
[HN7]Under New York law, all contracts contain an implied covenant of good faith and fair dealing in the course of contract performance. The covenant encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included. However, breach of the implied covenant of good faith is merely a breach of the underlying contract, meaning as a matter of law that allegations of the breach of the implied covenant are irrelevant to recovery unless they are based on conduct different from the conduct that constitutes the alleged breach of contract. In other words, such a claim may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain.

**Contracts Law > Consideration > Promissory Estoppel**
[HN8]In New York, promissory estoppel has three elements: (1) an unambiguous promise; (2) reasonable and foreseeable reliance on the promise; and (3) injury as a result of the reliance.

**Contracts Law > Consideration > Promissory Estoppel**
[HN9]New York courts limit promissory estoppel claims to instances of unconscionable injury only where promissory estoppel is invoked as a defense to the Statute of Frauds. But New York courts generally do not require a showing of unconscionability where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise.

**Torts > Intentional Torts > Invasion of Privacy > General Overview**
[HN10]See N.Y. Civ. Rights Law § 51 (2007).

**Torts > Intentional Torts > Invasion of Privacy > Appropriation > Elements**
[HN11]N.Y. Civ. Rights Law § 51 (2007) applies only when a plaintiff's name, likeness, or voice is used within the state.

Case 1:07-cv-11091-JSR    Document 12-2    Filed 02/07/2008    Page 7 of 80

2007 U.S. Dist. LEXIS 16487, *; 19 Am. Disabilities Cas. (BNA) 22

*Torts > Intentional Torts > Invasion of Privacy > Appropriation > Defenses*

[HN12]A plaintiff may not bring an invasion-of-privacy claim if the unauthorized use of her name, likeness, or voice was newsworthy. Newsworthy uses include not only descriptions of actual events but also articles concerning political happenings, social trends or any subject of public interest. A finding of newsworthiness depends on context: While one who is a public figure or is presently newsworthy may be the proper subject of news or informative presentation, the privilege does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information.

*Contracts Law > Remedies > Equitable Relief > Quantum Meruit*
*Torts > Intentional Torts > Invasion of Privacy > Appropriation > General Overview*

[HN13]Because New York does not recognize a common-law right of privacy, the exclusive remedy for nonconsensual commercial uses of a plaintiff's name and likeness is N.Y. Civ. Rights Law §§ 50 and 51. Similarly, those sections provide the exclusive remedy for a plaintiff's unjust enrichment claim.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview*

[HN14]See New York City, N.Y., Admin. Code § 8-107(1)(a).

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview*

[HN15]The New York State Human Rights Law provides, in part: It shall be an unlawful discriminatory practice f or an employer or licensing agency, because of the disability of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. N.Y. Exec. Law § 296(1)(a) (2007). The term "disability" includes a condition regarded by others as such an impairment. N.Y. Exec. Law § 292(21)(c).

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview*

[HN16]A nonresident plaintiff may invoke the protection of the New York City and New York State Human Rights Laws only by proving that the discriminatory act or acts took place within the jurisdiction in question. In addition to requiring that the act have taken place within New York, courts interpreting the City Human Rights Law have consistently required that the discriminatory act or acts have had an impact in New York City.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview*

[HN17]The fact that the New York City Human Rights Law requires plaintiffs to show an impact within the jurisdiction suggests that the New York State Human Rights Law also contains such a requirement.

**COUNSEL:** [*1]  For Anna Pearce, professionally known as Patty Duke, Plaintiff: Jennifer L. Nutter, LEAD ATTORNEY, Epstein Becker & Green P.C., Los Angeles, CA; Linda Auerbach Allderdice, LEAD ATTORNEY, Epstein Becker & Green, P.C., Los Angeles, CA; Traycee Ellen Klein, LEAD ATTORNEY, Epstein, Becker & Green, P.C., New York, NY.

For Manhattan Ensemble Theater, Inc., a New York domestic not-for-profit corporation, Golda Tour 1, L.P., a New York domestic limited partnership, David Fishelson, an individual, Fishelson Productions, Inc., a New York domestic business corporation, Defendants: Gaurav I. Shah, Friedman, Kaplan, Seiler and Adelman, NY, NY.

**JUDGES:** KIMBA M. WOOD, United States District Judge.

**OPINION BY:** KIMBA M. WOOD

**OPINION**

*OPINION AND ORDER*

KIMBA M. WOOD, U.S.D.J.:

Defendants Manhattan Ensemble Theater, Inc., Golda Tour 1, L.P., David Fishelson, and Fishelson Productions, Inc. move to dismiss this action by Plaintiff Anna Pearce, for failure to state a claim on which relief may be granted. Fed. R. Civ. P. 12(b)(6). In this action, Plaintiff alleges (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) promissory [*2] estoppel; (4) invasion of privacy, pursuant to Section 51 of the New York Civil Rights Law; (5) unjust enrichment; and (6) employment discrimination, pursuant to the New York City and State Human Rights Laws. For the reasons stated below, Defendants' motion is granted in part and denied in part.

Case 1:07-cv-11091-JSR    Document 12-2    Filed 02/07/2008    Page 8 of 80

2007 U.S. Dist. LEXIS 16487, *; 19 Am. Disabilities Cas. (BNA) 22

## BACKGROUND

The following facts, drawn from the Complaint except where noted, must be accepted as true for purposes of this motion to dismiss. *See Kirch v. Liberty Media Corp., 449 F.3d 388, 392 (2d Cir. 2006).*

Plaintiff Anna Pearce, known professionally as Patty Duke, is a citizen of Idaho. (Compl. P1.) Defendant David Fishelson is a citizen of New York. (*Id.* P4.) Defendants Manhattan Ensemble Theater, Inc., Golda Tour I, L.P., and Fishelson Productions, Inc. are, respectively, a nonprofit corporation, a limited partnership, and a business corporation organized under New York law and doing business in New York. (*Id.* PP2-3, 5.)

Plaintiff is a celebrated film, television, and stage actress, best known for her starring roles in *The Miracle Worker* and *The Patty Duke Show*. (*Id.* P9.) In October 2004, Defendants proposed to Plaintiff's agent,   [*3] Mitchell K. Stubbs, that Plaintiff consider accepting the role of Israeli prime minister Golda Meir in William Gibson's play *Golda's Balcony*, on the national tour. (*Id.* PP11-12.) Defendants told Stubbs that Plaintiff's reunion with playwright Gibson, the author of *The Miracle Worker*, would be a "fun AND meaningful" marketing hook that could prove highly profitable. (*Id.* PP13-14.) Plaintiff later told Stubbs that she approved of the script. (*Id.* P16.) Stubbs then began negotiations with Defendants on Plaintiff's behalf. (*Id.*) Meanwhile, Plaintiff underwent heart bypass surgery in November 2004. (*Id.* P17.)

Plaintiff contends that sometime after December 8, 2004, Stubbs and Defendants reached an agreement that Plaintiff would perform the role of Golda Meir. (*Id.* PP22-23.) [1] Specifically, Stubbs and Defendants agreed that (1) Plaintiff would perform as Golda Meir from in or about September 2005 to on or about May 31, 2006; (2) Plaintiff would accept no other entertainment engagements during that time; (3) Defendants would pay Plaintiff $ 25,000 for each week of performances, and the guaranteed Actors' Equity rate for each week of rehearsals, but no less [*4]  than fifteen weeks of full salary even if the show closed; (4) Plaintiff would receive 10% of all weekly ticket sales over $ 150,000 and 15% of all weekly sales over $ 175,000; and (5) Defendants would compensate Plaintiff for any losses suffered in the event Defendants breached the agreement. (*Id.* P23.) Defendants then requested and were given Plaintiff's contact information. (*Id.* P25.) Stubbs believed that the exchange of contact information confirmed that the agreement was a binding contract, because of Stubbs's standing policy that "industry people" be allowed to contact Plaintiff directly only after agreeing on the terms and conditions of Plaintiff's engagement. (*Id.* P10.) Defendant Fishelson spoke directly to Plaintiff on January 5, 2005, and met

with her in New York on January 20, 2005. (*Id.* P25.) Thereafter, Defendants distributed press releases and advertising materials announcing Plaintiff's casting and her reunion with Gibson, materials that helped Defendants secure theaters and ticket sales for *Golda's Balcony*. (*Id.* PP26-28.) Plaintiff began to learn her lines and forgo other career opportunities. (*Id.* P29.)

> 1   Defendants do not agree that they reached a contract with Plaintiff on the terms described in this paragraph. Rather, as discussed in the next section, they contend that while Defendants emailed Stubbs a draft agreement that contained these terms, the draft was only a proposal. As explained below, the Court may not consider the draft email at this stage, and Plaintiff's version must be accepted as true.

[*5]  At their January 20 meeting, Plaintiff told Defendant Fishelson that she had been unable to complete the filming of a television program earlier that month. (*Id.* P30.) This conversation led Defendants to believe, incorrectly, that Plaintiff's heart surgery had disabled her. (*Id.* P32.) On March 7, 2005, Defendants instructed their attorney to "divest" themselves of Plaintiff. (*Id.* P31.) Thereafter, Defendants cast another actress, Valerie Harper, as Golda Meir, yet continued to use Plaintiff's name and likeness to advertise the production. (*Id.* P33.)

## STANDARD OF REVIEW

[HN1]Defendants may move to dismiss a claim under *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim on which relief can be granted. In weighing a motion to dismiss, the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006).* "A complaint may not be dismissed under the Rule unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set [*6]  of facts" entitling her to relief. *Id. at 250* (internal quotation marks omitted).

As a threshold matter, in deciding the motion to dismiss, the Court may not consider an unsigned draft agreement emailed to Stubbs, Plaintiff's agent, during the course of negotiations (*see* Neier Affirmation, Ex. B), because it is not annexed to or referenced in the Complaint, and because Plaintiff did not rely on it in drafting the Complaint.[HN2] On a motion to dismiss, a court may consider a document other than an exhibit to a complaint only if it is one on which the plaintiff "solely relies and which is integral to the complaint." *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).* The Second Circuit has emphasized that "a plaintiff's *reliance* on the terms and effect of a document in draft-

Case 1:07-cv-11091-JSR    Document 12-2    Filed 02/07/2008    Page 9 of 80

2007 U.S. Dist. LEXIS 16487, *; 19 Am. Disabilities Cas. (BNA) 22

ing the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original). [2] By the Second Circuit's standards, Plaintiff did not rely on the draft agreement in preparing the Complaint: The Complaint makes no reference [*7] to the draft agreement, Plaintiff did not sign the draft agreement, and the parties disagree about whether and how the draft agreement relates to their relationship. Accordingly, the Court cannot consider the draft agreement in deciding this motion. [3]

> 2    The *Chambers* court affirmed the district court's decision to consider written contracts between plaintiffs and defendants, because "[t]he Amended Complaint is replete with references to the contracts and requests judicial interpretation of their terms." *Id.* at 153 n.4. By contrast, it disapproved the district court's decision to consider certain unsigned codes setting forth standard minimum terms for contracts with members of plaintiffs' union, because "[t]he Amended Complaint does not refer to the Codes, plaintiffs apparently did not rely on them in drafting it, and none of the Codes submitted to the court were signed by the [defendants]," and because "the parties disagree as to whether and how the Codes relate to or affect the contractual relationships at issue." *Id.* at 154. The court added that "[c]ourts have declined to consider unsigned documents in ruling on motions to dismiss." *Id.* at 154 n.5 (citing cases).

[*8]

> 3    Conversion to summary judgment would also be inappropriate because discovery has not yet occurred. *See Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999) ([HN3]"[P]arties are entitled to a reasonable opportunity to present material pertinent to a summary judgment motion.").

## DISCUSSION

### I. *Breach of Contract*

Defendants first argue that Plaintiff cannot sustain a claim for breach of contract because no enforceable contract existed. Plaintiff concedes that there was no written agreement between the parties, but she alleges that the parties had an oral agreement that is enforceable under New York law. [4] [HN4]"[U]nder New York law, oral agreements are binding and enforceable absent a clear expression of the parties' intent to be bound only by a writing." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 109 (2d Cir. 2003). Factors to which courts look in evaluating the parties' intent to be bound include (1) any explicit statement that only a writing shall be binding; (2) partial performance; (3) complete

negotiation of [*9] all terms; and (4) whether the subject matter of the contract is one that normally requires a written agreement. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984); *see also Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 575-76 (2d Cir. 1993) (listing variety of additional factors that may be considered). The Complaint alleges that "the parties reached an agreement" with definite terms and conditions (Compl. PP23, 25), and that Plaintiff "spent a substantial amount of time learning her lines and otherwise preparing for her role" and "forewent other career opportunities" (*id.* P29). [5] These allegations, taken as true, could satisfy the factors described by the Second Circuit in *Horn & Hardart.*

> 4    Plaintiff did not specify the form of the agreement in the Complaint (*see* Compl. P23); her memorandum of law, however, describes the agreement as oral (*see* Pl.'s Mem. of Law in Opp'n 8.).

> 5    Although Defendants argue at length that the draft agreement -- which contains a merger clause (*see* Neier Affirmation, Ex. B, P19) -- expresses the parties' intent not to be bound by an oral agreement, the Court cannot consider the draft agreement and accompanying email message at this stage, as explained above.

[*10] Defendants also contend that even if an oral contract existed, it is unenforceable because of the Statute of Frauds, which invalidates any unwritten agreement incapable of performance within one year. [6] They note that the Complaint alleges that the agreement was made "[i]n the days and weeks" following December 2004, but that the tour was not to conclude until May 2006. (Compl. P23.)

> 6    [HN5]The Statute of Frauds provides, in relevant part: "Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking . . . [b]y its terms is not to be performed within one year from the making thereof . . . ." N.Y. Gen. Oblig. Law § 5-701(a)(1) (McKinney 2007).

[HN6]New York courts interpret the Statute of Frauds narrowly. *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 472 N.E.2d 992, 993-94, 483 N.Y.S.2d 164 (N.Y. 1984). [*11] The Court of Appeals has stated that the Statute "encompass[es] only those contracts which, by their terms, have absolutely no possibility in fact and law of full performance within one year. . . . however unexpected, unlikely, or even improb-

Case 1:07-cv-11091-JSR    Document 12-2    Filed 02/07/2008    Page 10 of 80

2007 U.S. Dist. LEXIS 16487, *; 19 Am. Disabilities Cas. (BNA) 22

able that such performance will occur during that time frame." *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 694 N.E.2d 56, 58, 670 N.Y.S.2d 973 (N.Y. 1998) (citations and internal quotation marks omitted). In particular, an agreement does not fall afoul of the Statute of Frauds if it contains an express option to terminate within one year, because rightful termination is one means of completing performance. *North Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22 N.Y.2d 171, 239 N.E.2d 189, 191, 292 N.Y.S.2d 86 (N.Y. 1968). By contrast, "[a] contract is not 'to be performed within a year' if it is terminable within that time only upon the breach of one of the parties." *Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 107 (2d Cir. 1985).

Plaintiff has alleged that the parties agreed she would receive "no fewer than fifteen (15) weeks of full salary (even if the show closed)." (Compl. P23.) Given this allegation, Plaintiff [*12] may be able to prove that the parties contemplated termination and agreed that Defendants would have the right to terminate the arrangement even before the fifteen-week mark, in which case Plaintiff would receive no less than fifteen weeks' salary. Such an express provision, if proven, would remove the agreement from the ambit of the Statute of Frauds. The Complaint thus may not be dismissed for failure to satisfy the Statute.

## II. *Breach of the Covenant of Good Faith and Fair Dealing*

Defendants argue that the second count of the Complaint, alleging a breach of the implied covenant of good faith and fair dealing, should be dismissed as duplicative of the breach-of-contract count.

[HN7]Under New York law, all contracts contain an implied covenant of good faith and fair dealing in the course of contract performance. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 663 N.E.2d 289, 291, 639 N.Y.S.2d 977 (N.Y. 1995). The covenant encompasses "'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 385 N.E.2d 566, 569, 412 N.Y.S.2d 827 (N.Y. 1978) (quoting 5 Williston, [*13] *Contracts* § 1293, at 3682 (rev. ed. 1937)). However, breach of the implied covenant of good faith "'is merely a breach of the underlying contract,'" *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (quoting *Geler v. Nat'l Westminster Bank USA*, 770 F. Supp. 210, 215 (S.D.N.Y. 1991)), meaning as a matter of law that allegations of the breach of the implied covenant are irrelevant to recovery unless they are based on conduct different from the conduct that constitutes the alleged breach of contract, *Geler*, 770 F. Supp. at 215. In other words, "such a claim may be brought, if at all, only

where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." *Sauer v. Xerox Corp.*, 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000).

Plaintiff's allegations of breach of the implied covenant of good faith and fair dealing are not based on conduct different from the conduct that constitutes the alleged breach of contract. The Complaint alleges that Defendants breached the implied covenant of good faith [*14] and fair dealing "by failing and refusing to honor their agreement that Ms. Pearce would play the role of Golda and by failing and refusing to compensate Ms. Pearce for the work that she did and according to their promises." (Compl. P43.) These promises to cast and compensate Plaintiff were also allegedly terms of the parties' oral contract (*id.* P23), and any violation of these promises would constitute breach of contract as well. [7] The second count of the Complaint is duplicative and is therefore dismissed.

> 7    Plaintiff's citation of *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989), is inapposite. The alleged breach of good faith in *Leberman* concerned the disingenuous interpretation of an ambiguous contract provision, not an outright breach of the contract, as here.

## III. *Promissory Estoppel*

Defendants raise two objections to the third count of the Complaint, which claims promissory estoppel.

First, Defendants argue that Plaintiff has not alleged the [*15] basic elements of promissory estoppel. [HN8]In New York, promissory estoppel has three elements: (1) an unambiguous promise; (2) reasonable and foreseeable reliance on the promise; and (3) injury as a result of the reliance. *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000). The Complaint alleges that the parties had an unambiguous agreement [8] (Compl. P23), that Plaintiff relied on the promise in learning her lines and forgoing other career opportunities (*id.* P29), and that she has been financially and emotionally harmed by her reliance (*id.* PP29, 37). Plaintiff has thus alleged the elements of promissory estoppel.

> 8    As explained above, Defendants' contention that the parties did not have an unambiguous agreement relies impermissibly on documents extrinsic to the Complaint.

Second, Defendants take the position that the promissory estoppel claim should be dismissed because Plaintiff did not allege an "unconscionable" injury from her reliance. [HN9]New York courts limit promissory estoppel claims [*16] to instances of unconscionable injury

Case 1:07-cv-11091-JSR    Document 12-2    Filed 02/07/2008    Page 11 of 80

2007 U.S. Dist. LEXIS 16487, *; 19 Am. Disabilities Cas. (BNA) 22

only where promissory estoppel is invoked as a defense to the Statute of Frauds. *See Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir. 1977) (requiring unconscionable injury lest "[t]he strongly held public policy reflected in New York's Statute of Frauds . . . be severely undermined"); *see also Cunnison v. Richardson Greenshields Sec., Inc.*, 107 A.D.2d 50, 485 N.Y.S.2d 272, 275 (App. Div. 1985); *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 99 A.D.2d 522, 471 N.Y.S.2d 299, 302 (App. Div. 1984). But New York courts generally do not require a showing of unconscionability where promissory estoppel is invoked to prevent injustice stemming from reliance on a gratuitous promise. *See Eber-NDC, LLC v. Star Indus., Inc.*, 13 Misc. 3d 1222A, 831 N.Y.S.2d 347, 2006 WL 2944669, at *2 (N.Y. Sup. Ct. 2006) (explaining that unconscionability is not an element of this variety of promissory estoppel claim, and citing cases); *see also Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (citing cases). Because Plaintiff's promissory estoppel claim is of the [*17] latter type, unconscionability is not a required element.

## IV. *Invasion of Privacy*

The fourth count of the Complaint alleges that Defendants' unauthorized use of Plaintiff's name and image in advertising and press materials after deciding not to cast her in the production constitutes invasion of privacy, in violation of Section 51 of the New York Civil Rights Law. [9]

> [9]  Section 51 of the Civil Rights Law provides, in relevant part:
>
> > [HN10]Any person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait, picture or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use . . . .
>
> N.Y. Civ. Rights Law § 51 (McKinney 2007).

Defendants [*18] first argue that the invasion-of-privacy claim is time barred under the applicable one-year statute of limitations. *See* N.Y. C.P.L.R. § 215(3)

(McKinney 2007). The Complaint states that Defendants circulated the allegedly offending press materials "[i]n the days that followed" January 20, 2005 (Compl. P26), but before Plaintiff's termination on March 7, 2005 (*id.* P31). This action was filed on February 24, 2006. It is possible that the allegedly unlawful uses of Plaintiff's name first occurred after February 24, 2005, in which case dismissal on this ground would not be warranted. Plaintiff need not allege a specific publication date to survive a motion to dismiss, because Defendants, not Plaintiff, bear the burden of proof on the affirmative defense of the statute of limitations. *Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GmbH*, 150 F. Supp. 2d 566, 572 (S.D.N.Y. 2001).

Next, Defendants claim that Plaintiff has failed to show that her name, likeness, or voice has been used in New York State. [10] The Complaint alleges that the uses of Plaintiff's identity took place at least in part in New York State. (Compl. [*19] P55.) Defendants appear to contend that because Plaintiff's alleged engagement was for the "national" tour of *Golda's Balcony*, use in New York State is precluded. (Defs.' Mem. of Law 20 (citing "obvious fact" that promotion "would have been directed at venues outside of New York").) But Defendants offer no support for their assumption that a national tour would exclude New York.

> [10]  Section 51 [HN11]applies only when a plaintiff's name, likeness, or voice is "used within this state." N.Y. Civ. Rights Law § 51 (McKinney 2007).

Finally, Defendants contend that any press releases and advertising containing Plaintiff's name and likeness are shielded by the "newsworthiness" exception to Section 51. [HN12]A plaintiff may not bring an invasion-of-privacy claim if the unauthorized use of her name, likeness, or voice was newsworthy. Newsworthy uses include "not only descriptions of actual events but also articles concerning political happenings, social trends or any subject of public interest." [*20] *Messenger ex rel. Messenger v. Gruner + Jahr Printing & Publ'g*, 94 N.Y.2d 436, 727 N.E.2d 549, 552, 706 N.Y.S.2d 52 (N.Y. 2000) (citations omitted). A finding of newsworthiness depends on context: as the Court of Appeals has written, "While one who is a public figure or is presently newsworthy may be the proper subject of news or informative presentation, the privilege does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information." *Gautier v. Pro-Football, Inc.*, 304 N.Y. 354, 107 N.E.2d 485, 488 (N.Y. 1952). Thus in *Stephano v. News Group Publications, Inc.*, 64 N.Y.2d 174, 474 N.E.2d 580, 485 N.Y.S.2d 220 (N.Y. 1984), a photograph of the plaintiff modeling a bomber jacket

Case 1:07-cv-11091-JSR    Document 12-2    Filed 02/07/2008    Page 12 of 80

2007 U.S. Dist. LEXIS 16487, *; 19 Am. Disabilities Cas. (BNA) 22

was deemed newsworthy where it accompanied a *New York* magazine article on fashion, but the identical photo would not have been newsworthy if circulated by a clothier. *Compare, e.g., Finger v. Omni Publ'ns Int'l, Ltd., 77 N.Y.2d 138, 566 N.E.2d 141, 564 N.Y.S.2d 1014 (N.Y. 1990)* (photograph of adults and children newsworthy where used to illustrate magazine article), *with Cohen v. Herbal Concepts, Inc., 63 N.Y.2d 379, 472 N.E.2d 307, 482 N.Y.S.2d 457 (N.Y. 1984)* [*21] (photograph of mother and child not newsworthy where used to promote cosmetic products). [11]

> 11 Defendants cite *Stephano* for the proposition that "[i]t is the content of the article and not the defendant's motive or primary motive to increase circulation which determines whether it is a newsworthy item, as opposed to a trade usage." *Stephano, 474 N.E.2d at 585*. This citation is misleading. The Court of Appeals was discussing the irrelevance of a *magazine's* motivation to increase circulation by reporting on interesting and newsworthy topics, not the irrelevance of motivation generally. *See also Messenger, 727 N.E.2d at 552* (discussing motivation of "publication" to increase "circulation of a newsworthy article" (internal quotation marks omitted)).

Defendants' press releases and advertisements do not fall within the newsworthiness exception. The press releases and advertisements are said to have been newsworthy because they reported the "fun" and "meaningful" fact [*22] that Plaintiff's appearance in *Golda's Balcony* would have reunited her with playwright William Gibson, author of *The Miracle Worker*, in which Plaintiff starred in 1959. (Defs.' Mem. of Law 21-22.) But Defendants' purpose in preparing and disseminating materials with Plaintiff's name and likeness cannot be interpreted as reporting on a "social trend" or a "subject of public interest"; rather, the purpose was to entice prospective theater owners and ticket buyers. Defendants' alleged activities were thus undertaken "for advertising purposes or for the purposes of trade," *N.Y. Civ. Rights Law § 51* (McKinney 2007), and Plaintiff's invasion-of-privacy claim may not be dismissed pursuant to the newsworthiness exception. [12]

> 12 Because Defendants raise the issue of newsworthiness on a motion to dismiss, the invasion-of-privacy count may be dismissed only if there are no grounds on which Plaintiff might potentially prevail. After discovery, Defendants may again attempt to demonstrate that their specific uses of Plaintiff's name and likeness, if any, were newsworthy enough to fall outside the scope of *Section 51*.

[*23]  **V. *Unjust Enrichment***

Count Five of the Complaint alleges that Defendants were unjustly enriched by their unauthorized use of Plaintiff's name and image. [HN13]Because New York does not recognize a common-law right of privacy, *Roberson v. Rochester Folding Box Co., 171 N.Y. 538, 64 N.E. 442, 443 (N.Y. 1902)*, the exclusive remedy for nonconsensual commercial uses of a plaintiff's name and likeness is *Sections 50* and *51* of the Civil Rights Law, *Messenger, 727 N.E.2d at 551*. Similarly, those sections provide the exclusive remedy for Plaintiff's unjust enrichment claim. *See Myskina v. Conde Nast Publ'ns, Inc., 386 F. Supp. 2d 409, 420 (S.D.N.Y. 2005)* ("Under New York law, common law unjust enrichment claims for unauthorized use of an image or likeness are subsumed by *Sections 50* and *51*."); *Zoll v. Jordache Enters., No. 01 Civ. 1339 (CSH), 2002 U.S. Dist. LEXIS 24570, 2002 WL 31873461, at *16 (S.D.N.Y. Dec. 24, 2002)* (same). Count Five is therefore dismissed.

**VI. *Employment Discrimination***

The final two counts of the Complaint allege that Defendants discriminated against Plaintiff on the basis of a perceived disability, [*24] in violation of the New York City Human Rights Law and the New York State Human Rights Law. [13] Defendants move to dismiss these counts because Plaintiff is not a New York citizen and, Defendants contend, the alleged acts of discrimination did not take place in New York City or State.

> 13 The New York City Human Rights Law provides, in relevant part:
>
>> [HN14]It shall be an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived . . . disability . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.
>
> *N.Y.C. Code § 8-107(1)(a)*.
>
> [HN15]The New York State Human Rights Law provides, in relevant part: "It shall be an unlawful discriminatory practice . . . [f]or an employer or licensing agency, because of the . . . disability . . . of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate

Case 1:07-cv-11091-JSR    Document 12-2    Filed 02/07/2008    Page 13 of 80

2007 U.S. Dist. LEXIS 16487, *; 19 Am. Disabilities Cas. (BNA) 22

against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a) (McKinney 2007). The term "disability" includes "a condition regarded by others as such an impairment." *Id.* § 292(21)(c).

[*25]  [HN16]A nonresident plaintiff may invoke the protection of the City and State Human Rights Laws only by proving that the discriminatory act or acts took place within the jurisdiction in question. *E.g., Salvatore v. KLM Royal Dutch Airlines*, No. 98 Civ. 2450 (LAP), 1999 U.S. Dist. LEXIS 15551, 1999 WL 796172, at *16 (S.D.N.Y. Sept. 30, 1999) (city); *Beckett v. Prudential Ins. Co. of Am.*, 893 F. Supp. 234, 238 (S.D.N.Y. 1995) (state). In addition to requiring that the act have taken place within New York, courts interpreting the City Human Rights Law have consistently required that the discriminatory act or acts have had an impact in New York City. *See Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F. Supp. 2d 506, 527 (S.D.N.Y. 2000) ("[T]he [City Human Rights Law] only applies where the actual impact of the discriminatory conduct or decision is felt within the five boroughs, even if a discriminatory decision is made by an employer's New York City office."); *Salvatore*, 1999 U.S. Dist. LEXIS 15551, 1999 WL 796172, at *16; *Shah v. Wilco Sys., Inc.*, 27 A.D.3d 169, 806 N.Y.S.2d 553, 558 (App. Div. 2005). For example, several courts have dismissed claims [*26]  under the City Human Rights Law when the allegedly discriminatory decision to terminate the employee was made at a corporation's New York City offices, but the employee worked outside the city limits. *See Lucas v. Pathfinder's Pers., Inc.*, No. 01 Civ. 2252 (BSJ), 2002 U.S. Dist. LEXIS 8529, 2002 WL 986641, at *1 (S.D.N.Y. May 13, 2002); *Duffy v. Drake Beam Morin*, No. 96 Civ. 5606 (MBM), 1998 U.S. Dist. LEXIS 7215, 1998 WL 252063, at *12 (S.D.N.Y. May 19, 1998); *Lightfoot v. Union Carbide Corp.*, No. 92 Civ. 6411 (RPP), 1994 U.S. Dist. LEXIS 6191, 1994 WL 184670, at *5 (S.D.N.Y. May 12, 1994).

But while courts in this District have uniformly held that the City Human Rights Law requires plaintiffs to prove an impact within the city, they do not agree on whether the State Human Rights Law has an analogous "impact" requirement. Some district court opinions have required plaintiffs who sue for violations of the State Human Rights Law to show that discriminatory decisions by defendants have had an impact in New York State. *See Lucas*, 2002 U.S. Dist. LEXIS 8529, 2002 WL 986641, at *2 (finding impact requirement in state law "[f]or essentially the same reason" as in city law); *cf. Duffy*, 1998 U.S. Dist. LEXIS 7215, 1998 WL 252063, [*27]  at *13 (holding that act within state is "insufficient to establish a violation" of State Human Rights Law).[14]

Other opinions, notably *Torrico v. IBM Corp.*, 319 F.Supp. 2d 390 (S.D.N.Y. 2004), have declined to require proof of an impact in New York State, reasoning that while the City Human Rights Law includes an impact requirement, "no New York authority suggests that the [State Human Rights Law] is similarly limited." *Torrico*, 319 F. Supp. 2d at 399 n.5; *see also Hart v. Dresdner Kleinwort Wasserstein Sec., LLC*, No. 06 Civ. 0134 (DAB), 2006 U.S. Dist. LEXIS 56710, 2006 WL 2356157, at *8 (S.D.N.Y. Aug. 9, 2006) (citing *Torrico* without further analysis); *Tebbenhoff v. Elec. Data Sys. Corp.*, No. 02 CV 2932 (TPG), 2005 U.S. Dist. LEXIS 29874, 2005 WL 3182952, at *5 (S.D.N.Y. Nov. 29, 2005) (same).

> 14  *Iwankow v. Mobil Corp.*, 150 A.D.2d 272, 541 N.Y.S.2d 428 (App. Div. 1989), cited by both Plaintiff and Defendants, is not on point. The court in *Iwankow* dismissed the plaintiff's claim because, although he alleged that the decision to terminate him as "part of a world-wide reduction in force" was made at defendant's New York headquarters, he failed to allege that the decision to implement that reduction in a discriminatory fashion was made in New York. *Id.* at 429. The plaintiff therefore failed to meet the threshold "New York act" requirement, let alone the additional "New York impact" requirement.

[*28]  This Court agrees with the line of decisions that have found that the State Human Rights Law requires that there have been an impact in New York State. Courts have traditionally read the City and State Human Rights Laws in parallel. *See Dunson v. Tri-Maintenance & Contractors, Inc.*, 171 F. Supp. 2d 103, 113-14 (E.D.N.Y. 2001) (citing cases); *Mohamed v. Marriott Int'l, Inc.*, 905 F. Supp. 141, 157 (S.D.N.Y. 1995) ("The wording of the city ordinance and the manner in which it has been applied show a clear intent to parallel the obligations and the remedies provided by the State of New York . . . ."); *see also Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (applying "same standards of analysis" on aiding and abetting to City and State Human Rights Laws because laws' language is "virtually identical" (internal quotation marks omitted)). If anything, the City Human Rights Law "was intended to be *more* protective than the state [law]." *Farrugia v. North Shore Univ. Hosp.*, 2006 NY Slip Op 26344, 820 N.Y.S.2d 718, 724, 13 Misc. 3d 740 (Sup. Ct. 2006) (emphasis added). Given this background, [HN17]the fact that [*29]  the City Human Rights Law requires plaintiffs to show an impact within the jurisdiction suggests that the State Human Rights Law also contains such a requirement. This Court thus follows *Lucas* and similar decisions in holding that both the City and the State Human

2007 U.S. Dist. LEXIS 16487, *; 19 Am. Disabilities Cas. (BNA) 22

Rights Laws require Plaintiff to show Defendants' discriminatory actions had an actual impact in New York.

Because the Complaint does not allege any discriminatory impact in New York, Plaintiff cannot support claims under either the City or the State Human Rights Law. The Complaint alleges the following relevant facts: Plaintiff is a citizen of Idaho, but all Defendants are New York citizens. (Compl. PP1-5.) The parties' oral agreement specified that Plaintiff would perform the role of Golda Meir in the national tour of *Golda's Balcony*, which would be staged in "various theaters across the United States." (*Id.* PP23, 28.) Plaintiff was not engaged to perform in New York City, where the role of Golda was filled by another actress (*id.* P13); the Complaint does not specify whether any performances were expected to take place in New York State. Although representatives of Defendants met with Plaintiff in New York [*30] City (*id.* P25), the Complaint does not allege that any other aspect of Plaintiff's work was to occur in New York City or State. [15] Even though it can reasonably be inferred from the Complaint that Defendants' allegedly discriminatory decision to terminate Plaintiff was made in New York City, Plaintiff has failed to make the requisite allegation that the decision had an impact in New York City and State.

15   Additionally, Plaintiff's brief contains new allegations, not presented in the Complaint, that the parties contemplated future performance of the contract in New York City: rehearsals, costume fittings, and tapings of commercials. (Pl.'s Mem. of Law 21.) Because these allegations were not properly pled, the Court may not consider them, and it need not decide whether they would be sufficient to preserve Plaintiff's employment discrimination claims from dismissal.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted in part and denied in part. Counts One, Three, [*31] and Four are sustained. Counts Two, Five, Six, and Seven are dismissed.

SO ORDERED.

Dated: New York, New York

March 6, 2007

Kimba M. Wood

United States District Judge

# Exhibit C

LEXSEE



Positive
As of: Feb 05, 2008

**JOSEPH DUFFY, SYLVAN VON BURG and RAPHAEL GRAHAM, Plaintiffs, -against- DRAKE BEAM MORIN, HARCOURT GENERAL, INC. and HARCOURT BRACE AND COMPANY, Defendants.**

**96 Civ. 5606 (MBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1998 U.S. Dist. LEXIS 7215**

**May 15, 1998, Decided**
**May 19, 1998, Filed**

**DISPOSITION:** [*1] Harcourt General's motion for a summary judgment of dismissal granted, and DBM's motion granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employees sued employer and its parent company for violations of the Age Discrimination in Employment Act, 29 U.S.C.S. § 621 et seq., the Employee Retirement Income Security Act (ERISA), 29 U.S.C.S. § 1140 et seq., and state and local anti-discrimination laws. Defendant parent company moved, pursuant to Fed. R. Civ. P. 56(c), for a summary judgment of dismissal on all claims and employer moved for partial summary judgment.

**OVERVIEW:** Employer installed new performance standards. The three plaintiffs were discharged for failure to meet the new standards. The court granted parent company's motion for summary judgment because there was no showing that parent company was involved in any of the employment decisions made by employer. Defendants had separate human resources departments and employer established its own policies, including the decisions to discharge each of the employees. Two employees claimed retaliation. The court found sufficient evidence of material facts to establish a prima facie case. First employee alleged he was wrongfully denied payment on consultant contract with employer and second employer alleged he was denied his full severance pay.

Thus, employer's motions on these claims were denied. However, the court found no evidence that employees were wrongfully discharged to deny them benefits under ERISA. The court also dismissed the state and local claims because employees were not residents and were therefore not subject to the state and local anti-discrimination laws.

**OUTCOME:** The court granted summary judgment to parent company. It denied partial summary judgment on the retaliation claims filed by two employees, but granted the motion as to the ERISA and the state and local anti-discrimination claims.

**CORE TERMS:** severance, fired, summary judgment, retaliation, independent contractors, pension, prima facie case, pension rights, package, vested, competencies, enhanced, benefit plans, retirement, consultant, retirement benefits, entitled to receive, discriminatory conduct, discriminatory, workshop, termination, subsidiary, favorable, genuine, pretext, vesting, saving, hired, times, judgment of dismissal

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Opposition > General Overview*

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN1]On a-motion for summary judgment, the moving party bears the burden of proving that there are no material facts in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Although the burden of persuasion is always on the moving party, the non-movant may not resist a motion for summary judgment merely by offering conclusory assertions suggesting that there is some metaphysical doubt as to the material facts. Rather, the non-movant must set forth specific facts that demonstrate a genuine issue for trial. Fed. R. Civ. P. 56(e).

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN2]In employment discrimination cases, where liability often turns on the issue of intent, courts should approach a motion for summary judgment with special caution. Because employers rarely leave direct evidence of discriminatory intent, the court must scrutinize all of the available evidence in search of circumstantial proof to rebut the employer's explanation for its actions.

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
*Labor & Employment Law > Discrimination > Age Discrimination > Defenses & Exceptions > General Overview*
[HN3]That discrimination cases are subject to a heightened duty of care does not mean that summary judgment is unavailable in such cases. When an employer provides convincing evidence explaining its conduct, and the plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact and grant summary judgment to the employer.

*Labor & Employment Law > Employment Relationships > At-Will Employment > Employers*
*Torts > Vicarious Liability > Corporations > Subsidiary Corporations*
[HN4]The law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances. Whether a case presents such circumstances turns on the outcome of a flexible four-part test aimed at determining the degree of interrelationship

between the two entities. The "single employer" doctrine, as this test has come to be known, provides as follows: A parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. Although each of these factors is important, the second one -- centralized control of labor relations -- should be the focus of the inquiry. That criterion has been distilled further into the following question: "What entity made the final decisions regarding employment matters related to the person claiming discrimination?"

*Labor & Employment Law > Discrimination > Age Discrimination > Enforcement*
[HN5]First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN6]A finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities*
*Labor & Employment Law > Discrimination > Age Discrimination > Enforcement*
[HN7]A prima facie case of retaliation stemming from a charge of age discrimination requires proof of the following four elements: 1) the plaintiff was engaged in an activity protected under the Age Discrimination in Employment Act; 2) the employer was aware of the plaintiff's participation in the protected activity; 3) the plaintiff was subject to an adverse employment action; and 4) there is a nexus between the protected activity and the adverse action taken.

*Labor & Employment Law > Discrimination > Age Discrimination > Employment Practices > General Overview*

[HN8]"Adverse employment action" includes dismissal, demotion, diminution of an employee's wages or benefits, and other actions by an employer which cause an employee to suffer a materially adverse change in the terms and conditions of employment. The court also has found adverse employment action even after an employee has been terminated where the employer takes some additional step which adversely affects the employee's ability either to secure future employment, or to expeditiously ascertain and enforce his rights against the employer. The requisite causal connection may be proved indirectly by showing that the protected activity was followed closely by discriminatory treatment.

***Labor & Employment Law > Discrimination > Age Discrimination > Employment Practices > General Overview***
[HN9]Failing to pay an employee severance to which he is entitled is an adverse employment action.

***Labor & Employment Law > Discrimination > Age Discrimination > Employment Practices > General Overview***
***Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > General Overview***
[HN10]Conditioning payment of severance on employee's willingness to sign severance agreement is not unlawful where employee was not otherwise entitled to severance.

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Interference With Protected Rights***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Vesting***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Prohibited Transactions***
[HN11]Section 510 of Employee Retirement Income Security Act (ERISA) makes it unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. 29 U.S.C.S. § 1140. Although this section is concerned primarily with protecting plan participants from termination motivated by an employer's desire to prevent a pension from vesting, ERISA also protects employees whose pension rights are fully vested against actions by

their employers that are specifically intended to prevent them from accruing additional vested benefits.

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Interference With Protected Rights***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Participation & Vesting > Accrual***
[HN12]No Employee Retirement Income Security Act (ERISA) cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behinds, a termination of employment. Thus, a plaintiff must do more than show that if he had not been terminated, he would have been able to accrue additional benefits. Rather, the ultimate inquiry in a § 510 of ERISA, 29 U.S.C.S. § 1140, case is whether the employer had the specific intent to interfere with the employee's ERISA rights.

***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Interference With Protected Rights***
[HN13]To state a prima facie case under § 510 of Employee Retirement Income Security Act (ERISA), 29 U.S.C.S. § 1140, a plaintiff must prove: 1) that he is an employee who may be entitled to receive benefits under a plan covered by ERISA; 2) that he was otherwise qualified for the job he held; and 3) that the timing of his discharge and the resulting cost saving to the employer raises an inference of discrimination.

***Labor & Employment Law > Discrimination > Age Discrimination > Employment Practices > General Overview***
***Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies***
[HN14]There is no inference of discrimination where employee was fired four months before enhanced pension rights would have vested.

***Governments > Local Governments > Ordinances & Regulations***
***Labor & Employment Law > Discrimination > General Overview***

[HN15]The City Human Rights Law prohibits employers from discriminating against its employees, inter alia, on the basis of age. N.Y.C. Admin. Code § 8-107. However, both New York State law and the New York City Administrative Code limit the applicability of the City Human Rights Law to acts occurring within the boundaries of New York City. See N.Y. Gen. Mun. Law § 239-s (1990); N.Y.C. Admin. Code § 2-201 (1986).

*Civil Rights Law > Practice & Procedure > Civil Rights Commissions > Authority*
*Governments > Local Governments > Duties & Powers*
*Governments > Local Governments > Ordinances & Regulations*
[HN16]The Administrative Code vests in the New York City Commission on Human Rights the authority and jurisdiction to eliminate and prevent discrimination within the City of New York. Thus, in order to state a claim under the City Human Rights Law, a plaintiff must allege that he was discriminated against by the defendant within New York City.

**COUNSEL:** For Plaintiffs: JOSEPH J. RANNI, ESQ., Ranni & Smith, New York, NY.

For Defendants: THOMAS R. KELLY, ESQ., Epstein Becker & Green, New York, NY.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION AND ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Joseph Duffy, Sylvan Von Burg, and Ralphael Graham [1] sue their former employer Drake Beam Morin ("DBM"), and its parent company, Harcourt General, Inc. ("Harcourt General"), for violating the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621, et seq. (1994), the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1140 et seq. (1994), and state and local anti-discrimination laws. Harcourt General moves pursuant to Fed. R. Civ. P. 56(c) for a summary judgment of dismissal on all claims. DBM moves for partial summary judgment on certain claims. For the reasons stated below, Harcourt General's motion is granted, and DBM's motion is granted in part and denied in part.

1  Graham sues in both plaintiffs' original and First Amended Complaint under the name "Raphael Graham."

[*2] I.

The following facts, viewed in the light most favorable to plaintiffs, [2] are relevant to defendants' motions for summary judgment: DBM provides career counseling and management services to companies and their employees. (Def. Rule 56.1 Statement P 21) DBM has its main office in Manhattan, and branch offices in Melville, New York, and Parsippany, New Jersey, among other places. (Def. Rule 56.1 Statement PP 4, 44, 69) [3] Duffy, Von Burg, and Graham were formerly employed by DBM as consultants. (Compl. PP 10, 42, 67)

2  Plaintiffs failed to file a statement of facts as to which there exists a genuine issue of material fact as required by Local Civil Rule 56.1. As a result, any facts in Defendant's Rule 56.1 Statement that are not controverted by plaintiffs' papers and supporting documents are deemed admitted pursuant to the terms of that Rule. *See Glazer v. Formica Corp., 964 F.2d 149, 154 (2d Cir. 1992)* (citing *Dusanenko v. Maloney, 726 F.2d 82, 84 (2d Cir. 1984))*.

3  "Compl." refers to plaintiffs' First Amended Complaint filed in May 1997.

[*3] DBM is a wholly-owned subsidiary of Harcourt General. (Def. Rule 56.1 Statement P 1) Although Harcourt General reviews DBM's financial reports regularly and requires DBM to obtain its approval before making significant changes in operations (Walz Depos. at 22-23), Harcourt General exercises no day-to-day control over DBM. (Def. Rule 56.1 Statement P 2) Moreover, Harcourt General and DBM have separate human resources departments (*id.* P 10), and DBM develops its own policies and makes its own decisions as to the hiring, discipline, and termination of its employees. (*Id.* P 3) However, DBM employees are eligible to participate in pension and benefit plans administered by Harcourt General. (Walz Depos. at 40-41)

Beginning in 1994, DBM implemented new performance standards for its consultants called "core competencies." (Def. Rule 56.1 Statement P 23) Each consultant at DBM reviewed the core competencies with his or her manager before they took effect. (*Id.* P 25) At that time, DBM gave its consultants the option of either remaining at DBM and performing in accordance with the core competencies, or resigning and taking advantage of an enhanced severance package. (*Id.* P 26) [*4] Consultants who chose the former course, but who failed to meet the new performance standards, were fired and received only a standard severance package. (*Id.* P 27; Kelly Aff. Exs. M, N) DBM rehired some of these former employees to perform consulting work for DBM

clients as independent contractors, although these consultants -- who are no longer DBM employees -- are ineligible to participate in DBM's pension or benefit plans. (Ranni Aff. Ex. 1 at 9)

### A. *Joseph Duffy*

Duffy was hired by DBM on December 2, 1985. (Def. Rule 56.1 Statement P 29) At all times relevant to this case, Duffy worked out of DBM's office in Melville, New York. (*Id.* P 30) When DBM introduced the core competencies in early 1995, Duffy elected to remain at DBM and attempt to meet the new standards. (*Id.* P 28) On October 6, 1995, DBM fired Duffy on the ground that he had failed to meet these standards. (*Id.* P 31) At that time, Duffy's pension rights were fully vested for both normal and early retirement benefits in the DBM pension plan. (*Id.* P 34) On October 13, 1995, Duffy filed a charge of employment discrimination against DBM with the Equal Employment Opportunity Commission ("EEOC"). [*5] (Ranni Aff. Ex. 13)

In November 1995, DBM hired Duffy as an independent contractor to conduct a two-day workshop for one of DBM's clients. (Def. Rule 56.1 Statement P 37) After Duffy conducted the workshop, but before he was paid for that work, DBM asked Duffy to sign an independent contractor agreement. (*Id.* P 38) The agreement contained, *inter alia*, a non-competition provision barring Duffy from performing consulting services for any of DBM's clients for at least one year. ( Ranni Aff. Ex. 20 P 7) The parties dispute whether the agreement DBM asked Duffy to sign was its "standard" independent contractor agreement (Def. Reply Mem. at 20; Kelly Aff. Exs. AG, AH), or a more restrictive version of the one DBM typically offers to other independent contractors. (Pl. Mem. at 17; Ranni Aff. Ex. 21) When Duffy refused to sign the independent contractor agreement, DBM refused to pay him for the workshop. (Def. Rule 56.1 Statement P 42) DBM subsequently dropped its demand that Duffy sign the agreement and paid him in full. (*Id.*)

### B. *Sylvan Von Burg*

Von Burg was hired by DBM on May 23, 1988 ( *id.* P 44), and he worked at all relevant times at DBM's main office in New York [*6] City. (Compl. P 44) When the core competencies were introduced, Von Burg, like Duffy, declined DBM's offer of an enhanced severance package and elected instead to continue working at DBM. (Def. Rule 56.1 Statement P 28) On June 30, 1995, DBM fired Von Burg on the ground that he, too, had failed to satisfy the new performance standards. ( *Id.* PP 12, 46) On October 13, 1995, Von Burg filed a charge of discrimination against DBM with the EEOC. (Compl. P 50; Kelly Aff. Ex. Q) At the time he was fired, Von Burg's pension rights were fully vested for normal retirement benefits under DBM's pension plan

(Def. Rule 56.1 Statement P 46), but he was more than three years away from having his rights vest for early retirement benefits. ( *Id.* P 47)

### C. *Ralphael Graham*

Graham was hired by DBM on May 1, 1985. ( *Id.* P 49) At all relevant times, Graham worked at DBM's office in Parsippany, New Jersey. (Compl. P 69) Graham also continued to work at DBM after the core competencies were introduced in 1995. (Def. Rule 56.1 Statement P 50) On October 27, 1995, Mark Landsberg, Graham's supervisor at DBM, met with Graham to discuss his performance. (*Id.*) At that meeting, Landsberg offered [*7] Graham an enhanced severance package if he would accept early retirement and sign a severance agreement. ( *Id.* P 51) Graham neither signed the agreement nor returned to work after October 27, 1995. ( *Id.* P 52) However, DBM continued to pay him salary through December 20, 1995. (*Id.*) When Graham left DBM, his pension rights were fully vested for both normal and early retirement benefits. ( *Id.* P 55) On December 1, 1995, Graham filed a discrimination complaint with the EEOC. (Ranni Aff. Ex. 14)

The parties dispute whether Graham was still employed by DBM between October 27, 1995, and December 20, 1995, and how much severance pay, if any, Graham was entitled to receive from DBM when he left. However, viewed in the light most favorable to Graham, the facts reveal that Graham was fired by DBM on October 27, 1995, when he refused to accept early retirement and sign the severance agreement. (Graham Depos. at 129; Ranni Aff. Ex. 13) The payments Graham received from DBM after October 27, 1995, were amounts to which he was entitled under DBM's standard severance package (Ranni Aff. Ex. 12), and based on his ten years of service with DBM, Graham was entitled to continue receiving [*8] those payments until January 26, 1996. (*Id.*)

### D. *Procedural History*

After they received right-to-sue letters from the EEOC, plaintiffs filed this action against DBM and Harcourt General alleging unlawful age discrimination and retaliation in violation of the ADEA and state and local anti-discrimination laws. Plaintiffs claim also that defendants fired them in an effort to deny them their pension rights in violation of ERISA. Harcourt General moves pursuant to Rule 56(c) for a summary judgment dismissing all claims. DBM moves for partial summary judgment on the following claims: 1) Duffy's and Graham's retaliation claims; [4] 2) Duffy's, Von Burg's, and Graham's ERISA claims; 3) Duffy's and Graham's claims under the New York City Human Rights Law ("City Human Rights Law"), N. Y. City Admin. Code § 8-107 *et seq.* (1986);

and 4) Graham's claims under the New York State Human Rights Law ("State Human Rights Law"), N. Y. Exec. Law § 296 (McKinney 1990).

4 Von Burg does not assert a claim for retaliation.

[*9] II.

[HN1]On a-motion for summary judgment, the moving party bears the burden of proving that there are no material facts in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). Although the burden of persuasion is always on the moving party, the non-movant may not resist a motion for summary judgment merely by offering conclusory assertions suggesting that "there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Rather, the non-movant must set forth specific facts that demonstrate a genuine issue for trial. See Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

[HN2]In employment discrimination cases, where liability often turns on the issue of intent, courts should approach a motion for summary judgment with special caution. See Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994). Because employers rarely leave direct evidence of discriminatory intent, the court must scrutinize all of the available evidence in search [*10] of circumstantial proof to rebut the employer's explanation for its actions. See Hollander v. American Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990).

However, that [HN3]discrimination cases are subject to a heightened duty of care does not mean that summary judgment is unavailable in such cases. See McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994). When an employer provides convincing evidence explaining its conduct, and the plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact and grant summary judgment to the employer. See Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).

III.

Harcourt General moves for a summary judgment of dismissal on each of plaintiffs' claims. It argues that it is not liable to plaintiffs because they worked for DBM, and not Harcourt General, and because Harcourt General was not involved in any of the employment decisions that are at issue in this case. 5 (Def. Mem. at 21) I agree.

5 Harcourt General argues also that plaintiffs' discrimination claims should be dismissed because plaintiffs failed to exhaust their administrative remedies before filing suit against Harcourt General. (Def. Mem. at 12-13) Because I agree with Harcourt General's first argument, I do not reach this alternative ground for dismissal.

[*11] As the Second Circuit recently observed, "[HN4]the law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances." Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996). Whether a case presents such circumstances turns on the outcome of a "flexible four-part test aimed at determining the degree of interrelationship between the two entities." Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240 (2d Cir. 1995). The "single employer" doctrine, as this test has come to be known, provides as follows:

A parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.

Id. at 1240 (quotation omitted). 6 Although each of these factors is important, the second one -- centralized control of labor relations -- should be the focus of the inquiry. See Id. at 1241; see, e.g., Sharkey v. Lasmo (Aul Ltd.), 992 F. Supp. 321 (S.D.N.Y. 1998). That criterion has been distilled further into the following question: "What entity [*12] made the final decisions regarding employment matters related to the person claiming discrimination?" Arrowsmith, 69 F.3d at 1240 (quotation omitted).

6 It is unclear whether this standard is also the proper one for assessing whether Harcourt General may be held liable for the ERISA violations allegedly committed by DBM. See, e.g., Carner v. MGS - 576 5th Ave., Inc., 992 F. Supp. 340; 1997 U.S. Dist. LEXIS 22584, *29, 1998 WL 33978, at *10 (S.D.N.Y. 1998) (holding that single employer doctrine does not apply to ERISA claims). I need not resolve this issue here because plaintiffs' ERISA claims must be dismissed on the ground that plaintiffs fail to present a prima facie case of intentional interference with their pension rights as required by that statute, see discussion infra at pp. 20-24.

Applying the single employer doctrine to the facts of this case demonstrates that Harcourt General may not be

held liable for the allegedly discriminatory conduct of DBM. It is uncontroverted that DBM and Harcourt General have separate [*13] human resources departments (Def. Rule 56.1 Statement P 9), and that DBM establishes its own policies and makes its own decisions as to the hiring, discipline, and termination of its employees. (*Id.* P 3) It is likewise undisputed that plaintiffs worked for DBM and that each was supervised by another DBM employee. (Duffy Depos. at 60-61; Von Burg Depos. at 114-115; Graham Depos. at 45-48) It follows from these undisputed facts that DBM, and not Harcourt General, made the "final decisions" regarding plaintiffs' employment that are at issue here. *See Arrowsmith, 69 F.3d at 1240.*

The other *Arrowsmith* factors support this conclusion. Nothing in the record suggests that Harcourt General and DBM have interrelated operations such as shared employees or office space, *cf. Regan v. In the Heat of the Nite, Inc., 1995 U.S. Dist. LEXIS 9682,* No. 93 Civ. 862, 1995 WL 413249, at *4 (S.D.N.Y. July 12, 1995) (restaurants jointly liable based on shared employees and office space), or that they have any of the same officers or managers. *Cf. Dortz v. City of New York, 904 F. Supp. 127, 145-47 (S.D.N.Y. 1995)* (medical school jointly liable where it controlled hospital's operations and supervised its employees, [*14] including plaintiff). The only factor that favors requiring Harcourt General to answer for the acts of its subsidiary -- common ownership and financial control -- is insufficient, without more, to create such liability. *See Balut v. Loral Elec. Sys., 988 F. Supp. 339, 347 (S.D.N.Y. 1997)* ("the mere fact of a parent-subsidiary relationship does not trigger liability").

Plaintiffs resist this conclusion, arguing that Harcourt General was involved in the employment decisions at issue in this case. They surmise that DBM must have obtained Harcourt General's approval before implementing the core competencies because the new standards represented a significant change in DBM's operations. (Pl. Mem. at 9) In support of this claim, plaintiffs assert that DBM's implementation of the core competencies resulted in the firing of at least ten employees over the age of 40. (*Id.*) Plaintiffs also suggest that Harcourt General had a strong interest in the core competencies because, as the administrator of DBM's pension and benefit plans, Harcourt General benefitted directly from any reduction in the number of DBM employees who were eligible to participate in these plans. (*Id.*) These allegations [*15] are not supported by the record.

Although Harcourt General generally requires DBM to obtain its approval before making significant changes in operations (Walz Depos. at 22-23), there is no evidence that such approval was either sought or obtained with respect to any of DBM's actions at issue here. Rather, plaintiffs offer only speculation that implementa-

tion of the new performance standards was a significant change in DBM's operations that would have required Harcourt General's approval. Plaintiffs' failure to support these allegations with evidence is particularly striking given the extensive pre-trial discovery in this matter.

Furthermore, that Harcourt General administers the pension and benefit plans for its subsidiaries, including DBM, is hardly uncommon, *see, e.g., Pagan v. NYNEX Pension Plan, 52 F.3d 438, 439 (2d Cir. 1995); Reichelt v. Emhart Corp., 921 F.2d 425, 427-28 (2d Cir. 1990),* nor is it proof that Harcourt General made the employment decisions at issue here. *See Richard v. Bell Atlantic Corp., 946 F. Supp. 54, 62-63 (D.D.C. 1996)* (that parent administers pension and benefit plans for its subsidiary is of "low or no probative value" in determining single [*16] employer status) (citing *Frank v. U.S. West, Inc., 3 F.3d 1357, 1363 (10th Cir. 1993)).* Accordingly, plaintiffs' discrimination claims against Harcourt General must be dismissed.

IV.

DBM also moves for partial summary judgment on the following claims: 1) Duffy's and Graham's retaliation claims; 2) Duffy's, Von Burg's, and Graham's ERISA claims; 3) Duffy's and Graham's City Human Rights Law claims; and 4) Graham's State Human Rights Law claims. These claims are subject to the familiar three-step framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973),* and later refined in *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981),* among other cases. *See Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997)* (retaliation); *Dister v. Continental Group, Inc., 859 F.2d 1108, 1112 (2d Cir. 1988)* (ERISA). A court applying this standard proceeds as follows:

> [HN5]First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie [*17] case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true

reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252 (quoting *McDonnell Douglas*, 411 U.S. at 802)).

### A. *Duffy's and Graham's Retaliation Claims*

Although DBM concedes that disputed issues of fact preclude summary judgment on plaintiffs' age discrimination claims (Def. Reply Mem. at 5), it has moved for summary judgment on Duffy's and Graham's retaliation claims. *See Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir. 1986) ("[HN6]A finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint."). [HN7]A prima facie case of retaliation stemming from a charge of age discrimination requires proof of the following four elements: "1) the plaintiff was engaged in an activity protected under the ADEA; 2) the employer was aware of the plaintiff's participation in the protected [*18] activity; 3) the plaintiff was subject to an adverse employment action; and 4) there is a nexus between the protected activity and the adverse action taken." *Wanamaker*, 108 F.3d at 465; *accord Hollander*, 895 F.2d at 85. [7]

> 7    Duffy and Graham assert identical claims of retaliation under the ADEA and the City and State Human Rights Laws. These state and local law claims are governed by the same standards as those brought under the ADEA. *See Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1158 (2d Cir. 1993).

"[HN8]Adverse employment action" includes dismissal, demotion, diminution of an employee's wages or benefits, and other actions by an employer which cause an employee to suffer a "materially adverse change in the terms and conditions of employment." *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.), *cert. denied*, 139 L. Ed. 2d 404, 118 S. Ct. 563 (1997). The Court of Appeals also has found adverse employment action even after an employee has been terminated where the employer takes some additional step [*19] which adversely affects the employee's ability either to secure future employment, *see Silver v. Mohasco Corp.*, 602 F.2d 1083, 1090 (2d Cir. 1979) ("blacklisting" former employee), *rev'd on other grounds*, 447 U.S. 807, 65 L. Ed. 2d 532, 100 S. Ct. 2486 (1980), or to "expeditiously ascertain and enforce [his] rights [against the employer]." *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (refusing to participate in grievance procedure). The requisite causal connection may be proved "indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . ." *Id.* (citing *DeCintio v. West-chester County Medical Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987)).

### 1. *Duffy*

Duffy claims that DBM retaliated against him for filing a complaint with the EEOC by refusing to pay him for the workshop he conducted in November 1995 unless he signed an independent contractor agreement with DBM. (Pl. Mem. at 17) As noted, that agreement contained a non-competition provision which would have restricted Duffy's right to work as a consultant for any of DBM's clients for at least one year. ( *Ranni Aff. Ex. 20 P 7*) DBM concedes that these allegations satisfy [*20] the first two elements of a prima facie case of retaliation. (Def. Mem. at 31) However, it argues that Duffy fails to establish the third and fourth elements. ( *Id.* at 31-32) I disagree.

As noted, Duffy filed a complaint with the EEOC on October 13, 1995. (Ranni Aff. Ex. 13) Approximately one month later, in mid-November 1995, DBM hired Duffy to conduct a two-day workshop for one of DBM's clients as an independent contractor. (Def. Rule 56.1 Statement P 37) DBM subsequently refused to pay Duffy unless he signed the agreement described above. ( *Ranni Aff. Ex. 12 P 7*)

Of course, that DBM rehired Duffy as an independent contractor was not adverse employment action. *Cf. Boyle v. McCann-Erickson, Inc.*, 949 F. Supp. 1095, 1104-05 (S.D.N.Y. 1997) ("Here, plaintiff had already been terminated; accordingly this alleged decision [not to rehire him to do freelance work] did not effect his employment nor hinder him in any way from enforcing his rights."). However, that DBM refused to pay him for work he had already performed unless he signed an agreement restricting his right to work in the future arguably qualifies as adverse employment action. *Cf. Silver*, 602 F.2d at 1090 (employer's [*21] "blacklisting" of former employee prevented him from securing future employment). Further, that DBM forced the agreement on Duffy approximately one month after he filed his EEOC complaint is sufficient to establish a prima facie case of retaliation. *See Johnson*, 931 F.2d at 207.

The burden now shifts to DBM to provide a legitimate, non-discriminatory reason for its conduct. *See Hollander*, 895 F.2d at 83. DBM claims that the agreement it required Duffy to sign was its "standard" independent contractor agreement, and that in doing so, DBM was treating Duffy the same as its other independent contractors. In support of this claim, DBM has submitted a blank independent contractor agreement (Kelly Aff. Ex. AG), as well as testimony from one of its employees to the effect that the agreement proffered to Duffy was prepared using that form as a template.

(Collins Depos. at 514-15) Together, this evidence is sufficient to meet DBM's burden of production on this issue. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

Because DBM has carried this burden, Duffy must show that DBM's proffered reason was not the true reason for its actions but was instead a pretext [*22] for discrimination. *See Burdine*, 450 U.S. at 255-56. However, Duffy need not present additional evidence to satisfy this burden and may rely instead on the evidence that established his prima facie case. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). Here, it is clear that DBM's refusal to pay Duffy after he completed the work was wrongful. DBM did not ask Duffy to sign the independent contractor agreement before he performed the work, nor is there any competent evidence that Duffy knew at the time he agreed to conduct the workshop that he would have to limit his future employment significantly if he accepted work from DBM. As noted, DBM forced the agreement on Duffy approximately one month after Duffy filed his complaint with the EEOC.

Moreover, there is evidence in the record -- although admittedly not much -- which casts doubt on DBM's claim that all its independent contractors worked according to the same terms that were offered to Duffy. (Ranni Aff. Ex. 21) Duffy's evidence, taken together and viewed in the light most favorable to him, suggests that DBM may have treated Duffy differently from its other independent contractors. [*23] As a result, Duffy has shown that there is a genuine issue of material fact as to whether DBM's proffered reason for its actions was a pretext for discrimination. Accordingly, DBM's motion for summary judgment on Duffy's retaliation claims is denied.

2. *Graham*

Graham alleges that DBM retaliated against him for filing his EEOC complaint by refusing to pay him the severance to which he claims to have been entitled. (Pl. Mem. at 16) Graham argues that DBM stopped paying him severance on December 20, 1995, and that based on his ten years of service at DBM, he was entitled to continue receiving payments until January 26, 1996. (*Id.*) Again, DBM concedes that Graham has established the first two elements of a prima facie case (Def. Mem. at 31), but argues that he fails to establish the third and fourth elements. (Def. Reply Mem. at 18-19) Once again, I disagree.

Viewing the facts in the light most favorable to Graham, DBM fired Graham on October 27, 1995, when he refused to accept early retirement and sign a severance agreement. (Pl. Mem. at 16) As noted, Graham filed a discrimination complaint with the EEOC on December 1,

1995. (Ranni Aff. Ex. 14) Approximately three weeks later, [*24] on December 20, 1995, DBM stopped making severance payments to Graham (*id.* Ex. 17), even though he was entitled to receive such payments until January 26, 1996. (*Id.* Ex. 12) Because [HN9]failing to pay an employee severance to which he is entitled is an adverse employment action, *see Wanamaker*, 108 F.3d at 466, and because DBM stopped making these payments less than three weeks after Graham filed a complaint with the EEOC, *see Johnson*, 931 F.2d at 207, Graham has stated a prima facie case of retaliation.

DBM claims that it had a legitimate, non-discriminatory reason for discontinuing these payments to Graham. It argues that contrary to Graham's assertions, Graham was still an employee of DBM from October 27, 1995, through December 20, 1995, although DBM had told him to stop reporting to work while he considered whether to accept the enhanced severance package and sign the severance agreement. (Def. Rule 56.1 Statement P 51) Thus, DBM alleges, Graham was receiving salary -- and not severance payments -- during this period. (*Id.* P 52)

Furthermore, DBM claims that it contacted Graham on December 20, 1995, and requested that he accept the package or return to work. ( [*25] *Id.* P 53) When Graham refused to do either, DBM deemed him to have retired and ceased paying him salary. (*Id.* P 54) DBM claims also that Graham was not entitled to severance because he had retired, even though Graham never signed the severance agreement or received the enhanced severance package. (Def. Reply Mem. at 19) Based on the above allegations and supporting evidence, DBM has met its burden of setting forth a legitimate, non-discriminatory explanation for its conduct. *See Jackson v. Lyons Falls Pulp & Paper, Inc.*, 865 F. Supp. 87, 95 (N.D.N.Y. 1994) ([HN10]conditioning payment of severance on employee's willingness to sign severance agreement not unlawful where employee was not otherwise entitled to severance); *Cronin v. ITT Corp.*, 737 F. Supp. 224, 230 (S.D.N.Y.) (same), *aff'd*, 916 F.2d 709 (1990) (table).

Graham must now show that this explanation was not the true reason for DBM's actions but was instead a pretext for discrimination. *See Burdine*, 450 U.S. at 255-56. Again, a plaintiff does not have to present additional evidence to carry this burden and may rely instead on the evidence that established his prima facie case. *See Hicks*, 509 U.S. at 510. [*26] On this record, I cannot determine whether DBM's proffered reason for discontinuing the payments to Graham was pretextual because there is a genuine issue of fact as to whether Graham was entitled to receive severance pay from DBM and, if so, how much. DBM's severance policy, as reflected in its employee handbook, arguably supports both Graham's and

DBM's positions. (Ranni Aff. Ex. 12) The handbook states that employees "released" by DBM are entitled to receive severance payments, but those electing "retirement, whether 'early,' 'normal,' or 'deferred,'" are not. (*Id.*) Whether DBM "released" Graham, or whether he "retired" is an issue of fact for trial.

Apart from whether Graham was entitled to severance under DBM's severance policy, other evidence in the record suggests that DBM's reason for discontinuing salary payments to Graham may have been pretextual. DBM paid severance to both Duffy and Von Burg, even though each of them -- like Graham -- declined the enhanced severance package and refused to sign the severance agreement. (Kelly Aff. Exs. M, N) Further, the agreement that DBM asked Graham to sign appears to acknowledge that Graham was entitled to receive DBM's standard [*27] severance package even if he declined the enhanced one. ( *Ranni Aff. Ex. 5 P 6*) Under these circumstances, Graham's evidence, viewed in the light most favorable to him, is sufficient to raise an inference of discrimination and therefore also to defeat DBM's motion for summary judgment. *See Fisher v. Vassar College,* 114 F.3d 1332, 1338 (2d Cir. 1997) (en banc) ("The sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case."), *cert. denied,* 139 L. Ed. 2d 752, 118 S. Ct. 851 (1998). Accordingly, DBM's motion for summary judgment on Graham's retaliation claims is denied.

### B. *Duffy's, Von Burg's, and Graham's ERISA claims*

[HN11]Section 510 of ERISA makes it unlawful for "any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140 (1994). Although this section is concerned primarily with "protecting plan participants from termination motivated by an employer's desire to prevent a pension from vesting," *Inter-Modal Rail* [*28] *Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.,* 520 U.S. 510, 117 S. Ct. 1513, 1515, 137 L. Ed. 2d 763 (1997) (quotations and citations omitted), ERISA also protects employees whose pension rights are fully vested against actions by their employers that are specifically intended to prevent them from accruing additional vested benefits. *See Gitliz v. Compagnie Nationale Air France,* 129 F.3d 554, 558 (11th Cir. 1997); *Conkwright v. Westinghouse Elec. Corp.,* 993 F.2d 231, 238 (4th Cir. 1991); *Clark v. Resistoflex Co., Div. of Unidynamics Corp.,* 854 F.2d 762, 770 (5th Cir. 1988).

However, "[HN12]no ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Titsch v. Reliance Group, Inc.,* 548 F. Supp. 983, 985 (S.D.N.Y. 1982), *aff'd,* 742 F.2d 1141 (2d Cir. 1983) (table). Thus, a plaintiff must do more than show "that if he had not been terminated, he would have been able to accrue additional benefits." *Dister,* 859 F.2d at 1111 (quotation omitted). Rather, "the ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere [*29] with the employee's ERISA rights . . . ." *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1222 (11th Cir. 1993).

[HN13]To state a prima facie case under § 510, a plaintiff must prove: 1) that he is an employee who may be entitled to receive benefits under a plan covered by ERISA; 2) that he was otherwise qualified for the job he held; and 3) that the timing of his discharge and the resulting cost saving to the employer raises an inference of discrimination. *See Dister,* 859 F.2d at 1114-15; *Burger v. Litton Indus., Inc.,* 1996 U.S. Dist. LEXIS 5560, *46, No. 91 Civ. 0918, 1996 WL 421449, at *17 (S.D.N.Y. Apr. 25, 1996) (Peck, M.J.). In this case, DBM concedes that the first element has been established (Def. Mem. at 37), and disputed issues of fact preclude summary judgment as to whether plaintiffs were otherwise qualified for the jobs they held at DBM. However, Duffy's, Von Burg's, and Graham's ERISA claims must be dismissed because they have failed to establish the third element of a prima facie case -- that the timing of their discharge and the resulting cost saving to DBM raises an inference of discrimination. *See Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d [*30] Cir. 1997).

As noted, Duffy's and Graham's pension rights were fully vested for both early and normal retirement benefits when DBM fired them. (Def. Rule 56.1 Statement PP 34, 55) At the time he was fired, Von Burg was fully vested for normal retirement benefits, but was more than three years away from vesting for early retirement. (*Id.* P 47) As a consequence, that DBM fired plaintiffs when it did fails to raise an inference of discrimination. *See Burger,* 1996 U.S. Dist. LEXIS 5560, *52, 1996 WL 421449, at *17 ([HN14]no inference where employee fired four months before enhanced pension rights would have vested); *see also Turner v. Schering-Plough Corp.,* 901 F.2d 335, 348 (3d Cir. 1990) (no inference where employee fired more than two years before vesting).

Nor is there evidence that DBM -- or Harcourt General, for that matter -- stood to reap substantial costs savings by firing plaintiffs. *See Sweet v. Electronic Data Systems, Inc.,* 1996 U.S. Dist. LEXIS 5544, *31, No. 95 Civ. 3987, 1996 WL 204471, at *11 (S.D.N.Y. Apr. 26, 1996) ("Plaintiff has offered nothing about . . . the amount of benefits he might has received, [or] the amount EDS may have saved by letting him [*31] go . . . to suggest that the decision to fire him was motivated by a desire to avoid pension or health care responsibili-

ties."). On this record, the mere fact that plaintiffs were terminated fails to raise an inference that DBM fired them with the specific intent to deny plaintiffs their pension rights. *Cf. Dister, 859 F.2d at 1155* (inference proper where employee fired four months before vesting and plaintiff presented evidence of substantial cost saving to employer); *Corcoran v. GAB Business Servs., Inc., 723 F. Supp. 966, 969 (S.D.N.Y. 1989)* (inference proper where employee fired seven months before vesting coupled with evidence of cost saving).

Nor is this case similar to *Seaman v. Arvida Realty Sales,* 985 F.2d 543 (11th Cir. 1993), upon which plaintiffs rely. In *Seaman,* the Court permitted Seaman to proceed with her ERISA claims against her former employer, Arvida, even though her pension rights were fully vested at the time of her discharge. *Id. at 546.* Seaman alleged that Arvida's decision to terminate her prevented her from receiving additional vested benefits under Arvida's pension plan. *Id. at 546.* In holding that this allegation was sufficient [*32] to state a claim under ERISA, the Elventh Circuit relied heavily on Arvida's admission that it had fired Seaman because she refused to accept a change in status from employee to independent contractor and the concomitant loss of pension and health benefits. *Id. at 544.* On these facts, the Court reversed the district court's dismissal of Seaman's ERISA claims. *Id. at 547.*

*Seaman* is readily distinguishable. Unlike the employer in *Seaman,* DMB did not fire plaintiffs because they refused to give up their right to participate in DBM's pension and benefit plans. Rather, it fired them because they failed to perform under the new performance standards. Whether those standards discriminated against plaintiffs on the basis of age, or whether DBM applied them in a discriminatory manner, are issues to be decided at trial. However, plaintiffs have come forth with no evidence that DBM's decision to fire them was motivated by a desire to reduce its contributions to the pension and benefits plans. Accordingly, plaintiffs' ERISA claims must be dismissed.

C. *Duffy's and Graham's City Human Rights Law claims*

Duffu's and Graham's City Human Rights Law claims must be be [*33] dismissed because neither Duffy nor Graham was subjected to discriminatory conduct within New York City. * The [HN15]City Human Rights Law prohibits employers from discriminating against its employees, *inter alia,* on the basis of age. *See* N.Y.C. Admin. Code § 8-107. However, both New York State law and the New York City Administrative Code limit the applicability of the City Human Rights Law to acts occurring within the boundaries of New York City. *See* N.Y. Gen. Mun. Law § 239-s (McKinney 1990); N.Y.C. Admin. Code § 2-201 (1986); *see also Levy v.*

City Comm'n on Human Rights, 85 N.Y.2d 740, 743, 628 N.Y.S.2d 245, 246-47, 651 N.E.2d 1264 (1995) ("[HN16]The Administrative Code . . . vests in the New York City Commission on Human Rights the authority and jurisdiction to eliminate and prevent discrimination within the City of New York.") (citation and footnote omitted). Thus, in order to state a claim under the City Human Rights Law, a plaintiff must allege that he was discriminated against by the defendant within New York City. *See Casper v. Lew Lieberbaum & Co.,* 1998 U.S. Dist. LEXIS 4063, *13, No. 97 Civ. 3016, 1998 WL 150993, at *4 (S.D.N.Y. Mar. 31, 1998); *Wishner* [*34] *v. Continental Airlines,* 1997 U.S. Dist. LEXIS 10867, *17, No. 94 Civ. 8239, 1997 WL 42086, at *8. (S.D.N.Y. July 25, 1997).

8 DBM argues also that plaintiffs' City Human Rights Law claims -- including Von Burg's -- must be dismissed because they failed to serve a copy of their complaint on the New York City Commission on Human Rights and the Corporation Counsel as required by N.Y.C. Admin. Code § 8-502 (1986). (Def. Mem. at 23-24) Whatever doubt may have existed before, *see, e.g., Paladines v. Poulos,* 1994 U.S. Dist. LEXIS 10170, *5, No. 93 Civ. 9031, 1994 WL 389022, at *3 (S.D.N.Y. July 22, 1994) (service of complaint on administrative agencies is a prerequisite to suit under City Human Rights Law); *see also Gray v. Shearson Lehman Bros., Inc.,* 947 F. Supp. 132, 137 (S.D.N.Y. 1996) (dismissing City Human Rights Law claim where plaintiff failed to serve complaint on administrative agencies and did not oppose dismissal on that ground), it is now settled that filing a complaint with the above agencies is not a prerequisite to bringing suit under the City Human Rights Law. *See Quirk v. Sherry,* 238 A.D.2d 274, 656 N.Y.S.2d 874 (1st Dep't 1997); *Westphal v. Catch Ball Products Corp.,* 953 F. Supp. 475, 481 (S.D.N.Y. 1997); *Kim v. Dial Serv. Int'l, Inc.,* 1997 U.S. Dist. LEXIS 66, *21, No. 96 Civ. 3327, 1997 WL 5902, at *7-8 (S.D.N.Y. Jan 8, 1997).

[*35] Here, it is undisputed that, at all relevant times, Duffy and Graham worked at DBM's offices in Melville, New York, and Parsippany, New Jersey, respectively. (Def. Rule 56.1 Statement P 30; Compl. P 69) Duffy's and Graham's immediate supervisors, Joelyn Cecere and mark Landsberg, respectively, also worked in these field offices. (Duffy Depos. at 132-33; Kelly Aff. Ex. AA; Trum. Depos. at 487; Ranni Aff. Ex. 13) By contrast, nothing in the record suggests that either Duffy or Graham was subjected to discriminatory conduct by DBM in New York City.

Moreover, even if, as Duffy and Graham claim, the decision to fire them was made by DBM at its headquarters in New York City, that fact, standing alone, is insufficient to establish a violation of the City Human Rights Law when the employees affected by that decision did not work in New York City. *See Lightfoot v. Union Carbide Corp.*, 1994 U.S. Dist. LEXIS 6191, *16, No. 92 Civ. 6411, 1994 WL 184670, at *5 (S.D.N.Y. May 12, 1994) (dismissing City Human Rights Law claim where plaintiff worked in Connecticut even though decision to adopt early retirement program that led to plaintiff's dismissal was made at defendant's New York City office), [*36] *aff'd,* 110 F.3d 898 (2d Cir. 1997). To hold otherwise would be to expand the City Human Rights Law to cover any employee who is fired pursuant to a decision handed down by an employer from its New York City headquarters, no matter where the employee in question actually works. Accordingly, because neither Duffy nor Graham was subject to any discriminatory conduct in New York City, Duffy's and Graham's City Human Rights Law claims are dismissed.

### D. *Graham's State Human Rights Law claims*

For essentially the same reasons, Graham's State Human Rights Law claims also must be dismissed. The State Human Rights Law -- like its local law counterpart -- prohibits employers from discriminating against their employees, *inter alia,* on the basis of age. *See* N.Y. Exec. Law § 296(a). Although the State Human Rights Law, unlike the City Human Rights Law, applies to certain discriminatory acts committed outside New York State, *see* N.Y. Exec. Law. § 298-a (McKinney 1990) ("The provisions of this article shall apply as hereinafter provided to an act committed outside this state against a resident of this state . . . if such act would constitute an unlawful discriminatory practice [*37] if committed within this state"), The State Human Rights Law affords no remedy to a non-New York resident who suffers discrimination outside New York State. *See Iwankow v. Mobil Corp.*, 150 A.D.2d 272, 272, 541 N.Y.S.2d 428 (1st Dep't 1989) ("absent an allegation that a discriminatory act was committed in New York or that a New York State resident was discriminated against, New York's courts have no subject matter jurisdiction over the alleged wrong [under the State Human Righst Law]."); *Beckett v. Prudential Ins. Co.*, 893 F. Supp. 234, 238 (S.D.N.Y. 1995) ("the [State Human Rights Law] does not provide a non-resident with a private cause of action for discriminatory conduct committed outside New York by a New York corporation").

Graham is a resident of Morristown, New Jersey. (Compl. P 3) As noted, Graham worked, at all times relevant to this case, at DBM's branch office in Parisippany, New Jersey. (*Id.* P 69) Graham's immediate supervisor also worked in that office. (Trum Depos. at 487;

Ranni Aff. Ex. 13) Nothing in the record suggests that Graham was subjected to discriminatory conduct by DBM in New York State.

Similarly, even if the decision to fire Graham was [*38] made by DBM at its headquarters in New York City, that fact is insufficient to establish a violation of the State Human Rights Law. *See Miller v. Citicorp.*, 1997 U.S. Dist. LEXIS 2395, No. 95 Civ. 9728, 1997 WL 96569, at *8-9 (S.D.N.Y. Mar. 4, 1997); *Sherwood v. Olin Corp.*, 772 F. Supp. 1418, 1426 (S.D.N.Y. 1991). As Judge Preska noted recently in *Miler*, this same argument was considered and rejected by the Appllate Division in *Ivwanko:*

> Plaintiff attempts to salvage his [State Human Rights Law] claim by asserting that CSI could not have acted as it did in Floridaa without the approval of Citicorp and Citibank, N.A. in New York. A similar contention was raised and rejected in *Iwankow.* There, the court noted that 'the only jurisdictional nexus asserted in the complaint, apart from the fact that defendants are domestic corporations, is that plaintiff's termination was part of a worldwide reduction in force which was decided upon at corporate headquarters in New York. The court rejected the application of the [State Human Right Law] [on those facts] . . . .

1997 U.S. Dist. LEXIS 2395, 1997 WL 96569, at *9 (citations omitted). This result does [*39] not leave Graham without a remedy under state law; he has asserted claims -- which DBM does not challenge -- under the New Jersey Law Against Discrimination, N.J. Stat. Ann § 10:5-1 *et seq.* (West 1993). Accordingly, Graham's State Human Rights Law claims must be dismissed. [9]

> 9    Alternatively, I would reach the same result were I to apply New York's choice-of-law rules to determine whether New York or New Jersey law governs Graham's claims. *See Littman v. Firestone Tire & Rubber Co.*, 709 F. Supp. 461, 469 (S.D.N.Y. 1989) (New Jersey law applies to wrongful discharge claim where plaintiff worked and was fired in New Jersey.

For the above reasons, Harcourt General's motion for a summary judgment of dismissal is granted. DBM's motion for a summary judgment of dismissal is granted. DBM's motion for partial summary judgment is denied with respect to Duffy's and Graham's retaliation claims, and is granted in all other respects.

1998 U.S. Dist. LEXIS 7215, *

SO ORDERED:                                Michael B. Mukasey

Dated: New York, New York                  [*40]  U.S. District Judge

May 15, 1998

**Exhibit D**

LEXSEE



Positive
As of: Feb 05, 2008

**CHRISTOPH E. KULL, Plaintiff -against- DAVIDOFF OF GENEVA (NY), INC.,
DAVIDOFF OF GENEVA (CT), INC., DAVIDOFF DIRECT, INC., DAVIDOFF
OF GENEVA, INC., DAVIDOFF OF GENEVA LICENSING CORP., DAVIDDOFF
OF GENEVA (USA), INC., and OETTINGER IMEX, AG, Defendants.**

**01 Civ. 4831 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**2004 U.S. Dist. LEXIS 11575**

**June 22, 2004, Decided
June 23, 2004, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment was granted in part and denied in part. Kull's motion for summary judgment as to Defendants' counterclaims was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee sued defendant related companies for retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964 and New York human rights law, for claims under the Connecticut Fair Employment Practices Act (CFEPA), as well as claims for breach of contract, promissory estoppel, breach of the covenant of good faith and fair dealing, unjust enrichment, and intentional and negligent infliction of emotional distress.

**OVERVIEW:** The employee alleged that the companies unlawfully terminated his employment in retaliation for bringing forward the sexual harassment allegations of his wife, and his secretary. Two of the companies counterclaimed for breach of the fiduciary duty of loyalty and tortious interference with contract advantage or prospective economic advantage, based on the employee's alleged acceptance of kickbacks from a vendor. The companies moved for summary judgment. The employee moved for summary judgment as to the counterclaims. Inter alia, the court held that although the employee performed some duties at the companies' New York retail store, he lived and worked in Connecticut and the decision to terminate him was not effected in New York, precluding the New York human rights law claim. However, the court had jurisdiction over the Title VII and CFEPA retaliation claims, which survived because there was total disagreement between the parties as to both the kickback and harassment claims. The employee claimed that an employment agreement was laid out in a missing letter, which the companies claimed did not exist, so summary judgment on that claim was inappropriate as well.

**OUTCOME:** The companies' motion for summary judgment was granted with respect to the employee's claims for retaliation under the New York Executive Law, promissory estoppel, breach of the covenant of good faith and fair dealing, and unjust enrichment, and denied as to all other claims. The employee's motion for summary judgment as to the counterclaims was denied.

**CORE TERMS:** termination, summary judgment, kickback, notice, cigar, retaliation, harassment, terminate, emotional distress, entity, infliction, supervisor, sexual harassment, issue of fact, protected activity, tortious interference, terminated, outrageous, good faith, unjust enrichment, imputed, fair dealing, contract claims, promissory estoppel, counterclaims, employment practice, dinner party, citations omitted, retaliatory, impropriety

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1]Under Fed. R. Civ. P. 56, an action will be dismissed on summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN2]On a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN3]On a motion for summary judgment, once a moving party presents appropriate support showing that there is no genuine issue of material fact, the nonmoving party must present similar support setting forth specific facts about which a genuine issue remains. Fed. R. Civ. P. 56(e). The party with the burden of proof at trial must make a showing sufficient to establish the existence of an element essential to that party's case.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN4]On a motion for summary judgment, mere conclusory allegations will not suffice. Fed. R. Civ. P. 56(e). When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN5]Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., prohibits retaliation for behavior protected under its provisions. The statute states that it is an unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice or because he has made a charge of an unlawful employment practice. 42 U.S.C.S. § 2000e-3(a). Both New York and Connecticut have similar state laws codified as part of their human rights laws. N.Y. Exec. Law § 296(3-a)(c) (2001 & Supp. 2004); Conn. Gen. Stat. § 46a-60(a)(4) (2003).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN6]Although there are exceptions in general, acts committed outside New York against a nonresident are not covered by the New York statute.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employers*
[HN7]See 42 U.S.C.S. § 2000e(b).

*Labor & Employment Law > Discrimination > Actionable Discrimination*
[HN8]The Connecticut human rights law requires a minimum of three employees for an entity to be subject to its provisions. Conn. Gen. Stat. § 46a-51(10).

*Labor & Employment Law > Discrimination > Actionable Discrimination*
[HN9]See Conn. Gen. Stat. § 46a-51(10).

*Labor & Employment Law > Discrimination > Actionable Discrimination*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN10]The term "employer" has been construed liberally under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. Accordingly, the United States Court of Appeals for the Second Circuit uses the single employer doctrine in order to determine whether two entities will be regarded as a single employer subject to joint liability for employment-related acts. Because application of the doctrine results in the treatment of two or more ostensibly separate entities as a single, integrated

enterprise, the number of employees of each entity can be aggregated when examining jurisdictional thresholds. There are four factors used in determining whether two entities can be considered a single employer: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. The most important of the four factors is the second -- centralized control of labor relations. No one factor is controlling, and not every factor is required. Whether entities can be joined as a single employer is a question of fact. These factors also apply to a claim brought under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 et seq.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN11]A claim for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., requires proof of the following four elements: (1) the plaintiff was engaged in a protected activity; (2) the employer was aware of the participation; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the activity and the action taken.

*Evidence > Procedural Considerations > Circumstantial & Direct Evidence*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN12]Without direct evidence of retaliation, courts use the order and allocation of proof established in McDonnell-Douglas Corp. v. Green. Under this framework, once a plaintiff, establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. If the defendant is successful, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reason was pretextual, and was instead an unlawful retaliation.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN13]The analysis for a retaliation claim is substantially the same under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 et seq. as under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employer Liability > Coworkers*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employer Liability > Supervisors*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN14]In a number of retaliation cases, the courts have imputed to the employer knowledge held by an employer's agent, such as a supervisor, of unlawful actions in order to hold the employer itself liable for those actions.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN15]To establish a prima facie retaliation case, the plaintiff must still demonstrate a connection between his protected activity and the adverse employment action against him. With respect to proving this connection, then, the question as to whether the knowledge of the protected activity can be imputed is more or less beside the point.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN16]A court cannot resolve conflicting testimony on a motion for summary judgment.

*Civil Rights Law > Practice & Procedure > Limitation Periods*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN17]A Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. retaliation claim plaintiff must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent. In the absence of direct evidence of a retaliatory motive, the requisite nexus between the protected activity and the adverse employment action can be shown through a close temporal proximity. Although there is no bright-line rule, a variety of time limits within a year have been used to raise a question regarding the nexus between a protected activity and retaliatory action.

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Labor & Employment Law > Discrimination > Retaliation > General Overview*

[HN18]A retaliation plaintiff can defeat a motion for summary judgment by producing sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false and that discrimination was the real reason.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*

[HN19]Pursuant to New York choice-of-law rules, contract claims are governed by a "center of gravity" or "grouping of contacts" test, under which courts apply factors such as the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. The places of contracting and performance are given the greatest weight.

*Contracts Law > Types of Contracts > Express Contracts*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Exceptions > Implied Contracts*

[HN20]Under Connecticut law, all employer-employee relationships not governed by express contracts involve some type of implied contract of employment. Generally, contracts of permanent employment for an indefinite term are at-will. The parties can modify this default rule by agreement.

*Contracts Law > Types of Contracts > General Overview*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
*Labor & Employment Law > Wrongful Termination > Breach of Contract > Employer Handbooks*

[HN21]Terms of an employment contract can differ from the provisions set forth in general company literature.

*Contracts Law > Consideration > Enforcement of Promises > Forbearance*
*Contracts Law > Consideration > Promissory Estoppel*

[HN22]In Connecticut, a claim for promissory estoppel has three prongs: (1) a clear and definite promise; (2) a change in position in reliance; and (3) resulting injury. A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. Promissory estoppel is a doctrine often used in the absence of a contractual relationship -- for instance, where consideration is lacking -- to place liability on the promisor. It is therefore not inconsistent to find the absence of a contract, yet find liability based on promissory estoppel.

*Contracts Law > Consideration > Enforcement of Promises > General Overview*
*Contracts Law > Consideration > Promissory Estoppel*

[HN23]Mere lack of seeking another job is not the sort of change in position that an employee can use to support a claim of promissory estoppel against an employer.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Contracts Law > Types of Contracts > Covenants*

[HN24]Under Connecticut law, every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. The claim exists to fulfill the reasonable expectations of the contracting parties as they presumably intended. The claim is separate from and can be maintained in addition to a breach of contract claim.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN25]The elements of a bad faith claim are as follows: (1) plaintiff and defendant entered into a contract under which the plaintiff had a reasonable expectation of benefits; (2) the defendant undertook actions that undermined the plaintiff's right to collect certain benefits; and (3) the defendant acted in bad faith.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN26]Bad faith means more than more negligence; it involves a dishonest purpose.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*
*Labor & Employment Law > Wrongful Termination*

[HN27]In a bad faith termination case, an at-will employee must establish that his dismissal was for a demonstrably improper reason, the impropriety of which is derived from a violation of some important public policy.

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Wrongful Termination > Public Policy*
*Labor & Employment Law > Wrongful Termination > Remedies > General Overview*
[HN28]A plaintiff bringing a claim for violation of the implied covenant of good faith and fair dealing must also establish that he does not otherwise have an adequate means of vindicating that public policy.

*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
[HN29]A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. The elements of the claim are that (1) the defendant benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of payment was to the plaintiff's detriment.

*Contracts Law > Remedies > Equitable Relief > General Overview*
*Labor & Employment Law > Employment Relationships > General Overview*
*Labor & Employment Law > Wrongful Termination > Breach of Contract > Formation*
[HN30]Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract. Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*
[HN31]Under Connecticut law, to establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*
[HN32]On an intentional infliction of emotional distress claim under Connecticut law, where the primary dispute has to do with the second prong: the extreme or outrageous nature of the conduct, whether the defendant's conduct is sufficient to satisfy the extreme and outrageous standard is a question, in the first instance, for the court. Where reasonable minds can differ, however, it becomes an issue for the jury. The conduct in question must exceed all bounds usually tolerated by decent society. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview*
[HN33]In the context of an intentional infliction of emotional distress claim in Connecticut, both Connecticut and federal courts in the circuit have been reluctant to find conduct of defendants to be extreme and outrageous. However, extreme or outrageous conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > Elements*
[HN34]To succeed on a claim for negligent infliction of emotional distress, a plaintiff must prove that the defendant should have: (1) realized its conduct involved an unreasonable risk of causing plaintiff distress; and (2) realized the distress, if caused, might result in illness or bodily harm.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > General Overview*
[HN35]In Connecticut, in the work context, a claim for negligent infliction of emotional distress arises only when it is based upon unreasonable conduct of the defendant during the termination process. The requirement that the behavior be linked to the termination process, however, has been interpreted more broadly under Connecticut law. Courts have dismissed plaintiffs' claims when, for instance, he or she remains employed or if the termination was wrongful, but involved no egregious conduct.

***Civil Procedure > Jurisdiction > Subject Matter Juris-
diction > Supplemental Jurisdiction > Pendent Claims***
***Civil Procedure > Federal & State Interrelationships >
Choice of Law > General Overview***
***Civil Procedure > Federal & State Interrelationships >
Erie Doctrine***
[HN36]A federal court sitting in diversity or adjudicating
state law claims that are pendent to a federal claim must
apply the choice of law rules of the forum state.

***Civil Procedure > Federal & State Interrelationships >
Choice of Law > General Overview***
***Governments > Fiduciary Responsibilities***
[HN37]Under New York law, a claim for breach of fidu-
ciary duty against a corporation is governed by the law
of the relevant company's state of incorporation.

***Civil Procedure > Federal & State Interrelationships >
Erie Doctrine***
[HN38]Where neither side has argued that another na-
tion's law be applied, it is initially assumed that the other
nation's law is the same as the forum state's law, and
either party may challenge that assumption at any time in
the litigation by providing "reasonable written notice" of
its intent to raise the issue. Fed. R. Civ. P. 44.1.

***Civil Procedure > Federal & State Interrelationships >
Choice of Law > General Overview***
[HN39]In tort cases, New York courts apply an "interest
analysis," under which the law of the jurisdiction with
the greatest interest in the matter is applied.

***Civil Procedure > Federal & State Interrelationships >
Choice of Law > General Overview***
[HN40]Under New York's choice of law formulation, the
significant contacts are, almost exclusively, the parties'
domiciles and the locus of the tort. If conflicting con-
duct-regulating laws are at issue, the law of the jurisdic-
tion where the tort occurred will generally apply because
that jurisdiction has the greatest interest in regulating
behavior within its borders.

***Contracts Law > Formation > General Overview***
[HN41]Without a mutual assent, or a meeting of the
minds, there cannot be a valid accord. Whether a meeting
of the minds has occurred is a factual determination.

***Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Waiver & Preservation***
[HN42]Waiver is the intentional relinquishment of a
known right. The four elements of waiver are as follows:
(1) the existence of a right or defense; (2) the opportunity
to apply and use that right or defense; (3) the knowledge
of the ability to use that right or defense; and (4) actions
of the party who possesses that right or defense that
amount to a relinquishment of that right.

***Business & Corporate Law > Corporations > Directors
& Officers > Management Duties & Liabilities > Gen-
eral Overview***
***Governments > Fiduciary Responsibilities***
[HN43]A president of a corporation is in a fiduciary rela-
tionship to the corporation. The president occupies a
position of the highest trust and therefore he is bound to
use the utmost good faith and fair dealing in all his rela-
tionships with the corporation.

***Business & Corporate Law > Corporations > Directors
& Officers > Management Duties & Liabilities > Gen-
eral Overview***
***Civil Procedure > Summary Judgment > Standards >
Genuine Disputes***
***Governments > Fiduciary Responsibilities***
[HN44]In the context of a breach of fiduciary duty claim,
the factfinder must determine whether a transaction be-
tween a corporation and its officer is of a type that would
lead to the burden-shifting regime set out in Murphy,
and, if so, whether the officer can meet such burden.

***Business & Corporate Law > Agency Relationships >
Duties & Liabilities > Knowledge & Notice > General
Overview***
***Business & Corporate Law > Corporations > Forma-
tion > Corporate Existence, Powers & Purpose > Pow-
ers > General Overview***
***Torts > Business Torts > Commercial Interference >
General Overview***
[HN45]In Connecticut, the elements of tortious interfer-
ence are the existence of a contractual or beneficial rela-
tionship, the defendants' knowledge of that relationship,
the intent to interfere with it, and the consequent actual
loss suffered by the plaintiff. Under Connecticut law, an
agent of a corporation may be held liable for interfering
with a contract of that corporation if he was not acting
legitimately within the scope of his duties, but was using
corporate power improperly for his personal gain. He
acts for personal gain if he seeks personal financial gain
or is motivated by personal animus. To sustain the claim,
the claimants must show that the agent's actions were

tortious; that is, that they involved fraud, misrepresentation, intimidation, or molestation, or that he acted maliciously. The claim requires some showing of improper means or motive. The tort does not require a breach of contract.

*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
[HN46]Although parties claiming tortious interference with a contract may have trouble showing that they lost a business opportunity, damages may be recoverable where the interference causes the performance to be more expensive or burdensome.

**COUNSEL:** For Christoph E. Kull, Plaintiff: Alan S. Pralgever, LEAD ATTORNEY, Wolf, Block, Brach & Eichler Hammer & Gladstone, P.C., Roseland, NJ.

For Davidoff of Geneva (NY), Inc., Davidoff of Geneva (USA), Inc., Defendants: Elise M. Bloom, LEAD ATTORNEY, Jackson Lewis, LLP, New York, NY.

For Davidoff of Geneva (NY), Inc., Davidoff of Geneva (CT), Inc., Davidoff Direct, Inc., Davidoff of Geneva, Inc., Davidoff of Geneva Licensing Corporation, Davidoff of Geneva (USA), Inc., Oettinger Imex, AG, Defendants: Jennifer B. Courtian, LEAD ATTORNEY, Jackson Lewis, LLP, New York, NY.

For Davidoff of Geneva (CT), Inc., Davidoff Direct, Inc., Davidoff of Geneva, Inc., Davidoff of Geneva Licensing Corporation, Oettinger Imex, AG, Defendants: Elise M. Bloom, LEAD ATTORNEY, Jackson Lewis, LLP, White Plains, NY.

For Davidoff of Geneva (CT), Inc., Oettinger [*2] Imex, AG, Counter Claimants: Elise M. Bloom, LEAD ATTORNEY, Jackson Lewis, L.L.P., White Plains, NY.

For Davidoff of Geneva (CT), Inc., Oettinger Imex, AG, Counter Claimants: Jennifer B. Courtian, LEAD ATTORNEY, Jackson Lewis, L.L.P., New York, NY.

For Christoph E. Kull, Counter Defendant: Alan S. Pralgever, LEAD ATTORNEY, Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, P.C., Roseland, NJ.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINION BY:** Lawrence M. McKenna

**OPINION**

*MEMORANDUM AND ORDER*

McKENNA, D.J.

Plaintiff brings this action against the Swiss company Oettinger Imex, AG (referred to here as "Oettinger") and its United States corporate entities Davidoff of Geneva (NY), Inc., Davidoff of Geneva (CT), Inc., Davidoff Direct, Inc., Davidoff of Geneva, Inc., Davidoff of Geneva Licensing Corp., and Davidoff of Geneva (USA), Inc. (collectively "Davidoff"), alleging retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq.* (Title VII), Article 15 of the New York State Executive Law, § 290 *et seq.,* and the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-51 [*3] *et seq.* He also brings common law claims for breach of contract, promissory estoppel, breach of the covenant of good faith and fair dealing, unjust enrichment, and intentional and negligent infliction of emotional distress. Plaintiff alleges that Defendants unlawfully terminated his employment in retaliation for bringing forward the sexual harassment allegations of his wife, Theres Kull, and his secretary, Alexandra Domond.

Defendants Oettinger and Davidoff of Geneva (CT) bring counterclaims for breach of the fiduciary duty of loyalty and tortious interference with contract advantage or prospective economic advantage, arising from Plaintiff's alleged acceptance of kickbacks from one of Defendants' vendors, Avo Uvezian.

Defendants have filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure with respect to all of Plaintiff's claims, as well as Davidoff of Geneva's and Oettinger's two counterclaims, and Plaintiff has filed a motion for summary judgment with respect to both of the counterclaims. For the reasons set forth below, Defendants' motion is granted in part and denied in part, and Plaintiff's [*4] motion is denied.

**Background**

Oettinger is a Swiss corporation whose principal business is the retail sale of cigars, smoking products, perfumes, wines, chocolates, fine writing instruments, and other accessories. (Def. 56.1 Stmt. P 1). [1] In 1986, Oettinger decided to expand its business. To that end, it created five United States subsidiaries and one United States holding company. (*Id.* P 2.) The United States operation sells primarily Davidoff tobacco and related products. (*Id.* P 3). In conjunction with this expansion, Oettinger hired Christoph Kull, who relocated to the United States in 1987 with his wife and, at the time, two children. (*Id.* 4-5.) In 1989, Kull purchased a home in Riverside, Connecticut, with the aid of a loan from Oettinger. (*Id.* P 6; Kull Dep. at 146-47.) Kull began his

employment as president of each of Oettinger's United States corporations on January 1, 1987, overseeing the operations of the companies. (Def. 56.1 Stmt. PP 7-8.) Although, upon moving to the United States, Kull was paid by Davidoff of Geneva (NY), once the Connecticut operations were created, he was paid by Davidoff of Geneva (CT). (Kull Dep. at 45-46; *see also* Def. [*5] 56.1 Stmt. P 15.) His office was located in Stamford, Connecticut. (Def. 56.1 Stmt. P 8.)

> 1    Both parties, pursuant to Local Rule 56.1, have submitted statements of undisputed material facts in support of their motions for summary judgment, as well as counter-statements in opposition to the other parties' statements. The two documents connected to Defendants' motion for summary judgment will be referred to as "Def. 56.1 Stmt." and "Pl. Opp. 56.1 Stmt." Likewise, the two documents connected to Plaintiff's motion will be referred to as "Pl. 56.1 Stmt." and "Def. Opp. 56.1 Stmt." Similarly, the memoranda associated with the Defendants' motion will be referred to as "Def. Mem.", "Pl. Opp.", and "Def. R. Mem.", while the documents associated with Plaintiff's motion will be referred to as "Pl. Mem.", "Def. Opp.", and "Pl. R. Mem." Because multiple affidavits with both lettered or numbered exhibits have been submitted, each affidavit will be referred to by name and date, along with the exhibit number or letter, if necessary.

[*6] From the commencement of his employment until January 1, 1998, Kull reported directly to Dr. Ernst Schneider, president of Oettinger, and George Schelker, one of Oettinger's directors. (*Id.* PP 4, 9.) On January 1, 1997, Schneider hired Dr. Reto Cina as chief executive operator of Oettinger and its United States subsidiaries. (Id. P 10.) Cina reported to Schneider and Schelker and as of January of 1998, Kull reported directly to Cina. (*Id.* PP 13-14. )

Avo Uvezian was an independent supplier of cigars to Oettinger and its United States companies from 1988 until March of 1995. (*Id.* P 19.) His cigars included the brand AVO XO, which he began producing in 1993 and first sold to Davidoff in 1994. (*Id.* P 25; Uvezian Dep. at 36.) Oettinger eventually bought Uvezian's trademark, AVO, as well as the production rights to AVO cigars; the deal went into effect on March 1, 1995. (Def. 56.1 Stmt. P 20.) At the same time, Uvezian became a consultant to Oettinger regarding the marketing and production of AVO cigars. (*Id.* P 21.) Throughout this time period and until his dismissal -- from 1988 until March of 2000 -- Kull was Uvezian's primary contact with Oettinger, and Kull placed [*7] all orders for Uvezian's cigars. (*Id.* P 22.)

Aside from the facts listed above, the parties' accounts of the underlying allegations in this dispute differ significantly. The dispute is primarily based on two sets of alleged activities, about which there is considerable disagreement: first, a financial arrangement between Kull and Uvezian, and second, the alleged sexual harassment by Cina of Kull's wife and secretary and Kull's subsequent reaction. In addition, there is a dispute over the terms of Kull's contract.

First, it is undisputed that there was a financial arrangement between Kull and Uvezian that was outside their professional dealings. Defendants argue this was a kickback scheme Kull devised and imposed on Uvezian; Kull, on the other hand, argues that he accepted a loan from Uvezian, which he paid back in full.

According to Defendants' version of the facts, when Uvezian began producing AVO XO cigars in 1993, Kull used the opportunity to begin a kickback scheme with Uvezian. (*Id.* PP 25-30.) In 1993, Defendants say, Uvezian informed Kull of the new line of cigars and presented him with a price list. Kull then placed an order for the cigars, but arranged the transaction [*8] so that Davidoff was charged an extra $ 0.25 per cigar than that indicated on the price list. (*Id.* PP 25-27). Kull allegedly told Uvezian that, upon receipt of payments, Uvezian should transfer the extra amount directly to him. (*Id.* P 28.) To facilitate this transfer, Kull directed Uvezian to open a bank account in Puerto Rico, which Uvezian did on May 9, 1994, and told him to deposit the additional money there. (*Id.* P 29; Uvezian Dep. at 66.) After that, Uvezian withdrew money from that account a number of times and issued checks in varying amounts at Kull's direction. (Def. 56.1 Stmt. PP 30-31.) Uvezian also allegedly made cash payments to Kull from his own personal savings after Davidoff bought the rights to the AVO brand. (*Id.* P 32; Uvezian Dep. at 71.)

According to Defendants, Oettinger and Davidoff first became aware of the kickback scheme when Uvezian approached Cina with the information at a tobacco products trade show in Las Vegas in July of 1999. (Def. 56.1 Stmt. PP 23-24.) Cina asked for documentary evidence, and Uvezian agreed to provide it by September of 1999. (*Id.* PP 33-34.) In the meantime, Cina returned to Switzerland and informed Schneider and [*9] Schelker of Uvezian's allegations. (*Id.* P 35.) On August 4, 1999, Schneider and Schelker informed a committee of Oettinger's board of directors of the allegations, and the committee concluded that, should the allegations be substantiated, Kull would be terminated. (*Id.* P 37; Minutes of August 4, 1999, Meeting, Bloom Aff. of 2/28/03 Ex. K.) By August 9, Oettinger had begun to look for Kull's replacement and had retained Halter & Partner, a Swiss managerial recruiting firm. (Def. 56.1 Stmt. P 40; Letter from Halter & Partner to Oettinger of 8/9/99,

Bloom Aff. of 2/28/03 Ex. L (confirming contract for "the search for and selection of a managing director for America for the firm Oettinger Imex AG").)

In September of 1999, Uvezian provided Cina with the requested documentation of his dealings with Kull, consisting of a bankbook, withdrawal forms, and copies of checks, which Cina forwarded to Schneider and Schelker. (Def. 56.1 Stmt. PP 42-43.) On November 8, 1999, Schelker met with Uvezian to discuss the arrangement. (*Id.* P 45.) The Oettinger board members decided to wait to terminate Kull until after the Christmas holidays and after a replacement was found, reasoning that under [*10] Cina's close supervision and scrutiny, Kull would be unable to engage in any further financial impropriety. (*Id.* P 46-47.) On February 25, 2000, Oettinger's board of directors executed its decision to terminate Kull, and on March 3, 2000, in Kull's Stamford office, Schelker informed Kull of the decision and terminated his employment. (*Id.* PP 48-49.)

Kull's version of the events leading up to his termination, unsurprisingly, differs dramatically. Kull admits to having financial interactions with Uvezian apart from Oettinger's business, but disputes many of the details of Defendants' version. Kull maintains that any money Uvezian gave him was a loan -- one Uvezian himself suggested -- for personal reasons. (Kull. Dep. at 100; Pl. Opp. 56.1 Stmt. P 30, at 3.)[2] Furthermore, Kull states that Uvezian, not Kull, suggested opening the account in Puerto Rico, at least in part to give Kull access to local ATMs, and that any activity was due to Uvezian's acting on his own. (Kull Dep. at 98, 104.) Additionally, any increase in the price of the cigars, Kull testified, was a result of expenses that Uvezian did not initially realize he had to bear as the trademark holder. (Kull Dep. at [*11] 97.)

    2   Both parties' counter 56.1 statements provide a paragraph-by-paragraph response to the moving party's 56.1 statement, and then lists additional facts, restarting the paragraph numbering at 1. AS a result, both documents will be cited with both paragraph number and page number.

As for Oettinger's knowledge of any financial interactions between Kull and Uvezian, Kull maintains that Oettinger first learned of the arrangement in 1995, when Uvezian informed Rene Hollenstein, head of purchasing, production, and product development. (Pl. 56.1 Stmt. P 11.) Hollenstein then did nothing with the information. (Pl. Opp. 56.1 Stmt. P 20(1), at 13; Uvezian Dep. at 49.) Contrary to Cina's testimony, Uvezian testified that he did not mention a kickback scheme to Cina in Las Vegas in July, but first mentioned it to him at a dinner party on September 27, 1999, at Hollenstein's request. (Pl. 56.1 Stmt. P 18; Uvezian Dep. at 116-18; *see also* Fax from

Cina to Uvezian of 4/26/00, Koenigsberg Aff. of 3/3/03 Ex. Q (confirming [*12] date of dinner party).) Kull acknowledges that there is a document purporting to be the minutes of an August 4, 1999, meeting at which the kickbacks were allegedly discussed, but calls its validity into question, and questions whether the meeting actually occurred. (Pl. Opp. 56.1 Stmt. P 38, at 4.) At most, Kull says, the minutes appear only to authorize an investigation. (*Id.* P 20(4), at 14.)[3] Kull also disputes the meaning bestowed upon the August 9 letter from the management selection firm Halter & Partner. (*Id.* P 41, at 4.) Because Kull maintains that Cina first found out about Uvezian's allegations in late September of 1999, and not at a trade show in July, he also denies that Cina requested documents regarding a kickback scheme from Uvezian in July of 1999. (*Id.* P 42, at 4.) Furthermore, he takes issue with the rationale that Cina could prevent any impropriety through close scrutiny, as he says that he had no supervisors in the United States, nor did he have daily or even weekly contact with any supervisors. (*Id.* P 47, at 5.)

    3   Kull refers to an August 6 letter, although the Court assumes he is referring to the minutes of the meeting that purportedly occurred on August 4.

[*13] The second set of activities involves alleged sexual harassment by Cina. Kull asserts that, instead of being terminated because of any financial impropriety, he was terminated because he reported the sexual harassment of his wife and secretary. Both parties dispute the other's allegations having to do with the timing of events leading up to Kull's termination. According to Kull's version, on July 8, 1999, Davidoff held a company picnic in Connecticut at which Cina, Kull, and Kull's wife, Theres, were in attendance. (Pl. 56.1 Stmt. P 3.) On July 26, 1999, Mrs. Kull contacted Robert C. Edmonds, in-house counsel at Davidoff, and informed him that at the picnic, Cina had behaved in a sexually inappropriate manner towards her. (Pl. 56.1 Stmt. P 12; Letter from Edmonds to Schneider of 8/30/99, Koenigsberg Aff. of 4/3/2003 Ex G, at 3.) Meanwhile, on July 20, 1999, Kull's secretary, Alexandra Domond, reported to Edmonds that Cina had behaved in a sexually inappropriate manner toward her. (Pl. 56.1 Stmt. P 15.) Edmonds, along with Davidoff's director of human resources, conducted a preliminary investigation into the allegation on July 30. (Def. 56.1 Stmt. P 52; Letter from Edmonds to Schneider [*14] of 8/30/99, at 2.) On August 10, Edmonds informed Kull of his plans to arrange a meeting with the Oettinger principals regarding the alleged harassment. (Def. 56.1 Stmt. P 54.) On August 11, Edmonds scheduled that meeting for August 19. (E-mail from Edmonds to Schweizer [Schneider's Assistant] of 8/11/99, Bloom Aff. of 2/28/03 Ex. S.) In response, on August 13, 1999, Kull himself went to Switzerland and

informed Schneider and Schelker of the allegations against Cina. (Def. 56.1 Stmt. P 55.)

According to Defendants, although Edmonds scheduled his meeting on August 11, he did not inform them of the purpose of the meeting. (Def. 56.1 Stmt. PP 52-53.) Therefore, according to Defendants, Schneider and Schelker first heard of the allegations on August 13, when Kull informed them in person. At the scheduled August 19 meeting with Edmonds, Schneider and Schelker informed Edmonds that if the allegations were found to be true, Cina would be discharged. (*Id.* P 57.) As far as Domond's allegations are concerned, Defendants insist that her report to Edmonds was made at Kull's urging. (Def. 56.1 Stmt. P 58). Indeed, on August 16, 1999, Domond withdrew her complaint and stated she did not want [*15] to pursue "any action whatsoever" in relation to the allegations. (Letter from Edmonds to Schneider of 8/30/99, at 2.) According to Defendants, however, even though Edmonds informed them that Domond expressed her wishes to withdraw her complaint, Schneider and Schelker suggested that he continue the investigation, including interviewing Cina himself, and re-interviewing Domond and the coworker who allegedly witnessed the impropriety. (Def. 56.1 Stmt. P 59.) According to Defendants, Cina first heard of the allegations of sexual harassment on August 26, 1999. (*Id.* P 60.)

Roughly one month later, according to Kull, at the dinner party in September of 1999, Rene Hollenstein asked Uvezian to tell Cina about the incident regarding the money. Oettinger then decided to terminate Kull on February 25, 2000. (Pl. 56.1 Stmt. PP 18-19.) Defendants deny this, and aver that the money was not discussed at the dinner party, and that the decision to terminate Kull was made on August 4, pending the outcome of any investigation of the kickback scheme. (Def. Opp. 56.1 Stmt. PP 18-19, at 6-7.)

The final disputed issue underlying the above allegations and Kull's termination has to do with the terms [*16] of Kull's employment contract. A letter, dated September 23, 1986, sets forth the general terms and conditions of Kull's employment with Davidoff; Kull signed it soon after receiving it. (Letter from Oettinger to Kull of 9/23/86, Bloom Aff. of 2/28/03 Ex. V.) Notably, the letter does not state that the parties must give advance notice before dissolution of the employment relationship, or that termination could be effected only for cause. (*Id.*) The letter does, however, state that the details of the contract along with a description of the responsibilities were still being worked out. (Letter from Oettinger to Kull of 9/23/86, at 2.) Defendants claim that no such detailed contract was ever executed, while Kull maintains that they did subsequently issue a letter that stated that both parties agreed to give the other six

months' notice before terminating the employment relationship. (Def. 56.1 Stmt. P 65; Pl. Opp. 56.1 Stmt. P 65, at 6.)

Related to this issue is the handbook for employees of Davidoff. Both parties agree that the provisions of the handbook state that all employment with Davidoff is "at will," and that Davidoff could terminate an employee's employment with or without [*17] cause or notice. (Def. 56.1 Stmt. P 69.) Kull, however, argues that the language of the handbook was overridden by the contract between them. (Pl. Opp. 56.1 Stmt. P 69, at 6.)

**Standard of Review**

[HN1]Under Rule 56, an action will be dismissed on summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Silver v. City Univ. of New York,* 947 F.2d 1021, 1022 (2d Cir. 1991). [HN2]The court must view all evidence in the light most favorable to the nonmoving party. *Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)).

[HN3]Once a moving party presents appropriate support showing that there is no genuine issue of material fact, the nonmoving [*18] party must present similar support setting forth specific facts about which a genuine issue remains. Fed. R. Civ. P. 56(e); *see Anderson,* 477 U.S. at 256. The party with the burden of proof at trial must "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). [HN4]Mere conclusory allegations will not suffice. Fed. R. Civ. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir. 1994).

**Discussion**

**I. Retaliation under Title VII, the New York Executive Law, and the Connecticut Fair Employment Practices Act**

[HN5]Title VII prohibits retaliation for behavior protected under its provisions. The statute states that it is an "unlawful employment practice for an employer to

discriminate against any of his employees [*19] ... because he has opposed any practice made an unlawful employment practice ... or because he has made a charge" of an unlawful employment practice. 42 U.S.C.A. § 2000e-3(a) (West 2003). Both New York and Connecticut have similar state laws codified as part of their human rights laws. *See* N.Y. Exec. L. § 296(3-a)(c) (McKinney 2001 & Supp. 2004); Conn. Gen. Stat. § 46a-60(a)(4) (2003).

## A. Jurisdiction under the New York Executive Law

Defendants argue that Kull cannot bring a claim under the New York Executive Law because he is a non-resident complaining of acts of retaliation that occurred outside the state of New York, for which the New York statute provides no remedy. (Def. Mem. at 16.)

[HN6]Although there are exceptions, *see* N.Y. Exec. L. § 298-a, in general, acts committed outside New York against a nonresident are not covered by the New York statute. *See, e.g., Duffy v. Drake Beam Morin,* 1998 U.S. Dist. LEXIS 7215, No. 96 Civ. 5606, 1998 WL 252063, at *12 (S.D.N.Y. May 19, 1998) ("The State Human Rights Law affords no remedy to a non-New York resident who suffers discrimination outside New York State," despite that company [*20] was headquartered in New York City); *Beckett v. Prudential Ins. Co. of America,* 893 F. Supp. 234, 241 (S.D.N.Y. 1995) (New York Human Rights Law does not apply to actions taken outside New York state by non-New York corporation); *Iwankow v. Mobil Corp.,* 150 A.D.2d 272, 541 N.Y.S.2d 428, 428 (App. Div. 1st Dep't 1989) (Canadian citizen and London, England, resident who was terminated by New York corporation not covered by statute).

That Kull performed some of his duties at the New York retail store does not exempt him from this rule. Since at least 1989, when he bought his home in Riverside, Connecticut, he has been a resident of the state of Connecticut. Kull's office is in Connecticut, and the decision to terminate him was effected by a Swiss corporation in either Basel, Switzerland, where the decision was made, or Stamford, Connecticut, where the termination actually occurred.

Defendants' motion for summary judgment is therefore granted with respect to the retaliation claim under the New York Executive Law.

## B. Defendants' Status as an Employer Under Title VII and the Connecticut Fair Employment Practices Act

Defendants argue that the retaliation [*21] claims against Davidoff Direct, Davidoff of Geneva, Davidoff of Geneva Licensing, Davidoff of Geneva (USA), and Davidoff of Geneva (NY) should be dismissed, as those entities do not have enough employees to be subject to the requirements of Title VII. Similarly, they argue that three of those entities -- Davidoff Direct, Davidoff of Geneva Licensing, and Davidoff of Geneva (USA) -- each of which has zero employees, do not have enough employees to fall under Connecticut's Fair Employment Practices Act.

[HN7]Under Title VII, an employer is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ...." 42 U.S.C.A. § 2000e(b). Similarly, the [HN8]Connecticut statute requires a minimum of three employees for an entity to be subject to its provisions. Conn. Gen. Stat. § 46a-51(10) [HN9](defining employer as "any person or employer with three or more persons in such person's or employer's employ").

[HN10]The term "employer" has been construed liberally under Title VII. Accordingly, the Second Circuit [*22] uses the single employer doctrine in order to determine "whether two entities will be regarded as a single employer subject to joint liability for employment-related acts." *Murray v. Miner,* 74 F.3d 402, 404 (2d Cir. 1996). Because application of the doctrine results in the treatment of two or more ostensibly separate entities as a single, integrated enterprise, the number of employees of each entity can be aggregated when examining jurisdictional thresholds like those at issue here. *See Smith v. K&F Indus., Inc.,* 190 F. Supp.2d 643, 647 (S.D.N.Y. 2002).

There are four factors used in determining whether two entities can be considered a single employer: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1240 (2d Cir. 1995). The most important of the four factors is the second -- centralized control of labor relations. *See Cook,* 69 F.3d at 1240. No one factor is controlling, and not every factor is required. *Lihli Fashions Corp. v. NLRB,* 80 F.3d 743, 747 (2d Cir. 1996). [*23] Whether entities can be joined as a single employer is a question of fact. *Id.*

The *Cook* factors also apply to a claim brought under the CFEPA. *See Zoldak v. Tacala, Inc.,* 2000 U.S. Dist. LEXIS 21621, No. 3:99 CV 1565, 2000 WL 1576419, at *4 n.13 (D. Conn. Sept. 27, 2000) (citing *Levy v. Comm'n on Human Rights & Opportunities,* 35 Conn. App. 474, 480, 646 A.2d 893 (1994)).

Here, the economic relationships among the various Davidoff entities in the United States are significant, and Kull has raised an issue of fact as to their integrated nature. Kull submitted an affidavit stating that the enter-

prise was run in an integrated manner, sharing a board of directors and a single stockholder. (Kull Aff. PP 3-4.) The entities shared accounting, and profitability was measured for the enterprise as a whole. (*Id.* P 4.) As for centralized control of labor relations, the most important factor, the entities shared their management functions and used the same human resources departments, all from the Connecticut offices. (*Id.* P 4.) *See Smith,* 190 F. Supp.2d at 647 (use of common human resources department significant factor in finding single employer relationship).

[*24] Although the defendants are entitled to show at trial that the entities were separate and should not be integrated, for the purposes of this motion integration is a question of fact, and it is undisputed that, if integrated, the enterprise employed enough people to meet all relevant jurisdictional thresholds. Summary judgment is therefore inappropriate on those grounds.

## C. Retaliation Under Title VII and the CFEPA

[HN11]A claim for retaliation under Title VII requires proof of the following four elements: (1) the plaintiff was engaged in a protected activity; (2) the employer was aware of the participation; (3) the plaintiff was subject to an adverse employment action; and (4) there is a nexus between the activity and the action taken. *Duffy,* 1998 U.S. Dist. LEXIS 7215, 1998 WL 252063, at *6 (citing *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 465 (2d Cir. 1997)).

[HN12]Without direct evidence of retaliation, courts use the order and allocation of proof established in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir. 1995). Under this framework, once a plaintiff, establishes [*25] a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. If the defendant is successful, the plaintiff must prove by a preponderance of the evidence that the defendant's proffered reason was pretextual, and was instead an unlawful retaliation. *Id.*

[HN13]The analysis for a retaliation claim is substantially the same under the CFEPA as under Title VII. *See Arnold v. Yale New Haven Hosp.,* 213 F. Supp.2d 142, 151 (D. Conn. 2002) (citing *Brittell v. Dep't of Correction,* 247 Conn. 148, 164, 717 A.2d 1254 (1998); *Pascal v. Storage Tech. Corp.,* 152 F. Supp.2d 191, 196 n.1 (D. Conn. 2001) (citations omitted).

### 1. Kull's Prima Facie Case

Here, neither side disputes that Kull engaged in a protected activity. An internal complaint of discrimination, such as Kull's notification to Schneider and

Schelker of Cina's alleged harassment, satisfies that prong. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 65 (2d Cir. 1992). Likewise, Kull's termination is unquestionably an adverse act. The disputed issues here, therefore, relate to the second and [*26] fourth prongs: whether Defendants were aware of Kull's actions before deciding to terminate him, and, if so, whether his protected actions were, in fact, the reason for his termination.

Kull must demonstrate that Defendants were aware of his activity regarding the sexual harassment claims at the time they decided to terminate him. Defendants insist that the decision to terminate Kull was originally made at the August 4, 1999, meeting, pending confirmation of his wrongdoing. (Def. Mem. at 21.) Although Theres Kull and Alexandra Domond had already approached Edmonds, Davidoff's in-house counsel, about their alleged harassment by Cina, and Edmonds had begun his investigation, Defendants maintain that the board of directors was not aware of the allegations until Kull himself informed Schelker and Schneider on August 13, 1999. (Def. Mem. at 22.)

Kull, on the other hand, states that because Kull notified Edmonds, the corporation as a whole should be treated as having knowledge of his allegations prior to the August 4, 1999, meeting. (Pl. Opp. at 15.) Kull cites *Old Republic Ins. Co. v. Landauer Assoc., Inc.,* 1989 U.S. Dist. LEXIS 13422, No. 88 Civ. 434, 1989 WL 652570 (S.D.N.Y. Nov. 9, 1989), for [*27] the proposition that notice to an officer can be imputed to the corporation. *Landauer Assoc.,* however, involved the construction of a insurance policy. There, the senior vice president did not disclose a potential claim against the insured company. Imputing the officer's knowledge to the corporation itself, the court excluded the undisclosed claim from the corporation's coverage. 1989 U.S. Dist. LEXIS 13422, [WL] at *8.

Although that case is distinguishable on a number of grounds (as Defendants point out), similar imputation of knowledge has been used in the Title VII context. [HN14]In a number of cases, the courts have imputed to the employer knowledge held by an employer's agent, such as a supervisor, of unlawful actions in order to hold the employer itself liable for those actions. For example, in *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir. 1998), the plaintiff sued her employer for the hostile work environment created by the sexual harassment of her coworker. Because the harassment was attributable to a coworker, however, rather than a supervisor, the company was liable only for its own negligence; therefore, an important issue existed as to whether the company knew or should have [*28] known of the situation. 157 F.3d at 63. But because the plaintiff had informed her (and her coworker's) immediate supervisor, and because that su-

pervisor had a duty to relay sexual harassment complaints to the company, the court imputed the supervisor's knowledge of the harassment to the company itself. [4] *Id.* at 64. Similarly, *Torres v. Pisano,* 116 F.3d 625 (2d Cir.), *cert. denied,* 522 U.S. 997, 139 L. Ed. 2d 404, 118 S. Ct. 563 (1997), also involved sexual harassment in the workplace -- this time by an immediate supervisor. The plaintiff there complained to Pisano, the supervisor who was in charge of the department and who became the harasser's immediate supervisor. 116 F.3d at 628. The court imputed Pisano's knowledge to the employer. *Id.* at 636-37. The knowledge was imputed on the grounds that, as the harasser's supervisor, Pisano had a duty to act on the information and stop the harassment, and on the alternative grounds that Pisano had a duty to inform the employer of the harassment. *Id.* at 637.

> 4   The court's imputation was based both on general agency principles as well as the company's express written policy. 157 F.3d at 64.

[*29]  Here, however, Kull is attempting to impute the knowledge, not of the harassing behavior itself, but of his protected activity; that is, his complaints about the harassment to Edmonds. Although most cases involving imputation of knowledge in the Title VII context involve the former, at least one court has also imputed knowledge of the protected activity. *See Sales v. YM & YWHA of Washington Heights & Inwood,* 2003 U.S. Dist. LEXIS 839, Nos. 00 Civ. 8641, 01 Civ. 1796, 2003 WL 164276, at *7-8 (S.D.N.Y. Jan. 22, 2003) (employee complained of harassment to mid-level supervisor; knowledge of complaint imputed to the Y) (citing *Torres,* 116 F.3d at 636-37) .

[HN15]To establish a prima facie case, however, Kull must still demonstrate a connection between his protected activity -- alerting members of the corporation to Cina's alleged harassment -- and his termination. With respect to proving this connection, then, the question as to whether the knowledge of the protected activity can be imputed is more or less beside the point. Without actual knowledge, it would be illogical to find that Oettinger's termination of Kull was retaliatory. [5]

> 5   Likewise, in *Sales,* the plaintiff's retaliation claim was dismissed because, although the court imputed the knowledge of the protected activity to the Y, the plaintiff could show no causal connection between the protected activity and his termination. 2003 U.S. Dist. LEXIS 839, 2003 WL 164276, at *8.

[*30]  However, there is an issue of material fact as to whether Schneider and Schelker had actual knowledge of Kull's actions with respect to Cina before deciding to terminate Kull. Because Kull informed Edmonds of the harassment, and Edmonds had to communicate with Schneider and Schelker in order to set up the meeting regarding the harassment, an issue of fact is raised as to whether they had actual knowledge of the allegations before August 13, when Kull informed them himself. [6] (*See* Pl. Opp. at 15.) Furthermore, Kull maintains that investigation into any financial impropriety did not begin until after the dinner party on September 27, 1999, when Hollenstein asked Uvezian to inform Cina about his relationship with Kull. (*Id.* at 16; Uvezian Dep. at 116-18.) Although Cina testified that Uvezian told him about a kickback scheme in July of 1999 (Cina Dep. at 103-04), his testimony conflicts with Uvezian's testimony denying that he mentioned it to Cina in July (Uvezian Dep. at 122). The dinner party referred to was well after Schelker and Schneider, as well as Cina, were made aware of Kull's complaints about Cina. [HN16]The Court cannot resolve conflicting testimony on a motion for summary [*31] judgment.

> 6   The e-mail from Edmonds to Schweizer, Schneider's assistant, setting up the meeting, however, does not mention the reason for the meeting. (E-mail from Edmonds to Schweizer of 8/11/99.)

Finally, Kull was not actually terminated until February 25, 2000, and he disputes the validity of the August 4 meeting minutes that Defendants have put into evidence. Because of the numerous disagreements surrounding the timing of the events -- including the conflict between Cina's and Uvezian's testimony -- issues of fact abound as to Oettinger's actual knowledge of Kull's allegations regarding Cina.

As for the fourth prong, [HN17]a Title VII retaliation claim plaintiff must show that "the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent." *Treglia v. Town of Manlius,* 313 F.3d 713, 720 (2d Cir. 2002). In the absence of direct evidence of a retaliatory motive, the requisite nexus between the protected activity and the adverse employment action [*32]  can be shown through a close temporal proximity. *Id.* (citing *Cifra v. GE,* 252 F.3d 205, 217 (2d Cir. 2001)). Although there is no bright-line rule, a variety of time limits within a year have been used to raise a question regarding the nexus between a protected activity and retaliatory action. *See Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554-55 & n.5 (2d Cir. 2001) (collecting cases).

Construing the facts in the light most favorable to Kull, it is possible that Hollenstein learned of the alleged kickback scheme in 1995 and did nothing about it. Further, Oettinger's principals could have known of the alleged harassment perpetrated by Cina at least by August 4, 1999, when the board decided to terminate him, pend-

ing the results of an investigation. In the alternative, it could be found that the allegations were first brought to Oettinger's attention in September of 1999, soon after Kull made his allegations of sexual harassment, and were acted upon soon thereafter. In any event, Oettinger's subsequent written decision of February 25 to terminate Kull is in close enough proximity to raise an issue of fact as to the causal [*33] link between Kull's protected activity and his termination.

### 2. Defendants' Proffered Legitimate, Non-Retaliatory Reason for Kull's Termination

Defendants must articulate a legitimate, non-retaliatory reason for Kull's termination. Defendants maintain that their decision to terminate Kull's employment had nothing to do with his report of Cina's sexual harassment, but rather was the result of their reasonable belief that Kull had solicited and accepted kickbacks from Uvezian. (Def. R. Mem. at 6.)

As described above, Defendants maintain that, once they heard of the allegations of the kickbacks, when Uvezian told Cina in July of 1999 at the trade show in Las Vegas, they immediately began considering Kull's termination. This process began, they state, before Schneider and Schelker heard of Kull's allegations of sexual harassment on August 13, or when Cina first heard about the allegations on August 26. (Def. Mem. at 22.) To prove that the termination procedure was already underway, Defendants have submitted the minutes of the August 4 meeting and the August 9 letter from Halter & Partner, the managerial recruitment firm.

In support of their allegations that Kull was taking kickbacks [*34] from Uvezian, Defendants have put forth the deposition of Uvezian, in which he testified that Kull placed orders for his cigars at a price of $ .25 more per cigar than Uvezian gave on his price list (Uvezian Dep. at 36), and that Uvezian deposited the money into an account opened in May of 1999 in Puerto Rico and either issued checks from that account to Kull or, after Oettinger bought Uvezian's trademark, paid Kull cash. (Def. Mem. at 23; Uvezian Dep. at 66-68, 70-71, 78.) Additionally, they submit deposits made to the Puerto Rican bank, checks drawn, and a chart of all payments made. (Uvezian Aff. Exs. A-E.)

Uvezian's deposition, affidavit, and minutes of the meeting satisfy the Defendants' burden of production with respect their legitimate, non-retaliatory reason for terminating Kull.

[HN18]Kull can defeat Defendants' motion for summary judgment by "producing sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false and that discrimination was the real reason." *Rose v. James River Paper Co.,*

*2 F. Supp.2d 245, 253 (D. Conn. 1998).* Kull, in fact, raises a number of factual issues regarding the validity of Defendants' [*35] assertions. Fundamentally, Kull states the exchange of money between Uvezian and him was a loan, and one that Uvezian himself suggested. (Kull Dep. at 100.) Additionally, as stated above, Kull asserts that, contrary to Defendants' assertions, Uvezian first informed Hollenstein of his financial arrangements with Kull in 1995, long before Defendants acted on the information. (Uvezian Dep. at 48-49.) Although Defendants indicate that the information Hollenstein received was quite vague and not something that would normally be cause for further investigation (Hollenstein Dep. at 18-19), Uvezian's deposition testimony appears to relate a very specific description of the transactions (Uvezian Dep. at 49), and therefore an issue of fact exists as to whether Hollenstein knew of Kull's and Uvezian's arrangement and chose to do nothing about it. Uvezian testified that, at Hollenstein's urging, he told Cina about the financial scheme at a dinner party at Cina's residence in Zurich in September of 1999. (Uvezian Dep. at 116-17.) Oettinger's lack of action until after Kull reported Cina's alleged behavior therefore raises an issue of fact as to the defendants' motive.

There are also conflicting [*36] accounts as to the amount of money at issue. In Defendants' version of the story, Davidoff paid an extra $ .25 for each cigar in the AVO brand, an amount that would have added up to approximately $ 50,000. (*See* Uvezian Aff. P 10 & Ex. B (chart listing all sales of AVO XO cigars and payments from Uvezian to Kull between Jan. 10, 1994, and May 20, 1997).) Kull states, however, that Uvezian's submitted records include bank deposit statements equaling only $ 22,500. (Uvezian Aff. Ex. A; *see also* Pl. Opp. at 8-9.) Kull states that he repaid the loan of $ 22,500 on June 6, 2000, after his termination. (Letter from Kull to Uvezian of 6/6/00 & Check from Kull to Uvezian of 6/6/00, Koenigsberg Aff. of 4/3/03 Ex. M.) Uvezian testified that further cash payments were made out of his own account after he sold his trademark (Uvezian Dep. at 71); however, he stated at another point that he wanted clear records of any transactions and therefore did not want to deal in cash (Uvezian Dep. at 67-68.) The timing issues discussed above also contribute to the factual dispute. In any event, Kull vehemently denies taking kickbacks (Kull Dep. at 124), and the issue is unquestionably a disputed one.

[*37] In short, the total disagreement between the parties regarding both the kickback and harassment claims makes disposition by summary judgment on both the Title VII and the CFEPA claims impossible. [7]

7 Kull also brought to the Court's attention the Supreme Court case *Desert Palace, Inc. v. Costa,*

539 U.S. 90, 156 L. Ed. 2d 84, 123 S. Ct. 2148 (2003), regarding a mixed-motive instruction to a jury in a Title VII case. Although the issue of mixed motives may come up during the course of trial, the issue is not relevant to the current motions.

## II. Kull's Contract Claims

The crux of Kull's contract claims has to do with the amount of notice given before he was terminated. According to Kull, his contract with Davidoff required both parties to give the other at least six months' notice before terminating the employment relationship. Because Oettinger and Davidoff gave Kull no notice, Kull is suing for breach of contract and other related claims. [8]

8 Defendants argue that Connecticut law should govern Kull's contract claims. (Def. Mem. at 26-27.) Although Kull does not directly contest this, he cites both Connecticut and New York law in his discussion regarding his contract claims. (Pl. Opp. at 26.) [HN19]Pursuant to New York choice-of-law rules, contract claims are governed by a "center of gravity" or "grouping of contacts" test, under which courts apply factors such as the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 (2d Cir.), cert. denied, 522 U.S. 864, 139 L. Ed. 2d 112, 118 S. Ct. 169 (1997) (quoting *Brink's Ltd. v. S. African Airways,* 93 F.3d 1022, 1030-31 (2d Cir. 1996), cert. denied, 519 U.S. 1116, 136 L. Ed. 2d 845, 117 S. Ct. 959 (1997) (citing *In re All-state Ins. Co. & Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 908, 613 N.E.2d 936 (N.Y. 1993))). The places of contracting and performance are given the greatest weight. *Id.*

In this particular case, neither party directly addresses the location of contract, although Kull states in his deposition that the original place of business for the United States operations was New York. (Kull Dep. at 45.) However, Kull cites primarily Connecticut law and, absent further evidence on the issue, the Court will apply Connecticut law.

[*38] A. Breach of Contract

[HN20]Under Connecticut law, "all employer-employee relationships not governed by express contracts involve some type of implied 'contract' of employment." *Torosyan v. Boehringer Ingelheim Pharms., Inc.,* 234 Conn. 1, 13, 662 A.2d 89 (1995). Generally, contracts of permanent employment for an indefinite term are at-will. *Id. at 14* (citing *D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.,* 202 Conn. 206, 211 n.1, 520 A.2d 217 (1987)). The parties can modify this default rule by agreement. *Id. at 15.*

In order to prevail on his claim that the contract between Davidoff and Kull did, in fact, contain a clause requiring six months' notice before termination, Kull must put forth evidence showing that Davidoff "agreed, either by words or action or conduct, to undertake any form of actual contract commitment" requiring such notice before termination. *Therrien v. Safeguard Mfg. Co.,* 180 Conn. 91, 94-95, 429 A.2d 808 (1980), quoted in *D'Ulisse-Cupo,* 202 Conn. at 211 n.2.

Although the original letter of September 23, 1986, which lays out the employment agreement between Kull and [*39] Davidoff, mentions nothing about the required notice period prior to termination, the letter explicitly states that a more detailed contract will follow. Both parties agree that this more detailed instrument never materialized; however, Kull testified in his deposition that he received a letter signed by Schelker after his employment began. (Kull. Dep. at 51-52.) That letter, he testified, contained a reciprocal agreement between Kull and Oettinger to give six months' notice before termination -- desirable because of the distance between the operations. Kull also testified that Schelker contacted him about the agreement. (*Id.* at 51.)

Although Defendants deny that such a letter ever existed, and Kull cannot produce the letter, claiming it was missing when he cleaned his office (Kull Dep. at 51), Kull's testimony at least raises an issue of fact with respect to his claim. *See Torosyan,* 234 Conn. at 12, 662 A.2d at 96 (in trial over contract dispute in which plaintiff stated that defendants made statements regarding his job security and defendants denied having made statements, trial court found the plaintiff's version to be credible).

Defendants cite two cases [*40] to support their assertion that Kull's testimony alone is insufficient to raise an issue of fact: *Drew v. Sears, Roebuck & Co.,* 1997 U.S. Dist LEXIS 23843, at *39, No. 3:95 CV 1746 (D. Conn. Feb. 24, 1997), and *Reynolds v. Chrysler First Commercial Corp.,* 40 Conn. App. 725, 732, 673 A.2d 573 (1996). In *Drew,* however, the court stated specifically that the plaintiff did not "set forth any oral representations made by Defendant that would give rise to an implied contract." 1997 U.S. Dist. LEXIS 23843, at *39. In *Reynolds,* similarly, the plaintiff put forth no other evidence than his own feelings and beliefs about the existence of a contract. 40 Conn. App. at 732. Here, in contrast, Kull has testified to behavior that could potentially give rise to a contract.

Defendants also refer to the Davidoff personnel manual to defeat Kull's claim. The manual in question states that all contracts are at-will, and that termination may be effected at any time without notice. (Davidoff Personnel Manual, Bloom Aff. of 2/28/03 Ex. W, at 2.) However, its existence does not foreclose the possibility that Kull had a different contract [*41] with Davidoff. [HN21]Terms of an employment contract can differ from the provisions set forth in general company literature. *See Torosyan, 234 Conn. at 13-14* (in order to find that implied employment contract incorporates representations in employee publication, trier of fact required to find that issuance of handbook was offer that employee then accepted); *see also Tutko v. James River Paper Co.,* No. 3:96 CV 1256, 1998 U.S. Dist. LEXIS 20664, at *18 (D. Conn. Nov. 12, 1998), *aff'd,* 199 F.3d 1323 (2d Cir. 1999) (company's strategy statements did not create implied contract to terminate only for cause because, even if characterized as offers, no evidence that plaintiff accepted) (citing *Torosyan, 234 Conn. at 13-14*).

Defendants' motion for summary judgment on Kull's breach of contract claim is therefore denied.

## B. Promissory Estoppel

[HN22]In Connecticut, a claim for promissory estoppel has three prongs: (1) a clear and definite promise; (2) a change in position in reliance; and (3) resulting injury. *Hood v. Aerotek, Inc.,* 2002 U.S. Dist. LEXIS 3513, No. 3:98 CV 1524, 2002 WL 294762, at *5 (D. Conn. Feb. 19, 2002); *see also D'Ulisse-Cupo, 202 Conn. at 213* [*42] ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." (quoting Restatement (Second) of Contracts § 90)).

Promissory estoppel is a doctrine often used in the absence of a contractual relationship -- for instance, where consideration is lacking -- to place liability on the promisor. *Stewart v. Cendant Mobility Servs. Corp., 267 Conn. 96, 104, 837 A.2d 736 (2003).* It is therefore not inconsistent to find the absence of a contract, yet find liability based on promissory estoppel. *Stewart, 267 Conn. at 110.*

This particular case does the opposite. As mentioned above, an issue of fact exists as to the contract claim; that is, there is an issue of fact as to an offer with respect to the alleged six months' notice provision. Such offer is a promise, satisfying the first prong of the inquiry. *Stewart, 267 Conn. at 105* ("Although 'an offer is nearly always a promise,' all promises are not offers.") (quoting [*43] 1 E. Farnsworth, *Contracts* § 3.3, at 188 (2d ed. 1998)).

Where Kull's claim falls short, however, is the second prong: reliance. Kull has not put forth any evidence of reliance on the alleged promise of six months' notice before termination. Kull does claim that he did not actively seek other employment. (Pl. Opp. at 27; Kull Dep. at 283.) [HN23]Mere lack of seeking another job, however, is not the sort of change in position that can be used to support a claim of promissory estoppel. In *Tutko,* for example, the defendant's motion for summary judgment on plaintiff's promissory estoppel claim was granted when plaintiff could not prove detrimental reliance. 1998 U.S. Dist. LEXIS 20664, *20-21. The plaintiff in *Tutko* merely said he "had never entertained the thought of leaving." 1998 U.S. Dist. LEXIS 20664, at *21. Here, similarly, Kull has put forth no evidence that he detrimentally relied on the alleged promise of six months' notice before termination. Defendants' motion for summary judgment as to Kull's promissory estoppel claim, therefore, is granted.

## C. Breach of the Covenant of Good Faith and Fair Dealing

[HN24]Under Connecticut law, "every contract carries an implied covenant of [*44] good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon,* 224 Conn. 231, 238, 618 A.2d 501 (1992). The claim exists to "fulfill the reasonable expectations of the contracting parties as they presumably intended." *Magnan v. Anaconda Indus., Inc.,* 193 Conn. 558, 567, 479 A.2d 781 (1984). The claim is separate from and can be maintained in addition to a breach of contract claim. *Martin v. Dupont Flooring Sys., Inc.,* 2004 U.S. Dist. LEXIS 9373, No. 3:01 CV 2189, 2004 WL 726903, at *6 (D. Conn. Mar. 31, 2004) (citing *Buckman v. People Express, Inc.,* 205 Conn. 166, 170-71, 530 A.2d 596 (1987)). [HN25]The elements of this claim are as follows: (1) plaintiff and defendant entered into a contract under which the plaintiff had a reasonable expectation of benefits; (2) the defendant undertook actions that undermined the plaintiff's right to collect certain benefits; and (3) the defendant acted in bad faith. *Martin,* 2004 U.S. Dist. LEXIS 9373, 2004 WL 726903, at *7 (citing *Fairfield Fin. Mortgage Group, Inc. v. Salazar,* 2002 Conn. Super. LEXIS 1352, No. CV 000339752S, 2002 WL 1009809, [*45] at *3 (Conn. Super. Ct. Apr. 23, 2002)). [HN26]"Bad faith means more than more negligence; it involves a dishonest purpose." *Habetz, 224 Conn. at 237.* Furthermore, [HN27]in a termination case, an at-will employee "must establish that his dismissal was for a demonstrably improper reason, the impropriety of which is derived from a violation of some important public policy." *Rose, 2 F. Supp.2d at 255* (citing *Johnson v. Chesebrough-Pond's,* 918 F.

Supp. 543, 550 n.4 (D. Conn. 1996)); *see also Magnan, 193 Conn. at 572*.

As set out in the section discussing Kull's retaliation claims, Kull has raised issues of material fact as to Defendants' retaliatory termination, which, if true, would violate an important public policy as set forth in Title VII. However, if there is an adequate remedy under statutory law, then the claim cannot stand separately. [HN28]"A plaintiff bringing a claim for violation of the implied covenant of good faith and fair dealing must also establish that he does not otherwise have an adequate means of vindicating that public policy." *Rose*, 2 F. Supp.2d at 255 (dismissing claim because plaintiff had adequate [*46] remedy under Age Discrimination in Employment Act); *Tutko*, 1998 U.S. Dist. LEXIS 20664, at *23-24 (same). [9] Here, because an adequate remedy is potentially provided under both Title VII and CFEPA, Kull's claim is entirely duplicative, and defendants' motion for summary judgment with respect to Kull's claim for breach of the implied covenant of good faith and fair dealing is granted.

9 Both *Rose* and *Tutko* cite *Bennett v. Beiersdorf, Inc.*, 889 F. Supp. 46, 49 (D. Conn. 1995), in which the federal district court denied the plaintiff's claim for breach of the implied covenant of good faith and fair dealing for race discrimination in her employment, because of the existence of sufficient remedy under the federal statutory scheme. *Bennett*, in turn, cites *Atkins v. Bridgeport Hydraulic Co.*, 5 Conn. App. 643, 648, 501 A.2d 1223 (1985), a much-cited Connecticut appellate case. *Atkins* discussed a common law wrongful discharge claim, and also required a violation of public policy and the absence of sufficient remedy. More recently, the Connecticut Supreme Court decided *Burnham v. Karl & Gelb, P.C.*, 252 Conn. 153, 158-59, 745 A.2d 178 (2000), in which it discussed *Atkins* and affirmed its holding, again in the context of a common law wrongful discharge claim. The decision was not unanimous, however, and although the dissent agreed with the basic premise (and cited *Bennett*), it pointed out that the remedy under federal statutory law ought to be truly sufficient, and not an inadequate administrative process, as it believed to be the case in *Burnham. 252 Conn. at 172* (McDonald, C.J., dissenting). The dissent also noted that the requisite public policy violation can be predicated on the violation of public policy expressed in a federal statute, as here. *Id.* (quoting *Faulkner v. United Technologies Corp.*, 240 Conn. 576, 585-86, 693 A.2d 293 (1997)). In Kull's case, the statutory remedy is

sufficient, and fits within both the dissenting and majority opinions of *Burnham*.

[*47] **D. Unjust Enrichment**

[HN29]"'A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another.'" *Gagne v. Vaccaro*, 255 Conn. 390, 408, 766 A.2d 416 (2001) (quoting *Franks v. Lockwood*, 146 Conn. 273, 278, 150 A.2d 215 (1959)) (other citations omitted). The elements of the claim are that (1) the defendant benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and (3) the failure of payment was to the plaintiff's detriment. *Gagne, 255 Conn. at 409* (citations omitted).

Kull brings this cause of action based on the lack of notice given to him by Davidoff, discussed above. Defendants assert that Kull's recovery under the doctrine of unjust enrichment is barred because his behavior in accepting kickbacks would prevent his receiving an equitable remedy. *See Bauer v. Waste Mgmt. of Conn., Inc.*, 239 Conn. 515, 525, 686 A.2d 481 (1996) (discussing defense of unclean hands to equitable relief). Defendants also argue [*48] the claim fails because of Kull's lack of proof of the agreement, and because he does not allege that he was not paid for the work he performed. (Def. Mem. at 32-33.)

As stated above, there are material issues of fact with regard to both the notice provision of the parties' employment contract, as well as Kull's alleged acceptance of kickbacks. However, if it is shown at trial that Kull and Davidoff did have an enforceable contract requiring notice before termination, then such contract would bar Kull's recovery under an unjust enrichment theory. [HN30]"Unjust enrichment applies whenever 'justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract ....' Indeed, lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." *Gagne v. Vaccaro*, 255 Conn. at 401 (quoting 12 S. Williston, *Contracts* § 1479, at 272 (3d ed. 1970)).

Furthermore, it is not alleged that Defendants withheld pay for any work performed by Kull. *See Mitchell v. Town of Orange*, 2001 Conn. Super. LEXIS 3611, No. CV 000069298S, 2001 WL 1707084, at *2 (Conn. Super. Ct. Dec. 20, 2001) ("It is [*49] also true, in an analysis of unjust enrichment, that the town did not receive any benefit from plaintiff for which it did not pay.")

Because Kull potentially has a remedy under contract law, his claim under the doctrine of unjust enrichment is dismissed.

## III. Kull's Tort Claims

Kull claims that Defendants' retaliatory termination of his employment after falsely accusing him of receiving kickbacks constitutes intentional and negligent infliction of emotional distress. [10]

> 10   Kull also apparently bases his claim upon the theory that Cina's harassment of Mrs. Kull constitutes an infliction of emotional distress upon Kull. Defendants state that Kull does not meet the evidentiary requirements for a plaintiff to make a claim for bystander liability, including that of severe physical injury or death on the part of the victim. *See Clohessy v. Bachelor*, 237 Conn. 31, 56, 675 A.2d 852 (1996). Because summary judgment is denied on other grounds, the Court does not address this issue.

### A. [*50]   Intentional Infliction of Emotional Distress

[HN31]Under Connecticut law, to establish a claim for intentional infliction of emotional distress, a plaintiff must prove the following: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Stonington*, 254 Conn. 205, 210, 757 A.2d 1059 (2000) (citing *Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986)).

[HN32]The primary dispute here has to do with the second prong: the extreme or outrageous nature of the conduct. Whether the defendant's conduct is sufficient to satisfy the extreme and outrageous standard is a question, in the first instance, for the Court. *Etienne v. Wal-Mart Stores, Inc.*, 186 F. Supp.2d 129, 136 (D. Conn. 2001). Where reasonable minds can differ, however, it becomes an issue for the jury. *Bell v. Bd. of Educ. of West Haven*, 55 Conn. App. 400, 410, 739 A.2d 321 (1999) [*51] (citing *Mellaly v. Eastman Kodak Co.*, 42 Conn. Supp. 17, 18-19, 597 A.2d 846 (Conn. Super. Ct. 1991)). The conduct in question must exceed "'all bounds usually tolerated by decent society.'" *Appleton*, 254 Conn. at 210 (quoting *Petyan*, 200 Conn. at 254 n.5 (quoting W. Prosser & W. Keeton, *Torts* § 12, at 60 (5th ed. 1984))).

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

*Appleton*, 254 Conn. at 210-11 (2000) (quoting 1 Restatement (Second) of Torts § 46 cmt. d, at 73 (1965)).

[HN33]Both Connecticut and federal courts in this circuit have been reluctant to find conduct of defendants to be extreme and outrageous. *See Etienne*, 186 F. Supp. 2d at 137-38 (collecting cases). However, [*52] extreme or outrageous conduct "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." 1Restatement (Second) of Torts § 46 cmt. e, *quoted in Mellaly*, 42 Conn. Supp. 17, 20, 597 A.2d 846 (employer who taunted employee about his alcoholism and harassed in other ways when he knew of employee's disease of alcoholism reached required threshold of outrageousness).

*Talit v. Peterson*, 44 Conn. Supp. 490, 692 A.2d 1322 (Conn. Super. Ct. 1995), a similar case to the current one, involved a plaintiff who alleged that defendants criticized her and caused her to lose her employment in retaliation for filing a grievance. The court found that the claim survived a motion to dismiss. 44 Conn. Supp. at 497-98. At a minimum, the court stated, reasonable minds could differ as to whether the conduct was extreme and outrageous, and the question therefore had to go to a jury. *Id.* at 498 (citing 1 Restatement (Second) of Torts § 46 cmt. h). *See also* [*53] *Nguyen v. Newberry Industries, Inc.*, 1997 Conn. Super. LEXIS 3120, No. CV 970571319, 1997 WL 746442, at *5 (Conn. Super. Ct. Nov. 14, 1997) (encouragement to conceal work-related injury followed by termination within statute of limitation period for filing workers' compensation claim, plus additional conduct, potentially extreme and outrageous).

Kull has presented evidence which, when construed in the light most favorable to him, could show that he was an innocent employee whose whose spouse and secretary were harassed, and when he reported the matter, he was accused of accepting kickbacks and then terminated. There are issues appropriate for determination by a jury, including whether Defendants' behavior was extreme and outrageous, and Defendants' claim for summary judgment as to Kull's claim of intentional infliction of emotional distress is therefore denied.

## B. Negligent Infliction of Emotional Distress

[HN34]To succeed on a claim for negligent infliction of emotional distress, a plaintiff must prove that the defendant should have: (1) realized its conduct involved an unreasonable risk of causing plaintiff distress; and (2) realized the distress, if caused, might result in illness or bodily [*54] harm. *Etienne v. Wal-Mart Stores, Inc.,* 186 F. Supp.2d 129, 138 (citing *Barrett v. Danbury Hosp.,* 232 Conn. 242, 260-61, 654 A.2d 748 (1995)). [HN35]In the work context, a claim for negligent infliction of emotional distress arises only when it is based upon unreasonable conduct of the defendant during the termination process. *Perodeau v. City of Hartford,* 259 Conn. 729, 744, 762-63, 792 A.2d 752 (2002).

Defendants argue that because there is no evidence - - and Kull does not allege -- that Schelker acted unreasonably when he went to Kull's office to terminate him, the claim must fail. (Def. Mem. at 35-36.) The requirement that the behavior be linked to the termination process, however, has been interpreted more broadly under Connecticut law. Courts have dismissed plaintiffs' claims when, for instance, he or she remains employed, *see, e.g.,* *White v. Martin,* 23 F. Supp.2d 203, 208 (D. Conn. 1998); *Perodeau,* 259 Conn. at 744, or if the termination was wrongful, but involved no egregious conduct, *see, e.g.,* *Belanger v. Commerce Clearing House, Inc.,* 25 F. Supp.2d 83, 84-85 (D. Conn. 1998) (no [*55] claim where defendant stated it would consider plaintiff for open position, then terminated her, because plaintiff alleged no inconsiderate, humiliating, or embarrassing actions); *Parsons v. United Techs. Corp.,* 243 Conn. 66, 88-89, 700 A.2d 655 (1997) ("The mere termination of employment, even where it is wrongful, is ... not, by itself, enough to sustain a claim for negligent infliction of emotional distress."); *Pavliscak v. Bridgeport Hosp.,* 48 Conn. App. 580, 598, 711 A.2d 747, *cert. denied,* 245 Conn. 911, 718 A.2d 17 (1998) (at-will employee termination in private, albeit without warning, did not satisfy requirements for negligent infliction of emotional distress). In contrast, Kull's allegations of retaliation and accusations, for which he has sufficiently raised factual issues, are closely enough related to the "termination process" to fit within this requirement of the claim. *See, e.g.,* *Copeland v. Home & Cmty. Health Servs., Inc.,* 285 F. Supp.2d 144, 153 (D. Conn. 2003) (insensitivity about health problems and related inflexibility about return date to work, resulting in termination, stated claim); *Grossman v. Computer Curriculum Corp.,* 131 F. Supp.2d 299, 309-10 (D. Conn. 2000) [*56] (false accusations about job performance, bad-mouthing to customers, and other efforts designed to bring about termination satisfied requirement that conduct involve termination process).

Defendants' motion for summary judgment with respect to Kull's claim for negligent infliction of emotional distress is therefore denied.

## IV. Defendants' Tort Claims

Defendants Oettinger and Davidoff of Geneva (CT), Inc., bring counterclaims against Kull for breach of his fiduciary duty of loyalty and for tortious interference with contract advantage or tortious interference with prospective economic advantage. For these claims, Kull argues that New York law should apply (Pl. R. Mem. at 10); Defendants argue that Connecticut law applies (Def. Opp. at 11).

[HN36]"A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir. 1989) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)). Therefore, New York's choice of law rules govern the choice in this case.

[HN37]Under New York law, a [*57] claim for breach of fiduciary duty against a corporation is governed by the law of the relevant company's state of incorporation -- here, Connecticut. [11] *High View Fund, L.P. v. Hall,* 27 F. Supp.2d 420, 428 n. 6; *Hart v. General Motors Corp.,* 129 A.D.2d 179, 517 N.Y.S.2d 490, 492 (App. Div. 1st Dep't 1987) (citing *Diamond v. Oreamuno,* 24 N.Y.2d 494, 248 N.E.2d 910, 301 N.Y.S.2d 78, 85 (N.Y. 1969)).

> 11    Although Oettinger AG is incorporated in Switzerland, [HN38]neither side has argued that Swiss law be applied. It is therefore initially assumed that Swiss law is the same as Connecticut law, and either party may challenge that assumption at any time in the litigation by providing "reasonable written notice" of its intent to raise the issue. Fed. R. Civ. P. 44.1; *see also* *Fairmont Foods Co. v. Manganello,* 301 F. Supp. 832, 837 (S.D.N.Y. 1969).

The governing law for Defendants' claim for tortious interference is also chosen [*58] using New York's choice of law rules. [HN39]In tort cases, New York courts apply an "interest analysis," under which the law of the jurisdiction with the greatest interest in the matter is applied. *AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir. 1992); *see also* *Babcock v. Jackson,* 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743, 749 (N.Y. 1963). [HN40]Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 480 N.E.2d 679, 491 N.Y.S.2d

*90, 95 (N.Y. 1985)*. "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc., 81 N.Y.2d 66, 612 N.E.2d 277, 595 N.Y.S.2d 919, 922 (N.Y. 1993)*.

Although it is true, as Kull argues, that Davidoff of Geneva (NY) is a New York corporation, and that Uvezian's cigars were sold in New York (Pl. R. Mem. at 10), Davidoff of Geneva (NY) is not a party to the counterclaims. Davidoff of Geneva (CT), one of the counterclaiming defendants, [*59] is incorporated in Connecticut. (Cmplt. P 8).

Furthermore, the location of the torts is focused in Connecticut. Kull's office was in Connecticut, and the majority of Davidoff employees worked in Connecticut. That AVO cigars were sold in New York does not change the result of the inquiry. Therefore, the Court will apply Connecticut law to both of Defendants' counterclaims.

### A. Kull's Defenses

As a preliminary matter, Kull has raised two defenses to Defendants' counterclaims, discussed briefly below.

### 1. Accord and satisfaction

Kull argues that his repayment of the loan to Uvezian results in accord and satisfaction, and that therefore Defendants cannot maintain their claims. (Pl. Mem. at 13.)

[HN41]"'Without a mutual assent, or a meeting of the minds, there cannot be a valid accord.' Whether a meeting of the minds has occurred is a factual determination." *M.J. Daly & Sons, Inc. v. City of West Haven, 66 Conn. App. 41, 48, 783 A.2d 1138*, cert. denied, *258 Conn. 944, 786 A.2d 430 (2001)* (quoting and citing *Munroe v. Emhart Corp., 46 Conn.App. 37, 42-43, 699 A.2d 213*, cert. denied, *243 Conn. 926, 701 A.2d 658 (1997))*.

Because [*60] issues of fact exist as to whether money is still outstanding and whether Defendants intended to release Kull of those sums, Kull's defense of accord and satisfaction fails.

### 2. Waiver and the Statute of Limitations

Kull argues that, by waiting for five years after Uvezian informed Hollenstein about the arrangement with Kull, Defendants have waived their right to sue for tortious interference. (Pl. Mem. at 13.) [HN42]"Waiver is the intentional relinquishment of a known right."

*Wadia Enters., Inc. v. Hirschfeld, 224 Conn. 240, 251, 618 A.2d 506 (1992)* (citations omitted). The four elements of waiver are as follows: (1) the existence of a right or defense; (2) the opportunity to apply and use that right or defense; (3) the knowledge of the ability to use that right or defense; and (4) actions of the party who possesses that right or defense that amount to a relinquishment of that right.*Greenwich Plaza, Inc. v. Whitman & Ransom, 1996 Conn. Super. LEXIS 984, No. CV 95054081, 1996 WL 240458, at *9 (Conn. Super. Ct. Mar. 19, 1996)* (citing *Novella v. Hartford Accident & Indemn., 163 Conn. 552, 562, 316 A.2d 394 (1972))*.

Because there is an issue of fact with respect [*61] to the second element -- that is, Defendants maintain they did not find out about Kull's activity until July of 1999 -- the defense fails. Kull's statute of limitations defense with respect to Defendants' claim for tortious interference fails for the same reason. [12]

> 12   Connecticut's statute of limitations for torts is three years, as set forth in <u>Conn. Gen. Stat. § 52-577</u>.

### B. Breach of Fiduciary Duty

Defendants argue that Kull's activities in accepting kickbacks entailed a breach of his fiduciary duty of loyalty.

[HN43]As president of Davidoff, Kull was in a fiduciary relationship to the corporation. *Katz Corp. v. T.H. Canty & Co., Inc., 168 Conn. 201, 207, 362 A.2d 975 (1975)* (citing *Arrigoni v. Adorno, 129 Conn. 673, 681, 31 A.2d 32 (1943))*. Kull "occupied a position of the highest trust and therefore he [was] bound to use the utmost good faith and fair dealing in all his relationships with the corporation." *Id.* (citations omitted).

Defendants [*62] argue that the burden-shifting regime described in *Murphy v. Wakelee, 247 Conn. 396, 721 A.2d 1181 (1998)*, under which Kull would be required to prove by clear and convincing evidence that his financial arrangement with Uvezian was made in good faith, should govern. <u>247 Conn. at 400</u>. Because Kull cannot meet this heightened burden of proof, Defendants state, summary judgment should be granted in Defendants' favor. (Def. Opp. at 16.)

*Murphy,* however, was a case affirming a jury verdict. The current case is in a significantly different posture. [HN44]A factfinder must determine whether the transaction is of a type that would lead to the burden-shifting regime set out in *Murphy,* and, if so, whether Kull can meet such burden. *See Murphy, 247 Conn. at 405* (applying burden-shifting only to cases that involve, *inter alia,* fraud, self-dealing, conflict of interest, or suspicious circumstances). "The recitation of this standard

does not allow the court to conclude ... that [Kull's] factual denials do not raise genuine issues of material fact, and the court does not, in the context of summary judgment, decide the weight of the facts or [*63] resolve factual disputes." *Conn. Nat'l Bank v. Rytman,* 2002 Conn. Super. LEXIS 2759, No. X01CV870159941S, 2002 WL 31126311, at *3 (Conn. Super. Ct. Aug. 21, 2002) (citation omitted).

Multiple factual issues, as discussed in various sections above, remain with respect to this claim. Therefore, with respect to Defendants' claim of breach of fiduciary duty, summary judgment as to both sides is denied.

### C. Intentional Interference with Business Relations

Defendants claim that Kull intentionally interfered with their contract relationship or business relations with Uvezian. [13]

> 13  In their cross-complaints, Davidoff of Geneva (CT) and Oettinger label their claim "Tortious Interference With Contract Advantage and/or Tortious Interference With Prospective Economic Advantage," but refer to "tortious interference with business relations" in their memoranda to the Court. (Def. Opp. at 19.) The differences are irrelevant here. *See Swift v. Ball,* 2003 Conn. Super. LEXIS 2770, No. CV 010344047S, 2003 WL 22413406, at *2 (Conn. Super. Ct. Oct. 6, 2003) (discussing distinction between contract advantage and business relations); *Warner v. Dembinski,* 2003 Conn. Super. LEXIS 1103, CV020079206, 2003 WL 1995932, at *2 (Conn. Super. Ct. Apr. 4, 2003) (discussing prospective economic advantage).

[*64] [HN45]"The elements of tortious interference are the existence of a contractual or beneficial relationship, the defendants' knowledge of that relationship, the intent to interfere with it, and the consequent actual loss suffered by the plaintiff." *Hart, Nininger & Campbell Assoc., Inc. v. Rogers,* 16 Conn. App. 619, 629, 548 A.2d 758 (1988) (citing *Solomon v. Aberman,* 196 Conn. 359, 383, 493 A.2d 193 (1985); *Harry A. Finman & Son, Inc. v. Conn. Truck & Trailer Serv. Co.,* 169 Conn. 407, 415, 363 A.2d 86 (1975)). Under Connecticut law, an agent of a corporation -- here, Kull -- may be held liable for interfering with a contract of that corporation if he was not acting legitimately within the scope of his duties, but was using corporate power improperly for his personal gain. *Metro. Entm't Co. v. Koplik,* 20 F. Supp.2d 354, 361 (D. Conn. 1998) (citing *Murray v. Bridgeport Hosp.,* 40 Conn. Supp. 56, 60-61, 480 A.2d 610 (Conn. Super. Ct.

1984)). He acts for personal gain if he seeks personal financial gain or is motivated by personal animus. *Id.* (citing *Bennett v. Beiersdorf, Inc.,* 889 F. Supp. 46, 52 (D. Conn. 1995)). [*65]  To sustain the claim, Defendants must show that Kull's actions were tortious; that is, that they involved fraud, misrepresentation, intimidation, or molestation, or that he acted maliciously. The claim requires some showing of improper means or motive. *Weiss v. Wiederlight,* 208 Conn. 525, 536, 546 A.2d 216 (1988) (citations omitted). The tort does not require a breach of contract. *Automatic Bus. Prods. Co. v. Hankinson,* 1992 Conn. Super. LEXIS 47066, 1992 WL 117777, at *5 (Conn. Super. Ct. May 19, 1992).

Kull argues that Uvezian's loans to him did not harm the relationship between Defendants and Uvezian. He argues that because Davidoff purchased Uvezian's trademark and line of cigars, and that a profitable relationship continued between Uvezian and Defendants after Kull's termination, Defendants cannot show any injury resulting from the alleged interference. (Pl. Mem. at 8-9.) [HN46]Although Defendants may have trouble showing that they lost a business opportunity, *see Automatic Bus. Prods. Co.,* 1992 U.S. Dist. LEXIS 1523, 1992 WL 117777, at *5, damages may be recoverable "where the interference causes the performance 'to be more expensive or burdensome.'" *Herman v. Endriss,* 187 Conn. 374, 376-77, 446 A.2d 9 (1982) [*66]  (quoting 4 Restatement (Second) of Torts § 766A), for which Defendants have put forth evidence.

Both parties have set forth sufficient evidence to show genuine issues of material fact as to Kull's propriety or impropriety, as well as Defendants' resulting loss or lack thereof; therefore, summary judgment for both parties is denied.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Kull's claims for retaliation under the New York Executive Law, promissory estoppel, breach of the covenant of good faith and fair dealing, and unjust enrichment, and denied as to all other claims. Kull's motion for summary judgment as to Defendants' counterclaims is denied.

So Ordered.

Dated: June 22, 2004

Lawrence M. McKenna

U.S.D.J.

# Exhibit E

LEXSEE



Positive
As of: Feb 05, 2008

JOSEPH R. MILLER, Plaintiff, -against- CITICORP, CITIBANK (NYS),
CITIBANK, N.A., and CITICORP SERVICES, INC., Defendants.

95 Civ. 9728 (LAP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1997 U.S. Dist. LEXIS 2395

March 3, 1997, Decided
March 4, 1997, FILED

**DISPOSITION:**     [*1]  Defendants' motion to dismiss
granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee
brought an action for race and national origin discrimi-
nation in employment in violation of 42 U.S.C.S. § 1981 et
seq. and the New York State Human Rights Law, N.Y.
Exec. Law § 296 et seq., against defendant employers as
well as a common law claim of promissory estoppel. The
employers filed motions to dismiss the complaint pursu-
ant to Fed. R. Civ. P. 12(b)(6).

**OVERVIEW:** The employee, an African American,
began his employment in 1959 and was employed over
the years by the parent company and its various affiliated
entities. The employee was a vice president, but alleged
that, based upon his performance ratings and length of
service, he was entitled to a promotion to senior vice
president. The employee alleged that there was a
continuing pattern of discrimination against him based
upon his race and his American national origin. The
court held that the employee failed to establish a
continuing violation and that the statute of limitations
barred all alleged violations prior to November 16, 1992.
The court held that the New York Human Relations Law,
N.Y. Exec. § 298, did not apply because the employee
did not reside in New York after 1992. The court held
that the doctrine of promissory estoppel did not apply to
employment contracts. The court held that the parent
corporation was not liable for the alleged discriminatory

liable for the alleged discriminatory acts of its subsidiar-
ies. The court held that dismissal was warranted because
the employee's 24-page rambling complaint did not com-
ply with the requirements of Fed. R. Civ. P. 8(a) of a
short, plain statement of the claim for relief.

**OUTCOME:** The court granted the employer's motion
and dismissed the action without prejudice as to those
claims that were not time barred nor legally insufficient.

**CORE TERMS:** continuing violation, manager, promis-
sory estoppel, discriminatory, senior, national origin,
subsidiary, promotion, vice, discriminatory act, staff,
statute of limitations, resident, appraisal, career, entity,
business manager, accomplishments, outstanding, super-
visor, counseling, assigned, rating, state residents, cause
of action, present case, limitations period, corporate veil,
time-barred, systematic

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Motions to Dismiss*
[HN1]In deciding a motion to dismiss, the court must
view the complaint in the light most favorable to the
plaintiff. The court must accept as true the factual allega-
tions stated in the complaint, and draw all reasonable
inferences in favor of the plaintiff. A motion to dismiss

can only be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief.

***Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Public Discrimination***
***Governments > Legislation > Statutes of Limitations > Time Limitations***
***Torts > Procedure > Statutes of Limitations > General Overview***
[HN2]Claims under 42 U.S.C.S. § 1981 are governed by the statute of limitations applicable to personal injury actions in the state in which the federal court sits. New York has a three-year statute of limitations pursuant to N.Y. C.P.L.R. § 214(5).

***Governments > Legislation > Statutes of Limitations > Extension & Revival***
***Governments > Legislation > Statutes of Limitations > Tolling***
***Labor & Employment Law > Discrimination > Actionable Discrimination***
[HN3]To establish a continuing violation, a plaintiff must show a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the limitations period. Establishment of a continuing violation will toll the statute of limitations until the last discriminatory act in furtherance of the discrimination has taken place.

***Governments > Legislation > Statutes of Limitations > Extension & Revival***
***Labor & Employment Law > Discrimination > Actionable Discrimination***
***Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions***
[HN4]The mere fact that past discriminatory acts have a present effect on a plaintiff does not mean that the plaintiff has demonstrated a continuing violation. Further, merely alleging that a defendant's actions constitute a continuing policy and practice of discrimination is not enough. Instead, a plaintiff must show "compelling circumstances" surrounding the discrimination. The continuing violation exception applies only in cases involving specific, ongoing policies or practices, such as discriminatory seniority lists or discriminatory employment tests. Multiple incidents of discrimination, even similar ones, that are not related to a specific policy or program, do not amount to a continuing violation.

***Governments > Legislation > Statutes of Limitations > Extension & Revival***
***Labor & Employment Law > Discrimination > Actionable Discrimination***
[HN5]Mere allegations that a defendant's actions constituted a continuing policy and practice of discrimination are not enough, particularly where the incidents alleged are not interrelated.

***Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination***
***Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Protected Parties***
***Labor & Employment Law > Discrimination > Public Contracts > General Overview***
[HN6]42 U.S.C.S. § 1981 prohibits all racial discrimination in the making of private contracts and is intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Section 1981 does not, however, forbid discrimination based solely on the place or nation of plaintiff's origin.

***Labor & Employment Law > Discrimination > Racial Discrimination > Federal & State Interrelationships***
[HN7]See the New York Human Relations Law, N.Y. Exec. Law § 298-a.

***Labor & Employment Law > Discrimination > Racial Discrimination > Federal & State Interrelationships***
[HN8]The New York Human Relations Law, N.Y. Exec. Law § 298, does not provide a non-resident with a private cause of action for discriminatory conduct committed outside New York by a New York corporation.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
***Labor & Employment Law > Discrimination > Racial Discrimination > Federal & State Interrelationships***
[HN9]Absent an allegation that a discriminatory act was committed in New York or that a New York state resident was discriminated against, New York's courts have no subject matter jurisdiction over the alleged wrong.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview***

*Torts > Vicarious Liability > Corporations > Subsidiary Corporations*
[HN10]New York courts display a considerable reluctance to pierce the corporate veil of the parent of a subsidiary.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
[HN11]Even a wholly-owned subsidiary with identical executive officers is not considered an agent for its parent corporation unless that subsidiary can be characterized as a "mere dummy." The relevant question is whether the subsidiary "exists solely to serve the parent."

*Contracts Law > Consideration > Detrimental Reliance*
*Contracts Law > Consideration > Promissory Estoppel*
[HN12]A plaintiff who seeks to state a claim for promissory estoppel under New York law must demonstrate three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) injury sustained by the party asserting the estoppel by reason of his reliance.

*Contracts Law > Consideration > Promissory Estoppel*
[HN13]Under New York law, promises surrounding an employment relationship are insufficient to state a cause of action for promissory estoppel. In New York, promissory estoppel is reserved for a limited class of cases based on unusual circumstances.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN14]See Fed. R. Civ. P. 8(a).

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN15]Complaints that are rambling, repetitious, and unnecessarily voluminous fail to meet the minimum requirements of Fed. R. Civ. P. 8(a), because unnecessary prolixity in pleading places an unjustified burden on the court and on the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.

*Civil Procedure > Pleading & Practice > Pleadings > General Overview*
*Civil Procedure > Dismissals > Involuntary Dismissals > General Overview*

[HN16]Courts will dismiss complaints which ramble, which needlessly speculate, accuse, and condemn, and which contain circuitous diatribes far removed from the heart of the claim.

**COUNSEL:** For JOSEPH R. MILLER, plaintiff: Leroy Wilson, Jr., Leroy Wilson, Jr., Esq., P.C., White Plains, NY.

**JUDGES:** LORETTA A. PRESKA, United States District Judge

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, United States District Judge:

This is an action alleging racial and national origin discrimination in violation of 42 U.S.C. § 1981 et seq. (West 1994) ("Section 1981") and the New York State Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296 et seq. (McKinney 1993 & Supp. 1995), as well as a common law claim for promissory estoppel. Plaintiff Joseph Miller ("Miller") alleges that since 1975, he has been the victim of systematic racial and national origin discrimination by Citicorp, Citibank (NYS), Citibank and Citibank Services, Inc. ("CSI"). Plaintiff also alleges that employees of the various defendants made promises to him that are sufficient to give rise to a claim for promissory estoppel. Defendants have moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), on a variety of bases. For the reasons that follow, defendants' motion is granted.

**BACKGROUND**

Mr. Miller's Complaint is lengthy [*2] and somewhat prolix, consisting of 63 pages and more than 212 paragraphs. Mr. Miller, an African-American who is presently a "Vice President of Citicorp or Citibank, N.A.," (Complaint, P 1) alleges that he has been "demoted, denied equal terms and conditions of employment and denied promotions" due to race and national origin discrimination. (Id.). Plaintiff began his employment with Citibank (and its various affiliated entities) in 1959 and has worked there ever since, except for brief hiatuses. He alleges that the discrimination against him began in 1975, when he returned from a Citibank-sponsored educational leave. At that time Citibank had no positions open for him, and Mr. Miller was "forced to network within the corporation in order to find a position." (Complaint, P 12). He eventually found a position in "NYBD." (Id.).

From 1975-79, plaintiff worked in Manhattan, eventually being appointed Area Director of thirteen Citibank branches in Manhattan. He alleges that a white female resigned to protest his appointment and that "in a bizarre ritual," he was summoned to the Human Resources Department to discuss the woman's resignation. (Complaint, P 13). Mr. Miller's next promotion [*3] was to Chief of Staff to the Regional Manager in a territory including 35 branches and 1,400 staff members. According to Mr. Miller, he was threatened with removal from the Chief of Staff position for poor performance. (Id.). He alleges that "this threat evaporated when those who had threatened him learned that Plaintiff possessed information to show that he was one of the division's better performers." (Id.). The corporation, however, never gave plaintiff an incentive plan award (an "IPA") during this period. (Complaint, P 14).

In 1976, plaintiff became a Vice President of Citibank, N.A. At some point thereafter, he left Citibank temporarily to serve as CEO of the Municipal Credit Union, a position from which he returned in 1981. (Complaint, P 16). Upon his return, Miller alleges that he was promised by "someone from the office of the President, or the Office of the Chairman . . . that he would not suffer the same fate that he had suffered when he returned from his educational leave." (Complaint, P 17). Nonetheless, Mr. Miller claims he was without a position for three to six months until, after extensive networking, he found a position in Citicorp's Acceptance Company, Inc. in St. [*4] Louis, Missouri. He accepted this position, he alleges, only after various senior executives promised him that he would receive assignments commensurate with his skills, accomplishments, and grade. Mr. Miller contends that these promises were never fulfilled; instead, he was treated as a junior manager, told to expect such a status for eight to ten years while he learned the business, and assigned tasks for which he had insufficient support staff. He alleges that despite his superior performance, he never received an IPA during his time in this job. (Complaint, P 23).

In 1981, plaintiff accepted a temporary assignment involving the clean up of the Student Loan Business in Rochester, New York. Again, plaintiff alleges that Citibank failed to award him an IPA despite his superior performance. (Complaint, P 24).

In March, 1982, plaintiff returned to St. Louis. He accepted a permanent position with the Student Loan Business and eventually took charge of the operations and technology function of Citibank-NYS. (Complaint, P 26). In April, 1982, Mr. Miller complained that his performance appraisal did not reflect the true extent of his accomplishments and refused to sign the appraisal, [*5] which rated his performance as "standard." (Complaint, P 28). Plaintiff then lists the subsequent promotions of a

one-time fellow Vice President who is a white female; he never expressly alleges, however, that he applied for or was qualified for the promotions earned by his sometime colleague. Mr. Miller also details the career rise of Bill Atwell, a white male whom he claims to have interviewed when Atwell first sought employment with Citibank and who eventually became plaintiff's supervisor. Mr. Miller again never alleges specifically that he applied or was qualified for the promotions received by Mr. Atwell. (Complaint, PP 36-37).

During 1985, plaintiff occupied the position of Vice President and Director of Operations at Citibank (NYS). In 1986, Mr. Atwell gave plaintiff a draft evaluation which rated his performance as "good." Plaintiff disputed this evaluation; in July, 1986, Atwell upgraded Mr. Miller's rating to "outstanding" and gave him a second "outstanding" rating in 1987. At that time, Mr. Atwell noted that he was "supportive of [Miller's] desire to be a Business Manager and will make him available for a promotional opportunity." (Complaint, P 44). Plaintiff's "second [*6] line manager" also wrote, "I am happy to discuss [Miller's] desire to become a Business Manager with him." (Complaint, P 45). On the same appraisal form, plaintiff reiterated his ambition to become a business manager and his conviction that he had demonstrated the necessary credentials to become one. Plaintiff alleges that at the time in question no African-American held the title of Business Manager, which is the designation for senior vice president and higher senior executive positions. (Complaint, PP 49-50). Plaintiff also contends that in 1987 he was the lowest paid "V" level Citibank Vice President, "given his experiences and his time in grade." (Complaint, P 54).

In 1988, plaintiff received a telephone call from Mr. Neubert, his "second line manager," ordering him to return to New York City immediately, apparently as a result of a complaint made by a white woman with whom Mr. Miller had had some sort of disagreement the same day. (Complaint, PP 55-56). Plaintiff also alleges that during the same period, he received threats from two white senior managers, John Tassie and Irwin Bernstein, that he or his family would suffer physical injury. (Complaint, P 57). Mr. Miller's [*7] customary verbosity fails him at this point in the Complaint; he does not describe the events giving rise to the threats or provide their precise content. He does, however, allege that neither employee who threatened him was disciplined. (Id.). Mr. Miller also alleges that he was subject to behavior "so unruly and threatening" from another manager, Mr. McElduff, at a meeting that the analyst who accompanied Miller to the meeting broke down in tears. (Complaint, P 58).

On January 14, 1988, plaintiff alleges that he received a telephone call from Mr. Atwell telling him not

to let Mr. Neubert upset him during their meeting in New York. (Complaint, P 60). Atwell also advised him to question Neubert as to why he had not received a promotion in twelve years. (Complaint, P 61). On January 22, 1988, plaintiff met with Mr. Neubert, who allegedly apologized for slamming down the phone and admitted that plaintiff had not "been treated as well as he should have." (Complaint, P 62).

In February, 1988, plaintiff again received an "outstanding" performance rating from Mr. Atwell who praised various aspects of Mr. Miller's accomplishments, but did not mention his desire to be promoted. Mr. Neubert [*8] joined in rating plaintiff as "outstanding" (Complaint, P 68). Mr. Neubert added, "[I] will do all I can to be responsive to and supportive of [Miller's] career aspirations." (Complaint, P 69). Mr. Miller used the comments section on the appraisal form to list his preferences for promotion; again, he does not allege that any of the desired positions were available. He also expressed his conviction that he merited an elevation to "W" level, complaining that he did not understand why he had been overlooked for twelve years. (Complaint, P 70).

Shortly thereafter, Mr. McElduff took over from Mr. Atwell as plaintiff's manager and met with him to discuss his career plans. McElduff suggested that plaintiff seek a position in New York City rather than Rochester, because that was where most of the senior level positions were. (Complaint, P 73). On March 10, 1989, while plaintiff was attending a funeral in New York City, McElduff removed him from his position in Rochester and transferred him to a position in New York that plaintiff alleges was ill-defined. (Complaint, PP 74-75). Plaintiff alleges, apparently as evidence of discrimination, (1) that Mr. McElduff scheduled a farewell event [*9] for him, but at a time he was out of the office; and (2) that McElduff asked one of plaintiff's former subordinates to mail a gift to him. (Complaint, P 77). Mr. McElduff also told plaintiff that his new assignment (reporting to a Mr. Cappi in New York) would be an upward move and position him for greater responsibility.

Plaintiff alleges that a number of white employees who had occupied positions beneath him in Rochester had been recruited to positions senior to his own under Mr. Cappi. (Complaint, P 82). He alleges that these reporting assignments severely humiliated him by underlining his de facto demotion. Plaintiff also complains that once again, he received no IPA or stock option, although he had received such benefits the previous year in Rochester.

In May, 1990, a Mr. J. Ospa, using in-house executive counseling sessions information, told plaintiff that he (a) had been mistreated over the past fourteen years; (b) was a very controversial person; (c) was a loner, did not get along with his superiors, colleagues and subordinates; (d) had excellent managerial skills; (e) had a propensity to generate anger in others; (f) was loath to ask for help when he needed it; and (g) did [*10] not dress properly. Plaintiff alleges that Mr. Ospa offered him four options:

> (1) placement in an organization regardless of his preferences;
>
> (2) continuation with executive counseling to see if it provided him with the opportunity he sought;
>
> (3) plaintiff could define a job, supervisor to work for and location where he wanted to work and Ospa and Heron, the Group Executive, would cause this to happen; and
>
> (4) acceptance that his career with Citicorp was over and resignation from the bank.

As any thinking human being would, plaintiff preferred the utopian option number three: the chance to define all of the contours of his dream job and a guarantee that the dream would be made a reality. Plaintiff also alleges that he was at least willing to consider option number two. (Complaint, P 92). He categorically rejected options one and four. Thereafter, plaintiff wrote to Mr. Heron with his grievances and demanded an explanation for what he perceived to be his mistreatment and inexplicable stagnation. He described the effect on his psyche of not being rewarded for his accomplishments as he believed he deserved. He also requested permission to bring his problems to the [*11] attention of the President and Chairman of Citicorp. (Complaint, PP 95-101).

Apparently, at some time in 1990, plaintiff received a personality profile (perhaps as part of the executive counseling process). He sent the profile to a Ms. Bowers and asked, "Why were none of these flatside items individually or collectively brought to my attention with respect to being 'career stoppers' and with an action effort for remediation?" (Complaint, P 104). Ms. Bowers never responded and Mr. Ospa indicated that plaintiff's counseling had concluded. When plaintiff indicated that he would bring the matter to the attention of the President and Chairman, however, Mr. Ospa requested another week to try to resolve the issues. As a result of Mr. Ospa's efforts, plaintiff received another performance appraisal, which he disputed and refused to sign. (Complaint, P 112). Plaintiff then requested his "Management by Objectives" documents from his supervisors, which he never received. (Complaint, PP 113-114). According

to plaintiff, the lack of an MBO negatively affected his ability to have his performance measured, to receive a bonus and stock option, and would impact his next salary review. (Complaint, [*12] P 115). Plaintiff alleges that one of his supervisors told him not to worry, while another informed him that he had already been deemed ineligible for a bonus or stock options for 1989. (Complaint, PP 116-19). Plaintiff also complains that he was never officially named the project manager of his project and therefore had difficulty calling meetings or issuing memoranda and that he was often excluded from meetings that "he felt were necessary for him to be effective in his role." (Complaint, P 120).

In August, 1990, Mr. Heron met with plaintiff and told him that McElduff's conduct had been "unprofessional and abhorrent." (Complaint, P 127). Mr. Heron also advised that he had identified a position for plaintiff with Mr. John Harrison and that he would issue instructions so that plaintiff would receive a bonus check for 1989. Mr. Heron's group, however, was reorganized in 1991, and "plaintiff was once again forced to search for a job." (Complaint, P 128).

Shortly after these allegations the Complaint abruptly switches gears, and plaintiff alleges, in a somewhat conclusory fashion, that Citicorp and its affiliated entities have engaged in a systematic policy that resulted in the exclusion [*13] of African-Americans from positions in senior management. (Complaint, PP 130-133). In furtherance of this policy, plaintiff alleges that Citibank, N.A. began transferring and reassigning large numbers of caucasian employees from New York to Tampa, Florida to work in World Wide Securities Services and Latin American Securities Services, while offering few African-Americans the same opportunities. (Complaint, P 133A).

Plaintiff, however, *was* transferred to Florida; in 1991, Citibank assigned plaintiff to work at Citicorp Latino, Inc. in Pompano Beach, Florida. In 1993 or 1994, this office merged into Citicorp Services, which based its operations in Tampa. Plaintiff alleges that from the time of his arrival in May, 1991, he has been subject to a hostile work environment, including unwelcome comments about his race, has been assigned to positions below his grade, and threatened with demotion. Plaintiff also claims that he was denied the necessary staff support in to accomplish his tasks, although his successor had no difficulty in upgrading plaintiff's former staff. (Complaint, PP 141-56). Plaintiff complained, and reiterates his claim in his Complaint, that "Latino management . . [*14] . undermined his efforts." (Complaint, P 162).

Plaintiff again abruptly detours, this time to quote verbatim Citicorp Latino's Equal Employment Opportunity and Affirmative Action Policy, which was appar-

ently published in 1994. (Complaint, P 172). A week after the policy's publication, plaintiff learned that Citicorp Latino had attempted to place him "on loan" to a private, nonprofit social services agency. (Complaint, P 174). According to plaintiff, this was a move designed to humiliate him and indicated that defendants believed that plaintiff was not marketable to third party commercial interests.

In 1994, plaintiff received information from his "second line manager" that customers in Colombia, South America were uncomfortable with plaintiff, and that people in Peru were also unhappy with him. (Complaint, PP 177, 179). The manager, Mr. Amaral, also stated that Brazilians and Argentineans were likely to have similar problems with him. (Complaint, P 178). Plaintiff additionally recounts that this same manager, unprompted, had earlier informed him that racial discrimination did not exist in Brazil, where he was from. (Complaint, P 183).

Plaintiff further alleges that in 1995, Mr. [*15] Amaral transferred all of plaintiff's work to two Latino males and assigned plaintiff to the position of Regional Travel Coordinator for Latin America. Plaintiff also received a copy of a memo from Mr. Amaral to a third party outside Citicorp that severely criticized his performance. (Complaint, P 190). Plaintiff demanded an apology but never received one.

In 1995, plaintiff learned that Mr. Amaral had been asked to identify possible candidates for the position of senior Country Coordinating Officer for Nigeria, a "V" level Vice President's position. (Complaint, P 192). Plaintiff indicated to Mr. Amaral that he wanted this job, but Mr. Amaral did not pass his name along. Plaintiff then directly contacted the hiring party who advised plaintiff that he did not have the necessary experience to qualify for the position. (Complaint, P 194). Without stating why he believes it to be true or even what his qualifications are, plaintiff categorically alleges, "This was false. Plaintiff was qualified for this position." (Complaint, P 195). Plaintiff concludes, "Citicorp or Citibank, N.A. and its subsidiaries, Citicorp Latino, Inc. and Citicorp Services, Inc. intentionally subjected Plaintiff [*16] to unequal and discriminatory treatment because of his race and his United States of America national origin." (Complaint, P 200).

Plaintiff filed the present action on or about November 16, 1995. Defendants' motion to dismiss followed. For the reasons discussed in detail below, defendants' motion is granted.

## DISCUSSION

### I. *Standard Applicable to a Motion to Dismiss*

[HN1]In deciding a motion to dismiss, I must view the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 237, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir. 1985). I must accept as true the factual allegations stated in the complaint, *Zinermon v. Burch,* 494 U.S. 113, 118, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990), and draw all reasonable inferences in favor of the plaintiff. *Haines v. Kerner,* 404 U.S. 519, 520-21, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972); *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir. 1993), *cert. denied,* 510 U.S. 1111, 127 L. Ed. 2d 375, 114 S. Ct. 1054, 114 S. Ct. 1055 (1994). A motion to dismiss can only be granted if it appears beyond doubt that the [*17] plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

**II. *Any* § 1981 *Claims Arising Before November 16, 1992 Are Untimely***

[HN2]Claims under 42 U.S.C. § 1981 are governed by the statute of limitations applicable to personal injury actions in the state in which the federal court sits. *See Goodman v. Lukens Steel Co.,* 482 U.S. 656, 661-62, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987). In the present case, that rule mandates the application of New York's three-year statute of limitations, pursuant to N.Y. Civ. Prac. L. & R. § 214(5). *See Mian v. Donaldson, Lufkin & Jenrette,* 7 F.3d 1085, 1087 (2d Cir. 1993); *Ortiz v. Morgenthau,* 772 F. Supp. 1430, 1432 (S.D.N.Y. 1991), *aff'd,* 962 F.2d 4 (2d Cir. 1992).

In the ordinary case, all of plaintiff's allegations relating to conduct that occurred prior to November 16, 1992 would be dismissed as time-barred. Plaintiff attempts to evade this result by asserting a continuing violation theory. [HN3]To establish a continuing violation, "a plaintiff must show 'a series of related acts, one or more of which falls [*18] within the limitations period, or the maintenance of a discriminatory system both before and during the [limitations] period.'" *LaBeach v. Nestle Co.,* 658 F. Supp. 676, 686 (S.D.N.Y. 1987) (quoting *Valentino v. U.S. Postal Service,* 218 U.S. App. D.C. 213, 674 F.2d 56, 65 (D.C.Cir. 1982)). Establishment of a continuing violation will toll the statute of limitations until the last discriminatory act in furtherance of the discrimination has taken place. *Miller v. Int'l Telephone & Telegraph Corp.,* 755 F.2d 20, 25 (2d Cir.), *cert. denied,* 474 U.S. 851, 88 L. Ed. 2d 122, 106 S. Ct. 148 (1985); *Blesedell v. Mobil Oil Co.,* 708 F. Supp. 1408, 1414 (S.D.N.Y. 1989).

[HN4]The mere fact that past discriminatory acts have a present effect on a plaintiff does not mean that plaintiff has demonstrated a continuing violation. *See*

*Delaware State College v. Ricks,* 449 U.S. 250, 258, 66 L. Ed. 2d 431, 101 S. Ct. 498 (1980); *United Airlines, Inc. v. Evans,* 431 U.S. 553, 558, 52 L. Ed. 2d 571, 97 S. Ct. 1885 (1977). Further, "merely alleging that Defendants' actions 'constitute a continuing policy and practice of discrimination' is not enough." *Acosta v. The Yale Club,* 1995 [*19] U.S. Dist. LEXIS 14881, at *15 (S.D.N.Y. 1995). Instead, plaintiff must show "compelling circumstances" surrounding the discrimination. *McPartland v. American Broadcasting Companies, Inc.,* 623 F. Supp. 1334, 1339 (S.D.N.Y. 1985). As courts have explained on numerous occasions, "the continuing violation exception applies only in cases involving specific, ongoing policies or practices, such as discriminatory seniority lists . . . or discriminatory employment tests . . . . Multiple incidents of discrimination, even similar ones, that are not related to a specific policy or program, do not amount to a continuing violation." *Burrell v. City Univ. of New York,* 894 F. Supp. 750, 759 (S.D.N.Y. 1995); *see also Lacey v. Carroll McEntee & McGinley, Inc.,* 1994 U.S. Dist. LEXIS 15298, at *11 (S.D.N.Y. 1994).

The plaintiff's own Complaint clearly reveals his inability to assert a continuing violation exception to the otherwise applicable three-year statute of limitations. Plaintiff has alleged a wide variety of conduct by unrelated persons in a multitude of entities, often located in different states; he has been unable to allege any facts supporting a policy or practice that would [*20] tie these disparate acts into a single wrong and justify tolling the statute of limitations. At most, plaintiff has raised the conclusory allegation that these diverse actors were participants in a continuing, systematic policy of discrimination; such allegations are, however, inadequate to meet the requirements of the continuing violation exception. *See Acosta,* 1995 U.S. Dist. LEXIS 14881, at *15 (rejecting a continuing violation argument and holding that [HN5]mere allegations that defendants' actions constituted a continuing policy and practice of discrimination were not enough, particularly where the incidents alleged were not interrelated).

Further, plaintiff's citation to *Cornwell v. Robinson,* 23 F.3d 694 (2d Cir. 1994) only serves to reinforce the conclusion that he has not met the test for a continuing violation. In that case, the Court of Appeals upheld the application of the exception in reliance upon the district court's findings "that defendants' personnel policies discriminated on the basis of gender and that Cornwell suffered race- and gender-based harassment that DFY and its supervisory personnel permitted to continue . . . [and] that in 1986 Cornwell suffered [*21] the *same* kinds of harassment at the hands of some of the *same* YDAs, and under the aegis of some of the *same* supervisory personnel." *Id.* at 704 (emphasis added). The circumstances of

*Cornwell* are plainly distinguishable from the present case, where the only common denominator among the multitude of discriminatory acts alleged by plaintiff is his bare assertion that they were part of an ongoing policy.

In the absence of a continuing violation argument, all of plaintiff's claims relating to conduct occurring before November 16, 1992 are untimely. Accordingly, those claims are dismissed with prejudice. [1]

> 1   Because this ruling embraces all claims that occurred prior to the effective date of the Civil Rights Act of 1991, I need not address defendants' arguments that plaintiffs' allegations concerning conduct that took place before November, 1991 do not state a claim under *Patterson v. McLean Credit Union*, 491 U.S. 164, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989).

### III. *Plaintiff* [*22] *Cannot State a Claim under § 1981 for Discrimination Based on National Origin*

Section 1981 [HN6]prohibits all racial discrimination in the making of private contracts and was "intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613, 95 L. Ed. 2d 582, 107 S. Ct. 2022 (1987). Section 1981 does not, however, forbid discrimination based "solely on the place or nation of [plaintiff's] origin." *Id.; see also Jafri v. Park Lane Hotel*, 1994 U.S. Dist. LEXIS 13285, No. 93 Civ. 3947, 1994 WL 514539, at *3 (S.D.N.Y. September 21, 1994) (holding that Section 1981 does not prohibit discrimination solely on the basis of national origin), *aff'd,* 62 F.3d 1412 (2d Cir. 1995); *Adames v. Mitsubishi Bank, Ltd.,* 751 F. Supp. 1548, 1558 (E.D.N.Y. 1990). Therefore, all of plaintiff's § 1981 claims which purport to rest on his "United States of America national origin" (Complaint, P 200) must be dismissed with prejudice.

### IV. *NYHRL Claims that Predate November 16, 1992 Must Also Be Dismissed*

Claims under the NYHRL, like § [*23] 1981 claims, are governed by a three-year statute of limitations. *See Lambert v. Genesee Hosp.,* 10 F.3d 46, 59 (2d Cir. 1993), *cert. denied,* 128 L. Ed. 2d 339, 114 S. Ct. 1612 (1994); *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 307, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). In the absence of a continuing violation exception, as discussed above, those of plaintiff's claims under the NYHRL that relate to conduct that occurred more than three years prior to the filing of the Complaint must be dismissed. This holding eliminates Citibank (NYS) as a defendant entirely, because any allegedly discrimina-

tory actions taken by that entity fall outside the limitations period under any of plaintiff's legal theories.

### V. *Any Remaining NYHRL Claims Must Be Dismissed Because Plaintiff Is Not a New York Resident*

The elimination of the time-barred claims means that plaintiff's only remaining cognizable claims relate to his employment in Florida, where he has resided since 1991. Plaintiff argues that N.Y. Exec. Law § 298-a (McKinney 1993) permits the application of the NYHRL to defendants' alleged conduct in Florida. This contention is based on a misunderstanding of [*24] the reach of the NYHRL.

The pertinent portions of Executive Law § 298-a provide:

> 1. [HN7]The provisions of this article shall apply as hereinafter provided to an act committed outside this state against a resident of this state or against a corporation organized under the laws of this state or authorized to do business in this state, if such act would constitute an unlawful discriminatory practice if committed within this state.
>
> 2. If a resident person or domestic corporation violates any provision of this article *by virtue of the provisions of this section,* this article shall apply to such person or corporation in the same manner and to the same extent as such provisions would have applied had such act been committed within this state except that the penal provisions of such article shall not be applicable.

N.Y. Exec. Law § 298-a (emphasis added). As the New York Appellate Division explained, the memorandum of the Law Revision Commission indicates that the new section was intended "to extend the whole article extra-territorially so that it applies to acts committed outside the state by state residents and non-residents alike *against state residents." Iwankow* [*25] *v. Mobil Corporation,* 150 A.D.2d 272, 273, 541 N.Y.S.2d 428 (1st Dep't 1989) (quoting Bill Jacket, L. 1975, ch. 662, § 2) (emphasis added). Because Mr. Miller was no longer a resident of New York during the time period of the actionable allegations, the NYHRL does not apply to his remaining claims. *See Beckett v. Prudential Ins. Co.,* 893 F. Supp. 234, 238 (S.D.N.Y. 1995) [HN8]("The NYHRL does not provide a non-resident with a private cause of action for discriminatory conduct committed outside New York by a New York corporation.").

Plaintiff attempts to salvage his NYHRL claim by asserting that CSI could not have acted as it did in Florida without the approval of Citicorp and Citibank, N.A. in New York. A similar contention was raised and rejected in *Iwankow*. There, the court noted that "the only jurisdictional nexus asserted in the complaint, apart from the fact that defendants are domestic corporations, is that plaintiff's termination was part of a worldwide reduction in force which was decided upon at corporate headquarters in New York." *Iwankow*, 150 A.D.2d at 273. The court rejected the application of the NYHRL, concluding that [HN9]"absent an allegation that a discriminatory [*26] act was committed in New York or that a New York state resident was discriminated against, New York's courts have no subject matter jurisdiction over the alleged wrong." *Id.* Plaintiff's Complaint alleges no discriminatory acts in New York after 1992, and he was not a resident of New York at that time. Plaintiff's post-1992 NYHRL claims are therefore also dismissed.

### VI. *Plaintiff Cannot Pierce the Corporate Veil and Hold Citicorp Liable for the Acts of its Subsidiaries*

Citicorp is, as plaintiff has alleged, the corporate parent of Citibank, Citibank (NYS) and CSI. Plaintiff seeks to hold Citicorp liable for the allegedly discriminatory acts of its subsidiaries. Plaintiff faces significant hurdles, however, in light of the fact that [HN10]"New York courts have displayed a considerable reluctance to pierce the corporate veil of the parent of a subsidiary." *Kelly v. Quotron*, 1993 U.S. Dist. LEXIS 4602, at *3 91 Civ. 5408 (WK) (S.D.N.Y. April 8, 1993) (dismissing Citicorp, Quotron's parent, as a defendant in a sex discrimination case). [HN11]Even a wholly-owned subsidiary with identical executive officers is not considered an agent for its parent corporation unless that subsidiary [*27] can be characterized as a "mere dummy." *See Berkey v. Third Ave. Ry. Co.*, 244 N.Y. 84, 95, 155 N.E. 58 (1926). Assuming that the relevant question is whether the subsidiary "exists solely to serve the parent," *Pebble Cove Homeowners' Ass'n v. Fidelity New York FSB*, 153 A.D.2d 843, 545 N.Y.S.2d 362 (2d Dep't 1989), plaintiff has not alleged any facts from which such a conclusion could be drawn. Accordingly, the claims against Citicorp are dismissed.

### VII. *Plaintiff Has Failed to State a Claim for Promissory Estoppel*

Plaintiff alleges that employees of various defendants made promises to him with respect to his employment that "lulled [him] . . . into foregoing litigation of his rights, including his demotion in 1989, with respect to his status and lost past and future compensation and opportunities." (Complaint, P 210). [HN12]A plaintiff who seeks to state a claim for promissory estoppel under New York law must demonstrate three elements: (1) a clear

and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) injury sustained by the party asserting the estoppel by reason of his reliance. *See Cyberchron Corp.* [*28] *v. Calldata Sys. Dev.*, 47 F.3d 39, 44 (2d Cir. 1995) (citations omitted); *see also Ripple's of Clearview, Inc. v. Le Havre Assocs.*, 88 A.D.2d 120, 452 N.Y.S.2d 447 (2d Dep't) (dismissing claim for promissory estoppel that omitted elements), *appeal denied*, 57 N.Y.2d 609 (1982).

Even if plaintiff had adequately alleged each element of promissory estoppel, however, his claim would not be sustainable under New York law. New York does not recognize promissory estoppel as a valid cause of action in the employment context. *Van Brunt v. Rauschenberg*, 799 F. Supp. 1467, 1473 (S.D.N.Y. 1992); *Dalton v. Union Bank of Switzerland*, 134 A.D.2d 174, 176-77, 520 N.Y.S.2d 764 (1st Dep't 1987); *Pancza v. Remco Baby, Inc.*, 761 F. Supp. 1164, 1172 (D.N.J. 1991) (finding that, [HN13]under New York law, "promises surrounding an employment relationship are insufficient to state a cause of action for promissory estoppel"); *Kelly v. Chase Manhattan Bank*, 717 F. Supp. 227, 235-36 (S.D.N.Y. 1989); *Tribune Printing Co. v. 263 Ninth Ave. Realty*, 88 A.D.2d 877 (1st Dep't) ("In New York [promissory estoppel] is reserved for a limited class of cases based on unusual circumstances."), [*29] *aff'd*, 57 N.Y.2d 1038, 457 N.Y.S.2d 785, 444 N.E.2d 35 (1982). Therefore, plaintiff's promissory estoppel claim is dismissed for failure to state a claim upon which relief can be granted.

### VIII. *Plaintiff Has Failed to Comply with Fed. R. Civ. P. 8(a)*

*Fed. R. Civ. P. 8(a)* provides that [HN14]"[a] pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." [HN15]Complaints that are rambling, repetitious, and unnecessarily voluminous fail to meet the minimum requirements of *Rule 8(a)*, because "unnecessary prolixity in pleading places an unjustified burden on the court and on the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Melnik v. American Fed'n of State, County, Mun. Employees*, 1994 U.S. Dist. LEXIS 15773, No. 94 Civ. 3404 (RPP), 1994 WL 613345, at *1 (S.D.N.Y. Nov. 4, 1994) (citing 5 C. Wright & A. Miller, Federal Practice & Procedure: Civil 2d § 1281, at 522 (1990)).

In *Donovan v. City of New York*, 1994 U.S. Dist. LEXIS 15573, No. 94 Civ. 3228 (JSM), 1994 WL 603210 (S.D.N.Y. Nov. 1, 1994), *aff'd sub nom Morrison Law Firm v. Clarion Co., Ltd.*, 60 F.3d 811 [*30] (2d Cir. 1995), the court pointed out that [HN16]courts

within this district have consistently seen fit to dismiss complaints "'which ramble, which needlessly speculate, accuse, and condemn, and which contain circuitous diatribes far removed from the heart of the claim.'" *Id* at *1 (quoting *Levine v. County of Westchester,* 828 F. Supp. 238, 241 (S.D.N.Y. 1993), *aff'd sub nom. Levine v. Dep't of Social Servs.,* 22 F.3d 1090 (2d Cir. 1994)); *accord Barsella v. United States,* 135 F.R.D. 64, 65-66 (S.D.N.Y. 1991); *Chodos v. FBI,* 559 F. Supp. 69, 71-72 (S.D.N.Y.), *aff'd,* 697 F.2d 289 (2d Cir. 1982), *cert. denied,* 459 U.S. 1111, 74 L. Ed. 2d 962, 103 S. Ct. 741 (1983).

In *Donovan,* the court dismissed a 24-page Complaint in which the plaintiff's discourse shifted constantly among three lawsuits in which he was involved, repeatedly spoke in conclusory terms, and lapsed into apparent irrelevancies. *Donovan,* 1994 U.S. Dist. LEXIS 15573, 1994 WL 603210, at *1. In the present case, plaintiff's 63-page, 212-paragraph Complaint sets forth his claims in unnecessarily excruciating detail. Plaintiff apparently found it necessary to plead each evidentiary fact that he felt supported his claims of [*31] discrimination. Under Rule 8's liberal standard, however, such needless profusion of allegations places an unacceptable burden both on the court and the opposing party who must wade through the mass of verbiage.

Because the Complaint so clearly fails to comport with Rule 8(a)'s requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief," the motion to dismiss on this basis is granted. The plaintiff may, however, rep lead those allegations that are neither time-barred nor legally insufficient; in other words, plaintiff may replead his § 1981 claims relating to racially discriminatory conduct that took place after November, 1992 and his "piercing the corporate veil" allegations against Citicorp.

## CONCLUSION

For the reasons set forth, defendants' motion to dismiss is granted. Plaintiff may replead those allegations described in Part VIII above, within twenty days of the date hereof.

SO ORDERED:

Dated: New York, New York

March *3,* 1997

LORETTA A. PRESKA, U.S.D.J.

# Exhibit F

LEXSEE



Caution
As of: Feb 05, 2008

**VITO SALVATORE, DEBRA ROTA, JOHN FRUHLING, MAURA KANE, PATRICIA MANFREDI, ROSEMARIE CONCA, PERRY COCOZZO, KASH YAGNIK, BARBARA DERN, MICHAEL GOUSKOS, ELEANOR GRECO, DWAYNE PETERKIN, ADELE KRONER, ANDREW BROSNAN, BEVERLY GORE, BARBARA MAIER, ALEX OMAR BENAISSA, and VINCENT TRICOLI, Plaintiffs, -against- KLM ROYAL DUTCH AIRLINES and EDUARD WAGEMANS, Defendants.**

**98 Civ. 2450 (LAP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1999 U.S. Dist. LEXIS 15551; 81 Fair Empl. Prac. Cas. (BNA) 873**

**September 30, 1999, Decided**
**September 30, 1999, Filed**

**DISPOSITION:**      [*1] KLM's motion to dismiss granted and Wagemans' motion to dismiss granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants moved to dismiss claims brought by plaintiffs alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and New York City Administrative Code, Title 8, §§ 8 -101 et seq.

**OVERVIEW:** Plaintiff employees sued defendants employer and former supervisor alleging sexual harassment, discrimination, retaliation, and constructive discharge. Defendant supervisor's conduct did not rise to the level of outrageousness, so claims of intentional infliction of emotional distress were dismissed except for the claims of two plaintiffs. Defendant supervisor's alleged sexual misconduct fell outside the employment relationship, and he did not act within the scope of his employment by engaging in alleged assaults. Workers' compensation law barred claims against defendant employer for negligent hiring, training, supervising, or retaining of supervisor. Hostile environment claims were dismissed because no

plaintiffs alleged defendants' conduct was severe or pervasive. Plaintiffs did not sufficiently allege participation in a protected activity known to defendants, an employment action adverse to plaintiffs, or a causal connection between the protected activity and the adverse action. Plaintiffs failed to allege facts that they were qualified to receive overtime or promotions.

**OUTCOME:** Defendant employer's motion to dismiss was granted because defendant was not vicariously liable for acts of employee. Defendant supervisor's motions to dismiss were granted in part and denied in part. Where his misconduct was not within scope of employment, claims were dismissed, but some human rights law claims could survive.

**CORE TERMS:** hostile, discriminatory, sexual, sex, harassment, national origin, offensive, retaliation, intentional infliction of emotional distress, hostile work environment, assault, sexually, protected activity, unwanted, overtime, severe, sexual orientation, assault and battery, overtime pay, scope of employment, pervasive, vicarious, abusive, official capacities, prima facie case, emotional, distress, touching, sexual harassment claim, workers' compensation

**LexisNexis(R) Headnotes**

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

**Civil Procedure > Summary Judgment > Standards > General Overview**
[HN1]In deciding a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff. A court must accept as true the factual allegations stated in the complaint, and draw all reasonable inferences in favor of the plaintiff. A motion to dismiss may be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief.

**Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Assault & Battery > General Overview**
**Governments > Legislation > Statutes of Limitations > Time Limitations**
**Torts > Intentional Torts > Assault & Battery > Defenses**
[HN2]In New York, claims of assault and battery have a one-year statute of limitations that runs from the date of each alleged act.

**Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements**
**Torts > Negligence > Causation > General Overview**
[HN3]To maintain a claim for intentional infliction of emotional distress under New York law, a plaintiff must plead and prove the following four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. Courts have relied on the "outrageous conduct" element to set reasonable bounds on this potentially limitless tort, and they have required that the plaintiff allege conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

**Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview**
[HN4]New York courts that have allowed claims of intentional infliction of emotional distress to proceed require that there be an unrelenting campaign of day in, day out harassment or that the harassment was accompanied by physical threats.

**Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements**
[HN5]It is well settled that insults do not meet the rigorous standard of intentional infliction of emotional distress.

**Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview**
**Torts > Vicarious Liability > Employers > Scope of Employment > Application of State Law**
**Torts > Vicarious Liability > Employers > Scope of Employment > Personal Activities**
[HN6]Under New York law, the doctrine of respondeat superior renders an employer vicariously liable for a tort committed by an employee acting within the scope of his employment. Intentional torts as well as negligent acts may fall within the scope of employment. In either situation, an employer need not have foreseen the precise act or the exact manner of injury as long as the general type of the conduct may have been reasonably expected. However, an employer is not liable for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business.

**Torts > Vicarious Liability > Employers > Activities & Conditions > Intentional Torts**
[HN7]New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context.

**Torts > Vicarious Liability > Employers > Activities & Conditions > Intentional Torts**
[HN8]Courts have held that the following five factors determine whether a tortious act was done in furtherance of employment: the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could have easily anticipated.

**Business & Corporate Law > Agency Relationships > Duties & Liabilities > Authorized Acts of Agents > Scope of Authority**
**Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims**
**Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims**

[HN9]The liability test is whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of his instructions. In applying that test, courts must apply a standard of general foreseeability. Normally, determination of the scope of employment depends largely on the facts and circumstances peculiar to each case and is ordinarily one for the jury. However, when a court takes as true all the facts alleged by the plaintiff and concludes that the conduct complained of cannot be considered within the scope of employment, then the court must dismiss the complaint for failure to state a claim.

*Torts > Business Torts > Negligent Hiring & Supervision > General Overview*
*Workers' Compensation & SSDI > Coverage > General Overview*
*Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > General Overview*
[HN10]In New York, recovery for injuries caused by the negligence of an employer is governed by the workers' compensation law. If recovery is available under the workers' compensation law, then that recovery is the plaintiff's exclusive remedy against the employer and other common law tort claims are prohibited.

*Torts > Intentional Torts > General Overview*
*Torts > Vicarious Liability > Employers > Activities & Conditions > Intentional Torts*
*Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > General Overview*
[HN11]However, workers' compensation is not the exclusive remedy for those tortious acts which the employer committed intentionally or which were perpetrated at the employer's direction or instigation. To fall within the intentional tort exception, however, the employee must allege that the employer engaged in conduct to bring about the consequences of the act. Mere knowledge or appreciation of the risk is insufficient to invoke the exception.

*Workers' Compensation & SSDI > Coverage > General Overview*
*Workers' Compensation & SSDI > Defenses > Fellow Servant Doctrine*
*Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > Exceptions*
[HN12]New York courts have rejected attempts to remove cases from the exclusivity provision of the workers' compensation law by alleging recklessness.

*Torts > Vicarious Liability > Employers > Scope of Employment > General Overview*
[HN13]Defendants with supervisory control over a plaintiff may not be held individually, or personally, liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.

*Torts > Vicarious Liability > Employers > Scope of Employment > General Overview*
[HN14]The weight of authority has leaned decidedly against permitting individual defendants to be sued in their official capacities. Courts have declined to find a private right of action against a supervisory employee in his official capacity because of the absence of Congressional intent to impose such liability on an employer.

*Labor & Employment Law > Employment Relationships > At-Will Employment > Employers*
*Torts > Vicarious Liability > Employers > Scope of Employment > General Overview*
[HN15]Two theories of liability have been recognized by the courts applying the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. Claims for discrimination brought under the Human Rights Law may be directed at either (1) employers or (2) persons who aid and abet an employer's violation of the statute. N.Y. Exec. Law §§ 296(1)(a), 292(6). The Human Rights Law does not define "employer," but courts have held that a corporate employee is not individually subject to a suit for discrimination if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others.

*Torts > Vicarious Liability > Employers > Scope of Employment > General Overview*
[HN16]Managers or supervisors may be held individually liable if they aid and abet discrimination as proscribed by the Human Rights Law, N.Y. Exec. Law § 296(6).

*Torts > Vicarious Liability > Employers > Scope of Employment > General Overview*
[HN17]A defendant must actually participate in the conduct giving rise to a discrimination claim.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

[HN18]Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. To prevail on a hostile work environment claim, a plaintiff must prove: (1) that she is a member of a protected group; (2) that she was the subject of unwelcome advances; (3) that the harassment was based upon her membership in the protected class; and (4) that the harassment affected a term, condition, or privilege of employment. A hostile environment under Title VII is a workplace permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter conditions of the victim's employment and create an abusive working environment. A court must be particularly concerned with the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

***Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment***
[HN19]While a plaintiff's subjective experience of a hostile environment is necessary to sustain a claim, it is not enough. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment, an environment that a reasonable person would find hostile or abusive, is beyond the purview of Title VII of the Civil Rights Act of 1964, U.S.C.S. § 2000e et seq.

***Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment***
[HN20]To determine whether a work environment is so hostile as to violate Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., the court must evaluate all relevant circumstances, and consider the social context in which particular behavior occurs and is experienced by its target. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

***Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment***
[HN21]In hostile environment cases, even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of liability under Title VII of the Civil Rights Act of 1964, U.S.C.S. §2000e et seq.

***Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment***
***Torts > Intentional Torts > Defamation > Defenses > Fair Comment & Opinion***
[HN22]Disparaging remarks about the capabilities of working mothers are not sufficiently severe to establish a hostile environment claim. Conclusory allegations of unwanted embarrassing sexually charged comments are also inadequate to state a claim.

***Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions > Sexual Orientation***
[HN23]Discrimination on the basis of sexual orientation is not prohibited by Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.

***Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities***
***Labor & Employment Law > Discrimination > Retaliation > General Overview***
***Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview***
[HN24]An employee engages in a protected activity when she has (1) opposed any practice made an unlawful employment practice by Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing, under Title VII.

***Labor & Employment Law > Discrimination > Age Discrimination > Employment Practices > Wages***
***Labor & Employment Law > Discrimination > Retaliation > General Overview***
***Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview***
[HN25]An employment action can be adverse even if it does not rise to the level of job termination or reduced

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

wages and benefits. Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of adverse.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN26]Without a link between the protected activity and the adverse employment action, a plaintiff's retaliation claims must fail.

*Labor & Employment Law > Discrimination*
[HN27]In order to sustain a claim based on failure to promote, a plaintiff must plead that he or she applied for a specific position and was rejected.

*Labor & Employment Law > Discrimination*
*Labor & Employment Law > Discrimination > Age Discrimination > Proof > Circumstantial Evidence*
*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Employee Burdens*
[HN28]To establish a prima facie case of discrimination in the provision of overtime pay, a plaintiff must allege that (1) he or she is a protected class member; (2) he or she was qualified for to receive overtime pay; (3) an employer denied the plaintiff overtime pay for overtime work performed; and (4) the denial of overtime occurred under circumstances giving rise to an inference of discrimination.

*Governments > Local Governments > Ordinances & Regulations*
[HN29]The Administrative Code of the City of New York applies only to conduct within the boundaries of New York City.

*Governments > Local Governments > General Overview*
[HN30]In order to state a claim under New York City Human Rights Law, a plaintiff must allege that he was discriminated against by the defendant within New York City. The fact that certain acts leading to discrimination may occur in New York City will not necessarily give rise to a claim under the City Human Rights Law. To determine the location of the discrimination, courts have looked to the location of the impact of the offensive conduct.

**COUNSEL:** For KLM ROYAL DUTCH AIRLINES, defendant: Michael J. Michael J. DiMattia, Ross & Hardies, New York, NY.

**JUDGES:** LORETTA A. PRESKA, United States District Judge.

**OPINION BY:** LORETTA A. PRESKA

**OPINION**

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, United States District Judge:

Plaintiffs brought this suit against their current and former employer KLM Royal Dutch Airlines ("KLM") and a former employee of KLM who was their supervisor, Eduard Wagemans ("Wagemans") (collectively, "defendants"). Plaintiffs allege that the defendants engaged in sexual harassment, discrimination, retaliation and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("Human Rights Law" or "HRL"), and New York City Administrative Code, Title 8, §§ 8-101 et seq. ("City Human Rights Law" or "City HRL"). Plaintiffs also assert various state law claims.

KLM now moves to dismiss most of the first, the entire fourth, sixth, seventh and eighth causes of [*2] action asserted in plaintiffs' Third Amended and Verified Complaint (the "Complaint" or "Compl."). pursuant to Rule 12(b)(6). Wagemans moves to dismiss the first, second, third, fifth and sixth causes of action, and joins in KLM's motion. For the reasons set forth below, KLM's motion to dismiss is granted and Wagemans' motion to dismiss is granted in part and denied in part.

**BACKGROUND**

The following facts are taken from the allegations in the Complaint, which I must accept as true for the purposes of this motion. The twenty named plaintiffs in this action are current and former KLM employees (or temporary workers) who held various positions in the office located in Elmsford, New York. (*See* Compl. P 3.) KLM is a Dutch corporation with offices in Elmsford, New York. (*See id.* PP 5, 10.) Wagemans is a former employee of KLM who worked at KLM's Elmsford, New York office as a "high-level manager". (*See id.* PP 11, 13.) Wagemans had the authority to direct and assign work to the plaintiffs, to evaluate their work, and to promote, demote or fire them. (*See id.* P 14.) The alleged conduct giving rise to this action is described more specifically below. In general, Wagemans [*3] harassed the

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

plaintiffs by making "sexual jokes, abusive sexual references, profane and abusive sexually oriented comments, unwanted sexually oriented physical contact and gestures, racial, ethnic and age related jokes." (*Id.* P 12.)

### DISCUSSION

#### I. Legal Standard

[HN1]In deciding a motion to dismiss, I must view the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985). I must accept as true the factual allegations stated in the complaint, *Zinermon v. Burch*, 494 U.S. 113, 118, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990), and draw all reasonable inferences in favor of the plaintiff, *see Haines v. Kerner*, 404 U.S. 519, 520-21, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972); *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir. 1993), *cert. denied*, 510 U.S. 1111, 127 L. Ed. 2d 375, 114 S. Ct. 1054, 114 S. Ct. 1055 (1994). A motion to dismiss may be granted only if it appears beyond doubt that the plaintiff can prove no set of [*4] facts in support of her claim which would entitle her to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). Even under this liberal standard, however, I find that many of plaintiffs' claims suffer from deficiencies that mandate their dismissal.

### II. Non-Statutory Claims

#### A. Assault and Battery

Plaintiffs' fourth claim is brought against both defendants and alleges that Wagemans committed the tort of assault and battery on many of the plaintiffs, "including but not limited to" the nine named plaintiffs in paragraph 201 of the Complaint. (*See* Compl. P 201.) Defendants move to dismiss that portion of the claim asserted by the eleven plaintiffs not specifically named in paragraph 201 on grounds that the statute of limitations has run.

[HN2]In New York, claims of assault and battery have a one-year statute of limitations that runs from the date of each alleged act. *See Ferran v. Williams*, 194 A.D.2d 962, 963, 598 N.Y.S.2d 866 (3d Dep't 1993). The original complaint was filed on March 16, 1998 and, thus, those claims that occurred before March 16, 1997 are time-barred. The following plaintiffs left KLM's employ [*5] before March 16, 1997: Salvatore, Rota, Fruhling, Kane, Dern, Gouskos, Peterkin, Brosnan, McGrath and Tricoli. To the extent that plaintiff Gore alleges any assault and battery claims, that conduct took place between July 1995 and January 1997 and therefore ended some fourteen months before plaintiffs commenced this action. (*See* Compl. P 133.) Plaintiffs concede this point,

arguing that the claim is confined to those nine named plaintiffs in paragraph 201, notwithstanding the phrase "including, but not limited to," which preceded those individuals. For these reasons, KLM's motion to dismiss the claim of assault and battery asserted against KLM on behalf of the eleven plaintiffs mentioned above is granted. [1]

> 1   Plaintiffs have withdrawn Rota's claim of discrimination based on pregnancy status and Gore's claim of intentional infliction of emotional distress. (*See* Pl. Mem. at 4 n.1.)

#### B. Intentional Infliction of Emotional Distress

[HN3]To maintain a claim for intentional infliction of emotional distress under [*6] New York law, a plaintiff must plead and prove the following four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *See Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993); *Bender v. City of New York*, 78 F.3d 787, 789 (2d Cir. 1996). Courts have relied on the "outrageous conduct" element to set reasonable bounds on this potentially limitless tort, *see Howell*, 81 N.Y.2d at 121, and they have required that the plaintiff allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983).

In the employment context, sexual harassment cases comprise the bulk of intentional infliction of emotional distress actions where plaintiffs prevail. *See O'Reilly v. Executone of Albany, Inc.*, 121 A.D.2d 772, 503 N.Y.S.2d 185 [*7] (3d Dep't 1986); *Koster v. Chase Manhattan Bank, N.A.*, 609 F. Supp. 1191 (S.D.N.Y. 1985); *Collins v. Willcox, Inc.*, 158 Misc. 2d 54, 600 N.Y.S.2d 884 (N.Y. County 1992). As I stated in *Nunez v. A-T Financial Info., Inc.*, 957 F. Supp. 438, 442 (S.D.N.Y. 1997), those [HN4]New York Courts that have allowed claims of intentional infliction of emotional distress to proceed require that there be an "unrelenting campaign of day in, day out harassment or that the harassment was accompanied by physical threats." *Id.* at 442.

The following plaintiffs allege claims of intentional infliction of emotional distress: Manfredi, Conca, Cocozzo, Yagnik, Greco, Kroner, Maier, Benaissa and Massa. (*See, e.g.*, Compl. P 225.) Most of the plaintiffs' claims involve offensive, harassing and discriminatory comments by Wagemans. (*See id.* P 53 (stating plaintiff

Case 1:07-cv-11091-JSR    Document 12-2    Filed 02/07/2008    Page 69 of 80

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

"looks like a whore"), P 55 ("lazy Italians"), P 77 ("you Indian people are always short and dark"), P 84 (referring to plaintiff as a "gangbanger" and women as "cunts"), P 147 ("Arabs cannot be trusted because they're allowed to have too many wives"). [HN5]It is well settled that insults [*8] do not meet the rigorous standard of intentional infliction of emotional distress. *See Leibowitz v. Bank Leumi Trust Co. of N.Y.*, 152 A.D.2d 169, 171, 548 N.Y.S.2d 513 (2d Dep't 1989). Here, many of the plaintiffs allege that the harassing and discriminatory gibes were accompanied with minor physical abuse like the slapping of the back of the head, (*see* Compl. PP 72, 78, 146), the placing of an arm around a female plaintiff, (*id.* P 64), and the occasional grabbing of a female plaintiff's hip, (*id.* P 57). As offensive as these alleged acts are, plaintiffs have not alleged that they were done with an intent to sexually harass or performed on a "day in, day out basis." *See Jaffe v. National League for Nursing*, 222 A.D.2d 233, 233, 635 N.Y.S.2d 9 (1st Dep't 1995) (stating hard slap on plaintiff's backside sufficiently alleged tort of assault and battery but declining to find intentional infliction of emotional distress); *Ponticelli v. Zurich Am. Ins. Group*, 16 F. Supp. 2d 414, 440 (S.D.N.Y. 1998) (finding allegation that plaintiff was shoved into file cabinet did not meet requirements for claim of intentional infliction of [*9] emotional distress).

However, plaintiffs Kroner and Benaissa do state a claim for intentional infliction of emotional distress. While these plaintiffs allege conduct that is not as depraved as that which this Court has found sufficient to state a claim in the past, *see Persaud v. S. Axelrod Co.*, 1996 U.S. Dist. LEXIS 160, No. 95 Civ. 7849, 1996 WL 11197, at *12 (S.D.N.Y. Jan. 10, 1996) (finding that plaintiff's allegations that she was subjected to continuous sexual harassment, including unwanted touching and threats by the knife-wielding defendant, were sufficient to state a cause of action for intentional infliction of emotional distress); *Olszewski v. Bloomberg L.P.*, 1997 U.S. Dist. LEXIS 9654, No. 96 Civ. 3393, 1997 WL 375690, at *7 (S.D.N.Y. Jul. 7, 1997) (permitting emotional distress claim because plaintiff alleged that she was raped and pressured not to reveal that fact after defendant became her supervisor); *but cf. Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 491 (S.D.N.Y. 1999) (finding the allegation of sexual battery (*i.e.*, touching plaintiff's breast) in sexual harassment context sufficient to survive summary judgment motion to dismiss intentional emotional distress [*10] claim), the touching was sufficiently pervasive. With respect to plaintiff Kroner, the Complaint alleges that Wagemans once dropped a pencil between her breasts, pushed her to the floor on two separate occasions, and "frequently" massaged her neck between January 1997 and October 1997. (*See* Compl. PP 108-11.) Similarly, plaintiff Ben-

aissa alleges that Wagemans rubbed his crotch against Benaissa's arm in a sexual fashion on "numerous occasions" while calling him "cute." (*See id.* PP 144-45.) Thus, Kroner and Benaissa state claims for intentional infliction of emotional distress.

I do not condone the alleged conduct towards any of these plaintiffs, which -- as alleged -- is boorish, vulgar, misogynistic and reprehensible. However, with respect to the plaintiffs other than Benaissa and Kroner, I hold that Wagemans' conduct does not rise to the level of outrageousness required by the case law. Accordingly, the claims of intentional infliction of emotional distress are dismissed except for the claims of plaintiffs Benaissa and Kroner.

C. Vicarious Liability

Plaintiffs seek to hold KLM liable for the torts of assault and battery and the intentional infliction of emotional distress [*11] committed by Wagemans. [HN6]"Under New York law, the doctrine of respondeat superior renders an employer vicariously liable for a tort committed by an employee acting within the scope of his employment." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (citing *Riviello v. Waldron*, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979) and *Heindel v. Bowery Sav. Bank*, 138 A.D.2d 787, 525 N.Y.S.2d 428 (3d Dep't 1988)). "Intentional torts as well as negligent acts may fall within the scope of employment. In either situation, an employer need not have foreseen the precise act or the exact manner of injury as long as the general type of the conduct may have been reasonably expected." *See Patterson v. Khan*, 240 A.D.2d 644, 644, 659 N.Y.S.2d 90 (2d Dep't 1997). However, an employer is not liable for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business. *See Tomka*, 66 F.3d at 1317 (citing *Heindel*, 525 N.Y.S.2d at 428; *Island Associated Coop., Inc. v. Hartmann*, 118 A.D.2d 830, 500 N.Y.S.2d 315 (2d Dep't 1986); [*12] [HN7] *Ross v. Mitsui Fudosan, Inc.*, 2 F. Supp. 2d 522, 531 (S.D.N.Y. 1998).

"New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." *Ross*, 2 F. Supp. 2d at 531 (dismissing claim for vicarious liability for the sexual advances made by plaintiff's supervisors who exposed themselves to plaintiff and forced her to watch a pornographic videotape); *accord Tomka*, 66 F.3d at 1318 (employees' sexual assaults upon co-employee and emotional distress stemming from those assaults "were not in furtherance of [employer's] business and were a complete departure from normal duties" of an employee as a matter of law); *Haybeck v.*

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

*Prodigy Servs. Co.*, 944 F. Supp. 326 (S.D.N.Y. 1996) (collecting New York cases); *Cornell v. State of New York*, 60 A.D.2d 714, 401 N.Y.S.2d 107 (3d Dep't 1977) (hospital not liable for sexual assault by hospital attendant on an infant under hospital's care), *aff'd*, 46 N.Y.2d 1032, 389 N.E.2d 1064, 416 N.Y.S.2d 542 (1979). [*13] Wagemans' alleged sexual misconduct falls outside the employment relationship and, thus, I dismiss that portion of the vicarious liability claim against KLM. (*See* Compl. PP 30, 44, 90, 104, 124, 145, 162.)

Plaintiffs point out, however, that not all of Wagemans' acts which allegedly constitute assault and battery were sexually charged. KLM responds that, nonetheless, vicarious liability does not attach to those unwanted touchings. [HN8]The New York Court of Appeals has held that the following five factors determine whether a tortious act was done in furtherance of employment:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could have easily anticipated.

*Riviello*, 47 N.Y.2d at 303. [HN9]The *Riviello* court's liability test is "whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of his instructions.'" [*14] *Id.* (quotation omitted). In applying that test, courts must apply a standard of general foreseeability. *Id.* at 304. Normally, determination of the scope of employment depends "largely on the facts and circumstances peculiar to each case" and is "ordinarily one for the jury." *Id.* at 302. However, when a "'court takes as true all the facts alleged by the plaintiff and concludes that the conduct complained of cannot be considered within the scope of employment, then the court must dismiss the complaint for failure to state a claim.'" *See Guveiyian v. Keefe*, 1998 U.S. Dist. LEXIS 1552, *5, No. 97 CV 5210, 1998 WL 273015, at *2 (E.D.N.Y. 1998) (quoting *Haybeck*, 944 F. Supp. at 326).

Here, it is clear as a matter of law that Wagemans did not act within the scope of his employment when he engaged in the alleged assaults. In reaching this conclusion, I am guided by the *Riviello* Court's discussion of vicarious liability and its specific reference to the intentional tort of assault. *See id.* at 304 (citing *Sims v. Bergamo*, 3 N.Y.2d 531, 534-35, 169 N.Y.S.2d 449, 147 N.E.2d 1 (1957) (assault of unruly patron by bartender to

protect [*15] employer's property and to maintain order on premises) and *De Wald v. Seidenberg*, 297 N.Y. 335, 337-338, 79 N.E.2d 430 (1948) (assault of tenant by building superintendent during attempted enforcement of occupancy rules)). In those cases, it was generally foreseeable that the employee might commit tortious assault given the nature of the employee's duties. Similarly, courts that have found vicarious liability in such situations have done so when the alleged tortious activity falls within the ambit of the employment. *See Petrousky v. United States*, 728 F. Supp. 890, 898 (N.D.N.Y. 1990) (holding employer vicariously liable for employee's libelous statements contained in administrative memoranda describing plaintiff's work performance); *Murray v. Watervliet City Sch. Dist.*, 130 A.D.2d 830, 830, 515 N.Y.S.2d 150 (3d Dep't 1987) (stating that it was generally foreseeable that a teacher, in front of other students, would tell plaintiff's daughter that plaintiff had become pregnant during plaintiff's secondary schooling); *Young Bai Choi v. D & D Novelties, Inc.*, 157 A.D.2d 777, 778, 550 N.Y.S.2d 376 (2d Dep't 1990) (affirming [*16] jury verdict for plaintiff who was injured when struck with snow shovel handled by defendant's employee while shoveling snow in front of defendant's business).

Taking the alleged facts as true, the conduct complained of cannot be considered to fall within the scope of Wagemans' employment as opposed to his pursuit of his own personal interests. It is clear that (1) there is no connection between the time, place and occasion for the assaults and Wagemans' status as a KLM employee; (2) the acts are not those commonly done by an employee like Wagemans; (3) the acts are a flagrant departure from the normal methods of operation and (4) the acts are those an employer hardly could have anticipated. The alleged fact that KLM knew about the acts of Wagemans does not bring these personal pursuits within the scope of employment. *See Haybeck*, 944 F. Supp. at 330. I note that other courts have ruled as a matter of law on this issue where the alleged acts similarly were removed from the scope of employment. *See Guveiyian*, 1998 WL 273015, at *2 (granting 12(b)(6) motion dismissing vicarious liability claim where plaintiff was assaulted by legislative assistant during [*17] voter registration drive); *Haybeck*, 944 F. Supp. at 330 (granting 12(b)(6) motion on grounds that employee's personal decision not to disclose his HIV positive status to plaintiff before engaging in consensual sexual relationship was not within scope of employment); *Rappaport v. International Playtex Corp.*, 43 A.D.2d 393, 352 N.Y.S.2d 241 (3d Dep't 1974) (reversing lower court for failing to dismiss and finding, as a matter of law, that injury sustained in a car accident which took place on plaintiff's way to do employment-related work at his girlfriend's house was outside the scope of employment).

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

Accordingly, KLM's motion to dismiss that portion of the complaint is granted.

### D. Negligent Hiring, Training, Retention and Supervision

[HN10]In New York, recovery for injuries caused by the negligence of an employer is governed by the workers' compensation law. *See Ross*, 2 F. Supp. 2d at 532. If recovery is available under the workers' compensation law, then that recovery is the plaintiff's exclusive remedy against the employer and other common law tort claims are prohibited. *See Persaud*, 1996 WL 11197, at *5. Therefore, the [*18] workers' compensation law bars those claims asserted against KLM for the negligent hiring, training, supervising or retaining of Wagemans. *See Walker v. Weight Watchers Int'l*, 961 F. Supp. 32, 35 (E.D.N.Y. 1997); *Ross*, 2 F. Supp. 2d at 533.

[HN11]However, workers' compensation is not the exclusive remedy for those tortious acts which the employer committed intentionally or which were "perpetrated at the employer's direction or instigation." *Thompson v. Maimonides Med. Ctr.*, 86 A.D.2d 867, 868, 447 N.Y.S.2d 308 (2d Dep't 1982); *see* N.Y. Work. Comp. Law § 11 (McKinney 1997); *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir.), *cert. denied*, 522 U.S. 997, 118 S. Ct. 563, 139 L. Ed. 2d 404 (1997). "To fall within the intentional tort exception, however, the employee must allege that the employer engaged in conduct to bring about the consequences of the act. Mere knowledge or appreciation of the risk is insufficient to invoke the exception." *Rosario v. Copacabana Night Club, Inc.*, 1998 U.S. Dist. LEXIS 7840, *27-28, No. 97 Civ. 2052, 1998 WL 273110, at *9 (S.D.N.Y. May 28, 1998) (quotations omitted).

Plaintiffs argue that the [*19] allegation that KLM was "negligent and/or reckless" enables plaintiffs to invoke the special exception. However, [HN12]New York courts have rejected attempts to remove cases from the exclusivity provision of the workers' compensation law by alleging recklessness. *See LeDoux v. City of Rochester*, 162 A.D.2d 1049, 557 N.Y.S.2d 821 (4th Dep't 1990) (dismissing complaint which alleged that co-employee acted negligently, carelessly and recklessly but which lacked any allegation that the coemployee acted "deliberately with intent to injure"); *Orzechowski v. Warner-Lambert Co.*, 92 A.D.2d 110, 112, 460 N.Y.S.2d 64 (2d Dep't 1983) (allegation of reckless conduct or gross negligence insufficient to allege intentional conduct). Taking the facts alleged in the Complaint as true, plaintiff has failed to allege that KLM "engaged in conduct to bring about the consequences of the act." *Rosario*, 1998 WL 273110, at *9.

Accordingly, KLM's motion to dismiss the claim for negligent or reckless hiring, training, supervision and retention is granted.

### III. Title VII and Human Rights Law Claims [2]

2    Plaintiffs concede the following: plaintiffs Salvatore, Rota, Kane, Manfredi, Gouskas, Brosnan and Massa have alleged claims of national origin and sex discrimination only, (Pl. Mem. at 14), plaintiff Fruhling has alleged religious and sex discrimination only, (*id.*), plaintiff Conca has alleged claims of national origin, sex and age discrimination only, (*id.*), plaintiff Cocozzo has alleged claims of national origin and sexual orientation discrimination only, (*id.*), plaintiff Yagnik has alleged claims of national origin discrimination and discrimination on the basis of color only, (*id.*), plaintiff Dern has alleged claims of sex, age and religious discrimination only, (*id.*), plaintiff Greco has alleged claims of sex discrimination and discrimination on the basis of pregnancy only, (*id.*), plaintiff Peterkin has alleged claims of sex, national origin and racial discrimination and discrimination on the basis of color only, (*id.*), plaintiff Kroner has alleged claims of sex, age and religious discrimination only, (*id.*), plaintiffs Gore and Maier have alleged claims of sex and age discrimination only, (*id.*), plaintiff Benaissa has alleged claims of national origin, sex and religious discrimination only, (*id.*), plaintiff McGrath has alleged a claim of sex discrimination only, (*id.*), and plaintiff Tricoli has alleged a claim of national origin discrimination only, (*id.*). Thus, to the extent the Complaint alleges other forms of discrimination pertaining to the above-described plaintiffs, those discrimination claims are dismissed.

Furthermore, I agree that plaintiff Brosnan's claim for national origin discrimination should be dismissed. The complaint does not contain any allegations as to Brosnan's national origin or any conduct of defendants relating to Brosnan's national origin. (Compl. PP 120-31.)

[*20] **A. Individual and Official Liability**

Plaintiffs bring Title VII claims against Wagemans in both his individual and official capacities. In *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), the Court of Appeals held that [HN13]defendants with supervisory control over a plaintiff may not be held individually, or personally, liable under Title VII. Accordingly, that portion of the Complaint which attempts to hold Wagemans individually liable is dismissed.

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

Plaintiffs correctly note that *Tomka* did not address the potential liability of individuals in their official capacity. *See Cook v. Arrowsmith Shelburne Inc., 69 F.3d 1235, 1241 n.2 (2d Cir. 1995)* (stating that the "issue of whether . . . an individual may be made a party defendant solely in the person's corporate capacity as an agent of the employer . . . was neither argued to, nor addressed in the *Tomka* court"). However, [HN14]the weight of authority in this circuit has leaned decidedly against permitting individual defendants to be sued in their official capacities. I recognized the strength of that reasoning in an earlier decision, *Crockett v. Pataki, 1998 U.S. Dist. LEXIS 14393*, No. 97 Civ. 3539, 1998 WL 614134, [*21] at *4 (S.D.N.Y. Sept. 14, 1998). [3] *See also McBride v. Routh, 51 F. Supp. 2d 153, 156, 1999 WL 364255*, at *3 (D. Conn. 1999) (collecting cases). Courts have declined to find a private right of action against a supervisory employee in his official capacity because of the absence of Congressional intent to impose such liability on an employer. *See Gray v. Shearson Lehman Bros., Inc., 947 F. Supp. 132, 136 (S.D.N.Y. 1996); Bonner v. Guccione, 916 F. Supp. 271, 279 (S.D.N.Y. 1996); Yaba v. Cadwalader, Wickersham & Taft, 896 F. Supp. 352, 353-54 & n.1 (S.D.N.Y. 1995)*. Accordingly, the Title VII cause of action against Wagemans in his official capacity is dismissed.

> 3    In light of my reconsideration of this issue in *Crockett*, plaintiff's reliance on my earlier decision of *Geiger v. E.I. DuPont Nemours & Co., Inc., 1997 U.S. Dist. LEXIS 2049*, No. 96 Civ. 2757, 1997 WL 83291, at *19-*20 (S.D.N.Y. Feb. 27, 1997), for the proposition that individuals may be sued in their official capacity for violations of Title VII is misplaced.

[*22] Wagemans also moves to dismiss the Human Rights Law claims against him. [HN15]Two theories of liability have been recognized by the courts applying the Human Rights Law. Claims for discrimination brought under the Human Rights Law may be directed at either (1) employers or (2) persons who aid and abet an employer's violation of the statute. *N.Y. Exec. Law §§ 296(1)(a)* & *292(6)*. The Human Rights Law does not define "employer," but the New York Court of Appeals has held that a corporate employee is not individually subject to a suit for discrimination if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others. *See Patrowich v. Chemical Bank, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984)*. Although it does not appear from the face of the Complaint that Wagemans was an "employer," (*see* Compl. P 228) (stating Wagemans was an "employee within the supervision and control of the defendant, KLM"), plaintiff has ade-

quately alleged that Wagemans was an "aider and abettor" under the Human Rights Law.

Several courts in the Second Circuit have held that [HN16]managers or supervisors may be held individually [*23] liable if they aid and abet discrimination as proscribed by *§ 296(6)* of the Human Rights Law. *Tomka, 66 F.3d at 1313; McNulty v. New York City Dep't of Fin., 941 F. Supp. 452, 459 (S.D.N.Y. 1996); Jungels v. State Univ. Col. of New York, 922 F. Supp. 779, 786 (W.D.N.Y. 1996)*, aff'd, *Jungels v. Jones, 112 F.3d 504 (2d Cir. 1997)*. The Appellate Division, First Department, has adopted the *Tomka* holding, *Steadman v. Sinclair, 223 A.D.2d 392, 636 N.Y.S.2d 325, 326* (1st Dep't 1996), but the Second Department and at least one lower New York court have rejected it. *See Trovato v. Air Express Int'l, 238 A.D.2d 333, 334, 655 N.Y.S.2d 656 (2d Dep't 1997); Foley v. Mobil Chemical Co., 170 Misc. 2d 1, 647 N.Y.S.2d 374, 380-82 (Monroe County 1996)*. The New York Court of Appeals has not spoken on this matter.

Recently, in *Ponticelli v. Zurich Am. Ins. Group, 16 F. Supp. 2d 414 (S.D.N.Y. 1998)*, the Court declined to recognize aiding and abetting claims against individuals under the Human Rights Law because of the split among the New York courts and the "potential [*24] for confusion on liability and remedies". *Id. at 440*. Nevertheless, I follow the majority of federal cases which have held that *Tomka*, as the law in this circuit, is binding. *See Bascomb v. Smith Barney Inc., 1999 U.S. Dist. LEXIS 353*, No. 96 Civ. 8747, 1999 WL 20853, at *5 (S.D.N.Y. Jan. 15, 1999); *Bigelow v. New York State Dep't of Corrections, 1997 U.S. Dist. LEXIS 18133*, *8 n.1, No. 97-CV-460, 1997 WL 733867, at *3 n.1 (N.D.N.Y. Nov. 7, 1997); *Johnson v. A.P. Prods., Ltd., 934 F. Supp. 625, 630 (S.D.N.Y. 1996); Tagare v. NYNEX Network Sys. Co., 921 F. Supp. 1146, 1152 (S.D.N.Y. 1996); Luongo v. Nationwide Mut. Ins. Co., 1996 U.S. Dist. LEXIS 11186*, No. 95 Civ. 3190, 1996 WL 445365, at *3 (S.D.N.Y. Aug. 7, 1996).

*Tomka* holds that [HN17]a defendant must "actually participate in the conduct giving rise to a discrimination claim." *66 F.3d at 1317*. The Complaint is replete with examples where Wagemans allegedly "actually participated" in the discrimination. In fact, Wagemans is the sole KLM employee alleged to have engaged in the discriminatory conduct. Accordingly, Wagemans' motion to dismiss the HRL claims is denied.

**B. Hostile Work Environment Claims**

[HN18]Title [*25] VII [4] affords employees the right to work in an environment "free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 2404-*

05, 91 L. Ed. 2d 49 (1986). To prevail on a hostile work environment claim, a plaintiff must prove: (1) that she is a member of a protected group; (2) that she was the subject of unwelcome advances; (3) that the harassment was based upon her membership in the protected class; and (4) that the harassment affected a term, condition, or privilege of employment. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir. 1993) (citing *Meritor*, 477 U.S. at 63-69, 106 S. Ct. at 2403-07). A hostile environment under Title VII is a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993); *Castro v. Local 1199*, 964 F. Supp. 719, 728 (S.D.N.Y. 1997) ("To sustain a [*26] Title VII claim under a hostile work environment theory, plaintiff must present evidence of racially vicious epithets, physically threatening or humiliating actions, or a pattern of such reprehensible behavior over an extended period of time."). A court must be particularly concerned with "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id. at 23, 114 S. Ct. at 371*. [HN19]While a plaintiff's subjective experience of a hostile environment is necessary to sustain a claim, it is not enough. As the Supreme Court has reminded, "conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Id. at 21, 114 S. Ct. at 367*; *Torres*, 116 F.3d at 631.

4  The standards governing harassment under the equal protection clause and the Human Rights Law are virtually identical to the standards applied to claims brought under Title VII; accordingly, this portion of the opinion addresses all of plaintiffs' harassment claims simultaneously. *See Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir.) ("We have repeatedly noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII"), *cert. denied*, 522 U.S. 997, 118 S. Ct. 563, 139 L. Ed. 2d 404 (1997); *Tomka*, 66 F.3d at 1304 n.4 (noting that New York courts apply the same standards of proof to claims brought under section 296 of the New York Executive Law as to those brought under Title VII); *Wise v. New York City Police Dep't*, 928 F. Supp. 355, 367 (S.D.N.Y. 1996) (employing Title VII standards

to analyze sexual harassment claim advanced under equal protection clause).

[HN20]

[*27] To determine whether a work environment is so hostile as to violate Title VII, I must evaluate all relevant circumstances, *see Harris*, 510 U.S. at 21, 114 S. Ct. at 367, and consider "the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998). Indeed, as the Supreme Court stated:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish . . . conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Id.*

Defendants move to dismiss the hostile environment claims of the following seven plaintiffs: Rota, Kane, Conca, Cocozzo, Yagnik, Maier and Tricoli. The allegations supporting these plaintiffs claims are discussed below. I hold that these seven hostile environment claims [*28] should be dismissed because none of the plaintiffs has alleged that defendants' conduct was severe or pervasive enough to warrant a finding of hostile environment harassment. In particular, the events alleged, while troubling and offensive, are alleged to have occurred episodically and without the degree of frequency necessary to uphold hostile environment claims. *See, e.g., Schwapp v. Town of Avon*, 118 F.3d 106, 109 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity,' meaning that 'instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments") (citing cases).

Plaintiffs' statement in their brief that the "discriminatory acts alleged were repeated, recurrent, and in fact, pervaded the daily work life of each plaintiff" is unsupported by factual allegations in the complaint. (Pl. Mem. at 15.) I understand that [HN21]in hostile environment cases, "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for

Case 1:07-cv-11091-JSR   Document 12-2   Filed 02/07/2008   Page 74 of 80

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

purposes of Title VII liability. [*29] " *Tomka*, 66 F.3d at 1305 (footnote and citations omitted). However, none of the alleged offensive touchings appear to rise to the level of sexual assault to compel me to engage in that analysis.

### 1. Rota

Rota alleges that Wagemans: (1) "told Rota that women with children (such as herself) should not be working, but should be home raising children"; (2) made unwanted embarrassing sexually charged comments to her; (3) called Rota a "gangbanger"; (4) questioned whether she was breastfeeding her newborn child and suggested that she was breastfeeding her child more for her own gratification than that of the child; (5) "screamed at Ms. Rota at the top of his lungs, and placed Ms. Rota in fear that he would become physical and hit her"; and (6) accused her of having a "bitchy" attitude. (Compl. P 37.)

Rota has not stated a claim for hostile work environment sexual harassment. She has not alleged that Wagemans' comments or conduct occurred with any significant frequency. *Tomka*, 66 F.3d at 1305 n.5 ("isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur [*30] in concert or with a regularity that can reasonably be termed pervasive"). Furthermore, [HN22]disparaging remarks about the capabilities of working mothers, such as those alleged here, are not sufficiently severe to establish a hostile environment claim. *Trezza v. The Hartford, Inc., 1998 U.S. Dist. LEXIS 20206*, *5, No. 98 Civ. 2205, 1998 WL 912101, at *1, *4 (S.D.N.Y. Dec. 30, 1998) (dismissing hostile work environment claims where defendants commented on the "'incompetence and laziness of women who are also working mothers'"). Conclusory allegations of "unwanted embarrassing sexually charged comments" are also insufficient to state a claim. *Gibson v. Jacob K. Javits Convention Ctr. of N.Y., 1998 U.S. Dist. LEXIS 3717*, No. 95 Civ. 9728, 1998 WL 132796, at *7-*8 (S.D.N.Y. Mar. 23, 1998) (dismissing allegations containing conclusory descriptions of hostile work environment). Moreover, Rota has not alleged that Wagemans' screaming was related to her gender. *See Cosgrove*, 9 F.3d at 1042 (plaintiff must prove that the harassment was based on her sex). Thus, Rota's hostile work environment claim must fail.

### 2. Kane

Similarly, Kane's allegations do not amount to actionable sexual harassment. Wagemans is alleged [*31] to have called Kane "sweetie pie," "Maura Baby," "cutie," and "stupid." (Compl. P 47.) In addition, Kane alleges that Wagemans told her to "shut up," that "Americans are lazy" and stood so close to Kane, that he

brushed up against her on "some occasions." (*Id.* PP 48-49.) Wagemans' alleged comments, albeit offensive, are not severe and do not state a claim for hostile environment harassment. The Complaint does not suggest that the "brushing up" against Kane on "some occasions" was so "severe" or "pervasive" as to have affected the terms or conditions of Kane's employment. *See Gibson*, 1998 WL 132796, at *9 (dismissing sexual harassment claim where employer stared at plaintiff, even though staring was deemed "of a sexual nature").

### 3. Conca

Plaintiff Conca alleges that Wagemans called her "wife" and "hon," "My Rosemarie," "You stupid woman" and that he would put his arm around Conca's shoulder or through her arm and say, "Come, Wife," "Come, Dear," or "Let's go, Hon." (Compl. PP 63-64.) In addition, Wagemans is alleged to have asked if Conca's husband was a "mafioso," made comments about the "Italian temper" and made derogatory comments about Conca's national origin [*32] as an American. (*Id.* P 65.) Furthermore, Wagemans allegedly said, in referring to Ms. Conca, "she looks nice for her age," and "she is good looking for an older woman." (*Id.* P 66.) I find that the alleged comments related to Conca's gender and national origin, and the alleged unwanted contact, do not amount to behavior creating a hostile work environment. Such casual comments and behavior do not suffice. *See Watts v. New York Police Dep't, 724 F. Supp. 99, 104 (S.D.N.Y. 1989)*.

With respect to Conca's age-related claims, Conca has not averred that she was aware of the allegedly offensive statements and, thus, does not state a claim for hostile environment harassment. *Gibson*, 1998 WL 132796, at *8 (dismissing hostile environment claim where plaintiff did not aver she was aware of the offensive conduct).

### 4. Cocozzo

As discussed below, [HN23]discrimination on the basis of sexual orientation is not prohibited by Title VII. Thus, to the extent Cocozzo claims Wagemans' comments created a hostile environment founded on sexual orientation, these claims are dismissed. Cocozzo also alleges that Wagemans called him a "crazy Italian" and a "mafioso". (*Id.* [*33] P 70.) Furthermore, Cocozzo alleges that on "numerous" occasions, Wagemans hit him on the back of the head. (*Id.* P 72.) Cocozzo also states that on one occasion, "Wagemans hit Mr. Cocozzo numerous time [sic] in the face with sheets of paper," (*Id.* P 73), and that on one occasion, "Mr. Wagemans kicked Mr. Cocozzo in the leg twice," (*Id.* P 74.) I conclude from this set of facts that, at most, Cocozzo has suggested that Mr. Wagemans "uses offensive language and has evinced a dislike for plaintiff." *Francis v. Chemical*

Case 1:07-cv-11091-JSR    Document 12-2    Filed 02/07/2008    Page 75 of 80

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

*Banking Corp.*, 62 F. Supp. 2d 948, 1999 U.S. Dist. LEXIS 12502, 1999 WL 617628, at *9 (E.D.N.Y. 1999) (dismissing claim for racially hostile work environment where plaintiff alleged four specific incidents involving racial comments and that defendant lunged at him, followed him into the bathroom and brushed his hand against plaintiff's buttocks). Cocozzo has not alleged a barrage of disparaging remarks based on his national origin, nor has he alleged a connection between the unwanted touchings and behavior indicative of national origin animus. *See Francis*, 1999 WL 617628, at *9 (dismissing claims where physical contact objectively carried no racial [*34] overtones).

5. Yagnik

Plaintiff Yagnik alleges that Mr. Wagemans made derogatory comments about Yagnik's national origin and his skin color such as "you Indian people are always short and dark." (Compl. P 77.) Yagnik also alleges that Wagemans hit Yagnik in the back of the head with his hand on numerous occasions. (*Id.* P 78.) Like Cocozzo, Yagnik has not alleged that he was repeatedly subjected to the offensive remarks or Wagemans' comments unreasonably interfered with his work performance. Wagemans' comments rise to no more than a "mere offensive utterance" which is not actionable under Title VII. *Harris*, 510 U.S. at 21, 114 S. Ct. at 370 ("Mere utterance of an . . . epithet which engenders offensive feelings in the employee does not sufficiently affect the conditions of employment to implicate Title VII." (quoting *Meritor*, 477 U.S. at 67, 106 S. Ct. at 2405 (citation and internal quotation marks omitted))).

6. Maier

Maier alleges that Wagemans subjected her to derogatory comments about her age such as "you are a lovely old lady" and frequent greetings such as "how are you, old lady?" (Compl. P 140.) She also alleges that Mr. Wagemans stated, [*35] "What are you, a lesbian?" (*Id.*) Maier also alleges that on one occasion, Wagemans "sneaked up behind Ms. Maier while she worked at her desk and stood so close to Ms. Maier that she jumped up and screamed in fear that he was about to pounce on her, grab her, and physically touch or even injure her." (*Id.* P 141.) Again, these comments are not severe or pervasive so as to create a hostile work environment. Furthermore, the isolated incident of Wagemans' "sneaking up" on Ms. Maier, cannot readily be attributed to Wagemans' attitudes about Ms. Maier's age or her gender. *Francis*, 1999 WL 617628, at *9 (dismissing hostile environment claims where vague descriptions of offensive language and conduct could not be readily attributed to racial animus).

7. Tricoli

Tricoli alleges that on numerous occasions, Wagemans made derogatory remarks about Tricoli's national origin and heritage, such as "Guinea," "lazy italian," "Mafioso," and "Gangster." (Compl. P 171.) These allegations, without more, do not establish a hostile work environment. Tricoli has not alleged that these comments alleged that these comments unreasonably interfered with his work performance. [*36] *Harris*, 510 U.S. at 23.

C. Sexual Orientation Claims

Defendants seek to dismiss those claims alleging harassment or discrimination based on sexual orientation because neither Title VII nor the Human Rights Law prohibits such discrimination. [5] I agree.

5    Only plaintiff Cocozzo asserts a claim on the basis of sexual orientation.

As Judge Wexler's well-reasoned opinion, *Simonton v. Runyon*, 50 F. Supp. 2d 159, 162 (E.D.N.Y. 1999), makes clear, harassment based on a plaintiff's sexual orientation, as opposed to a plaintiff's sex, is not covered by Title VII. In *Simonton*, the district court reviewed the recent Supreme Court case *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998), and the Court of Appeals' decision in *DeCintio v. Westchester County Medical Ctr.*, 807 F.2d 304 (2d Cir. 1986), cert. denied, 484 U.S. 825, 108 S. Ct. 89, 98 L. Ed. 2d 50 (1987). In *Oncale*, the Supreme [*37] Court emphasized that the discrimination alleged must be "based on sex." *Oncale*, 118 S. Ct. at 1002 (stating that the "critical issue . . . [is] whether the members of one sex are exposed to conditions of employment to which members of the other sex are not exposed") (quotation omitted). The Court left undisturbed that line of cases finding that discrimination based on sexual orientation is not discrimination based on sex and thus does not state a claim under Title VII. *See, e.g.*, *Dillon v. Frank*, 952 F.2d 403, 1992 WL 5436 (6th Cir. 1992) (holding no Title VII remedy for hostile work environment caused by taunts about plaintiff's homosexuality); *Williamson v. A.G. Edwards and Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989), cert. denied, 493 U.S. 1089, 110 S. Ct. 1158, 107 L. Ed. 2d 1061 (1990) (Title VII does not prohibit discrimination based on homosexuality).

The Court of Appeals has not yet addressed this precise question. In *DeCintio*, however, the Court considered whether Title VII applies to a plaintiff who alleged discrimination based on the preferential treatment that a hired female had received because [*38] of her "sexual liaison" with the employer. There, the Court of Appeals took pains to establish that the discrimination suffered was not the result of the plaintiff's sex, but because of the romantic relationship. In so doing, the Court of Appeals

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

cited with approval those cases refusing to extend Title VII protection to claims of discrimination based upon sexual orientation. *See DeCintio, 807 F.2d at 307.*

"In light of the clear requirement in *Oncale* that a Title VII claim must allege discrimination 'based upon sex' and the Second Circuit's holding in *DeCintio*, . . . plaintiff's hostile environment claim, stemming from treatment he received because he is a homosexual, does not state a claim for discrimination on the basis of sex in violation of Title VII." *Simonton, 50 F. Supp. 2d at 162.* Accordingly, defendants' motion to dismiss this portion of the Complaint is granted. [6]

    6  As noted in footnote 4, *supra*, Title VII and Human Rights Law claims are evaluated identically for purposes of discrimination, and thus this claim fails under the Human Rights Law.

[*39]  D. Retaliation Claims [7]

    7  Plaintiffs request to replead their retaliation claims is denied. Plaintiffs have now had four opportunities to plead their claims adequately. I also deny plaintiffs' request to replead after discovery. *See Jones v. Capital Cities/ABC Inc., 168 F.R.D. 477, 480 (S.D.N.Y. 1996)* ("'the purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists',*" Stoner v. Walsh, 772 F. Supp. 790, 800 (S.D.N.Y. 1991)).*

KLM and Wagemans seek to dismiss sixteen of plaintiffs' retaliation claims for failure to plead a *prima facie* case. [8] Citing the Court of Appeals' decisions in *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)* and *Tomka, 66 F.3d at 1308*, defendants argue that plaintiffs have not sufficiently alleged plaintiffs' participation in a protected activity known to the defendants, an employment action adverse to plaintiffs or a causal connection [*40] between the protected activity and the adverse employment action. *See also Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).*

    8  The sixteen are: Salvatore, Rota, Fruhling, Kane, Manfredi, Conca, Cocozzo, Yagnik, Dern, Gouskos, Peterkin, Brosnan, Gore, Maier, Benaissa and Massa. KLM does not seek to dismiss retaliation claims of Greco, Kroner, McGrath or Tricoli.

I agree that plaintiffs' retaliation claims cannot survive this motion. [HN24]"An employee engages in a protected activity when she has (1) 'opposed any practice made an unlawful employment practice' by Title VII, or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Blake-McIntosh v. Cadbury Beverages, Inc., 1999 U.S. Dist. LEXIS 16550,* No. 3:96- CV-2554, 1999 WL 643661, at *13 (D. Conn. Aug. 10, 1999). The complaint is devoid of any factual allegations stating that plaintiffs Fruhling, Cocozzo, Maier and Massa engaged in any [*41] protected activity. Therefore, their retaliation claims are dismissed.

The remaining twelve plaintiffs allege that each "objected to, opposed, and complained about Wagemans' conduct, which resulted in further discriminatory behavior against" each of these twelve plaintiffs. (Compl. PP 34, 40, 50, 60, 67, 80, 86, 92, 105, 130, 137, 149.) None of these plaintiffs has alleged specifically that they complained to KLM about Mr. Wagemans' conduct. Furthermore, none of these plaintiffs has alleged the particular conduct about which they complained, or that their complaints described Wagemans' conduct as discriminatory. *See Boyce v. New York City Mission Soc'y, 963 F. Supp. 290, 294 (S.D.N.Y. 1997)* (dismissing retaliation claim where plaintiff did not allege that conduct of which she complained was discriminatory); *Wilson v. The Reuben H. Donnelly Corp., 1998 U.S. Dist. LEXIS 17220,* *10, No. 98 Civ. 1750, 1998 WL 770555, at *4 (S.D.N.Y. Nov. 2, 1998) ("'In order to survive a motion to dismiss, a complaint asserting a civil rights violation must set forth specific factual allegations establishing a prima facie case'") (quoting *Murphy v. Cadillac Rubber & Plastics, Inc., 946 F. Supp. 1108, 1116 (W.D.N.Y. 1996)).* [*42]  Therefore, I find that plaintiffs have not sufficiently alleged that they participated in a protected activity with knowledge of the defendants.

Assuming that plaintiffs have adequately pleaded engagement in protected activity, they have failed to plead any nexus between any adverse employment action that can be gleaned from their complaint, and the protected activity. Furthermore, the failure to detail any adverse employment actions with any specificity, including temporal and contextual descriptions, *DeCintio, 821 F.2d 111, 114 (1987)* ("proof of causal connection can be established by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant") (citations omitted), make it impossible to infer a connection between the adverse action and plaintiffs' alleged complaints about Wagemans' conduct.

[HN25]An employment action can be adverse even if it does not rise to the level of job termination or reduced wages and benefits. *See Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997)* [*43]  (comparing Age Discrimination in Employment Act to Title

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

VII). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of "'adverse.'" *Id. at 466.* I cannot and need not engage in that analysis here. First, plaintiffs allege conclusorily that their complaints about Mr. Wagemans' conduct resulted in further discriminatory behavior against them. (Compl. PP 34, 40, 50, 60, 67, 80, 86, 92, 105, 130, 137, 149.) Without specific facts regarding the kind of behavior, and who participated in such behavior, I cannot determine whether the plaintiffs suffered an adverse employment action. *Cf. Spurlock v. NYNEX, 949 F. Supp. 1022, 1032 (W.D.N.Y. 1996)* (sustaining retaliation claims where plaintiff specified alleged retaliatory conduct). Second, even where plaintiffs plead arguably adverse employment actions, according to the twelve plaintiffs, the actions are alleged to have occurred "as a result of the discriminatory and harassing conduct of the defendants," (Compl. PP 35, 41, 51, 61, 68, 81, 87, 93, 106, 131, 138, 150.) Thus, the plaintiffs have not plead that the adverse [*44] employment action resulted from their participation in a protected activity. [HN26]Without a link between the protected activity and the adverse employment action, plaintiffs' retaliation claims must fail. [9]

> 9   For the reasons set forth in footnote 4, *supra*, these plaintiffs' claims for retaliation under the HRL are dismissed. *Stordeur v. Computer Assocs. Int'l, Inc., 995 F. Supp. 94, 103 (E.D.N.Y. 1998)* ("A claim under New York's Human Rights Law and under Title VII are essentially identical"); *Boyce, 963 F. Supp. at 295 n.3* ("Stating a retaliation claim under New York Law is substantially similar to Title VII.").

E. Failure to Promote

I agree that plaintiffs have not sufficiently alleged claims of a discriminatory failure to promote. [HN27]In order to sustain a claim based on failure to promote, a plaintiff must plead that he or she applied for a specific position and was rejected. *Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998)* (failure to promote [*45] claim dismissed where plaintiff alleged only that she had repeatedly requested a promotion). No plaintiff has alleged that he or she applied for a specific promotion. Instead, each relies on the general allegation that he or she was "denied . . . promotions . . . as a result of the discriminatory and harassing conduct of the defendants." (Compl. PP 35, 41, 51, 61, 68, 75, 81, 87, 93, 99, 106, 131, 138, 142, 150, 159, 169, 175.) [10] Plaintiffs suggest new facts in their opposition to defendant KLM's motion to dismiss the failure to promote claims. (Pl. Mem. at 18.) Even if I were to accept these allegations, I conclude still that plaintiffs have not alleged any specific positions

to which any plaintiff applied, and, therefore, have not alleged a *prima facie* case.

> 10   Plaintiff Kroner alleges, "After commencement of this action, KLM has retaliated against Ms. Kroner by denying her a transfer and/or promotion for which she applied." I construe this claim as one for retaliation, and not for failure to promote under Title VII, because by its terms, the claim accrued after the commencement of this litigation.

[*46] F. Denial of Overtime Pay and Benefits

[HN28]To establish a *prima facie* case of discrimination in the provision of overtime pay, a plaintiff must allege that (1) he or she is a protected class member; (2) he or she was qualified for to receive overtime pay; (3) an employer denied the plaintiff overtime pay for overtime work performed; and (4) the denial of overtime occurred under circumstances giving rise to an inference of discrimination. *See Austin v. Ford Models, Inc., 149 F.3d 148, 153 (2d Cir. 1998)* (dismissing claims for sex and age discrimination); *see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973)* (setting forth requirements for *prima facie* case of race discrimination). Plaintiffs have not met their burden here. Plaintiffs have failed to allege any facts showing that plaintiffs were qualified, by virtue of their positions or otherwise, to receive overtime. Furthermore, plaintiffs have not alleged that they worked overtime and are, therefore, entitled to receive overtime pay. Last, plaintiffs have not alleged that their protected class status was a factor in the denial of overtime [*47] pay. *See Austin, 149 F.3d at 154* (dismissing age discrimination claim where plaintiff failed to allege that overtime was paid only to employees younger than plaintiff); *Lamb v. Henderson, 1999 U.S. Dist. LEXIS 12144,* No. 98 Civ. 2756, 1999 WL 596271, at *3 (S.D.N.Y. Aug. 9, 1999) (dismissing age discrimination claim where plaintiff failed to allege disparate effect of alleged adverse employment decision). Therefore, plaintiffs have failed to set forth a *prima facie* case for discrimination in the failure to pay overtime.

For the same reasons fatal to their denial of overtime pay claims, plaintiffs' denial of benefits claims must fail. Plaintiffs have not alleged specific benefits denied, nor the basis for their entitlement to such benefits. In addition, they have failed to show that these benefits were given to persons outside plaintiffs' protected classes. [11]

> 11   For these reasons, plaintiffs' failure to promote, denial of overtime and benefits claims under the HRL also fail. *See Van Zant, 80 F.3d at 714* (citing cases).

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

[*48]  **IV. City Law Claims.** [12]

> 12  I agree with plaintiffs that compliance with the service requirements provided in section 8-502(c) of the New York Administrative Code is not a condition precedent to a valid suit. *See Cully v. Milliman & Robertson, Inc.*, 20 F. Supp. 2d 636, 643-44 (S.D.N.Y. 1998) ("The clear weight of authority in New York courts is that the § 8-502(c) requirement of notice to the City is not a condition precedent to a valid suit."); *Duffy v. Drake Beam Morin*, 1998 U.S. Dist. LEXIS 7215, *34 n.8, No. 96 Civ. 5606, 1998 WL 252063, at *11 n.8 (S.D.N.Y. May 19, 1998) ("Whatever doubt may have existed before, . . . , it is now settled that filing a complaint with the [New York City Commission on Human Rights and the Corporation Counsel] is not a prerequisite to bringing suit under the [City HRL]").

Plaintiffs Salvatore, Gouskos, Brosnan and Tricoli allege violations of the City HRL. Salvatore and Gouskos allege that Wagemans made "unwelcome, humiliating, sexually suggestive comments to Mr.   [*49] Salvatore and Mr. Gouskos" while Salvatore and Gouskos were at Wagemans' home in New York City at Wagemans' demand. (Compl. PP 32, 91.) Brosnan alleges that at a company outing in New York City, Wagemans put his arm around Brosnan "in another instance of an unwanted sexual advance and unwanted sexually charged physical contact." (Compl. P 126.) Salvatore and Tricoli allege that during a company outing in New York City, Mr. Wagemans made derogatory remarks to him about his national origin. (Compl. PP 33, 172.) Defendants assert that plaintiffs' claims under the City HRL should be dismissed because these alleged incidents, if true, had an impact on plaintiffs' employment in Westchester County, not New York City. Thus, defendants assert, the City HRL cannot apply to defendants claims because [HN29]the Administrative Code of the City of New York applies only to conduct within the boundaries of New York City.

I agree. The City HRL applies only to acts occurring within the boundaries of New York City. *Casper v. Lew Lieberbaum & Co., Inc.*, 1998 U.S. Dist. LEXIS 4063, *14, No. 97 Civ. 3016, 1998 WL 150993, at *4 (S.D.N.Y. Mar. 31, 1998) ("Both New York State law and the Administrative Code limit the applicability [*50] of the Administrative Code to acts that occur within the boundaries of New York City"). [HN30]In order to state a claim under the City HRL, a plaintiff must allege that he was discriminated against by the defendant within New York City. *See Duffy*, 1998 WL 252063, at *11.

The fact that certain acts leading to discrimination may occur in New York City will not necessarily give rise to a claim under the City HRL. *See Lightfoot v. Union Carbide Corp.*, 1994 U.S. Dist. LEXIS 6191, No. 92 Civ. 6411, 1994 WL 184670, at *5 (S.D.N.Y. May 12, 1994) (granting summary judgment for defendant where allegedly discriminatory program adopted by defendant in New York impacted plaintiff's employment in Connecticut), *aff'd*, 110 F.3d 898 (2d Cir. 1997); *Duffy*, 1998 WL 252063, at *12 (dismissing City HRL claim where decision to fire plaintiffs was made in New York City and plaintiffs worked outside New York City). To determine the location of the discrimination, courts have looked to the location of the impact of the offensive conduct. *See Casper*, 1998 WL 150993, at *5 (dismissing claims under City HRL where plaintiffs employed in Garden City, and sexually [*51] explicit comments made to New York City impacted on plaintiffs in the Garden City office); *Lightfoot*, 1994 WL 184670, at *5; *Duffy*, 1998 WL 252063, at *12; *Launer v. Buena Vista Winery, Inc.*, 916 F. Supp. 204, 213 (E.D.N.Y. 1996) (sustaining City HRL claims where plaintiff maintained office in New York City boundaries, defendant faxed plaintiff memorandum with discriminatory remarks to plaintiff's New York office and plaintiff was fired in New York).

In *Casper*, plaintiffs, who were employed in Garden City, New York, alleged that defendants made sexually explicit broadcasts through an interoffice microphone system from an office in Garden City, New York, to New York City, New York. *Id.* In addition, plaintiffs alleged that defendants answered plaintiffs' telephones, where calls were placed from New York City, with offensive language. *Id.* The court held that the sexually explicit comments and vulgar remarks had an impact on the plaintiffs solely at the Garden City office. The court stated, "The alleged violations of the Administrative Code were the quid pro quo and hostile environment sexual harassment claims, and the constructive [*52] discharge and retaliatory discharge claims, all of which impacted the plaintiffs in Garden City." *Id.* Although the *Casper* court noted that plaintiffs did not allege that the statements were made to them in New York City, offensive remarks or conduct alone within New York City may not be sufficient. *Cf. Launer*, 916 F. Supp. at 213 (plaintiff maintained office in New York City boundaries, was subjected to discriminatory remarks at plaintiff's New York office and plaintiff was fired in New York). In *Launer*, plaintiff Launer maintained an office in New York City where he was regularly contacted by his employer. *Id. at 207*. Launer alleged that his employer made discriminatory remarks to him and faxed Launer a memo with allegedly discriminatory remarks to his office in New York City. *Id. at 214*. In addition, Launer was fired in New York City. *Id.* The court held that Launer stated a claim under the City HRL.

1999 U.S. Dist. LEXIS 15551, *; 81 Fair Empl. Prac. Cas. (BNA) 873

In this case, while the alleged remarks and conduct may have originated within the boundaries of New York City, plaintiffs have failed to allege that the whole or substantial part of the discrimination occurred in New [*53] York City. Like *Casper*, here, the alleged violations of the Administrative Code are hostile environment, constructive discharge and retaliation, failure to promote and denial of overtime or benefits claims. These Plaintiffs concede that they are not employed in New York City, (Pl. Mem. at 20), and allege the offensive acts occurred on isolated occasions in New York City. Unlike *Launer*, plaintiffs do not allege that they were subject to any adverse employment action in New York City, such as termination, denial of overtime pay, benefits or promotions. Furthermore, even if the isolated incidents in New York City contributed to a hostile work environment, the plaintiffs' work environment is in Elmsford, New York, not New York City.

Accepting plaintiffs' allegations as true, I conclude that plaintiffs were not discriminated against within the boundaries of New York City because the impact of the conduct, if any, was felt on their employment in Westchester County. Plaintiffs' tangential contacts with New York City, even if within the scope of their employment, cannot support claims under the City HRL.

**CONCLUSION**

Defendants' motion to dismiss is granted in part and denied [*54] in part as follows:

(a) as to Count I, defendants' motion to dismiss the Human Rights Law claims marked "X" in Chart B included in Exhibit E to the Affidavit of Michael J. DiMattia in Support of KLM's Motion to Dismiss, sworn to Jan. 8, 1998 ("DiMattia Aff. Ex. E") is granted; defendant Wagemans' motion to dismiss all other Human Rights Law claims against him is denied except as described below; defendants' motion to dismiss the Title VII claims marked "X" in Chart C included in DiMattia Aff. Ex. E is granted; defendants' motion to dismiss the hostile environment, retaliation, failure to promote, denial of overtime and benefits claims marked "X" in Chart D included in DiMattia Aff. Ex. E is granted; defendant Wagemans' motion to dismiss all Title VII claims against him is granted; defendants' motion to dismiss the City HRL claims is granted;

(b) as to Count II, Wagemans' motion to dismiss the hostile environment claims of Rota, Kane, Conca, Cocozzo, Yagnik, Maier and Tricoli is granted;

(c) as to Count III, Wagemans' motion to dismiss the retaliation claims of the sixteen plaintiffs named in footnote 8, *supra*, is granted;

(d) as to Counts IV and V, defendants' [*55] motion to dismiss the assault and battery claims of plaintiffs Salvatore, Rota, Fruhling, Kane, Dern, Gouskos, Peterkin, Brosnan, McGrath, Tricoli and Gore is granted;

(e) as to Count VI, KLM's motion to dismiss the intentional infliction of emotional distress claims is granted as to all plaintiffs and Wagemans' motion to dismiss the intentional infliction of emotional distress claims is granted as to all plaintiffs except Kroner and Benaissa;

(f) as to Count VII, KLM's motion to dismiss is granted; and

(g) as to Count VIII, KLM's motion to dismiss is granted.

SO ORDERED:

DATED: New York, New York

Sept *30*, 1999

LORETTA A. PRESKA, U.S.D.J.