UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------

LINDA RYLOTT-ROONEY,

                Plaintiff,

        - against -

ALITALIA – LINEE AEREE ITALIANE –
SOCIETA PER AZIONI,

              Defendant.

----------------------------------------------------------

**Index No. 07 CV 11091 (JSR)**

**ECF CASE**


**REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS
<u>PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 2

ARGUMENT .................................................................................... 2

POINT I .......................................................................................... 2

PLAINTIFF'S OPPOSITION FAILS TO CURE THE DEFECTS IN HER
CLAIMS UNDER THE NYSHRL .......................................................... 2

    A.    As a Non-Resident, Plaintiff Cannot Apply the NYSHRL Extraterritorially ........ 3

    B.    The Cases Cited in Plaintiff's Opposition are Neither Binding nor
Persuasive .................................................................................. 4

POINT II ......................................................................................... 6

PLAINTIFF'S OPPOSITION FAILS TO CURE THE DEFECTS IN HER
CLAIMS UNDER THE NYCHRL .......................................................... 6

    A.    Plaintiff Fails to Distinguish Between the Locus of an Allegedly
Discriminatory Act and the Site of that Act's Impact ............................. 6

    B.    Cases cited in Plaintiff's Opposition are consistent with Alitalia's position ........ 8

    C.    Legislative intent to bolster New York City law is insufficient to extend its
territorial scope beyond the five boroughs ......................................... 11

POINT III ....................................................................................... 12

PLAINTIFF HAS AGREED TO DISMISS THE SECOND, FOURTH AND
FIFTH CLAIMS IN HER COMPLAINT .................................................. 12

CONCLUSION ................................................................................. 12

## CASES

*Duffy v. Drake Beam Morin, Harcourt Gen., Inc.*,
   1998 U.S. Dist. LEXIS 7215 (S.D.N.Y. 1998) ................................................ 3, 5, 7

*Germano v. Cornell University*, 2005 U.S. Dist. LEXIS 17759 .................................... 9

*Hart v. Dresdner Kleinworth Wasserstein Securities, LLC*,
   2006 U.S. Dist. LEXIS 56710 (S.D.N.Y. 2006) ........................................ 10

*International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC*,
   470 F.Supp.2d 345 (S.D.N.Y. 2007) .................................................... 9

*Launer v. Buena Vista Winery*,
   916 F.Supp. 204 (E.D.N.Y. 1996) ...................................................... 8

*Lucas v. Pathfinder's Pers., Inc.*,
   2002 U.S. Dist. LEXIS 8529 (S.D.N.Y. 2002) .................................... 3, 5

*Pearce v. Manhattan Ensemble Theater*,
   2007 U.S. Dist. LEXIS 16487 ...................................................... 5, 10

*Rice v. Scudder Kemper Investments, Inc.*,
   2003 U.S. Dist. LEXIS 14239 (S.D.N.Y. 2003) .................................... 3, 4

*Salvatore v. KLM Royal Dutch Airlines*,
   1999 U.S. Dist. LEXIS 15551 (S.D.N.Y. 1999) ........................................ 7

*Shah v. Wilco Systems, Inc.*, 27 A.D.3d 169, 176, 806 N.Y.S.2d 553, 558 (1st Dept. 2005),
   *appeal dismissed in part and otherwise denied*,
   7 N.Y. 859, 824 N.Y.S.2d 1129, (N.Y. 2006) ........................................ 7

*Starr v. Time Warner, Inc.*,
   2007 U.S. Dist. LEXIS 88219, *14 (S.D.N.Y. 2007) ................................ 11

*Tebbenhoff v. Elec. Data Sys. Corp.*,
   2005 U.S. Dist. LEXIS 29874 (S.D.N.Y. 2005) .................................... 5, 9

*Torrico v. Int'l. Bus. Machines Corp.*,
   213 F.Supp.2d 390 (S.D.N.Y. 2002) ................................................ 3, 4

## STATUTES

New York City Human Rights Law, City Administrative Code  "NYCHRL" .................... passim

New York State Human Rights Law, Executive Law "NYSHRL" ...................................... passim

ii

Defendant Alitalia Linee Aeree Italiane, S.p.A. ("Alitalia" or "Defendant") by its attorneys, Vedder Price P.C., submits this Reply Memorandum of Law in further support of its Motion to Dismiss the Complaint of Plaintiff Linda Rylott-Rooney ("Rylott-Rooney" or "Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

## PRELIMINARY STATEMENT

The gravamen of Defendant's motion is that neither the New York State Human Rights Law, Executive Law § 296 ("NYSHRL") nor the New York City Human Rights Law, City Administrative Code § 8-107 ("NYCHRL") applies to a resident of another state whose employment was located in another state, in this case, Minnesota.

The reach of the NYSHRL extends beyond the borders of New York State only when a New York resident is discriminated against outside the borders of New York. Because this exception does not apply to non-residents, it is of no use to Plaintiff. Relevant case law – case law that was introduced in Alitalia's Memorandum of Law in Support of its Motion to Dismiss ("Moving Memorandum") and that was almost entirely ignored in Plaintiff's Opposition – holds that non-resident plaintiffs must be able to show that an alleged discriminatory employment action impacted their employment within New York State. Because Plaintiff cannot do so, her claims brought under the NYSHRL must be dismissed. (*See* Point I, *infra*.)

The overwhelming majority of relevant case law requires that, in the context of a claim of employment discrimination under the NYCHRL, the actual impact of the discrimination be felt within the five boroughs. (*See* Point II(A), *infra*.) The cases presented in Plaintiff's Opposition either fail to address the NYCHRL, are outliers in the relevant body of case law or are actually

entirely consistent with the arguments set forth in Alitalia's Moving Memorandum. (*See* Point II(B), *infra*.) Finally, Plaintiff argues that, because the legislative intent behind the NYCHRL was to make it more progressive than its State or Federal counterparts, it should therefore be construed as applying to conduct which impacts employment beyond the City's borders. This argument ignores the clear statutory limitations of New York City law, and does nothing to refute Alitalia's argument that Plaintiff's NYCHRL claims must be dismissed. (*See* Point II(C), *infra*.)

Plaintiff has agreed to voluntarily withdraw her Second, Fourth and Fifth Causes of Action for aiding and abetting under State and City law, and for negligent and intentional infliction of emotional distress. (*See* Point III, *infra*.)

Accordingly, Plaintiff's Complaint must be dismissed in its entirety.

## STATEMENT OF FACTS

All the facts necessary for the Court to reach a conclusion on Alitalia's motion have been set forth in Plaintiff's Complaint, the relevant passages of which were repeated at page two of Alitalia's Moving Memorandum.

## ARGUMENT

### POINT I

### PLAINTIFF'S OPPOSITION FAILS TO CURE THE DEFECTS IN HER CLAIMS UNDER THE NYSHRL

Plaintiff attempts to distinguish only two of the cases cited in Defendant's moving memorandum, one of which is *Lucas v. Pathfinders, Inc.*, 2002 U.S. Dist. LEXIS 8529

(S.D.N.Y. 2002) (attached to Alitalia's Moving Memorandum as Exhibit A).[1]  Plaintiff is under

the impression that Alitalia views *Lucas* as standing for the proposition that "the jurisdiction of

the State Law does not extend to a non-resident employee."  (Opposition Point I(I), p. 4.)  This is

inaccurate.  Alitalia's position is that the NYSHRL may extend to some non-resident employees,

but not to Rylott-Rooney because her employment was in Minnesota and the impact of the

alleged discrimination was in Minnesota.

## A.    As a Non-Resident, Plaintiff Cannot Apply the NYSHRL Extraterritorially.

The reach of the NYSHRL may extend beyond the borders of New York State, but only

for New York residents.  "It is well established that the NY[S]HRL applies extraterritorially only

to New York residents; nonresidents are not covered, even if those nonresidents are

discriminated against by a resident of New York outside of New York."  *Rice v. Scudder Kemper*

*Investments, Inc.*, 2003 U.S. Dist. LEXIS 14239 (S.D.N.Y. 2003) (attached hereto as Exhibit A).

"The State Human Rights Law affords no remedy to a non-New York resident who suffers

discrimination outside New York State."  *Torrico v. Int'l. Bus. Machines Corp.*, 213 F.Supp.2d

390, 407 (S.D.N.Y. 2002) (quoting *Duffy v. Drake Beam Morin, Harcourt Gen., Inc.*, 1998 U.S.

Dist. LEXIS 7215 (S.D.N.Y. 1998) (attached to Alitalia's Moving Memorandum as Exhibit C)).

Plaintiff does not allege that she was ever a New York resident, and the Complaint

indicates that, at the time of her termination, she was a resident of Minnesota.  (Cplt. ¶¶ 4, 6.)

Consequently, this limited extension of the State Human Rights Law beyond the borders of New

York has no relevance to Plaintiff's NYSHRL claims.  However, this distinction explains why

---

[1]  Plaintiff's treatment of the second of these cases, *International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC*, 470 F.Supp.2d 345 (S.D.N.Y. 2007), actually supports Alitalia's position. See Point II(B)(2), *infra*.

Plaintiff is partially correct in the assertion that "there is no New York authority to suggest that the impact of a discriminatory act must be felt within New York for the NY[S]HRL to apply" (Opposition Point I(II), p. 6). While true enough for New Yorkers, it avails a non-resident nothing.

**B.    The Cases Cited in Plaintiff's Opposition are Neither Binding nor Persuasive.**

    **1.    The *Rice* Plaintiff's NYSHRL claims were dismissed, and *Torrico* offers only dictum in a footnote.**

In support of the proposition that a non-resident need not feel the impact of an alleged discriminatory act in New York for the NYSHRL to apply, Plaintiff cites two cases, neither of which stands for that rule. (Opposition Point I(II), p. 6) *Rice v. Scudder Kemper Investments, Inc.* in fact dismissed the non-resident plaintiff's NYSHRL claims in their entirety, and so is of no help to Plaintiff. 2003 U.S. Dist. LEXIS 14239, *14-15.

Plaintiff also misplaces reliance upon *Torrico v. Int'l. Bus. Machines Corp.*'s assertion, "Whether an employee who is not a New York resident falls within the scope of the NY[S]HRL's protection depends not on the place of employment . . . but rather on where the alleged acts of discrimination took place." *Torrico v. Int'l. Bus. Machines Corp.*, 213 F.Supp.2d 390, 407 n.11 (quoted in Opposition Point I(I), p. 5). This line of dictum, offered in a footnote to *Torrico*, is inapplicable to the immediate facts; unlike Rylott-Rooney, the *Torrico* plaintiff had lived and worked in New York. At the time of his termination he was on a temporary assignment to Chile, but because he had remained a New York resident during that assignment, the court found it unnecessary to address the question of the NYSHRL's applicability to conduct affecting non-residents. *Id.* at 407. Consequently, this single dictum was not relied upon by the court in reaching its holding, and it does not refute the body of case law presented in Alitalia's

NEWYORK/#191739.3

Moving Memorandum. *See Pearce v. Manhattan Ensemble Theater, Inc.*, 2007 U.S. Dist. LEXIS 16487, *30 ("Even though it can reasonably be inferred from the Complaint that Defendants' allegedly discriminatory decision to terminate Plaintiff was made in New York City, Plaintiff has failed to make the requisite allegation that the decision had an impact in New York City and State," attached to Alitalia's Moving Memorandum as Exhibit B); *Lucas v. Pathfinder's Pers., Inc.*, 2002 U.S. Dist. LEXIS 8529, *4 ("the fact that the decision to terminate Plaintiff was made in New York State is not sufficient to establish a violation of the NYSHRL"); *Duffy v. Drake Beam Morin, Harcourt Gen., Inc.*, 1998 U.S. Dist. LEXIS 7215, *37-38 ("even if the decision to fire Graham was made by DBM at its headquarters in New York City, that fact is insufficient to establish a violation of the State Human Rights Law").

### 2.    *Tebbenhoff* is a jurisprudential outlier that has been criticized since publication.

Plaintiff also relies upon *Tebbenhoff v. Elec. Data Sys. Corp.*, 2005 U.S. Dist. LEXIS 29874 (S.D.N.Y. 2005) (attached hereto as Exhibit B) for the proposition that the mere fact that a decision to terminate an employee was made in New York is sufficient to sustain a cause of action under the NYSHRL.  (Opposition Point I(I), p. 4.)  As discussed in Point II(B)(2), *infra*, the *Tebbenhoff* plaintiff maintained an office in New York, and business cards indicated that New York was his principal place of business.  2005 U.S. Dist. LEXIS 29874 at *15.  This alone is sufficient to distinguish it from the facts surrounding Plaintiff's termination.

Moreover, *Tebbenhoff* is an outlier in the contours of New York law on this topic, and has been criticized subsequent to its publication.  *See Pearce v. Manhattan Ensemble Theater, Inc.*, 2007 U.S. Dist. LEXIS 16487, *28 (holding, immediately following reference to *Tebbenhoff*, "This Court agrees with the line of decisions that have found that the State Human

5

Rights Law requires that there have been an impact in New York State"). As such, this Court should find that the law articulated in the cases set forth in Alitalia's Moving Memorandum – all but two of which Plaintiff's Opposition entirely fails to address – far outweighs any force that *Tebbenhoff* may have.

Because Rylott-Rooney cannot allege that she has ever been a resident of New York, she cannot invoke the NYSHRL regarding her employment in Minneapolis, Minnesota. Her NYSHRL claims must be dismissed with prejudice.

**POINT II**

**PLAINTIFF'S OPPOSITION FAILS TO CURE THE DEFECTS IN HER CLAIMS UNDER THE NYCHRL**

**A.    Plaintiff Fails to Distinguish Between the Locus of an Allegedly Discriminatory Act and the Site of that Act's Impact.**

In support of her assertion that the impact of Alitalia's termination of her employment was felt in New York City rather than in Minneapolis, Minnesota, Plaintiff alleges without reference to any legal authority that, "Clearly, the impact of the act of discrimination in this case was felt in New York City. . . . There is, therefore, no doubt, that the *locus* of the impact is in New York City" (Opposition Point I(II), p. 6, italics in original).

Plaintiff treats two terms – "locus" and "impact" – as if they were synonymous. They are definitely not, and the difference between the two mandates dismissal of this action. The distinction between these two terms is illustrated in *Shah v. Wilco Systems, Inc.*, the most recent published opinion from a New York State court on the applicability of the NYCHRL to an out-of-state plaintiff terminated by a New York employer. 27 A.D.3d 169, 176, 806 N.Y.S.2d 553,

NEWYORK/#191739.3

558 (1st Dept. 2005), *appeal dismissed in part and otherwise denied*, 7 N.Y. 859, 824 N.Y.S.2d

1129, (N.Y. 2006).  The court wrote:

> the locus of the decision to terminate [the plaintiff] is of no
> moment.  What is significant is where the impact is felt.  Thus,
> even if the termination decision had been made in New York City,
> the NYCHRL would not apply since its impact on her occurred [at
> the plaintiff's place of work] in New Jersey, not within the five
> boroughs.

Consequently, the fact that the decision to terminate Plaintiff was made in New York is

irrelevant; what is significant is that the impact of that decision was in Minneapolis, where

Plaintiff worked.

*Shah* illustrates that, as a dispositive matter in assessing a claim of employment

discrimination brought under the NYCHRL, courts look to the site of the impact of the alleged

discriminatory act, rather than to the site of the alleged discriminatory act itself.  "The fact that

certain acts leading to discrimination may occur in New York City will not necessarily give rise

to a claim under the City HRL.  To determine the location of the discrimination, courts have

looked to the impact of the offensive conduct."  *Salvatore v. KLM Royal Dutch Airlines*, 1999

U.S. Dist. LEXIS 15551, *50-51 (S.D.N.Y. 1999) (citations omitted, attached to Alitalia's

Moving Memorandum as Exhibit F).  This rule makes sense in the employment context because

"[t]o hold otherwise would be to expand the City Human Rights Law to cover any employee who

is fired pursuant to a decision handed down by an employer from its New York City

headquarters, no matter where the employee in question actually works."  *Duffy v. Drake Beam*

*Morin, Harcourt Gen., Inc.*, 1998 U.S. Dist. LEXIS 7215, *36.  With a single exception,

addressed below, the cases cited by Plaintiff in the Opposition are entirely consistent with these

rules of law.

**B.**    **Cases cited in Plaintiff's Opposition are consistent with Alitalia's position.**

    **1.**    *Launer v. Buena Vista Winery* **involved a plaintiff who maintained an office in New York.**

*Launer v. Buena Vista Winery*, 916 F.Supp. 204 (E.D.N.Y. 1996),[2] involved out-of-state employers and a plaintiff who maintained an office for those employers in New York City.  The office was closed when the plaintiff was terminated.  After litigation commenced, in an attempt to avoid personal jurisdiction, the employers denied the very existence of their New York City office.  The Court found this argument unpersuasive because the plaintiff "produced contrary evidence" of the office's existence, including, *inter alia*, "a phone bill that was reimbursed by the defendants as company calls from a number with a 718 area code," *id.* at 207.  In the face of the plaintiff's NYCHRL claim, the defendants again denied the existence of an office in New York City, and argued that, because the territorial reach of the NYCHRL did not extend beyond the five boroughs, the complaint should be dismissed.  Reminding the defendants that it had already found proof of the office's existence, the court observed, "Defendants continue to overlook the fact that the president of one of the companies allegedly made discriminatory remarks to Launer and faxed him a memo with allegedly discriminatory remarks at the (718) telephone number.  Furthermore, the firing occurred in New York."  *Id.* at 214, quoted in Opposition at Point I(I), pp. 4-5.  Far from holding that these events, in isolation, would be sufficient to sustain a cause of action under the NYCHRL, the court offered them simply as evidence that the defendants had, in fact, maintained an office in New York, and that consequently the impact of the decision to terminate the plaintiff was felt at that plaintiff's place of work in New York City.

---

[2] As this case is from the Eastern District of New York, Defendant offers *Launer* only for its persuasive value.  It is presumed that Plaintiff offers it for the same.

This was emphasized in *Germano v. Cornell University*, 2005 U.S. Dist. LEXIS 17759 (S.D.N.Y. 2005) (attached hereto as Exhibit C), a case involving a professor who taught at locations outside of New York, but alleged that he was fired in the city. Judge Batts found that *Lauer* did not preclude dismissal because "while the plaintiff in *Lauer* was terminated in New York City, he also maintained an office for the defendant employer in New York City and attended periodic regional company sales meetings there." *Id.* at *16. Because that was not the case for the *Germano* plaintiff, dismissal was appropriate.

2.      ***International Healthcare Exchange* and *Tebbenhoff* involved plaintiffs who maintained offices in New York.**

Like *Lauer*, *International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC*, 470 F.Supp.2d 345 (S.D.N.Y. 2007) involved an out-of-state employer and an employee working out of an office in New York City. The employer argued that, because it was based in Chicago, it was not subject to the NYCHRL. *Id.* at 352-53. The court held to the contrary, observing that "it is the site of the impact, not the place of origination, that determines where discriminatory acts occur. . . Defendants' alleged discriminatory conduct, though originating outside of the city, affected [the plaintiff] Cuene in New York City, and thus may form the basis of a cause of action under NYCHRL." *Id.* at 362. *See, also, Tebbenhoff v. Elec. Data Sys. Corp.*, 2005 U.S. Dist. LEXIS 29874, *15 (quoted in Opposition Point I(I), pp. 3-4; "as plaintiff was given an office in New York City, and business cards indicating New York City to be his central business location, his termination cannot be said to have had no impact within New York City").

These cases, cited by Plaintiff in the Opposition, are actually entirely consistent with Alitalia's arguments presented in its Moving Memorandum – and, in fact, stand for precisely the

9

opposite rule of law from that for which Plaintiff invokes them.  They hold that a discriminatory employment decision impacts an employee where he or she works, and that, without an impact in New York City, a plaintiff may not invoke the NYCHRL, even if the decision to terminate that employee was made within the five boroughs.

3.  *Hart* **is a jurisprudential anomaly that has been criticized since publication.**[3]

The single opinion cited by Plaintiff that suggests otherwise is inconsistent with the vast majority of relevant case law and has been the subject of criticism.  A year after publication of her *Germano* opinion, Judge Batts, without elaboration or distinguishing *Germano*, ruled that out-of-state employees could proceed with their NYCHRL claim in *Hart v. Dresdner Kleinworth Wasserstein Securities, LLC*, 2006 U.S. Dist. LEXIS 56710 (S.D.N.Y. 2006) (attached hereto as Exhibit D).  *Hart* itself became the subject of criticism and a contrary holding the following year, in *Pearce v. Manhattan Ensemble Theater*, 2007 U.S. Dist. LEXIS 16487, *27 (dismissing NYCHRL claim because impact was not felt in New York).  To date, it remains an outlier in NYCHRL jurisprudence.

Accordingly, because Plaintiff worked in Minneapolis, the fact that she was informed of her termination in New York is insufficient to invoke the NYCHRL.  Her discrimination claims brought under this law should therefore be dismissed.

---

[3] Plaintiff summarizes the facts of *Hart* as involving a citizen of New Jersey who alleged that he was terminated because of his disability by California residents.  (Opposition Point I(I), p. 5.)  Actually, *Hart* involves a number of female plaintiffs alleging that a "glass ceiling" at their place of employment violated New York's Human Rights Law.  The defendant sought to dismiss the State and City claims of a single plaintiff who had been a former resident of New York.  The case involving the New Jersey plaintiff is *Tebbenhoff*, cited in *Hart* at *25-26 and discussed at Point I(B)(2), *supra*.

10

**C.**    **Legislative intent to bolster New York City law is insufficient to extend its territorial scope beyond the five boroughs.**

Plaintiff argues that, because the NYCHRL was intended to be more progressive than its State or Federal counterparts, it should be applied to conduct that impacts employment outside New York City. (Opposition Point I(IV), pp. 7-8.) This confuses the goal of the law with its actual language. Section 2-201 of the New York City Administrative Code limits the territorial scope of the City's laws to:

> all that territory contained within the boroughs of Manhattan, The Bronx, Brooklyn, Queens and Staten Island . . . the boundaries, jurisdictions and powers of the city are for all purposes of local administration and government hereby declared to be co-extensive with the territory above described.

N.Y.C. Admin. Code § 2-201 (2008). Regardless of how broad or remedial the purposes of the City law may be, it does not extend beyond the borders of the five boroughs.

Plaintiff operates under the assumption that the letter of a given statute is unnecessary if the spirit is adequately articulated. Relevant case law does not allow such a great analytical leap from a general statement of intent for the City law to be more protective than State or Federal laws to a conclusion that a non-resident terminated from a job in Minneapolis may invoke the statute. *See, e.g., Starr v. Time Warner, Inc.*, 2007 U.S. Dist. LEXIS 88219, *14 (S.D.N.Y. 2007) ("both New York State law and the New York City Administrative Code limit the applicability of the City Human Rights Law to acts occurring within the boundaries of New York City," quoting *Duffy*, 1998 U.S. Dist. LEXIS 7215 at *11, attached hereto as Exhibit E). Like the other claims presented in Plaintiff's Opposition, this does nothing to defeat the arguments that Alitalia has set forth in its Moving Memorandum, and consequently, the Motion to Dismiss Plaintiff's NYCHRL claims should be granted in its entirety.

## POINT III

### <u>PLAINTIFF HAS AGREED TO DISMISS THE SECOND, FOURTH AND FIFTH CLAIMS IN HER COMPLAINT</u>

In its Moving Memorandum in support of this motion, Alitalia argued that Plaintiff's claims for aiding and abetting its own discriminatory conduct should be dismissed. Plaintiff acknowledges the legitimacy of the legal arguments presented by Alitalia. (Opposition Point II, p. 8.) Accordingly, the second and fourth causes of action in Plaintiff's Complaint should be dismissed with prejudice.

Similarly, Plaintiff has consented to dismissal of the claims for negligent and intentional infliction of emotional distress presented as a fifth cause of action in her Complaint. Accordingly, it should be dismissed with prejudice.

### <u>CONCLUSION</u>

For the foregoing reasons, Defendant Alitalia Linee Aeree Italiane, S.p.A. respectfully requests that all five causes of action in the Complaint be dismissed with prejudice in their entirety, and that it be granted such other and further relief as the Court may deem just and proper.

12

Dated:  New York, New York                VEDDER PRICE P.C.
        February 19, 2008


                                          By: ___/S/_____
                                                Alan M. Koral (AK 1503)
                                                Daniel C. Green (DG 0059)

                                              Attorneys for Defendant
                                              *Alitalia Linee Aeree Italiane SpA*
                                              1633 Broadway – 47th Floor
                                              New York, NY  10019
                                              (212) 407-7700


                                          13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

LINDA RYLOTT-ROONEY,

                              Plaintiff,                **Index No.: 07 CV 11091**


              -against-                                  **ECF CASE**

ALITALIA – LINEE AEREE ITALIANE –
SOCIETA PER AZIONI,,

                              Defendants.

--------------------------------------------------------

     I, Alan M. Koral, hereby declare, pursuant to 28 U.S.C. 1746, under penalty of perjury, that on February 19, 2008, I caused a copy of the foregoing **REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** to be served by electronically filing same, thereby ensuring that the following party, who registered to receive e-notices in this case, received a copy of same:

     Fausto E. Zapata, Jr., Esq. (FZ 4957)
     Law Office of Fausto E. Zapata, Jr.
     305 Broadway
     Suite 1101
     New York, NY 10007

     *Attorney for Plaintiff*
     *Linda Rylott-Rooney*


DATED:  New York, New York                    s/  Alan M. Koral
        February 19, 2008                            Alan M. Koral

NEWYORK/#191739.3

# Exhibit A

LEXSEE 2003 US DIST LEXIS 14239



Analysis
As of: Feb 19, 2008

**LARRY RICE, Plaintiff, -against- SCUDDER KEMPER INVESTMENTS, INC., ILLINOVA GENERATING CO., CONTINENTAL ENERGY SERVICES, INC., EYOB EASWARAN and MICHAEL O'NEILL, Defendants.**

**01 Civ. 7078 (RLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 14239*

**August 13, 2003, Decided
August 14, 2003, Filed**

**SUBSEQUENT HISTORY:** Subsequent appeal at Rice v. Wartsila NSD Power Dev., Inc., 2006 U.S. App. LEXIS 23883 (2d Cir. N.Y., Sept. 18, 2006)

**PRIOR HISTORY:** *Rice v. Scudder Kemper Invs., Inc., 2003 U.S. Dist. LEXIS 5734 (S.D.N.Y., Apr. 7, 2003)*

**DISPOSITION:**    [*1] Defendants' motion to strike allegations denied. Defendants' motion to dismiss plaintiff's amended complaint granted.

**COUNSEL:** LARRY RICE, Pro se, Ballwin, MO.

PETER N. HILLMAN, MELISSA J. LAROCCA, Of Counsel, CHADBOURNE & PARKE LLP, New York, NY, for Defendants.

**JUDGES:** ROBERT L. CARTER, U.S.D.J.

**OPINION BY:** ROBERT L. CARTER

**OPINION**

ROBERT L. CARTER, District Judge

Plaintiff, Larry Rice, brings this amended complaint against defendants, Scudder Kemper Investments, Inc. ("Scudder"), Illinova Generating Company ("Illinova"), Continental Energy Services, Inc. ("Continental"), Eyob Easwaran and Michael O'Neill alleging unlawful discrimination in violation of *New York Executive Law,*

*Article 15, § 296(1)* ("New York Human Rights Law" or "NYHRL"), willful and malicious breach of contract, and willful and malicious breach of *New York Labor Law, article 6, §§ 191, 193, 195* and *198.* Defendants now move to strike the new allegations from the amended complaint pursuant to *Rule 12(f), F.R. Civ. P.*, as well as renew their previous motion to dismiss for failure to state a claim pursuant to *Rule 12(b)(6), F.R. Civ. P.* Jurisdiction is proper [*2] pursuant to *28 U.S.C. § 1332* as the parties are diverse and alleged damages exceed $ 75,000.[1]

1    Plaintiff is a citizen of the state of Missouri. Scudder is a Delaware corporation with its principal place of business in New York, NY. Illinova is an Illinois corporation with its principal place of business in Illinois. Continental is incorporated pursuant to the laws of Montana and maintains its principal place of business in the same. Eyob Easwaran is a citizen of New York and Michael O'Neill is a citizen of Montana.

**Background**

The relevant facts construed in the light most favorable to plaintiff are as follows. Plaintiff is a white male citizen of Missouri. In 1995, he was working in Mexico City, Mexico, when defendants began negotiating with plaintiff to become General Manager and Chief Executive Officer of Jamaica Energy Partners ("JEP"), in Kingston, Jamaica. (See Pl.'s Am. Compl. PP 22, 24.) JEP is a Jamaican partnership owned by the corporate

defendants and Dr. Bird [*3] Co. Ltd., a St. Lucia corporation. (Id. at P 16.)

Plaintiff, then in his late forties, was advised during negotiations that defendants "needed someone with gray hair to get this thing setup and only needed him/her for three years as they could then find someone cheaper and younger to carry on." (Id. at P 25.) Thus, plaintiff alleges he was offered a three-year contract with an automatic termination at its conclusion. Plaintiff executed this contract with the express reservation, however, that the automatic termination date be removed from the terms. Defendants agreed to plaintiff's demand, removing the automatic termination date and communicating to plaintiff that the "intent from our side is clearly a long term relationship." (Id. at P 28.) On February 26, 1996, JEP's board approved the executed contract dated January 31, 1996 ("Agreement"), and plaintiff subsequently commenced work on or about March 1, 1996. (Id. at PP 31, 35.)

After almost three years of employment with JEP, plaintiff was fired on January 12, 1999. (Id. at P 37.) The alleged reason for plaintiff's termination was plaintiff's refusal to refrain from making public comments about JEP's sole customer, [*4] Jamaica Public Service Co. Ltd. ("JPSCo"). (Id. at PP 40, 41.) Following his termination, plaintiff was replaced by Carlton Stephen, a black Jamaican at least 10 years younger than plaintiff. (Id. at P 61.)

In accord with the provisions in plaintiff's Agreement with JEP (see LaRocca Aff. Ex. A), plaintiff filed a claim and demand for arbitration, protesting his termination and demanding nearly 15 million dollars in damages. (See LaRocca Aff. Ex. 6.) The arbitration took place in New York, NY, on October 24 and 26, 2001, and on January 7 and 8, 2002, during which plaintiff was represented by counsel. (See id.) In a long and detailed decision dated July 9, 2002, the arbitrator rejected plaintiff's claims of fraudulent inducement, defamation, intentional infliction of emotional distress, right to a discretionary bonus, right to retirement plan contributions, and right to reimbursement for plaintiff's vehicle. (See id.) The arbitrator did find that JEP breached the Agreement with plaintiff by violating the six-month written notice of termination provision when they made plaintiff's termination effective immediately. (See id.) The arbitrator found that this [*5] breach entitled plaintiff to several benefits that were withheld from him during the agreement's six-month notice period, namely reimbursement for medical, business, and relocation expenses along with unused vacation days. (See id.) The arbitrator awarded plaintiff $ 40,094.00 with interest, as compensation for these lost benefits. (See id.)

Following the conclusion of the arbitration, plaintiff filed his original complaint with this court alleging violations of the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 621, et seq.*, discrimination on the basis of race and national origin in violation of Title VII of the Civil Rights Act, *42 U.S.C. § 2000e, et. seq.*, unlawful discrimination in violation of the NYHRL, and willful and malicious breach of the agreement between plaintiff and defendants. The court has dealt with this action previously in two opinions, *Rice v. Scudder Kemper, 2003 U.S. Dist. LEXIS 994, No. 01 Civ. 7078, 2003 WL 174243 (S.D.N.Y. Jan. 27, 2003)* (Carter, J.), and, *Rice v. Scudder Kemper, 2003 U.S. Dist. LEXIS 5734, No. 01 Civ. 7078, 2003 WL 17424 (S.D.N.Y. April 8, 2003)* (Carter, J.), with which familiarity is assumed. [*6]

## Discussion

### I. Motion to Strike

Motions to strike pursuant to *Rule 12(f), F.R. Civ. P.*, may be made by a party to strike any immaterial matter from a party's pleadings. See *Rule 12(f), F.R. Civ. P.* Defendants are correct to point out that plaintiff's addition of new factual and legal allegations to his complaint went far beyond the leave to amend the court granted plaintiff. See Rice, 2003 WL 1846934, at *3. In granting plaintiff leave to amend, the court noted that the dismissal of his federal claims would require dismissal of his state claims as well because without valid federal claims or diversity jurisdiction, the court could no longer assert supplemental jurisdiction over plaintiff's state claims. See id. Mindful that the parties appeared diverse, the court instructed plaintiff how and under what statute plaintiff should amend his complaint in order to properly plead diversity jurisdiction and keep his claims in federal court. See id.

Plaintiff successfully complied with the court's instructions regarding diversity jurisdiction but also took the opportunity to add claims under New York's Labor Laws, as well as make several new factual [*7] allegations, including that the employment contract plaintiff is disputing is in fact a February contract and not the January one cited in his original complaint. (see Pl.'s Am. Compl. P 35), and other allegations supporting this contention. (See Pl.'s Am. Compl. P 55, 56, and 57.) Defendants are correct that the court retains the power to strike those amendments that fall outside of the court's granted leave, see *Index Fund, Inc., v. Hagopian, 107 F.R.D. 95, 98 (S.D.N.Y. 1985)* (Tenney, J.) and *Kuntz v. New York State Board of Elections, 924 F. Supp. 364, 366 (N.D.N.Y. 1996)* (McAvoy, J.), but the court prefers to evaluate plaintiff's claims on their merits as it is clear to the court that plaintiff's *pro se* status can be faulted for the procedural and formal defects of his pleadings.

## II. Motion to Dismiss

A motion to dismiss pursuant to *Rule 12(b)(6), F.R. Civ. P.*, requires the court to construe all factual allegations made in the complaint as true and to draw all reasonable inferences in favor of plaintiff in determining whether the complaint alleges any set of facts which would entitle plaintiff to relief. See *Caiola v. Citibank, N.A., 295 F.3d 312, 321 (2d Cir. 2002).* [*8] In short, the court's function is not to evaluate the strength of the pleadings but rather to determine their legal sufficiency. *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).*

### a. New York Labor Laws

In order to state a wage claim under article 6 of *New York Labor Laws §§ 191, 193, and 195*, plaintiff must fall within the statutory definition of an employee as provided by *Labor Law § 190.* See *Bhanti v. Brookhaven Memorial Hosp. Inc., 260 A.D.2d 334, 687 N.Y.S.2d 667, 669 (2nd Dep't 1999).* Defendants argue that plaintiff's status as an executive excludes him from the class of employees covered by article 6. This is a disputed point of statutory construction, and in determining the meaning of "employee" as defined by § 190, courts have chosen two different approaches to this problem. Some courts have chosen to interpret "employee" broadly, thus including executives. See, e.g., *Falk v. FFF Indus. Inc., 731 F. Supp. 134, 142 (S.D.N.Y. 1990)* (Leisure, J.) (finding that the definition of "employee" in § 190(2) is a broad term covering executives); *Cohen v. Stephen Wise Free Synagogue, 1996 U.S. Dist. LEXIS 4240, No. 95 Civ. 1659, 1996 WL 159096,* [*9] *at *4 (S.D.N.Y. April 4, 1996)* (Leisure, J.) (citing definition of employee as "any person employed for hire by an employer in any employment" in *N.Y. Labor Law § 190(2)* as justification for reading the statute broadly to include executives); *Daley v. The Related Cos., Inc., 179 A.D.2d 55, 581 N.Y.S.2d 758, 760 (1st Dep't 1992)* (finding that executives are included in article 6 and thus protected by § 198(1-a)); and *Lumet v. SMH, Inc., 1992 U.S. Dist. LEXIS 18545, No. 91 Civ. 3369, 1992 WL 380004, at *13 (S.D.N.Y. Dec. 4, 1992)* (Bernikow, M.J.) (citing Daley and Falk for the proposition that § 198 remedies are available to executives).

Other courts, however, including the New York Court of Appeals in *Gottlieb v. Laub & Co., 82 N.Y.2d 457, 626 N.E.2d 29, 605 N.Y.S.2d 213 (1993)*, have chosen to interpret article 6 as applying only to non-supervisory personnel, thus excluding executives from the protections of New York's Labor Laws. See, e.g., *Gottlieb v. Laub & Co., 605 N.Y.S.2d 213, 216 (1993)* (reading § 190 to exclude executives and managers from all classes of employees except for manual workers); *Cohen v. Fox-Knapp, Inc., 226 A.D.2d 207, 640 N.Y.S.2d*

554, 554-55 [*10] *(1st Dep't 1996)* (distinguishing Gottlieb by finding that plaintiff, although previously an executive, was a salesman or consultant at the time of his termination and thus covered by article 6); *Taylor v. Blaylock & Partners, 240 A.D.2d 289, 292, 659 N.Y.S.2d 257 (1st Dep't 1997)* (citing Gottlieb and Cohen for the proposition that executives are specifically excluded from article 6); *DeLeonardis v. Credit Agricole Indosuez, 2000 U.S. Dist. LEXIS 16506, No. 00 Civ. 0138, 2000 WL 1718543, at *11 (S.D.N.Y. Nov. 15, 2000)* (Baer, J.) (citing Gottlieb); and *Alter v. Bogoricin, 1997 U.S. Dist. LEXIS 17369, No. 97 Civ. 0662, 1997 WL 691332, at *13 (S.D.N.Y. Nov. 6, 1997)* (Mukasey, J.) (citing Gottlieb).

After reviewing the conflicting authority, the court finds *Gottlieb's* interpretation of § 190 most convincing for the following reason. While § 190(2) defines an employee to be "any person employed for hire by an employer in any employment," subdivision (7) of § 190 modifies subdivision (2) by including all employees not included in the previous subdivisions "except any person employed in a bona fide executive, administrative or professional capacity [.]" *NY Labor Law* [*11] § *190(7)* (emphasis added). "Employee" is defined generally in subdivision (2) not to create a broad class of employees but rather to establish that article 6 is limited to employer-employee relationships, thus excluding independent contractors, workers not intended to be covered by article 6. See *Bhanti, 687 N.Y.S.2d at 669.*

This understanding of § 190 and plaintiff's status as an executive lead the court to conclude that plaintiff cannot state a claim for lost wages under article 6. Plaintiff alleges alternatively that he became a consultant during the six-month notice period following his termination. Since the wages were withheld during this time period, plaintiff alleges that he should no longer be considered an executive for the article 6 claims but rather, a consultant. This argument is unavailing as there is nothing in the record to indicate such a status and more importantly, the wages allegedly withheld from plaintiff were due to him not as a consultant but rather pursuant to the terms of separation in the Agreement establishing him as the CEO of JEP. (See LaRocca Aff. Ex. 1.)

Plaintiff's status as an executive also deprives him of the ability to recover [*12] attorney's fees and costs under § 198. [2] In Gottlieb, the court specifically stated that § 198 provides relief for failures to "pay the wage required by this article." *Gottlieb, 82 N.Y.2d at 463* (emphasis in the original). The Gottlieb court then concluded that this language "clearly evinces a legislative intent to limit the remedies to violations of article 6." *Id.* This interpretation makes clear that since plaintiff cannot state a claim under article 6, he is also precluded from seeking

the remedies provided by *§ 198*. Plaintiff's claims under the Labor Law of New York are accordingly dismissed.

> 2  *NY Labor Law, Article 6, § 198(1-a)* allows an employee who prevails on a wage claim to recover reasonable attorney's fees and liquidated damages equal to twenty five percent of the total amount of the wages due.

**b. New York Human Rights Law**

Plaintiff claims that due to the New York choice-of-law provision in the Agreement with JEP, the parties agreed to be bound by [*13]  New York law and as a consequence, plaintiff should be considered a resident of New York for his NYHRL claims. This argument fails for two reasons. First, the language of the choice-of-law provision is not so broad as to cover all disputes between the parties. The Agreement reads in pertinent part that, "the validity, interpretation, construction, and performance of this Agreement shall be governed by the law of the state of New York." (See LaRocca Aff. Ex. A.) It is settled New York law that language such as this creates New York common law contractual claims but not statutory ones. See *Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996)*; *Burnett v. Physicians' Online, Inc., 1997 U.S. Dist. LEXIS 12111, No. 94 Civ. 2731, 1997 WL 470136, at *12 (S.D.N.Y. Aug. 15, 1997)* (Griesa, J.) (finding that a choice of law provision which stated, "this agreement shall be governed and construed in accordance with the law of the State of New York," did not preclude plaintiff from filing an action for gender discrimination under California law); and, *Plymack v. Copley Pharm., Inc., 1995 U.S. Dist. LEXIS 15104, No. 93 Civ. 2655, 1995 WL 606272, at *5 (S.D.N.Y. Oct. 12, 1995)* (Wood, J.) (Under New York law, [*14]  "[a] contractual choice of law provision ... does not bind the parties with respect to non-contractual causes of action."). For the parties to be bound by New York law with regard to non-contractual causes of action, the choice-of-law provision would have had to include much broader language, indicating that any controversy "arising out of or relating to" the agreement would be governed by the laws of New York, see *Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309-10 (2d Cir. 1994)*, or providing an exclusive forum selection clause purporting to cover all disputes arising out of the agreement. See *Internet Law Library v. Southridge, 223 F. Supp. 2d 474, 489 (S.D.N.Y. 2002)* (Carter, J.).

Even if plaintiff's choice-of-law analysis were correct, it would not vitiate the NYHRL's jurisdictional prerequisites. As a nonresident, plaintiff must show that he was discriminated against in New York in order to state a claim under the NYHRL. See *Beckett v. Prudential Ins. Co. of Am., 893 F. Supp. 234, 238 (S.D.N.Y. 1995)* (Scheindlin, J.). It is well established that the NYHRL

applies extraterritorially only to New York residents; nonresidents [*15]  are not covered, even if those nonresidents are discriminated against by a resident of New York outside of New York. See *Iwankow v. Mobil Corp., 150 A.D.2d 272, 274, 541 N.Y.S.2d 428 (1st Dep't 1989)*. Neither plaintiff's original nor his amended complaint alleges that plaintiff was discriminated against in New York and consequently plaintiff's NYHRL claims must be dismissed against all defendants.

**c. Breach of Contract**

Defendants allege that plaintiff's breach of contract claim was considered and ruled upon in the arbitration and is thus barred from being relitigated in this action by collateral estoppel. In a diversity case such as this, the court must apply the law of the state in which it sits, New York, to determine whether collateral estoppel applies to the disputed claim. See *BBS Norwalk One, Inc. v. Raccolta, Inc., 117 F.3d 674, 677 (2d Cir. 1997)*.

Under New York law, collateral estoppel will bar a claim if (1) there is "an identity of issue which has necessarily been decided in the prior action and is decisive of the present action," and (2) there was "a full and fair opportunity" to litigate the pertinent issues in the prior proceeding. [*16]  *Norris v. Grosvenor Marketing Ltd., 632 F. Supp. 1193, 1196 (S.D.N.Y. 1986)* (Tenney, J.) (quoting *Schwartz v. Public Adm'r of the County of the Bronx, 24 N.Y.2d 65, 298 N.Y.S.2d 955, 960, 246 N.E.2d 725 (1969))*. Collateral estoppel can be applied to issues without regard to whether the prior proceeding was an arbitration or before a court of law. *See Pennecom v. Merrill Lynch & Co., Inc., 2003 U.S. Dist. LEXIS 11229, No. 02 Civ. 5355, 2003 WL 21512216, at *5 (S.D.N.Y. July 1, 2003)* (Chin, J.).

There could not be a more apt example of identity of issue between claims as reflected by the similarities between plaintiff's complaint and his request for arbitration. The relevant provisions describing defendant's alleged breach of the Agreement are almost exactly identical, (compare Pl.'s Am. Compl. PP 43, 44 with LaRocca Aff. Ex. 4, PP 4, 5), and the arbitrator dealt systematically with each claim. (See LaRocca Aff. Ex. 6.) In her ruling, the arbitrator found that JEP breached the Agreement and awarded plaintiff damages accordingly. Plaintiff cannot now sue other parties on the same claim to attain what plaintiff believes his damages to actually be. See [*17]  *Pennecom, 2003 U.S. Dist. LEXIS 11229, 2003 WL 21512216, at *6*.

Plaintiff's claim that his amended complaint concerns a contract different from the one disputed in the arbitration is unavailing as the arbitrator ruled directly on this point. (See Pl.'s Am. Compl. P 3.) The arbitrator found that all of the alleged subsequent modifications made to the executed contract were barred by a merger

clause and that the only legally actionable contract between the parties was the January 31, 1996 Agreement. (See LaRocca Aff. Ex. 6.)

In considering whether plaintiff had a "full and fair opportunity" to be heard, the court notes that during the arbitration, plaintiff was represented by counsel, had the opportunity to present and cross-examine witnesses, file briefs, present evidence, and make arguments regarding his claims. In addition, the court finds that the arbitrator's decision was well reasoned, within the jurisdiction of the arbitrator pursuant to the arbitration provision in the Agreement, and devoid of fraud or misconduct.

In accord with the above, the court finds a precise identity of issue between plaintiff's amended complaint and his arbitration demand, a conclusive determination by the [*18] arbitrator of plaintiff's breach of contract claims, and that plaintiff had a full and fair opportunity

to be heard during the arbitration. Plaintiff's breach of contract claim is dismissed.

**Conclusion**

For the reasons stated above, defendants' motion to strike pursuant to *Rule 12(f), F.R. Civ. P.*, is denied. Defendants' motion to dismiss plaintiff's amended complaint pursuant to *Rule 12(b)(6), F.R. Civ. P.*, is granted. The clerk of the court is directed to close the case.

**IT IS SO ORDERED**

Dated: August 13, 2003

**ROBERT L. CARTER**

**U.S.D.J.**

# Exhibit B

LEXSEE



Caution
As of: Feb 19, 2008

**ROBERT R. TEBBENHOFF, Plaintiff, - against - ELECTRONIC DATA SYSTEMS CORPORATION, EDS E-SOLUTIONS, and RAYMOND CAPUANO, Defendants.**

**02 CV 2932 (TPG)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2005 U.S. Dist. LEXIS 29874**

**November 23, 2005, Decided
November 29, 2005, Filed**

**SUBSEQUENT HISTORY:** Affirmed by Tebbenhoff v. Elec. Data Sys. Corp., 2007 U.S. App. LEXIS 14632 (2d Cir., June 19, 2007)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee filed suit against defendants, his former employer and supervisor, alleging violations of New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and New York City Human Rights Law, New York City, N.Y., Admin. Code § 8-101 et seq. The employee also alleged intentional infliction of emotional distress, breach of contract, and violation of N.Y. Lab. Law § 190 et seq. Defendants moved for summary judgment.

**OVERVIEW:** The court first found that the employee's heart condition qualified as a disability. Additionally, the employee's employment history and work qualifications demonstrated that he was qualified for his job. Next, the employer asserted that the employee's termination was the result of his repeated acts of insubordinate behavior in refusing to follow the direction of his immediate supervisor, both regarding his sales commissions and, even more importantly, following the serious complaint lodged against him by a business partner of the employer. The court found the employee failed to show that defendants' proffered reasons for terminating him were pretextual or that defendants in fact had any discriminatory motive for terminating him. Finally, the court found that the employee's allegations did not rise to the level of outrageous conduct necessary to sustain a claim for intentional infliction of emotional distress. For instance, the employee failed to show that he was, in fact, terminated on the basis of his disability.

**OUTCOME:** Defendants' motion was granted in part, as to the disability discrimination and intentional infliction of emotional distress claims. Defendants' motion was denied in part, as to the claims for unpaid sales commissions and reimbursement of business expenses.

**CORE TERMS:** disability, email, emotional distress, termination, infliction, terminated, terminating, non-discriminatory, region, discriminatory, facie, sales commissions, customer, pricing, cause of action, heart attack, supervisor's, undisputed, outrageous, employment discrimination, summary judgment, discriminatory conduct, proffered, resident, sales representatives, contacted, software, doctor, quota, matter of law

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1]Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). If the evidence is such that a reasonable

jury could return a verdict for the nonmoving party, summary judgment will not lie. The burden is on the moving party to establish the absence of any material factual issues, and all ambiguities and permissible fact inferences must be drawn in favor of the nonmoving party. However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The nonmoving party may not rely on conclusory allegations or unsubstantiated speculation. Rather, to defeat a motion, there must be evidence on which the jury could reasonably find for the non-movant.

***Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions***

[HN2]The New York State Human Rights Law makes it an unlawful discriminatory practice for an employer to discharge an employee because of his or her disability. N.Y. Exec. Law § 296.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction***
***Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions***

[HN3]It is true that the New York State Human Rights Law does not provide a non-resident with a private cause of action for discriminatory conduct committed outside of New York. Absent an allegation that a discriminatory act was committed in New York or that a New York State resident was discriminated against, New York's courts have no subject matter jurisdiction over the alleged wrong.

***Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions***

[HN4]The fact that a decision to discriminatorily terminate a non-resident was made in New York can alone suffice to state a claim under New York State Human Rights Law. The fact that the impact of plaintiff's termination may have been felt in New Jersey does not alter this result.

***Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions***

[HN5]The New York City Human Rights Law makes it unlawful for an employer to discharge an employee because of his or her disability. New York City, N.Y., Admin. Code § 8-107.

***Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Burden Shifting***

[HN6]Discriminatory termination claims under the New York State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL) are analyzed by applying the same three-part McDonnell Douglas burden shifting test for evaluating such claims under Title VII. Under this analysis, the plaintiff has the initial burden to establish a prima facie case, which requires him to show that: (1) the defendants are subject to the NYSHRL or NYCHRL; (2) he was disabled within the meaning of those laws; (3) he was qualified to perform the essential functions of his job, perhaps with reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

***Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Burden Shifting***

[HN7]Under the McDonnell Douglas burden shifting test, if a plaintiff successfully established a prima facie case of disability discrimination, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. If the employer articulates such a non-discriminatory reason, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination. The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that, more likely than not, discrimination was the real reason for the employment action. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated remains at all times with the plaintiff.

***Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Burden Shifting***

[HN8]Under the McDonnell Douglas burden shifting test, the causation requirement requires a plaintiff to show that he was terminated because of his disability.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview***
***Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Employee Burdens***

[HN9]The burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion at the prima facie stage is de minimis.

***Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > General Overview***

[HN10]Stray remarks, even if made by a decision maker, do not constitute sufficient evidence to support a case of employment discrimination.

***Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements***

[HN11]Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

***Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview***

[HN12]New York courts have been generally unwilling to sustain claims for intentional infliction of emotional distress in connection with allegations of employment discrimination on the basis of disability. Cases in which such claims have been upheld all involved some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy.

**COUNSEL:** [*1]  For Robert R. Tebbenhoff, Plaintiff: Perry S. Heidecker, Milman & Heidecker, Lake Success, NY.

For Electronic Data Systems Corporation, Eds E. Solutions, Raymond Capuano, Defendants: Matthew Hampton Charity, Baker and Hostetler LLP, New York, NY; Stephen C. Sutton, Baker & Hostetler LLP, Cleveland, OH.

**JUDGES:** THOMAS P. GRIESA, U.S.D.J.

**OPINION BY:** THOMAS P. GRIESA

**OPINION**

Plaintiff Robert R. Tebbenhoff brings suit against his former employer, Electronic Data Systems Corp. ("EDS"), and his former supervisor at EDS, Raymond Capuano. His main claim is for employment discrimination. Plaintiff alleges that he was terminated from EDS because of his disability in violation of New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, et seq. Plaintiff also asserts a cause of action for intentional infliction of emotional distress, for actions allegedly taken by defendants in connection with his termination. Finally, plaintiff asserts causes of action for breach of contract and violation of New York Labor Law § 190 et seq., alleging that EDS failed to pay him certain commissions earned and business [*2]  expenses incurred while he was at EDS. Jurisdiction is based upon diversity of citizenship.

Plaintiff also named EDS E-Solutions as a defendant in this action. EDS E-Solutions is not a legal entity but rather a line of business operated by EDS in 2001 and 2002. Plaintiff was not employed by EDS E-Solutions and, in fact, EDS E-Solutions had no employees. Therefore, the action is dismissed as to EDS E-Solutions.

The remaining defendants move for summary judgment. The motion is granted in part and denied in part.

*FACTS*

EDS sells various information technology products. In June 2000 EDS hired plaintiff as a sales person with a fixed yearly salary and commissions to be paid for the sale of EDS products and services. Plaintiff's direct supervisor, defendant Raymond Capuano, was EDS's Vice President and Regional Sales Leader in the Northeast Region for EDS's E-Solutions line of products. Robert Koffler was another Northeastern Region EDS sales manager.

Jurisdictional requirements for plaintiff's state law claims require some discussion of plaintiff's work location. Plaintiff is a New Jersey resident. Because his sales position at EDS required him to travel through the Mid-Atlantic [*3]  region, it was convenient and efficient for him to work from home. According to defendants, plaintiff worked almost entirely from home. Plaintiff contends that while he did work from home "on occasion," he nevertheless "maintained a presence" at the New York City office where he was initially provided with office space and a computer. Throughout his tenure at EDS, however, plaintiff paid taxes as a New Jersey resident. Furthermore, after plaintiff's termination, he filed for New Jersey unemployment benefits, and indicated his work location as "Ramsey, New Jersey" in an application for New Jersey disability benefits.

2005 U.S. Dist. LEXIS 29874, *

Sales commissions at EDS were computed based upon a "cost model." The cost model was a computation that determined the pricing of EDS's products and services. Once the cost model was calculated and approved by EDS management, and the pricing incorporated in a sales contract, it would be submitted to EDS's business development office where it would be used to compute the responsible sales person's commission. Even after a commission had been computed, it could not be submitted to payroll for disbursement until approved by Capuano, Capuano's manager Marwan Rifka, and business [*4] manager Kevin Dolnick.

While employed with EDS, plaintiff made only one sale, in September 2000, to a company named Air Products Corp. The Air Products sale had two components, services and software. In January 2001 plaintiff received $ 3,820 as a commission for the software component of the Air Products deal. At some point after plaintiff received this $ 3,820 payment, a revised cost model for the Air Products deal was circulated within EDS. Under this revised cost model, an additional commission of nearly $ 14,000 would be due plaintiff for the software component of the Air Products sale. When plaintiff contacted the business development office to ask when he could expect to receive this additional commission, he was told that it would not be paid until approved by Rifka and Capuano. On February 20, 2001, EDS compensation and benefits employee Laura Farley emailed Capuano to ask where the "hold up" was on approving plaintiff's additional commission. In her email, Farley complained that plaintiff was accusing her office of "holding this deal for 4 months," and asked that Capuano speak with plaintiff.

In an email to Farley dated February 21, 2001 and copied to plaintiff, Capuano [*5] replied that management had not approved any additional commission for plaintiff and apologized for plaintiff's call. The following day, in an email addressed to his entire sales team including plaintiff, Capuano stated "You are not authorized to contact Laura Farley directly regarding commissions payments....Under no circumstances are you to contact her directly."

Despite these instructions, plaintiff continued to contact Farley and others in the business development office to press the issue of his alleged outstanding commission. A February 28, 2001 email from Farley to plaintiff states that she is responding to a voice mail from plaintiff regarding his commissions. Emails dated mid-March also indicate that plaintiff contacted other employees in the EDS business development office regarding his sales commissions. Plaintiff claims that, after Capuano's February 22 email, Capuano gave him express permission to contact Farley regarding his sales commissions. After Capuano's email, however, plaintiff con-

spicuously neglected to copy Capuano on emails he sent regarding his anticipated commissions.

On January 2, 2001 plaintiff suffered a serious heart attack and was immediately hospitalized. [*6] He returned to work within two weeks. Shawn Urias, another EDS employee, claims to have heard Capuano make several negative comments about plaintiffs heart problems including that plaintiff was "faking" the extent of his medical condition and using it as an excuse for not performing. According to Urias, Capuano also remarked that it was an inopportune time for plaintiff to have taken ill "since the region had quite a high quota to meet and that having him out ... would end up hurting the region if we couldn't meet our numbers." It is unclear from the record exactly when these alleged statements were made. Plaintiff himself, however, does not recall ever hearing anyone at EDS making derogatory statements about his heart attack.

In explaining the reasons for plaintiff's discharge, defendants focus primarily on his actions with regard to the relationship between EDS and a company named ARIBA. ARIBA was a "business partner" of EDS in the sense that EDS held licenses to sell various ARIBA information technology products and services along with its own. Plaintiff's work at EDS was focused exclusively on the sale of these licensed ARIBA products.

The relationship between ARIBA and EDS was [*7] somewhat strained. Although EDS was licensed to sell various ARIBA products, ARIBA maintained the right to sell those same products itself. This situation led to competition between the sales teams of the two companies, often for the same customers. Because plaintiff focused on the sale of ARIBA products, this competition affected him acutely and plaintiff complained from time to time about being "squeezed out" of software sales by ARIBA sales people, who would receive a larger commission if they could close a deal without plaintiff's involvement. Despite these tensions, however, plaintiff understood that he was responsible for working closely with ARIBA, and recognized that he was expected to foster a good relationship between EDS and ARIBA.

On March 8, 2001, Capuano received an email from ARIBA employee Marie Floria informing him that ARIBA salesperson Chris Powers had been "betrayed" by plaintiff in their joint sales effort directed to potential customer Mellon Bank. The email stated that plaintiff had revealed pricing information to Mellon Bank after agreeing with Powers not to do so. The email stated:

Chris gave Bob [Tebbenhoff] the lead. Bob told us that at some point [*8] Chris told him not to give pricing. . . . Chris wanted to present pricing with Tebben-

hoff which he said Bob agreed to. Bob called Mellon on his own. When Bob talked to Mellon he referenced the price they were quoted by Ariba. The customer was horrified that his rep from Ariba (with whom he had built strong relationship) would do that. The word collusion was mentioned. Actually Tebbenhoff told me the customer said that. Chris called Mellon and the customer asked him if he had told anyone his numbers (he did not know if Tebbenhoff had given pricing at the point). He replied 'no'. The customer caught him in a lie and it destroyed his position and his relationship.

Chris is not willing to lose commission or be betrayed again. I ... assured him that Bob was not going to be in any of his deals going forward.

Although this was not the first time tension arose between the two companies, defendants saw this complaint of "collusion" as a particularly serious threat to its relationship with ARIBA. As a result, a meeting was held with Capuano, Koffler, Floria, and certain senior ARIBA officers in attendance. Defendants maintain that this meeting was Capuano's altruistic idea to "assist [*9] plaintiff in mending his damaged relationship with ARIBA," an assertion that plaintiff disputes. In any event, the parties agree that, at the meeting, Capuano and Koffler attempted to defend plaintiff to the ARIBA sales executives. The meeting wound up with an agreement that another meeting would be held between all of the same parties but now including plaintiff, with the purpose of ensuring that they were "all on the same page going forward so that plaintiff would understand and utilize a sales strategy agreed to by both companies."

In anticipation of this EDS-ARIBA meeting, Capuano set up a preliminary face-to-face meeting with plaintiff, scheduled for March 14, 2001, to discuss ARIBA's complaints about plaintiff and to explain that ARIBA management had agreed to have a meeting with all in attendance to discuss these issues. On March 12, 2001, plaintiff informed Koffler that he would be meeting with his doctor on March 15, 2001 about the possibility of undergoing an additional medical procedure related to his heart condition, and that he might need to take a short term disability leave if it was determined that the procedure was necessary. Koffler thereafter relayed this information [*10] to Capuano.

On March 14, 2001, Capuano, Koffler, and EDS human resources employee Rukshana Mazagonwalla met with plaintiff, now for the dual purpose of both reviewing the ARIBA issue with plaintiff and discussing plaintiff's potential need to take a short term disability leave should his doctor so advise. At this meeting, Capuano explained the ARIBA representatives' problems with plaintiff and that he had "brokered" a meeting with the ARIBA executives. It is undisputed that, at this meeting, Capuano instructed plaintiff not to approach ARIBA sales representatives directly to address ARIBA's complaint, but rather to wait for the meeting with the ARIBA executives. At this meeting, Capuano also indicated that he and Koffler would call plaintiff on March 16 to discuss the results of plaintiff's March 15 doctor's visit

Despite the very clear instructions from Capuano not to contact any ARIBA sales representatives directly, on the very same day, plaintiff called ARIBA employee Floria and stated that he was concerned with ARIBA's perception of him and wanted to speak directly with the ARIBA representatives. Shortly thereafter, Floria notified Koffler of plaintiff's call. According to Koffler, [*11] Floria recounted that plaintiff told her that, regardless of the upcoming meeting, he was going to contact the ARIBA sales representatives directly on his own. Koffler immediately notified Capuano of what he viewed as plaintiff's insubordinate conduct in calling Floria to express his wish to contact the ARIBA sales employees directly.

Plaintiff met with his physician as scheduled on March 15, 2001. At that time his doctor recommended that he undergo an angioplasty and explained that he would need to take a short-term disability leave. Plaintiff did not notify Koffler or Capuano of this determination prior to their phone conversation the next day. On the following morning of March 16, 2001, Capuano and Koffler called plaintiff and notified him that he was terminated due to "long term insubordination." Prior to terminating plaintiff, Capuano accused him of leaving a nasty message on Mazagonwalla's voice mail, and renewed his accusation that plaintiff acted improperly in contacting Farley regarding his commission after being instructed not to do so.

Plaintiff first instituted this lawsuit in New York State Supreme Court. The case was removed to this court on April 16, 2002 based on [*12] diversity of citizenship.

### DISCUSSION

[HN1]Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, summary judgment will not lie. *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The burden is on the moving party to establish the absence of any material factual issues, and all ambiguities and permissible fact inferences must be drawn in favor of the nonmoving party. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003).

However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson, supra* at 247-48. The nonmoving party may not rely on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998). Rather, to defeat a motion, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson, supra* at 252. [*13]

### 1. Plaintiff's Claims Under the New York State Human Rights Law

Plaintiff asserts his First Cause of Action and part of his Third Cause of Action under [HN2]the NYSHRL, which makes it an unlawful discriminatory practice for an employer to discharge an employee because of his or her disability. NY Exec. Law § 296. Defendants assert that the NYSHRL does not apply to a non-resident claiming discriminatory conduct committed outside New York. It is undisputed that plaintiff is not a New York resident. Defendants claim that the alleged discriminatory conduct was committed outside New York because plaintiff was located in New Jersey when he was terminated.

[HN3]It is true that the NYSHRL does not provide a non-resident with a private cause of action for discriminatory conduct committed outside of New York. Absent an allegation that "a discriminatory act was committed in New York or that a New York State resident was discriminated against, New York's courts have no subject matter jurisdiction over the alleged wrong." *Iwankow v. Mobil Corp.,* 150 A.D.2d 272, 274, 541 N.Y.S.2d 428 (N.Y. App. Div. 1st Dep't 1989)

Here, defendants' conduct within New York is sufficient to satisfy the NYSHRL's jurisdictional [*14] requirement. First, it is undisputed that defendant Capuano was actually located in New York when he called to terminate plaintiff. Furthermore, the decision to terminate plaintiff was made in New York. [HN4]The fact that a decision to discriminatorily terminate a non-resident was made in New York can alone suffice to state a claim under NYSHRL. *Torrico v. IBM,* 319 F. Supp. 2d 390, 399 (S.D.N.Y. 2004). The fact that the impact of plaintiff's termination may have been felt in New Jersey does not alter this result. *See id.* For these reasons, plaintiff's action falls within the jurisdictional bounds of the NYSHRL.

### 2. Plaintiff's Claims Under New York City Human Rights Law

Plaintiff asserts his Second Cause of Action and part of his Third Cause of Action under the NYCHRL. Defendants challenge these claims, asserting that they are beyond the reach of that law. Like the NYSHRL, [HN5]the NYCHRL makes it unlawful for an employer to discharge an employee because of his or her disability. NYC Administrative Code § 8-107. Defendants state that the NYCHRL applies only when the actual impact of the discriminatory conduct or decision is felt within the five boroughs and that, [*15] because plaintiff worked mostly in New Jersey, his termination had its major impact there.

Defendants cite cases standing for the proposition that a discriminatory decision made in New York City cannot alone support a claim under the NYCHRL when no impact from that decision is felt in New York City. *See Lucas v. Pathfinder's Pers., Inc.,* 01-CV-2252, 2002 U.S. Dist. LEXIS 8529 (S.D.N.Y. 2002); *Lightfoot v. Union Carbide Corp.,* 1994 U.S. Dist. LEXIS 6191, 92-CV-6411, 1994 U.S. Dist. LEXIS 6191 at *16 (S.D.N.Y. May 12, 1994).

Unlike those cases, however, here a discriminatory act was committed within New York City when defendant Capuano called and terminated plaintiff from defendants' New York City offices. *See Launer v. Buena Vista Winery,* 916 F. Supp. 204, 214 (E.D.N.Y. 1996) (allowing NYCHRL action to proceed because the plaintiff's "firing occurred in New York"). Furthermore, as plaintiff was given an office in New York City, and business cards indicating New York City to be his central business location, his termination cannot be said to have had no impact within New York City. Plaintiff may therefore proceed under the NYCHRL.

### 3. The Merits of Plaintiff's [*16] Disability Discrimination Claim under the NYSHRL and NYCHRL

#### a. The Burden Shifting Analysis

[HN6]Discriminatory termination claims under the NYSHRL and NYCHRL are analyzed by applying the same three-part burden shifting test developed by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), for evaluating such claims under Title VII. *See Dawson v. Bumble & Bumble,* 398 F.3d 211, 224 (2d Cir. 2005). Under this analysis, the plaintiff has the initial burden to establish a prima facie case, which requires him to show that: (1) the defendants are subject to the NYSHRL or NYCHRL; (2) he was disabled within the meaning of those laws; (3) he was qualified to perform the essential

functions of his job, perhaps with reasonable accommodation; and (4) he suffered adverse employment action because of his disability. *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000).

[HN7]If the plaintiff successfully makes this showing, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. *Id.* If the employer articulates such a non-discriminatory reason, the [*17] plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination. *Id.* The plaintiff must "produce not simply "some evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that, more likely than not, discrimination was the real reason for the employment action.'" *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir. 1996). The "ultimate burden" of persuading the trier of fact that the defendant intentionally discriminated . . . remains at all times with the plaintiff. *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir. 2000).

**b. Plaintiff has Met His Initial Burden Under the NYSHRL and NYCHRL**

For purposes of the present motion both parties assume that plaintiff can satisfy the first three parts of his prima facie case. The court agrees, and finds that plaintiff has established these three elements. First, as discussed above, defendants' actions are subject to both [*18] the NYSHRL and NYCHRL. Second, plaintiff's heart condition qualifies as a disability under the broad definitions given that term by the NYSHRL and NYCHRL. *See* N.Y. Exec. Law § 292(21); N.Y.C. Admin. Code § 8-102(16). Finally, plaintiff's employment history and work qualifications demonstrate that he was qualified for his job.

The parties therefore focus on the fourth prong of plaintiff's prima facie case, [HN8]the causation requirement. This requires plaintiff to show that he was terminated because of his disability. *Argueta v. N. Shore Long Island Jewish Health Sys.,*2003 U.S. Dist. LEXIS 20456, 01-CV-4031, 2003 U.S. Dist. LEXIS 20456 at *20-21 (E.D.N.Y. 2003).

[HN9]The burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion at the prima facie stage is de minimis. *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 94 (2d Cir. 2001); *James v. New York Racing Ass'n,* 233 F.3d 149, 153 (2d Cir. 2000).

Plaintiff's prima facie showing of causation boils down to essentially three points. First, plaintiff asserts

that, at the time he was terminated, defendants either knew or were aware of the strong possibility that he [*19] might soon require short-term disability leave.

Second, plaintiff claims that Capuano and Koffler were concerned about the consequences that accommodating plaintiff with medical leave would have on their ability to meet the EDS Northeastern Division sales quota. As evidence of this concern, plaintiff cites an email from Koffler indicating that plaintiff's absence would "leave us severely understaffed" and an alleged statement by Capuano that plaintiff's illness came at a bad time because "the region had quite a high quota to meet." Finally, plaintiff avers that soon after his heart attack EDS hired Jon Sunstrom, a non-disabled employee, to replace him due to his heart attack.

Defendants deny that plaintiff's termination was related to his heart condition or potential need for disability leave. It is undisputed that Capuano terminated Northeastern region sales employee Ike Putterman just days prior to plaintiff's termination, and then, approximately two weeks later, terminated sales employee James Hanfling. Defendants argue that had they truly been concerned about their inability to meet their sales quota due to plaintiff's potential disability leave, they would not have terminated [*20] two other sales employees within days of plaintiff's discharge.

Defendants also dispute plaintiff's assertion that Sunstrom's hiring was related to plaintiff's disability or his potential need for short term disability leave. Defendants note that when EDS hired Sunstrom on March 8, 2001, plaintiff had not yet informed anyone at EDS that there was even a remote possibility of his taking disability leave.

Although defendants surely raise an issue about whether plaintiff has met his prima facie burden on causation, since only a minimal showing is required at this stage, the court finds that plaintiff has met that burden. This leads to the next question (and the one which is critical in the present case) as to whether defendants have articulated a legitimate non-discriminatory reason for terminating plaintiff.

**c. Defendants have Articulated Legitimate Non-discriminatory Reasons for Plaintiff's Termination**

Defendants assert that plaintiff's termination was the result of his repeated acts of insubordinate behavior in refusing to follow the direction of his immediate supervisor Capuano, both regarding his sales commissions and, even more importantly, following the serious complaint [*21] lodged against him by ARIBA.

First, defendants assert that despite being warned in writing not to contact Farley or any other EDS employees beside Capuano with regard to his sales commis-

sions, plaintiff disregarded those instructions and repeatedly contacted Farley and others to ask about his commission.

Even more troublesome to defendants were plaintiff's dealings with ARIBA. Plaintiff does not dispute the fact that the March 8, 2001 email from ARIBA employee Floria contained serious complaints against him including that he "betrayed" an ARIBA sales person and that, as a result, ARIBA was accused of "collusion." Nor does plaintiff dispute that this conduct threatened to harm the valuable relationship EDS had with ARIBA. Furthermore, plaintiff ascribes no improper motives to the email's author Floria.

Ultimately, though, plaintiff was discharged not because of ARIBA's complaint, but rather because of his failure, for the second time, to follow the direct instructions of his supervisor; instructions that were intended to help plaintiff ameliorate the tension that had developed between him and the ARIBA sales staff. After the March 8, 2001 email complaint from Floria, Capuano arranged [*22] a meeting between himself, plaintiff, Koffler, and senior ARIBA management to discuss ARIBA's concerns about plaintiff. Prior to that meeting, Capuano and Koffler specifically warned plaintiff not to address any issues with the ARIBA sales force directly, but rather to wait for the meeting Capuano had arranged. Despite these instructions, on the very same day, plaintiff called Floria and expressed his desire and intention to directly contact ARIBA sales employees regarding their concerns. Under these facts, defendants have more than met their burden to set forth legitimate nondiscriminatory reasons for plaintiff's termination.

**d. Plaintiff has Failed Show that Defendants' Legitimate Non-Discriminatory Reasons for Terminating him were Pretextual**

As described above, once a defendant articulates a legitimate, non-discriminatory explanation for terminating its employee, the plaintiff must raise a genuine issue concerning whether the employer's proffered reason was pre-textual and whether the true reason for the adverse employment decision was more likely than not the illegal discrimination alleged by the plaintiff. Here, plaintiff has done neither.

Much of plaintiff's response [*23] to defendants' reasons for terminating him is simply irrelevant. Plaintiff attempts to explain his behavior by reference to the "complex" and difficult EDS-ARIBA relationship and the fact that he and other EDS sales people had in the past been "squeezed out by self serving ARIBA sales people." These arguments are beside the point. Regardless of who was more at fault for the troubles between ARIBA and EDS generally, it is undisputed that plaintiff contributed to the tension between the two firms, both by

his initial "betrayal" of an ARIBA sales person, and by later refusing to follow his supervisor's instructions regarding how to ameliorate the situation. The court is not in a position to substitute its judgment for that of the EDS management in deciding whether plaintiff or the ARIBA sales staff was at fault or how best to remedy the situation. *Argueta v. N. Shore Long Island Jewish Health Sys., 2003 U.S. Dist. LEXIS 20456, 01-CV-4031, 2003 U.S. Dist. LEXIS 20456 at *13 (E.D.N.Y. 2003)*.

Plaintiff admits that despite being told by Capuano not to attempt to approach the ARIBA sales representatives directly with respect to ARIBA's complaints against plaintiff, he contacted Floria, an ARIBA employee, [*24] on the very same day and told her that he wanted to do just that. Plaintiff contends that he never disobeyed orders because he did not actually contact any ARIBA employees. Plaintiff states that although he "desired" to contact the ARIBA sales staff directly and expressed that desire to Floria, he did not "intend" to do so. This argument is just a matter of semantics. Plaintiff's call to Floria was precisely what Capuano was trying to avoid; it put her in an "uncomfortable position" vis-a-vis the ARIBA-EDS relationship. Defendants were not required to stand by quietly while plaintiff threatened to contravene their direct instructions.

Plaintiff points to two instances in which he alleges Capuano stated that he was "faking" his heart attack. Such allegations are insufficient to support his discrimination claim. *See Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998)* [HN10]("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."); *Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir. 2000)* (evidence of one stray comment by itself is usually not sufficient proof [*25] to show discrimination).

Plaintiff has failed to show that defendants' proffered reasons for terminating him are pretextual or that defendants in fact had any discriminatory motive for terminating him. His discrimination claim therefore fails.

**4. Plaintiff's Claim for Intentional Infliction of Emotional Distress**

Plaintiff's Seventh Cause of Action is for intentional infliction of emotional distress. [HN11]Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999)*.

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Chimarev v. TD Waterhouse Investor Servs.,* 280 F. Supp. 2d 208, 227 (S.D.N.Y. 2003) *aff'd,* 99 Fed. Appx. 259 (2d Cir. 2004) [*26] (*quoting Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 303, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983)).

Plaintiff bases his claim for intentional infliction of emotional distress on defendants' actions in terminating him, signing a complaint with the New York Police Department ("NYPD") for the return of plaintiff's company laptop, canceling his medical benefits, and allegedly threatening a headhunter to withdraw EDS business if he assisted plaintiff in finding new employment.

[HN12]New York courts have been generally unwilling to sustain claims for intentional infliction of emotional distress in connection with allegations of employment discrimination on the basis of disability. *Stuto,* 164 F.3d at 827; *Lichtenstein v. Triarc Cos.,* 02-CV-2626, 2004 U.S. Dist. LEXIS 8610, *32-33 (S.D.N.Y. 2004) ("Plaintiff should not be allowed to . . . subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress")

Cases in which such claims have been upheld all involved some combination of public humiliation, false accusations of criminal or heinous conduct, verbal abuse or harassment, physical threats, [*27] permanent loss of employment, or conduct contrary to public policy. *Stuto, supra* at 828. *See, e.g., Kaminski v. UPS,* 120 A.D.2d 409, 501 N.Y.S.2d 871 (N.Y. App. Div. 1st Dep't 1986) (false accusation of theft, false imprisonment, verbal abuse, and threat of prosecution resulted in coerced confession and resignation).

As a matter of law, plaintiff's allegations do not rise to the level of outrageous conduct necessary to sustain a claim for intentional infliction of emotional distress. As discussed above, plaintiff has failed to show that he was, in fact, terminated on the basis of his disability. His termination itself may therefore not serve as a basis for a claim of intentional infliction of emotional distress. Furthermore, Capuano filed his complaint with the NYPD only after multiple requests for the return of plaintiff's company laptop went unanswered, and when the laptop was returned, EDS dropped its complaint.

Finally, plaintiff's claims that Capuano warned his headhunter not to assist him in finding new employment

and terminated his medical benefits are insufficient to support a cause of action for intentional infliction of emotional distress. In *Murphy, supra,* [*28] the court held that allegations that plaintiff was transferred and demoted for reporting fraud, coerced to leave by being told that he would never be allowed to advance, discharged and ordered to leave immediately after reporting other alleged in-house illegal conduct, and then forcibly and publicly escorted from the building by guards when he returned the next day to pick up his belongings fell "far short" of the tort's "strict standard" for outrageous behavior. 58 N.Y.2d at 303. In *Burlew v. American Mut. Ins. Co.,* 63 N.Y.2d 412, 415, 417-18, 472 N.E.2d 682, 482 N.Y.S.2d 720 (1984), the defendant's intentional five-month delay in authorizing needed surgery in connection with plaintiff's worker's compensation claim was found not to be sufficiently extreme or outrageous to state a claim for intentional infliction of emotional distress. These cases demonstrate the very extreme conduct required by New York courts to be sufficient for a claim of intentional infliction of emotional distress. As a matter of law, defendants alleged actions do not meet that threshold.

**5. Plaintiff's Claims for Unpaid Sales Commissions on the Air Products Sale and Reimbursement for Business Expenses**

[*29] Plaintiff's Fourth, Fifth, and Sixth Causes of Action assert claims for unpaid sales commissions and reimbursement of business expenses plaintiff allegedly incurred while at EDS. The record is not sufficient to resolve these claims of plaintiff. Summary judgment cannot be granted on these claims. However, it is doubtful that a trial will be necessary. The court will confer with counsel about how to dispose of these claims properly.

*CONCLUSION*

For the foregoing reasons, defendants' motion is granted as to plaintiff's First, Second, Third, and Seventh Causes of Action, which are dismissed, and is denied as to the Fourth, Fifth, and Sixth Causes of Action.

SO ORDERED

Dated: New York, New York

November 23, 2005

THOMAS P. GRIESA

U.S.D.J.

# Exhibit C

LEXSEE



Analysis
As of: Feb 19, 2008

THOMAS J. GERMANO, Plaintiff, - against - CORNELL UNIVERSITY, NEW
YORK STATE SCHOOL OF INDUSTRIAL AND LABOR RELATIONS, EDWAR
J. LAWLER, RONALD SEEBER, and ANN W. MARTIN, Defendants.

03 Civ. 9766 (DAB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 17759

August 17, 2005, Decided
August 17, 2005, Filed

**DISPOSITION:**     [*1]  Defendants' motion to dismiss
GRANTED IN PART AND DENIED IN PART.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former instructor
sued defendants, a university, a college, and three indi-
viduals, claiming discrimination on the basis of age and
breach of contract under federal and state law, the New
York City Human Rights Law (NYCHRL), New York
City, N.Y., Admin. Code § 8-107(a), and for common
law breach of contract and breach of implied-in-fact con-
tract. Defendants moved to dismiss the instructor's
NYCHRL, contract, and implied contract claims.

**OVERVIEW:** The instructor taught at one of the uni-
versity's extension campuses. He alleged that defendants
tried to force him to retire by constant pressure, threats,
and harassment regarding his age. Defendants terminated
him after he offered employment to another instructor,
although they had advised him that he had such author-
ity. The court declined to dismiss for lack of subject mat-
ter jurisdiction. It had supplemental jurisdiction over the
NYCHRL claim because it arose from the same opera-
tive facts as the instructor's federal law claim. However,
the court otherwise granted defendants' motion to dis-
miss. The NYCHRL was limited to acts occurring within
the boundaries of New York City. Although the instruc-
tor cited four meetings and a dinner that occurred in the
city, the impact of those acts was felt where he worked,

which was not in this city. Further, the instructor did not
maintain an office or perform any job-related duties in
New York City. The instructor could not state a viable
breach of contract claim as there was no oral contract for
tenure. Similarly, there was no implied-in-fact contract
for tenure. The court denied the instructor leave to
amend because it would be futile.

**OUTCOME:** The court denied defendants' motion to
dismiss for lack of subject matter jurisdiction, but
granted their motion to dismiss the instructor's
NYCHRL, breach of express contract, and breach of
implied-in-fact contract claims. The court dismissed
these claims with prejudice.

**CORE TERMS:** tenure, implied-in-fact, termination,
terminated, retire, contract claims, causes of action, fac-
ulty, leave to amend, harassment, deans, vacant, factual
allegations, express contract, fill, matter jurisdiction,
present case, citation omitted, discriminated, contra-
dicted, terminating, appointment, impacted, tenured, din-
ner, supposedly, staffing, staff, employment contract,
breach of contract

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Subject Matter Juris-
diction > Federal Questions > General Overview*

***Civil Procedure > Jurisdiction > Subject Matter Juris-
diction > Jurisdiction Over Actions > General Overview***
***Civil Rights Law > General Overview***
[HN1]Where a district court has original federal question
jurisdiction over plaintiff's federal Age Discrimination in
Employment (ADEA), 29 U.S.C.S. 621 et seq., claim
under 28 U.S.C.S. § 1331, and where plaintiff's New
York City Human Rights Law, New York City, N.Y.,
Admin. Code § 8-107(a), claim arises out of the "same
nucleus of operative facts" as the ADEA claim, a court
clearly has supplemental subject matter jurisdiction over
this latter claim under 28 U.S.C.S. § 1367(a).

***Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Failures to State Claims***
***Evidence > Judicial Notice > General Overview***
[HN2]In deciding a Fed. R. Civ. P. 12(b)(6) motion, a
court must read a complaint generously, accepting as true
all factual allegations therein and drawing all reasonable
inferences in favor of plaintiff. Dismissal is only proper
when it appears beyond doubt that plaintiff can prove no
set of facts in support of his claim which would entitle
him to relief. Because a Rule 12(b)(6) motion is used to
assess the legal feasibility of a complaint, a court should
not assay the weight of the evidence which might be of-
fered in support thereof. Consideration of a Rule 12(b)(6)
motion is limited to the factual allegations in the com-
plaint, documents attached to the complaint as exhibits or
incorporated in it by reference, to matters of which judi-
cial notice may be taken, or to documents either in plain-
tiff's possession or of which plaintiffs had knowledge
and relied on in bringing suit.

***Civil Rights Law > General Overview***
***Governments > Local Governments > Claims By &
Against***
***Labor & Employment Law > Discrimination > Action-
able Discrimination***
[HN3]Under the New York City Human Rights Law
(NYCHRL), it is unlawful for an employer to discrimi-
nate against or discharge an employee on the basis of his
or her age. New York City, N.Y., Admin. Code § 8-
107(a). Both New York state law and the New York City
Administrative Code limit the applicability of the
NYCHRL to acts occurring within the boundaries of
New York City. N.Y. Gen. Mun. Law § 239-s (1999);
New York City, N.Y., Admin. Code § 2-201 (2003). In
order to state a claim under the NYCHRL, all plaintiffs
must allege that defendants intentionally discriminated
against them within New York City.

***Civil Rights Law > General Overview***

***Governments > Local Governments > Claims By &
Against***
***Labor & Employment Law > Discrimination > Action-
able Discrimination***
[HN4]To determine the location of the discrimination,
courts have looked to the location of the impact of the
offensive conduct. Plaintiff must show more than the
happenstance that a defendant has an office in New York
City.

***Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Failures to State Claims***
[HN5]If a plaintiff's allegations are contradicted by a
document attached to or incorporated by reference into a
complaint, those allegations are insufficient to defeat a
motion to dismiss.

***Contracts Law > Types of Contracts > Express Con-
tracts***
***Contracts Law > Types of Contracts > Implied-in-Fact
Contracts***
[HN6]A contract implied in fact may result as an infer-
ence from the facts and circumstances of the case, al-
though not formally stated in words and is derived from
the presumed intention of the parties as indicated by their
conduct. While an implied in fact contract is equally
binding as an expressed contract, and, like an express
contract, requires mutual assent evincing the intention of
the parties to be bound by specific contractual terms, it
rests upon the conduct of the parties and not their verbal
or written words.

***Contracts Law > Types of Contracts > Implied-in-Fact
Contracts***
***Labor & Employment Law > Employment Relation-
ships > General Overview***
[HN7]Where, as here, an express contract exists between
the parties concerning the same subject matter, there may
be no recovery upon a theory of implied contract.

***Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > General Overview***
***Civil Procedure > Pleading & Practice > Pleadings >
Amended Pleadings > Leave of Court***
***Contracts Law > Types of Contracts > General Over-
view***
[HN8]Under Fed. R. Civ. P. 15(a), leave to amend "shall
be freely given when justice so requires." Fed. R. Civ. P.
15(a). Although it is the usual practice upon granting a
motion to dismiss to allow leave to replead, a court may
dismiss without leave to amend when amendment would

be futile. A decision to grant leave to amend a complaint rests within the discretion of a district court.

**COUNSEL:** For Thomas J. Germano, Plaintiff: David M. Marek, New York, NY; Jeffrey Lew Liddle, Liddle and Robinson, LLP, New York, NY.

For Cornell University, New York State School of Industrial and Labor Relations, Edward J. Lawler, Ronald Seeber, Ann W. Martin, Defendants: Nelson E. Roth, Cornell University, Office of University Counsel, Ithaca, NY.

**JUDGES:** Deborah A. Batts, United States District Judge.

**OPINION BY:** Deborah A. Batts

**OPINION**

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, United States District Judge.

Plaintiff Thomas J. Germano commenced this action against the above-named Defendants, claiming that they discriminated against him on the basis of age in the course of his employment and termination thereof, and that the Defendants' termination of his employment was a breach of contract. Plaintiff asserts claims under the Age Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law (NYSHRL), and the New York City Human Rights Law ("NYCHRL"); as well as for common law breach of contract and breach of implied-in-fact contract. Defendants Cornell University, New York State School of Industrial and Labor [*2] Relations ("ILR School"), Edward J. Lawler, Ronald Seeber, and Ann W. Martin move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's NYCHRL, contract, and implied contract claims for failure to state a claim upon which relief can be granted. Defendants also move to dismiss Plaintiff's New York City Human Rights Law claim for lack of subject matter jurisdiction pursuant to F.R.C.P. 12(b)(1). For the reasons stated below, Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART.

**I. BACKGROUND**

**II.**

**A. Plaintiff's Employment at the ILR School**

Plaintiff began working at the ILR School on October 7, 1976. (Compl. P1). [1] The ILR School, a division of Defendant Cornell University, offers the nation's only four-year undergraduate program in industrial and labor relations. The school has several extension offices in the State of New York, including Buffalo, Rochester, Albany, Ithaca, New York City, and Long Island, which is where Plaintiff worked as the Director for the entire duration of his employment from October 7, 1976 until his termination on January 13, 2003. ( [*3] PP3, 12)*Id.*

> 1  Because Defendants' motion is brought under F.R.C.P. 12(b)(6), the Court accepts as true all factual allegations in the Complaint. *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995).

Plaintiff began his employment at the ILR School as an Extension Associate I, which is how the ILR School refers to instructors who work at its Extension offices. (Compl. P13). Extension associates have professional qualifications comparable to those of professors and associate professors at Cornell. (*Id.*). In 1988, Plaintiff "was promoted to Senior Extension Associate II, which was the ILR School Extension's version of 'tenure.'" (*Id.* P14). At that time, ILR School Associate Deans Lois Gray and Ronald Seeber told him that "once Cornell and the ILR School appointed him a Senior Extension Associate II, he had the equivalent of tenure, and, accordingly, could not be fired other than for cause or budgetary exigencies whereby the school [*4] was unable to continue paying his salary. (*Id.* P16).

**B. Harassment and Termination of Plaintiff** Beginning in 2000, Cornell, the ILR School, and Defendant Ann Martin, associate Dean of the ILR School until Cornell terminated her position in December 2002, [2] allegedly tried for two and half years to force him to retire by constant pressure, threats, and harassment regarding his age. (Compl. P20). For example, Martin first suggested that Plaintiff retire during a meeting on November 2, 2000, and allegedly repeated several times at this meeting that he should consider retiring and that "it's time" for him to retire. (*Id.* P21). Plaintiff next saw Martin at a meeting in New York City on February 6, 2001, where she allegedly asked him if he was considering retirement or suggestion to retire. (*Id.* P22). Subsequently, Plaintiff ate dinner in Manhattan with Martin on April 18, 2001 where she again allegedly asked Plaintiff if he planned on retiring. Moreover, at that same dinner, she supposedly "threatened to find someone else to do his work and that he should begin some serious retirement planning." (*Id.* P23).

> 2  Martin is now a Senior Extension Associate at the ILR School in Ithaca, NY. (Complaint P6).

[*5]  Thereafter, at a District Directors meeting in New York City on December 5, 2001, Martin announced that a committee would meet the next day to discuss the

future of the Long Island office and allegedly told Plaintiff specifically that his attendance was not necessary, although he had been the Director of that Office for nearly 25 years. (Compl. P26). On December 18th, Martin and Plaintiff met at JFK Airport where she allegedly told Plaintiff his office would have to produce savings or increased income in the amount of $ 20,000 to $ 25,000 by June 2002 and function with one less employee. Additionally, Plaintiff claims Martin "threatened to break the lease and close the Long Island Office either partially or completely." (*Id.* P27).

From January to June 2002, Plaintiff reduced the Long Island office's operating costs by approximately $ 25,000 while working with one less employee. (*Id.* P28). Meanwhile, on January 23, 2002, Martin allegedly told Plaintiff that if he would relinquish the position of Director she would stop harassing him to retire. (*Id.* P30).

On October 4, 2002, Martin met with Plaintiff at the Long Island office and informed him that Defendant Edward Lawler, [*6] Dean of the ILR School, had decided to close the Long Island Office to save money. (*Id.* P31). She allegedly stressed that the decision to close the Office was not made as a result of poor performance, and that in fact the office "was overachieving despite being understaffed." (*Id.*). Thereafter, during a conference call between ILR School Deans and Directors on October 9, Lawler allegedly told Plaintiff that ILR needed to save $ 500,000 and that some people might need to retire. (*Id.* P32). During this conversation, Martin supposedly said, "I know Tom Germano is sitting quietly in a great deal of pain, and I thank you for that, Tom. I'm sure others are feeling for you as I am." (*Id.*).

On October 24, 2002, Plaintiff allegedly received a letter from Lawler stating that Plaintiff's employment had been terminated for financial reasons effective July 1, 2002. (*Id.* P33). The letter did not mention performance or managerial problems. (*Id.*). The only other employee at the Long Island Extension office whose employment was terminated was a woman over 70 years old with only 2 1/2 years service to Cornell while the other employees, all junior and younger than Plaintiff, [*7] were allegedly offered employment with the ILR School's New York City district office. (*Id.* P34). However, after the Long Island Federation of Labor and the Long Island Labor Advisory Board threatened to lobby for an alternative provider of labor education in Long Island, the Long Island Office remained open and Plaintiff kept his job as Director. (*Id.* P39-40).

On December 23, 2002, Plaintiff sent an email to Lawler seeking confirmation that the Long Island office's current level of staffing would be retained and that a vacant labor studies support position could be filled. (Compl. P47). According to Jack Caffey, the President of

the Long Island Federation of Labor, Plaintiff allegedly had the authority to hire up to the current level of staff working at the Long Island Office at that time, plus fill the labor studies support position that had been vacant. (*Id.* P48). On December 24, 2002, Plaintiff sent a letter to Margaret Sipser Leibowitz, an ILR School employee who was teaching ILR classes in Ithaca in the fall of 2002, and called Tina Hament "to see if either or both would fill the one vacant position and one soon-to-be vacant position in the Long Island Office, respectively. [*8] " (*Id.* P49). Plaintiff claims both prospective employees were aware that any offer of employment Plaintiff made was contingent upon approval from Cornell. (*Id.*). A copy of the letter Plaintiff sent to Ms. Leibowitz was sent simultaneously to Lawler. (*Id.*).

Then, on January 3, 2003, Lawler responded to Plaintiff's December 23, 2002 email, and confirmed that Plaintiff had authority to keep current labor staffing, including sufficient staff support. (Compl. P50). Three days later, Plaintiff contacted Lawler's office on to confirm that he had authority to fill the labor staff support position that had been vacant since April 2002. (*Id.* P51). Later that same day, an employee in Lawler's office emailed Plaintiff and informed him that Lawler would not permit him to fill this position and Lawler would make no specific decisions about staffing in the Long Island office until the needs assessment for statewide labor was completed. (*Id.* P52).

On January 13, 2003, Plaintiff met Defendants Seeber and Lawler. (Compl. P53). At this meeting, these Defendants gave Plaintiff a letter, which stated that his employment with the ILR School was terminated because he had offered Ms. [*9] Leibowitz a position. (*Id.*).

## C. Procedural History of the Present Action

On February 13, 2003, Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging that Defendants terminated his employment because of his age in violation of the ADEA. (Compl. P8; Affidavit of Nelson E. Roth ["Roth Aff."], Ex. 2 (Charge of Discrimination)). On September 8, 2003, the EEOC dismissed Plaintiff's administrative charge, and informed him that he could file a private ADEA lawsuit in United States District Court within 90 days without a "right-to-sue" letter. (Compl. P9; Roth Affidavit, Ex. 3 (Letter from EEOC to Plaintiff, dated September 8 2003)).

Thereafter, on December 9, 2003, Plaintiff commenced the present action by filing his Complaint, alleging five causes of action: (1) an ADEA claim for employment discrimination-specifically, on-the-job harassment and eventual termination- on the basis of Plaintiff's

age (Compl. P62); (2) a New York State Human Rights Law Claim for age discrimination in employment based on the same conduct (id. P67); (3) a New York City Human Rights Law claim for age discrimination in employment [*10] (id. P72); (4) a breach of contract claim for allegedly terminating Plaintiff without cause in violation of an alleged contract under which he had life tenure, (id. PP16, 77-79); and (5) a breach of implied-in-fact contract for terminating Plaintiff despite Cornell and the ILR School's alleged prior treatment of Senior Extension Associate II's as tenured. (Id. P86). Defendants now move to dismiss the latter three claims pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may granted.

## II. DISCUSSION

### A. Rule 12(b)(1) Dismissal

Defendants move to dismiss Plaintiff's NYCHRL claim pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. However,[HN1] because this court has original federal question jurisdiction over plaintiff's federal ADEA claim under 28 U.S.C. § 1331, and because the NYCHRL claim arises out of the "same nucleus of operative facts" as the ADEA claim, the Court clearly has supplemental subject matter jurisdiction over this latter claim under 28 U.S.C. § 1367(a). United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Promisel v. First American Artificial Flowers, 943 F.2d 251, 254 (2d Cir. 1991) [*11] (noting that § 1367(a) codified the availability of pendent jurisdiction as set forth in Gibbs), cert. denied, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992). Accordingly, Defendants' Rule 12(b)(1) motion is wholly without merit.

### B. Rule 12(b)(6) Dismissal

[HN2]In deciding a Rule 12(b)(6) motion, the Court must read the complaint generously, accepting as true all factual allegations therein and drawing all reasonable inferences in favor of the plaintiff. Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). Dismissal is only proper when "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S.Ct. 99, 101-02 (1957)). Because a Rule 12(b)(6) motion is used to assess the legal feasibility of a complaint, a court should not "assay the weight of the evidence which might be offered in support thereof." Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980). [*12] Rather, consideration of a Rule 12(b)(6) motion is limited to the factual allegations in the complaint, docu-

ments attached to the complaint as exhibits or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit. Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993) (citing Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991), cert. denied, 503 U.S. 960, 112 S.Ct. 1561 (1992)).

### 1. NYCHRL Claim

[HN3]Under the New York City Human Rights Law, it is unlawful for an employer to discriminate against or discharge an employee on the basis of his or her age. N.Y.C. Admin.Code § 8-107(a). Both New York State law and the New York City Administrative Code limit the applicability of the NYCHRL to acts occurring within the boundaries of New York City. See N.Y. Gen. Mun. Law § 239-s (1999); N.Y.C. Admin.Code § 2-201 (2003). Consequently, in order to state a claim under the NYCHRL, all "plaintiffs must allege that the defendants [*13] intentionally discriminated against them within New York City." Casper v. Lew Lieberbaum & Co., 1998 U.S. Dist. LEXIS 4063, No. 97 Civ. 3016, 1998 WL 150993 at *4 (S.D.N.Y. Mar. 31, 1998).

[HN4]"To determine the location of the discrimination, courts have looked to the location of the impact of the offensive conduct." Salvatore v. KLM Royal Dutch Airlines, 1999 U.S. Dist. LEXIS 15551, No. 98 Civ. 2450, 1999 WL 796172 at *16 (S.D.N.Y. Sept. 30, 1999) (citing Casper, 1998 U.S. Dist. LEXIS 4063, 1998 WL 150993 at *5) (emphasis added). In Casper, plaintiffs worked in Garden City, and the alleged gender discrimination occurred over an interoffice microphone system from New York City to Garden City while plaintiffs were in Garden City. Casper, 1998 U.S. Dist. LEXIS 4063, 1998 WL 150993 at *5. Judge Koeltl dismissed the case because the comments impacted plaintiffs solely at the Garden City office. Id. "Plaintiff must show more than the happenstance that a defendant has an office in New York City." Id. 1998 U.S. Dist. LEXIS 4063, at *4 (citing Lightfoot v. Union Carbide Corp., 1994 U.S. Dist. LEXIS 6191, No. 92 Civ. 6411, 1994 WL 184670 at *5 (S.D.N.Y. May 12, 1994), aff'd, 110 F.3d 898 (2d Cir. 1997)).

Defendants argue that Plaintiff [*14] cannot as a matter of law maintain his NYCHRL claim because the alleged discrimination did not take place in New York City. (Def. Mem. Law at 7-8; Def. Reply at 1-2). Plaintiff alleges in his Complaint that Defendants discriminated against him at four meetings and dinners that took place in New York City at which Martin harassed and pressured him to retire. Assuming such conduct constitutes discrimination, Plaintiff still only felt the impact of

that discrimination in his place of occupation, Long Island, not New York City. *See Salvatore, 1999 U.S. Dist. LEXIS 15551, 1999 WL 796172 at *17* (finding that alleged "isolated incidents" of sexual and racial harassment occurring in New York City did not establish that the "whole or substantial part" of the alleged employment discrimination took place in New York City because the allegedly hostile work environment created by such incidents was in Westchester County-plaintiffs' place of employment- not New York City).

The facts of the present case mirror those in *Salvatore.* Like the Plaintiff here, the *Salvatore* plaintiffs were employed outside of New York City. Furthermore, the *Salvatore* plaintiffs were not subject to any adverse employment [*15] action, such as termination or denial of overtime pay, benefits or promotions, in New York City. *1999 U.S. Dist. LEXIS 15551, 1999 WL 796172 at *17.* Instead, the plaintiffs only alleged that defendant created a hostile working environment by making sexually suggestive and racial harassing remarks and unwanted sexual advances during a company outing in New York City and one of plaintiffs' visits to defendant's home in New York City. *Id. 1999 U.S. Dist. LEXIS 15551, at *15.* Ultimately, the court agreed with the defendant that these isolated incidents impacted plaintiffs' employment only in Westchester County- their place of employment-not New York City, and dismissed their NYCHRL claim under *Rule 12(b)(6). Id. 1999 U.S. Dist. LEXIS 15551, at *15-17.* Thus, to the extent that the present Plaintiff's NYCHRL claim rests on the aforementioned four incidents of harassment by Martin in New York City, it cannot survive *Rule 12(b)(6)* dismissal.

Plaintiff in turn argues that because the January 13, 2003 meeting at which he was finally terminated took place in New York City, this case is analogous to *Launer v. Buena Vista Winery, 916 F.Supp. 204 (E.D.N.Y. 1996),* in which the district court found that the plaintiff who had been terminated at [*16] a meeting in New York City and had discriminatory remarks faxed to him at his New York City phone number had suffered discrimination in New York City. *916 F.Supp. at 214;* (Pl. Mem. at 6-7). However, Plaintiff's Complaint makes no mention of the fact that such termination meeting occurred in New York City. Moreover, even if the Court takes notice of such fact, the present case is still distinguishable from *Launer* because while the plaintiff in *Launer* was terminated in New York City, he also maintained an office for the defendant employer in New York City and attended periodic regional company sales meetings there. *Launer, 916 F.Supp. at 206.* In contrast, Plaintiff did not maintain an office or any other workspace in New York City, nor did he perform any of his job-related duties there.

Instead, Plaintiff's situation is more analogous to the plaintiff in *Lightfoot v. Union Carbide Corp..* In *Lightfoot,* the plaintiff worked in Connecticut, and he occasionally brought work home with him to his residence in New York City. In addition, the defendants in that case approved the plaintiff's termination at a meeting in New York City. Nevertheless, [*17] Judge Patterson granted summary judgment in favor of the defendant on the plaintiff's NYCHRL claim, finding that the impact of defendant's alleged adverse employment action on the plaintiff occurred while the latter was employed in Connecticut. *Lightfoot, 1994 U.S. Dist. LEXIS 6191, 1994 WL 184670 at *5.* Accordingly, in the present case, Plaintiff has failed to allege that Defendants' adverse employment actions impacted him in New York and therefore cannot state a viable cause of action under the NYCHRL.

### 2. Breach of Contract

Plaintiff's fourth cause of action alleges that in terminating him from his position as a Senior Extension Associate II "without cause", Defendants breached their contract with him under which he allegedly was guaranteed life tenure and could only be fired "for cause and/or budgetary exigencies." (Compl. PP78-79). Such contract, which was allegedly oral rather than written, was in turn supposedly based on Defendants Gray and Seeber's alleged representation to Plaintiff that he had the "equivalent of tenure" upon his appointment as a Senior Extension Associate II, and the policies of Cornell and the ILR School, under which a Senior Extension Associate II is allegedly [*18] treated as "a tenured faculty member." (*Id.* PP16-17, 77).

However, the Cornell Faculty Handbook, which was submitted in conjunction with Defendants' Motion to Dismiss (*see* Affidavit of Nelson E. Roth ["Roth Aff."], Ex. 17) and which the Court may consider because it contains some of the "policies of Cornell" referred to in the Complaint (*see* Compl. P77), directly contradicts Plaintiff's version of the contract terms as set forth in the Complaint. [3] The Handbook in fact explicitly provides that rather than enjoying life tenure, "Senior Extension Associates are appointed for terms of up to five years and may be reappointed on the basis recommendations by the department and the appropriate extension director and deans(s)." (Roth Aff., Ex 17 at 33). Thus, the Complaint's allegations do not establish the existence of an oral contract for tenure between Defendants and Plaintiff. *See Matusovsky v. Merrill Lynch, 186 F.Supp.2d 397, 400 (S.D.N.Y. 2002)* ([HN5]"If a plaintiff's allegations are contradicted by [] a document [attached to or incorporated by reference into the complaint], those allegations are insufficient to defeat a motion to dismiss."); *In re Bristol-Myers Squibb Sec. Litig., 312 F.Supp.2d*

549, 555 (S.D.N.Y. 2004) [*19]  ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.") (citation omitted).
4

3   Defendants have also submitted several term appointment letters they sent to Plaintiff during the course of his employment which also appear to contradict the Complaint's allegation that he had tenure (see Roth Aff., Exs. 4-9); however, because none of these letters are attached to or even mentioned in the Complaint, the Court may not consider them in ruling on Defendants' present motion.

4   Indeed, in a recent decision, Judge Daniels granted Rule 12(b) (6) dismissal of an almost identical breach of contract claim brought against these very same defendants by Plaintiff's former colleague at the ILR School, Margaret Leibowitz, concluding that because the Faculty Handbook "clearly indicate[s] that appointments could be for no more than a five year period," "the allegations in [Leibowitz's] complaint fail to show that a contract existed between [her] and either Cornell University or the ILR School ensuring her employment indefinitely." Leibowitz v. Cornell Univ., 2005 U.S. Dist. LEXIS 1529, No. 03 Civ. 9976 (GD), 2005 WL 267560, at *6 (S.D.N.Y. Feb. 3, 2005).

[*20]  Accordingly, Plaintiff's breach of contract claim must be dismissed.

### 3. Breach of an Implied-in-Fact Contract

Plaintiff also alleges that even if there was no express employment contract granting him tenure, the parties had entered into an implied-in-fact contract under which he had tenure. (Compl. P83). This implied-in-fact contract, Plaintiff claims, arises from Defendants' conduct, the treatment of other Senior Extension Associate II's as having tenure, and the policies of Cornell and the ILR School. (Id. PP84-86).

[HN6]"A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words. . . and is derived from the presumed intention of the parties as indicated by their conduct." Jemzura v. Jemzura, 36 N.Y.2d 496, 503-04, 330 N.E.2d 414, 369 N.Y.S.2d 400 (1975) (internal quotations and citations omitted). While an implied in fact contract is equally binding as an expressed contract, id., and, like an express contract, requires mutual assent evincing the intention of the parties to be bound by specific contractual terms, see Maas v. Cornell Univ., 94 N.Y.2d 87, 93-94, 721 N.E.2d 966, 699

N.Y.S.2d 716 (1999) [*21]  (citations omitted), it "rests upon the conduct of the parties and not their verbal or written words." Parsa v. New York, 64 N.Y.2d 143, 148, 485 N.Y.S.2d 27 (1984).

As an initial matter, Defendants argue that "[a] plaintiff may not rely on an implied-in-fact contract where an express contract governs the subject matter." (Def. Mem. at 10). While Defendants have correctly stated the law, see Stissi v. Interstate & Ocean Transp. Co. of Philadelphia, 814 F.2d 848, 851 (2d Cir. 1987) ("It is an elementary principle of contract law that, where there exists an express contract for compensation, an action outside that contract will not lie."); Muhitch v. St. Gregory the Great Roman Catholic Church and School, 239 A.D.2d 901, 659 N.Y.S.2d 679, 680 (4th Dep't 1997) ([HN7]"Where, as here, an express contract exists between the parties concerning the same subject matter, there may be no recovery upon a theory of implied contract."), such rule has no application in the present case where, as stated above, there was no express employment contract giving Plaintiff tenure.

Nevertheless, Plaintiff has failed to allege adequately the existence of an [*22]  implied-in-fact contract between him and Defendants giving him lifetime tenure in employment. The Complaint's general reference to Cornell and the ILR School's "conduct indicating to [Plaintiff] that he was a tenured faculty member" (Compl. P84) is too vague to overcome a Rule 12(b)(6) motion. See Electronics Communs. Corp. v. Toshiba Am. Consumer Prods., 129 F.3d 240, 243 (2d Cir. 1997) (holding that conclusory statements in a complaint will not substitute for sufficient factual allegations when trying to overcome a motion to dismiss). Moreover, as discussed above, his allegations that granting him tenure was consistent with Defendants' treatment of other Senior Extension Associate II's and with Cornell and ILR School Policy are directly contradicted by the Cornell Faculty Handbook itself and thus carry no weight with the Court.

Accordingly, the Court also finds that Plaintiff has failed to a state viable claim for breach of implied-in-fact contract.

### C. Leave To Amend

Having found that Plaintiff's NYCHRL, contract, and implied-in-fact contract claims must be dismissed pursuant to Rule 12(b)(6), the Court must next determine whether Plaintiff should be granted leave to amend [*23] its Complaint to cure the defects in these three causes of action. [HN8]Under F.R.C.P. 15(a), leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, although "it is the usual practice upon granting a motion to dismiss to allow leave

to replead," *Cortec Industries, Inc., 949 F.2d at 48* (citing *Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990)*, a court may dismiss without leave to amend when amendment would be futile. *Oneida Indian Nation of New York v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003)* (citing *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 230, 83 S. Ct. 227 (1962))*. Ultimately, the decision to grant leave to amend a complaint rests within the discretion of the district court. *Foman, 371 U.S. at 182, 83 S.Ct. at 230.*

With respect to Plaintiff's NYCHRL claim, no additional amount of pleading will establish that Plaintiff felt the impact of the alleged discrimination in New York City. After all, Plaintiff's office was in Long Island. Even if Plaintiff alleges more [*24] acts of discrimination during meetings in New York City, the impact of such discrimination was still on Plaintiff's employment in Long Island. Similarly, as discussed above, even if Plaintiff alleges the termination meeting was in New York City, the impact of that meeting on plaintiff's employment was also in Long Island. Thus amendment of this claim would be futile. The same can also be said for Plaintiff's contract and implied-in-fact contract claims because no amount of additional allegations in the Complaint would change the fact that Cornell and the ILR's School's employment policy with respect to Senior Extension Associates, as expressly reflected by the Faculty Handbook, was to offer them 5-year employment terms rather than lifetime tenure.

Accordingly, leave to amend is denied with respect to all three of Plaintiff's dismissed claims.

III. CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss under Rule 12(b)(1) is DENIED, but their Motion to Dismiss the three causes of action under Rule 12(b)(6) is GRANTED. Accordingly, Plaintiff's New York City Human Rights Law, breach of express contract, and breach of implied-in-fact contract claims are DISMISSED WITH [*25] PREJUDICE. Defendants are directed to answer Plaintiff's two remaining causes of action within twenty (20) days of the date of this Order. Upon joinder of the remaining issues, a Rule 16 conference shall be scheduled by the Court.

SO ORDERED

DATED: New York, New York

August 17, 2005

Deborah A. Batts

United States District Judge

# Exhibit D

LEXSEE



Caution
As of: Feb 19, 2008

**JOANNE HART, et al., Plaintiffs, -against- DRESDNER KLEINWORT
WASSERSTEIN SECURITIES, LLC., et al., Defendants.**

**06 Civ. 0134 (DAB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**2006 U.S. Dist. LEXIS 56710**

**August 8, 2006, Decided
August 9, 2006, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employees sued
defendants, an employer and several individuals, alleging
discrimination and retaliation under the Equal Pay Act
(EPA), 29 U.S.C.S. § 206(d), N.Y. Lab. Law § 190 et
seq., the New York State Human Rights Law (NYHRL),
N.Y. Exec. Law § 290 et seq., and the New York City
Human Rights Law (NYCHRL), New York City, N.Y.,
Admin. Code § 8-101 et seq. Defendants moved to dis-
miss and strike. The employees contested the motions.

**OVERVIEW:** The employees, female executives for an
investment bank, alleged that there was a "glass ceiling"
preventing them from advancement and compensation
commensurate with male employees as well as equality
with respect to the terms and conditions of employment.
The employees further alleged that there was a "culture
of discrimination" against women, which included
openly inappropriate and offensive sexual behavior. The
court granted defendants' motion in part and denied it in
part. In particular, although they were executives, the
court found that the employees were covered by the state
equal pay laws, concluding that a broad interpretation of
employee was appropriate in addressing a discrimination
claim. However, as to an employee who had been trans-
ferred to London, the court found that the EPA and state
law applied only to work performed before her move.
Additionally, the court denied dismissal as to the
NYHRL and NYCHRL claims as to this employee since
she sufficiently alleged discriminatory decisions made

within the city and state. The court also denied the mo-
tion to strike, finding that allegedly scandalous allega-
tions in the complaint had a bearing on the employees'
claims.

**OUTCOME:** The court denied the motion to dismiss the
N.Y. Lab. Law claims. The court granted the motion to
dismiss the EPA claim as to a London-based employee
except for work performed prior to her move and denied
the motion to dismiss this employee's N.Y. Lab. Law
claim as to work performed before her move, but granted
it for work performed after her move. The court denied
the motion to dismiss the NYHRL and NYCHRL claims
and the motion to strike.

**CORE TERMS:** Pls' Mem Law, labor law, human
rights, work performed, extraterritorially, extraterritorial,
male, discriminatory, resident, sex, statute of limitations,
bonus, discriminatory act, discriminatory intent, dis-
criminate, scandalous, promotion, notice, law claims,
discrimination claim, vice president, investment bank,
discriminatory practices, establishment, admissible, fe-
male employees, predecessor, female, Equal Pay Act,
person employed

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Failures to State Claims*

[HN1]When deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must read the complaint generously, accepting as true the factual allegations in the complaint and drawing all inferences in favor of the pleader. A court will grant such a motion only if, after viewing plaintiff's allegations in a most favorable light, it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims***

[HN2]While a court considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim is limited to the facts stated in the complaint, the complaint includes any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. Courts may also consider documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit.

***Labor & Employment Law > Equal Pay > General Overview***

[HN3]See N.Y. Lab. Law § 194.

***Labor & Employment Law > Equal Pay > General Overview***

[HN4]"Employee" is defined as meaning any person employed for hire by an employer in any employment. N.Y. Labor Law § 190(2). "Manual worker," "railroad worker," and "commission salesman," are defined in N.Y. Lab. Law § 190(4)(5)(6), and "clerical and other worker" is defined in N.Y. Lab. Law § 190(7) as including "all employees not included in subdivisions four, five and six of this section, except any person employed in a bona fide executive, administrative or professional capacity whose earnings are in excess of six hundred dollars a week." N.Y. Labor Law § 190(7).

***Labor & Employment Law > Equal Pay > Federal & State Interrelationships***

[HN5]The New York labor law is analyzed in the same manner as claims under the federal Equal Pay Act, 29 U.S.C.S. § 206, which does not exclude executives.

***Labor & Employment Law > Equal Pay > General Overview***

[HN6]The United States Court of Appeals for the Second Circuit finds the analysis and reasoning of the court in Miteva v. Third Point Mgmt. Co., 323 F. Supp. 2d 573

(S.D.N.Y. 2004), is the better analysis and thus that a broad interpretation of the definition of employee in the New York labor statute is appropriate when addressing a discrimination claim.

***Evidence > Inferences & Presumptions > Presumptions***
***Evidence > Inferences & Presumptions > Rebuttal of Presumptions***
***Governments > Legislation > Effect & Operation > General Overview***
***Governments > Legislation > Interpretation***

[HN7]Statutes that do not state otherwise are not presumed to apply outside of the United States. It is a long standing principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States. However, this presumption against extraterritorial application of jurisdiction can be overcome when Congress clearly expresses its intent to do so.

***Labor & Employment Law > Equal Pay > Equal Pay Act > General Overview***

[HN8]See 29 U.S.C.S. § 206(d)(1).

***Labor & Employment Law > Equal Pay > Equal Pay Act > General Overview***

[HN9]Congress specifically stated that the Fair Labor Standards Act was not to be applied in foreign countries when it amended it in 1957. Section 213(f) states that 28 U.S.C.S. § 206 shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country. Congress amended the Act so that § 213(f) provided an exemption for work performed in a foreign workplace. In doing so, Congress noted that the Act was obviously designed to apply to a United States economy, and its application to overseas areas is usually inconsistent with local conditions of employment and is contrary to the best interest of the United States and the foreign areas.

***Evidence > Inferences & Presumptions > Presumptions***
***Governments > Legislation > Effect & Operation > General Overview***
***Governments > Legislation > Interpretation***

[HN10]As with federal statutes, state laws that are silent on the subject of extraterritorial application generally are presumed not to apply to foreign jurisdictions.

***Labor & Employment Law > Discrimination > General Overview***

[HN11]See N.Y. Exec. Law § 298-a(1).

*Governments > Legislation > Effect & Operation > General Overview*
*Labor & Employment Law > Discrimination > General Overview*
[HN12]Courts have interpreted N.Y. Exec. Law § 298-a(1) to apply to an act of discrimination committed outside of the state against a state resident, as well as to a discriminatory act that was committed in New York. Whether an employee who is not a New York resident falls within the scope of the N.Y. Human Rights Law's (NYHRL's) protection depends not on the place of employment but rather on where the alleged acts of discrimination took place. A nonresident plaintiff is required to show that he was discriminated against in New York to state a claim under the NYHRL. The NYHRL does not provide a cause of action to a New York resident for discriminatory acts committed outside of New York by a foreign corporation. There is no New York authority to suggest that the impact of a discriminatory act must be felt within New York for the NYHRL to apply.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions > General Overview*
[HN13]The New York City Human Rights Law, which does not include an extraterritorial provision, states that it shall be an unlawful discriminatory practice for an employer because of gender to discriminate against such person in compensation or in terms, conditions or privileges of employment. New York City, N.Y., Admin. Code § 8-107. The administrative code goes on to state that the statute's provisions shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed. New York City, N.Y., Admin. Code § 8-130.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Strike > General Overview*
[HN14]Fed. R. Civ. P. 12(f) permits a court to order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. Motions to strike are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation. Courts generally are very reluctant to deter-

mine disputed or substantial issues of law on a motion to strike. Courts should not tamper with the pleadings unless there is a strong reason for so doing. To prevail on a motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Strike > General Overview*
[HN15]Neither a district court nor an appellate court should decide to strike a portion of the complaint--on the grounds that the material could not possibly be relevant-- on the sterile field of the pleadings alone.

COUNSEL:  [*1]  For Joanne Hart, on behalf of herself an individual, Joanne Hart, and on behalf of all similarly situated persons, Traci Holt, on behalf of herself an individual, Traci Holt, and on behalf of all similarly situated persons, Maria Rubashkina, on behalf of herself an individual, Maria Rubashkina, and on behalf of all similarly situated persons, Jyoti Ruta, on behalf of herself an individual, Jyoti Ruta, and on behalf of all similarly situated persons, Kathleen Smith, on behalf of herself an individual, Kathleen Smith, and on behalf of all similarly situated persons, Kathleen Treglia, on behalf of herself an individual, Kathleen Treglia, and on behalf of all similarly situated persons, Plaintiffs: Douglas Holden Wigdor, Kenneth P. Thompson, Scott Browning Gilly, Thompson Wigdor and Gilly, NY, NY.

For Dresdner Kleinwort Wasserstein Securities LLC, Dresdner Kleinwort Wasserstein Services LLC, Dresdner Kleinwort Wasserstein LLC, Dresdner Kleinwort Wasserstein Limited, Dresdner Bank AG, Klaus Tanner, individual, William Bristowe, individual, Julian Plant, individual, Neil Winward, individual, Gregory Raykher, individual, Stephen Brooks, individual, David Waller, individual, Karen Cooperman,  [*2]  individual, James Pickering, individual, Frederick Bond, individual, Rupert Fraser, individual, Robert Boyd, individual, Defendants: Kenneth John Kelly, Epstein, Becker & Green, P.C. New York, NY.

JUDGES: Deborah A. Batts, United States District Judge.

OPINION BY: Deborah A. Batts

OPINION

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, United States District Judge.

Plaintiffs Joanne Hart, Traci Holt, Maria Rubashkina, Jyoti Ruta, Katherine Smith and Kathleen Treglia (collectively "Plaintiffs"), bring this proposed class action, seeking redress from alleged employment discrimination and retaliation by various Defendants in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d), New York Labor Law §§ 190 et seq., the New York State Human Rights Law, N.Y. Executive Law §§ 290 et seq., New York City Human Rights Law, and New York City Administrative Code §§ 8-101 et seq. Defendants Dresdner Kleinwort Wasserstein Securities LLC and Dresdner Kleinwort Wasserstein, LLC (collectively "Defendants") [1] move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), and to strike scandalous material from the Complaint, pursuant to Rule 12(f). For the following reasons, Defendants' [*3] motion to dismiss is DENIED in part and GRANTED in part, and Defendants' motion to strike certain material is DENIED.

> 1   The other Defendants named in the instant lawsuit do not join these Defendants in their motion to dismiss, and have filed Answers to the Complaint.

## I. BACKGROUND

Unless otherwise indicated, the following facts are taken from the Complaint; only those facts necessary to resolve the instant motion are included here.

### A. Parties

Plaintiffs are all female executives employed by various subsidiaries of parent company Dresdner Bank (collectively "DrKW" or "Company"), who are seeking redress on behalf of themselves and all other similarly situated former and current female employees.

Plaintiff Joanne Hart is in the Capital Markets Division and is a Director of Investor Relations in the International Equities Sales Group in the New York Office of DrKW; she has been employed by the Company since 1994. (Complaint P 18.)

Plaintiff Traci Holt is in the Capital Markets Division and she is a Vice President [*4] in the Structured Finance Group in the New York Office of DrKW; she has been employed by DrKW since 2001. (Complaint P 19.)

Plaintiff Maria Rubashkina is in the Global Business Services Division and is a Vice President in the Corporate Communications Department in the New York office of DrKW; she has been employed by the Company or a predecessor entity since 2000. (Complaint P 20.)

Plaintiff Jyoti Ruta is in the Capital Markets Division and is a Director in the Structured Finance Group in the New York office of DrKW; she has been employed by the Company or a predecessor entity since 1994, except for between 1999 and 2001. (Complaint P 21.)

Plaintiff Katherine Smith, who resides in London, England, is currently in the Capital Markets Division, and is a Director in the Equity Sales Trading Group in the London office of DrKW; she has been employed by the Company or a predecessor entity since 1996. (Complaint P 22.) Smith began her career at DrKW in the New York office and remained there through August 2002, when DrKW transferred her to the company's London office. (Complaint P 195.) Smith reports to one manager in New York and to one manager in London. (Complaint P 196.) When Smith [*5] moved overseas, she intended the transfer to London to be temporary: the work permit authorizing her to work in the United Kingdom expires on August 27, 2007. (Smith Aff. P 3.) Since moving, Smith's title and duties have remained the same, and she has maintained North American clients, including clients in New York. (Complaint P 196; Smith Aff. P 5.) Since moving, Smith has returned to New York approximately four weeks per year for business. (Smith Aff. P 5.) Smith received her bonus payment for 2002 in spring of 2003, pursuant to company practice. (Complaint P 196; Smith Aff. P 6.)

Plaintiff Kathleen Treglia is in the Capital Markets Division and she is a vice president in the Fixed Income Group at the New York office of DrKW; she has been employed by the Company or a predecessor since 1995. (Complaint P 23.)

The Defendants named in the lawsuit include several divisions of Dresdner Kleinwort Wasserstein and a dozen individual Defendants. According to the Complaint, Dresdner Kleinwort Wasserstein, LLC ("DrKW LLC") is a subsidiary of Dresdner Bank, and is a Delaware limited liability company with a principal place of business in New York, New York. (Complaint P 27.) Defendant Dresdner [*6] Kleinwort Wasserstein Securities LLC ("DrKW Securities") is the U.S. investment bank for its parent company, Defendant Dresdner Bank, and is a Delaware limited liability company with a principal place of business in New York City. (Complaint P 24.)

### B. Facts

Plaintiffs allege there is a "glass ceiling" at DrKW, which has prevented them from receiving equal opportunities for advancement in the form of denial of promotions, compensation commensurate with male employees, and equality with respect to the terms and conditions of their employment. (Complaint P 2.) Using statistical analysis, Plaintiffs allege in their Complaint the disparity

between men and women in senior level positions at DrKW. (Complaint PP 3-7.) Plaintiffs also allege that they are treated with hostility and denied equal terms and conditions of employment at DrKW, and that all written and unwritten policies and practices concerning assignments, evaluations, compensation, and promotion are not applied uniformly or fairly, and that Plaintiffs are unlawfully subject to a pervasive pattern of ongoing and continuing disparate treatment. (Complaint PP 8-9.) Plaintiffs also allege that DrKW discriminates against Plaintiffs [*7] by advancing male employees more quickly into preferred departments and to higher levels than female employees, by denying female employees equal job assignments, promotions and compensation, and by retaliating against female employees who oppose these discriminatory practices. (Complaint P 10.)

In their Complaint, Plaintiffs allege a "culture of discrimination" that permeates DrKW offices, and they include examples of certain remarks and incidents that they allege is evidence of this culture. (See Complaint PP 55-75.) Specifically, Plaintiffs state the following in their Complaint:

> . Although we live in 2006, the "glass ceiling" is alive and well at this German investment bank where women are treated as second class citizens with respect to all of the terms and conditions of their employment. This class action seeks to put an end to these intolerable and discriminatory practices. (Complaint, first sentence.)

> . Ms. Treglia similarly observed her male colleagues' openly inappropriate and offensive behavior. For example, the salesmen on her desk have openly commented on how they chose their female junior hires based on appearance, stating that they wished to have "eye candy" [*8] in the office. Ms. Treglia has also heard her male peers on the desk recount their experiences at various strip clubs, apparently a favorite haunt of DrKW's male employees. (Complaint P 73.)

> . Ms. Rubashinka was similarly told by a female DrKW employee that the receptionists in the London Graphics, Presentation and Printing department are selected based on their appearance. Ms. Rubashkina is also aware of a male Managing Director in the Corporate Finance and Origination department who routinely brought prostitutes to the office during the lunch hour. (Complaint P 74.)

> . Moreover, DrKW condones intimate relationships between its top male executives and their female subordinates, regardless of the circumstances. As just one example, Leonard Fischer, the former CEO of Defendant Dresdner Kleinwort Wasserstein and a married man, had an open affair with his personal assistant, with who he ultimately had an illegitimate child. (Complaint P 75.)

> . [W]hen Mr. Pickering assumed the position of Department Head of Corporate and External Affairs, he lacked the correct immigration visa and was working illegally as part of a visa-waiver program. (Complaint P 143.)

Defendants [*9] move, pursuant to Rule 12(b)(6), to dismiss the New York Labor Law claim, arguing that it does not protect Plaintiffs; they move to dismiss all of Plaintiff Katherine Smith's claims, because she lives in England; they move to dismiss all claims against Dresdner Kleinwort Wasserstein, LLC, because the company was never Plaintiffs' employer; and Defendants move, pursuant to Rule 12(f), to strike certain portions of Plaintiffs' Complaint.

## II. DISCUSSION

### A. Motion to Dismiss

[HN1]When deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must read the complaint generously, accepting as true the factual allegations in the complaint and drawing all inferences in favor of the pleader. Bolt Elec. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). The Court will grant such a motion only if, after viewing plaintiff's allegations in a most favorable light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992). [*10]

[HN2]While a court considering a Rule 12(b)(6) motion to dismiss for failure to state a claim is limited to the facts stated in the complaint, the complaint includes any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. See Paulemon v. Tobin, 30 F.3d 307, 308-09 (2d Cir. 1994); Rombach v. Chang, 355 F.3d 164, 169 (2d Cir. 2004). Courts may also consider "documents

either in plaintiff's possession or of which plaintiff [] had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

B. Dismissal of New York Labor Law Claims

Defendants move to dismiss all of Plaintiffs' claims under the New York Labor Law on the ground that all of the Plaintiffs are directors or vice presidents, and as such, are not covered under the law. (Defs.' Mem. Law at 19.) Plaintiffs argue that executives are covered under *§ 194 of the New York Labor Law*, which by its terms does not exclude executive-level employees. (Pls' Mem. Law at 23.)

The question of whether executives are covered under the New York Labor Law is far from settled [*11] in New York. Plaintiffs bring their labor law claims under Article 6 of N.Y. Labor Law § 194, which states in pertinent part:

> [HN3]No employee shall be paid a wage at a rate less than the rate at which an employee of the opposite sex in the same establishment is paid for equal work on a job the performance of which requires equal skill, effort and responsibility, and which is performed under similar working conditions. . .

Under the definitions section of the statute in Article 6, [HN4]"employee" is defined as meaning "any person employed for hire by an employer in any employment." N.Y. Labor Law § 190(2). The section goes on to define "manual worker," "railroad worker," and "commission salesman," in subsections four, five, and six, and then defines "clerical and other worker," in subsection seven as including "all employees not included in subdivisions four, five and six of this section, except any person employed in a bona fide executive, administrative or professional capacity whose earnings are in excess of six hundred dollars a week." N.Y. Labor Law § 190(7).

All of the Plaintiffs in the instant case are admittedly executives making more than $ 600 per week. Courts in New [*12] York are divided as to whether executives are covered under Article 6. Defendants point out that New York's highest court stated in *Gottlieb v. Kenneth D. Laub & Company* that executives are barred from relief. 82 N.Y.2d 457, 461, 626 N.E.2d 29, 605 N.Y.S.2d 213 (N.Y. 1993). The Gottlieb case addressed the question of whether a plaintiff was entitled to attorney's fees under N.Y. Labor Law § 198(1-a) when the plaintiff did not bring a claim for a substantive violation of the Labor

Law. The Court of Appeals in *Gottlieb* stated in dicta, and without any explanation, that individuals employed in an "executive, managerial or administrative capacity" are limited to recovery under Labor Law § 191 by the statute's "definitional exclusions." *Id.*

When confronted with the same question as here, the district court in *Miteva v. Third Point Mgmt Co.*, 323 F. Supp. 2d 573 (S.D.N.Y. 2004), decided after *Gottlieb*, analyzed the labor law in question and concluded that the statute does apply to executives. The *Miteva* court noted that most courts before *Gottlieb* interpreted the definition of "employee" broadly to include executives and professionals unless explicitly excluded. Describing [*13] the language in Gottlieb as "ambiguous" and "perhaps unintended," the *Miteva* court found:

> It would be illogical to suppose that the legislature intended to deny that category of persons employed in the workforce the protections of that prohibition, and thereby give employers a license to discriminate in pay on sexual grounds, by categorically excluding executives and professionals from the definitions of employees contained in another provision of the statute that is apparently designed for an entirely different purpose.

323 F. Supp. 2d 573, 581.

[HN5]The New York labor law is analyzed in the same manner as claims under the federal Equal Pay Act (EPA), 29 U.S.C. § 206, which does not exclude executives. *See, e.g., Gibson v. Jacob K. Javits Convention Ctr.*, No. 95 Civ. 9728, 1998 U.S. Dist. LEXIS 3717, *5 (S.D.N.Y. Mar. 23, 1998). Based on this Court's own analysis of the statute and case law, [HN6]this Court finds the analysis and reasoning of the *Miteva* court is the better analysis and thus that a broad interpretation of the definition of employee in the New York statute is appropriate when addressing a discrimination [*14] claim, and that the labor law applies to the instant Plaintiffs. Accordingly, Plaintiffs may pursue their state labor law claim against Defendants. Defendants' motion to dismiss this claim is DENIED.

C. Dismissal of Katherine Smith's Claims

Defendants move to dismiss the claims of Plaintiff Katherine Smith, and move to strike references to her from any refiled Complaint. (Defs.' Notice of Motion at 2; Defs' Mem. Law at 13.) Defendants argue that Smith is a U.S. citizen residing and working in London, England, and that none of the statutes Plaintiffs allege De-

fendants violated in the Complaint are applicable to her. (Defs.' Mem. Law at 13.) Plaintiffs argue that Smith has sufficient ties to New York to justify her claims under the EPA, N.Y. Labor Law, NYSHRL and the NYCHRL. (Pls' Mem. Law at 12.)

1. Federal Equal Pay Act

Defendants argue that the plain language of the Fair Labor Standards Act, of which the EPA is a part, precludes Plaintiff Smith's claims, because she has lived in England since August 2002, and any potential claims from when she worked in New York City before moving to England are barred by the statute of limitations for EPA claims, which is three years for willful [*15] violations. (Defs.' Mem. Law at 13-14.) Plaintiffs argue that Smith worked in New York for the first half of 2002, and did not receive her 2002 bonus until spring of 2003, and this payment is within the three-year statute of limitations for EPA claims. (Pls.' Mem. Law at 12.) Plaintiffs also argue Smith has a claim under the EPA for the time that she performed work in the United States after moving to London, which was, on average, four weeks a year. (Pls.' Mem. Law at 12-13.) Finally, Plaintiffs argue that the policy reasons behind the foreign application exception of § 213(f) are not implicated here, because the instant case is one for discrimination, not one demanding wage and hour minimums. (Pls.' Mem. Law at 13.)

As a preliminary matter, the Court finds that Plaintiff Smith's claims are not barred by the EPA's statute of limitations for willful violations, based on the fact that she was paid an allegedly discriminatory bonus in 2003 for work performed in 2002. Defendants argue that because Smith received her bonus from her employer in England, allowing her to use such payment to assert a claim in the United States for work performed the prior year would burden domestic and foreign [*16] companies. (Defs. Reply Mem. Law at 5.) According to the Complaint, Plaintiff was compensated unfairly because of her sex for work performed in the United States, before her employer asked her to move to England. Defendants would have the Court find that a company may discriminate freely and then transfer the victim of the discrimination out of reach of the law. Equity demands that the Court not penalize Plaintiff, who moved to a foreign country at her employer's request before she was paid her deferred bonus. Accordingly, Plaintiff's claim is within the statute of limitation for willful violations.

The Court now turns to the question of whether Smith, a U.S. citizen who has been working in London since 2002, with sporadic business trips back to New York City, may bring a valid EPA claim. [HN7]Statutes that do not state otherwise are not presumed to apply outside of the United States. *See United States v. Yousef,* 327 F.3d 56, 86 (2d Cir. 2003); *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248, 111 S. Ct. 1227, 113 L. Ed. 2d 274 (1991) ("It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial [*17] jurisdiction of the United States.") (citation and internal quotation marks omitted). However, this presumption against extraterritorial application of jurisdiction "can be overcome when Congress clearly expresses its intent to do so." *Yousef,* 327 F.3d 56, 86 (2d Cir. 2003) (citing cases).

Title 29 U.S.C. § 206(d)(1), entitled, "Prohibition of sex discrimination," states in pertinent part:

[HN8]No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . .

Unlike Title VII, the Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA"), which Congress amended to ensure extraterritorial application, [2] [HN9]Congress specifically stated that the FLSA was not to be applied [*18] in foreign countries when it amended it in 1957. Section 213(f) states that 29 U.S.C. § 206 "shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country." Congress amended the Act "so that section 213(f) provided an exemption for work performed in a foreign workplace." *Cruz v. Chesapeake Shipping, Inc.,* 932 F.2d 218, 226 (3d Cir. 1991). In doing so, "Congress noted that the Act was obviously 'designed to apply to a United States economy, [and its application] to overseas areas is usually inconsistent with local conditions of employment . . . and is contrary to the best interest of the United States and the foreign areas.'" *Id.* (quoting Senate Rep. No. 987, reprinted in 1957 U.S. Code Cong. & Admin. News 1756-57). Given Congress's clear intent *not* to apply the act abroad, there can be little question that the presumption against extraterritorial application of statutes applies.

2    *See Torrico v. International Business Machine Corp. I,* 213 F. Supp. 2d 390, 396-400 (S.D.N.Y. 2002) (explaining how Congress amended the three statutes specifically to apply to certain actions by U.S. employers that affect employees outside of the United States).

[*19] Plaintiffs are correct that the discrimination section of the EPA is analogous to other federal discrimination statutes, and that the exception to EPA's application extraterritorially is more appropriate in regard to minimum wage and hour violations. However, this logic cannot circumvent the plain language of § 213(f), which explicitly states that it does not apply extraterritorially.

Accordingly, Defendants' motion to dismiss Smith's EPA claims is GRANTED in part and DENIED in part; Smith may only bring EPA claims for her bonus payment in 2003 for work performed in the United States prior to her move to England.

2. New York Labor Law

Defendants also argue that Smith's New York Labor Law claim must be dismissed for the same reason as her EPA claim -- because the statute does not apply extraterritorially. (Defs.' Mem. Law at 14.) Plaintiffs make the same arguments here as they did under the EPA, and further argue that Smith alleges a number of intra-state actions and connections to New York that warrant coverage under New York law. (Pls.' Mem. Law at 16.) Specifically, Plaintiffs argue that one of Smith's two supervisors remained in New York; Smith was told that her duties and [*20] reporting lines would not change upon her move to London; Smith worked in New York approximately four weeks a year; she continued to service North American clients, many of whom were in New York; and Smith and her employer both believed her assignment in London was temporary. (Pls.' Mem. Law at 16.)

Unlike the federal EPA, which includes a specific exemption against the law's extraterritorial application, the New York EPA is silent as to its application abroad. However, [HN10]as with federal statutes, state laws that are silent on the subject of extraterritorial application generally are presumed not to apply to foreign jurisdictions.

In analyzing a section of the New York Labor Law pertaining to attorney's fees, and finding that the New York Labor Law did not apply extraterritorially, the court in *Hammell v. Banque Paribas,* said that the state statute "contains no clear statement of intended extraterratorial effect. . . . Nothing in the statute suggests that the legislators intended to give persons who were employed outside New York the right to come to New York to sue their employers . . ." No. 90 Civ. 4799, 1993 U.S. Dist. LEXIS 14755, *5 (S.D.N.Y. Oct. 19, 1993). Given [*21] the lack of any clear intent to apply the New York law extraterritorially, and given that the New York labor law generally is analyzed under the same rubric as the federal EPA (*see Howard v. Cmty. Action Org.,* 2003 U.S. Dist. LEXIS 9998, at *9 n.10 (W.D.N.Y. 2003); *Gibson,* 1998 U.S. Dist. LEXIS 3717, *5), the Court finds that for the same reasons as explained under the EPA, Plaintiff may not pursue her labor law claims overseas.

Because the statute of limitations under the New York EPA is six years, however, Smith may bring state EPA claims for the relevant period of time prior to her move to London. Accordingly, Defendants' motion to dismiss Smith's New York EPA claims is GRANTED in part and DENIED in part.

3. New York State Human Rights Law

Defendants also argue that Smith's claim under the New York State Human Rights Law must be dismissed because the law does not apply to a person living and working in England, and because the statute of limitations is three years, Smith is precluded from pursuing a claim from before she moved. (Defs.' Mem. Law at 15, 17.) Plaintiffs argue that the NYSHRL applies extraterritorially, given that one of Smith's two supervisors is based in New York, [*22] and decisions about Smith's pay, bonuses, and promotions, are made in part in New York. (Pls.' Mem. Law at 18-19.)

Unlike the New York Labor Law, the New York Executive Law, which is also known as the Human Rights Law, has an explicit provision regarding its extraterritorial application:

[HN11]The provisions of this article shall apply as hereinafter provided to an act committed outside this state against a resident of this state or against a corporation organized under the laws of this state or authorized to do business in this state, if such act would constitute an unlawful discriminatory practice if committed within this state." N.Y. C.L.S. Exec § 298-a(1). [HN12]Courts have interpreted this provision to apply to an act of discrimination committed outside of the state against a state resident, [3] as well as to "a discriminatory act [that] was committed in New York.

3    Plaintiffs do not indicate whether Plaintiff Smith is a "resident" of New York State, which

would make her eligible for the law's extraterritorial application.

[*23] *Torrico, 213 F. Supp 390, 407* (quoting *Iwankow v. Mobil Corp., 150 A.D.2d 272, 541 N.Y.S.2d 428, 429 (1st Dep't 1989)*). "Whether an employee who is not a New York resident falls within the scope of the NYHRL's protection depends not on the place of employment . . . but rather on where the alleged acts of discrimination took place." *Torrico, 213 F. Supp 390, 399*; *see also Rice v. Scudder Kemper Invs., Inc., No. 01 Civ. 7078, 2003 U.S. Dist. LEXIS 14239, at *14-15 (S.D.N.Y. Aug. 13, 2003)* (stating that non-resident plaintiff was required to show that he was discriminated against in New York to state a claim under the NYHRL); *Beckett v. Prudential Ins. Co. of Am., 893 F. Supp. 234, 238 (S.D.N.Y. 1995)* ("NYHRL does not provide a cause of action to a New York resident for discriminatory acts committed outside of New York by a foreign corporation."). As discussed in *Torrico,* there is no New York authority to suggest that the impact of a discriminatory act must be felt within New York for the NYHRL to apply. *Torrico, 319 F. Supp.2d at 390, 401 n.5.*

When Plaintiff Smith moved to [*24] London, her employer allegedly assured her that her duties would be the same, and her "reporting lines" would not change, implying that her connection to New York would remain the same. Further, the allegedly discriminatory decisions regarding Plaintiff's bonuses, salary, and promotions, were made partly in New York by one of two supervisors located in New York. Therefore, unlike cases that have found the NYHRL inapplicable extraterritorially because plaintiffs only alleged that the effects or impact of discriminatory acts were felt abroad, and they failed to allege discriminatory conduct that occurred in New York, Plaintiff Smith at this stage makes sufficient allegations about discriminatory decisions made within this state. Therefore, Plaintiff may proceed with her claim.

Accordingly, Defendants' motion to dismiss Smith's NYHRL claim is DENIED.

4. New York City Human Rights Law

Defendants argue for dismissal of Smith's claim under the New York City Human Rights Law for the same reasons as articulated under the New York State Human Right Law. (Defs.' Mem. Law at 18.) In light of conflicting authority regarding whether NYCHRL applies extraterritorially, Plaintiffs base their argument [*25] for its application here on policy reasons: that New York City has an interest in preventing discriminatory conduct within its borders, regardless of where the impact of such conduct is felt. (Pls.' Mem. Law at 22.)

[HN13]The New York City Human Rights Law, which does not include an extraterritorial provision,

states that it shall be an unlawful discriminatory practice for an employer "because of . . . gender . . . to discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Administrative Code § 8-107. The administrative code goes on to state that the statute's provisions,

> shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed.

NYC Administrative Code § 8-130.

Following the same reasoning for applying the New York State Human Rights Law, the court in *Tebenhoff v. Electronic Data Systems Corp.* found that the disability discrimination claims of a New Jersey plaintiff employee could proceed under [*26] the New York City Human Rights Law where he worked in New Jersey, but where the decision to fire him occurred in New York. No. 02 Civ. 2932, 2005 U.S. Dist LEXIS 29874, at *15 (S.D.N.Y. Nov. 23, 2005); *see also Launer v. Buena Vista Winery, 916 F. Supp. 204, 214 (E.D.N.Y. 1996)* (finding that despite the fact that plaintiff was a resident of New Jersey, the defendants were residents of California, and many of the discriminatory acts against plaintiff were made in California, the fact that certain acts occurred in New York City and plaintiff's actual firing occurred in New York City meant the case could proceed). The conclusions drawn in these cases differ from those drawn in other cases, where courts found that the determining factor for deciding whether the statute applied was whether the impact of a discrimination decision was felt within the five boroughs of New York City. *See, e.g., Germano v. Cornell Univ., No. 03 Civ. 9766, 2005 U.S. Dist. LEXIS 17759, *12-17 (S.D.N.Y. Aug. 17, 2005)* (granting defendants' motion to dismiss because defendants' adverse employment actions failed to impact plaintiff in New York); *Lucas v. Pathfinder's Pers., Inc., No. 01 Civ. 2252, 2002 U.S. Dist. LEXIS 8529, at *11 (S.D.N.Y. May 13, 2002)* [*27] (finding that decision to terminate an employee in New York City was insufficient to maintain a NYCHRL claim where plaintiff lived and worked in Massachusetts).

Although the courts differ on whether the impact of a discriminatory action must be felt within the five boroughs, all the courts agree that the discriminatory acts must be made within the City, which the Court concludes occurred here. Especially in light of the legislature's

preference for courts to interpret the New York City Human Rights Law expansively, the Court finds that for the same reasons as discussed in analyzing the state law claims, Plaintiff may pursue her city claim.

Accordingly, Defendants' motion to dismiss Plaintiff Smith's NYCHRL claim is DENIED.

### D. Dismissal of Claims Against Dresdner Kleinwort Wasserstein, LLC

Defendants move to dismiss the Complaint as to DrKW, LLC because neither it, nor its successor-in-interest, has ever been Plaintiffs' "employer." (Defs.' Mem. Law at 22.) Defendants argue that Plaintiffs are employed by DrKW Securities, DrKW Ltd. (UK), DrKW Services, or non-party DrKW (Guernsey) Limited. (Defs.' Mem. Law at 23; Cappelli Aff. P 3.) Plaintiffs argue, [*28] correctly, that whether DrKW LLC is an employer is a question of fact, to be answered after discovery is completed. Therefore, based on the Complaint, which is deemed to be true on a motion to dismiss, DrKW LLC shall remain a party in the case, and Defendants' motion to dismiss the claims against it is DENIED.

### E. Motion to Strike

Defendants move to strike certain "scandalous, immaterial, and impertinent" allegations from Plaintiffs' Complaint. (Defs.' Mem. Law at 7.) Specifically, Defendants move to strike all unnecessary, inflammatory, scandalous, and irrelevant allegations in the first sentence of the Complaint, and in paragraphs 73, 74, 75, and 143 of the Complaint. (Defs.' Mem. Law at 7-11; Defs.' Notice of Motion at 2.) These paragraphs pertain to: a reference to the Defendant being a "German" investment bank (Complaint at 1); a reference to strip clubs being "apparently a favorite haunt of DrKW's male employees" (Complaint P 73); a reference to one Plaintiff being aware of a managing director's practice of bringing prostitutes to the office during the lunch hour (Complaint P 74); a reference to a married former CEO having an affair and a child with his personal assistant (Complaint [*29] P 75); and a reference to a position filled by a person lacking the correct immigration visa who allegedly was working for the company illegally. (Complaint P 143).

[HN14]Fed. R. Civ. P. 12(f) permits the Court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Motions to strike 'are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation.'" Crespo v. N.Y. City Transit Auth., No. 01 CV 0671, 2002 U.S. Dist. LEXIS 2977, *34-35, 2002 WL 398805, at *11 (E.D.N.Y. Jan. 7, 2002) (quoting Lennon v. Seaman, 63 F. Supp. 2d 428, 446 (S.D.N.Y. 1999)). Courts generally are "very reluctant to determine disputed or substantial issues of law on a motion to strike." California v. Atl. Richfield Co. (In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.), No. M21-88, MDL 1358, 2005 U.S. Dist. LEXIS 12400, *5-6 (S.D.N.Y. June 24, 2005) (quoting Simon v. Manufacturers Hanover Trust, 849 F. Supp. 880, 882 (S.D.N.Y. 1994)); see also Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976) [*30] ("[C] courts should not tamper with the pleadings unless there is a strong reason for so doing."). To prevail on a motion to strike, a party must demonstrate that "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." Roe v. City of N.Y., 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001) (quoting Koch v. Dwyer, 2000 U.S. Dist. LEXIS 14181, *4, No. 98 Civ. 5519, 2000 WL 1458803, *1 (S.D.N.Y. Sept. 29, 2000)).

Defendants argue that the allegations are variously scandalous, impertinent, immaterial, "malicious 'Rambo' tactics," and "an irresponsible ploy plainly designed to inflame opinion and prejudice the defendants." (Defs.' Mem. Law at 9, 11.) Defendants also argue that the assertions violate various sections of the New York Code of Professional Responsibility Disciplinary Rules. (Defs.' Mem. at 11.) Plaintiffs argue that three of the paragraphs in question are in a section of the Complaint entitled, "Culture of Discrimination," and that all of the challenged assertions "are [*31] pertinent to the issue of discriminatory intent and to establishing the basis for class treatment." (Pls.' Mem. Law at 5.)

Plaintiffs' discrimination allegations pertain to unequal pay, and not sexual harassment or a hostile work environment, claims that might make the disputed anecdotes more obviously relevant. However, it cannot be said that the disputed allegations have no bearing on the suit. Incidents of perceived sexism may be admissible to demonstrate a defendant's discriminatory intent, which is necessary to support Plaintiffs' sex discrimination claims. See Crespo, 2002 U.S. Dist. LEXIS 2977, *34-37 (holding that paragraphs in a complaint pertaining to dismissed harassment and hostile work environment claims should not be stricken because they were relevant to prove defendant's discriminatory intent); see also Eaton v. American Media Operations, 96 Civ. 6158, 1997 U.S. Dist. LEXIS 46, *15 (S.D.N.Y. Jan. 8, 1997) ("The incidents [plaintiff] alleges underlying her sexual harassment claim may be admissible to demonstrate defendants' discriminatory intent to support her sex discrimination claim."). It cannot be said that the allegations here [*32] have no bearing on the suit. For Plaintiffs to prevail on their discrimination theory, they will have to show dis-

criminatory intent, and the theory that women were not as highly valued as men, as demonstrated by a "culture of discrimination," may successfully demonstrate this. As to the reference to "German investment bank" in the first paragraph, Defendants have not shown that this description is a "blatant appeal to prejudice."

Accordingly, the Court finds that because the allegations may be admissible, may have a bearing on the issues of the case, and do not unfairly prejudice the Defendants, they shall not be stricken. Furthermore, [HN15]"[N]either a district court nor an appellate court should decide to strike a portion of the complaint--on the grounds that the material could not possibly be relevant--on the sterile field of the pleadings alone." *See Sloup v. Loeffler, No. 05 Civ. 1766, 2006 U.S. Dist. LEXIS 16991, *8 (E.D.N.Y. Mar. 13, 2006)* (quoting *Lipsky, 551 F.2d 887, 893*). Accordingly, the Court DENIES Defendants' motion to strike. certain allegations.

F. Refiled Complaint

Defendants also move for an Order directing Plaintiffs to withdraw [*33] the Complaint and refile it without reference to home addresses of any of the individual Defendants. (Defs.' Mem. Law at 12.) Defendants point to the United States District Court for the Southern District of New York, "Notice Regarding Privacy and Public Access to Electronic Civil and Criminal Case Files." This notice was written in compliance with the E-Government Act of 2002, which states that, "You should not include sensitive information in any document filed with the Court unless such inclusion is necessary and relevant to the case." A list of types of sensitive information includes "Home Addresses. If home addresses must be used, use only the City and State." Plaintiffs argue in their opposition that Defendants' home addresses are easily available on the Internet, and are not sensitive information. (Pls' Mem. Law at 11.)

Although Plaintiffs are correct that home address information is readily accessible on the Internet, and pre-

sumably in a hard copy phone book, the fact that personal information is widely available does not warrant publicizing Defendants' home addresses in a legal document. Plaintiffs shall refile their Complaint in accordance with the Notice Regarding Privacy [*34] and Public Access to Electronic Civil and Criminal Case Files for the United States District Court for the Southern District of New York. Furthermore, the print-outs from the Internet search service bearing Defendants' home addresses that are attached to Plaintiff's opposition to Defendants' motion to dismiss shall be removed and the document refiled as well.

III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED in part and GRANTED in part: Defendants' motion to dismiss Plaintiffs' N.Y. Labor Law claims is DENIED; Defendants' motion to dismiss Plaintiff Smith's federal EPA claim is GRANTED, except for work performed in the United States prior to her move to England; Defendants' motion to dismiss Plaintiff Smith's N.Y. Labor Law claim is DENIED as to work performed before her move to England, but GRANTED for work performed after her move; Defendants' motion to dismiss Plaintiff Smiths' NYHRL and NYCHRL claims is DENIED; Defendants' motion to dismiss the Complaint as to DrKW, LLC is DENIED; Defendants' motion to strike certain allegations is DENIED; and Defendants' request that Plaintiffs refile their Complaint without reference to Defendants' home addresses [*35] is GRANTED. Defendants shall answer the Complaint within 45 days of the date of this Memorandum and Order.

Dated: New York, New York

August 8, 2006

Deborah A. Batts

United States District Judge

**Exhibit E**

LEXSEE



Cited
As of: Feb 19, 2008

**ZOHREH STARR a/k/a ZOE STARR, Plaintiff, - against - TIME WARNER, INC.
and TIME WARNER CABLE, INC., Defendants.**

**07 Civ. 5871 (DC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**2007 U.S. Dist. LEXIS 88219**

**November 21, 2007, Decided
November 21, 2007, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee
alleged that defendant former employer discriminated
against her and terminated her employment because of
her disability and Iranian origin. The employee filed suit
against the employer and defendant parent company un-
der Title VII of the Civil Rights Act of 1964, the Ameri-
cans With Disabilities Act (ADA), the Family Medical
Leave Act (FMLA), and city and state laws. Defendants
moved to dismiss.

**OVERVIEW:** The employee also claimed damages for
negligent and intentional infliction of emotional distress.
Defendants argued that the Title VII, ADA, FMLA, and
Connecticut claims were time-barred; that New York
State and City laws were inapplicable as all alleged acts
occurred in Connecticut; and that the employee failed to
state a claim on which relief could be granted under state
tort laws. The parent argued that the complaint failed to
allege any relationship between the parent and the em-
ployer or between the parent and the employee. The
court agreed with most of defendants' arguments, how-
ever, the Title VII claims against the employer survived
dismissal. Based on the allegations, the employee filed a
timely charge of discrimination with the United States
Equal Employment Opportunity Commission. Defen-
dants' motion to dismiss the Title VII claim as time-
barred was denied, without prejudice to the filing of a
summary judgment motion if discovery showed that the
employee's employment was actually terminated on

January 11, 2005. The allegations did not state an ADA
claim because a nearly two-year leave of absence was
not a reasonable accommodation under the ADA.

**OUTCOME:** Defendants' motion to dismiss was denied
as to the employee's claim of employment discrimination
under Title VII against the employer. All other claims
were dismissed, and all claims against the parent were
dismissed.

**CORE TERMS:** disability, emotional distress, reason-
able accommodation, infliction, termination, leave of
absence, prima facie case, discriminatory, time-barred,
qualified to perform, discriminated, national origin, oc-
curring, eligible, employment practices, employment
discrimination, state tort, fair notice, outrageous, resi-
dent, terminated, facts establishing, failure to state a
claim, factual allegations, statute of limitations, cause of
action, own safety, outrageous conduct, work-related,
well-pleaded

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Motions to Dismiss*
[HN1]On a motion to dismiss, a court's consideration is
limited to facts stated on the face of the complaint, in
documents appended to the complaint or incorporated in
the complaint by reference, and to matters of which judi-
cial notice may be taken.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2]On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN3]On a motion to dismiss for failure to state a claim, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely. The United States Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language adopting in its place a "plausibility" requirement. As interpreted by the United State Court of Appeals for the Second Circuit, this did not announce a universal standard of heightened fact pleading, but instead requires a flexible plausibility standard, which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible. In any event, bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations and will not defeat a motion to dismiss.

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Time Limitations > General Overview*
[HN4]Under Title VII of the Civil Rights Act of 1964, the statute of limitations for filing a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) is 300 days in states such as New York and Connecticut that have an agency with the authority to address charges of discriminatory employment practices. 42 U.S.C.S. § 2000e-5(e)(1). Failure to file a timely charge of discrimination with the EEOC renders that claim time-barred, thereby preventing a claimant from bringing the claim in federal court.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
*Labor & Employment Law > Discrimination > Actionable Discrimination*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > General Overview*

[HN5]A prima facie case of discrimination under Title VII of the Civil Rights Act of 1964 requires a plaintiff to show that (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. A complaint in an employment discrimination action need not contain specific facts establishing a prima facie case of discrimination to survive a motion to dismiss. Because the prima facie case operates as a flexible evidentiary standard, a complaint need only comply with the pleading standard articulated in Fed. R. Civ. P. 8(a) to assert an employment discrimination claim. Thus, the complaint must include only a short and plain statement of the claim showing that the pleader is entitled to relief. Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Hence, a plaintiff in a Title VII case need only allege that she was discriminated against in the terms and conditions of her employment on account of national origin or other unlawful factor.

*Labor & Employment Law > Discrimination > Disability Discrimination > Defenses & Exceptions > Statutes of Limitations*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Statutes of Limitations > General Overview*
[HN6]The statute of limitations for filing a claim under the Americans With Disabilities Act and Title VII of the Civil Rights Act of 1964 are identical. 42 U.S.C.S. § 12117 (incorporating 42 U.S.C.S. § 2000e-5(e)).

*Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Employee Burdens*
[HN7]To establish a prima facie Americans With Disabilities Act (ADA) case, a plaintiff must show that (1) the plaintiff's employer is subject to the ADA; (2) the plaintiff was disabled within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of her disability. Although a plaintiff need not plead specific facts establishing a prima facie case of discrimination in violation of the ADA to survive a motion to dismiss.

*Labor & Employment Law > Discrimination > Disability Discrimination > Reasonable Accommodation > General Overview*

[HN8]A nearly two-year leave of absence is not a reasonable accommodation under the Americans With Disabilities Act.

***Labor & Employment Law > Discrimination > Disability Discrimination > Reasonable Accommodation > Undue Hardship***

[HN9]In general, a leave of absence is a reasonable accommodation. The Americans With Disabilities Act, however, does not require an employer to grant an employee an indefinite leave of absence. An employer cannot be expected to hold a job open for an extended period of time. A medical leave would be unreasonable if, for example, the request is for a very long leave of absence, such as one year. As a matter of law, a two-year leave is too long an absence from work to be reasonable.

***Labor & Employment Law > Leaves of Absence > Family & Medical Leave Act > Coverage & Definitions > Employees***

[HN10]29 U.S.C.S. § 2611 defines an eligible employee as one who has been employed for at least 12 months by the employer with respect to whom leave is requested.

***Labor & Employment Law > Leaves of Absence > Family & Medical Leave Act > Coverage & Definitions > General Overview***

[HN11]The Family Medical Leave Act provides eligible employees with the right to a total of 12 workweeks of leave during any 12-month period for a serious medical condition as defined by the Act. 29 U.S.C.S. § 2612(a)(1).

***Labor & Employment Law > Discrimination > Actionable Discrimination***
***Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview***
***Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Employee Burdens***
***Labor & Employment Law > Discrimination > National Origin Discrimination > Coverage & Definitions***
***Labor & Employment Law > Discrimination > National Origin Discrimination > Proof > Employee Burdens***

[HN12]New York City, N.Y., Admin. Code § 8-107 prohibits discharge from employment on the basis of national origin and disability. To state a claim under the New York City Human Rights Law, however, a plaintiff must allege that he was discriminated against by the defendant within New York City.

***Labor & Employment Law > Discrimination > Actionable Discrimination***

[HN13]The New York State Human Rights Law, unlike the New York City Human Rights Law, may apply to discriminatory acts committed outside New York State if they are committed outside the state against a resident of the state and such act would constitute an unlawful discriminatory practice if committed within the state. N.Y. Exec. Law § 298-a.

***Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview***
***Labor & Employment Law > Discrimination > Disability Discrimination > Proof > Burdens of Proof > Employee Burdens***

[HN14]The elements of a prima facie case for discrimination prohibited by the New York State Human Rights Law (NYSHRL) are the same as a claim under the Americans With Disabilities Act: a plaintiff must show that (1) her employer was subject to the NYSHRL; (2) she was disabled within the meaning of the NYSHRL; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability.

***Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions > General Overview***
***Labor & Employment Law > Discrimination > National Origin Discrimination > Exhaustion of Remedies***
***Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies > Filing of Charges***

[HN15]Conn. Gen. Stat. § 46a-60 of the Connecticut Fair Employment Practices Act (CFEPA) prohibits discriminatory employment practices on the basis of national origin and disability. To bring an action under the CFEPA, a plaintiff must first file a complaint with Connecticut's Commission on Human Rights and Opportunities within 180 days after the alleged act of discrimination. Conn. Gen. Stat. §§ 46a-82, 46a-100.

***Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > Elements***

[HN16]In New York, a cause of action for negligent infliction of emotional distress arises only in unique circumstances, when a defendant owes a special duty only

to a plaintiff or where there is proof of a traumatic event that caused the plaintiff to fear for her own safety.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > General Overview*

[HN17]The discharge of an employee does not give rise to a claim for negligent infliction of emotional distress because a corporation owes the same duties to all employees.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > Elements*

[HN18]To recover damages for negligent infliction of emotional distress, such a cause of action must generally be premised upon conduct that unreasonably endangers a plaintiff's physical safety or causes the plaintiff to fear for his or her own safety.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > Elements*

[HN19]In Connecticut, claims for negligent infliction of emotional distress are restricted to conduct occurring during the process of the termination of employment.

*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > Elements*

[HN20]For conduct occurring in the context of termination to amount to a negligent infliction of emotional distress (NIED), Connecticut courts generally require that termination be done in a way that is unreasonable, humiliating, or embarrassing. The mere act of terminating the plaintiff's employment is insufficient to establish an NIED claim.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*

[HN21]To state a claim for intentional infliction of emotional distress (IIED) under both Connecticut and New York laws, a plaintiff must plead the following four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress. Both Connecticut and New York courts treat the first element as a threshold issue when analyzing an IIED claim because the requirement of extreme and outrageous conduct is rigorous, and has been met only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employers*

[HN22]Parent companies may be considered employers of a subsidiary's employees for the purposes of Title VII of the Civil Rights Act of 1964 when evidence shows that the two companies have (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.

**COUNSEL:**  [*1] SYLVOR & RICHMAN, LLP, Attorneys for Plaintiff, By: Boris Sorin, Esq., New York, New York.

SEYFARTH SHAW, LLP, Attorneys for Defendants, By: Richard Reice, Esq., Anjanette Cabrera, Esq., New York, New York.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION**

*MEMORANDUM DECISION*

**CHIN, D.J.**

In this employment discrimination case, plaintiff Zohreh "Zoe" Starr alleges that her former employer, Time Warner Cable ("TWC"), discriminated against her and terminated her employment because of her disability and Iranian origin. Starr brings claims against TWC and its parent company Time Warner ("TW") under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans With Disabilities Act (the "ADA"), the Family Medical Leave Act (the "FMLA"), New York State Human Rights Law ("State Human Rights Law" or "NYSHRL"), New York City Human Rights Law ("City Human Rights Law" or "NYCHRL"), and Connecticut Fair Employment Practices Act ("CFEPA"). She also claims damages for negligent and intentional infliction of emotional distress ("NIED" and "IIED," respectively).

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically, they argue that the Title VII, ADA, FMLA,  [*2] and CFEPA claims are time-barred; that New York State and City laws are inapplicable because all alleged acts occurred in Connecticut; and that Starr has failed to state a claim on which relief can be granted under state tort laws. TW also moves to dismiss all claims against it on the ground that the complaint "fails to allege any relationship between Time Warner Cable and Time Warner, Inc. or between Time Warner, Inc. and Plaintiff." (Def. Mem. 2).

For the reasons that follow, defendants' motion to dismiss is denied in part and granted in part.

### BACKGROUND

For purposes of this motion, the facts as alleged in Starr's complaint are assumed to be true. Although the parties have submitted affidavits and exhibits with their briefs, [HN1]on a motion to dismiss, a court's consideration is "limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir. 1991). Accordingly, I do not rely on the parties' affidavits and exhibits for purposes of this motion, except for certain documents incorporated in the complaint  [*3] by reference.

#### A. *Facts*

On September 8, 2003, Starr, then a resident of New York State, began working at TWC's offices in Stamford, Connecticut. (Compl. P 10). Plaintiff alleges that during her employment, TWC created a hostile work environment and discriminated against her because of her Iranian origin. Specifically, she alleges that TWC took away her projects and responsibilities, cut her off from work-related communications, excluded her from meetings and company activities, advised other employees not to speak to her, attempted to damage her reputation at TWC, and prevented her from transferring to another department. (Compl. PP 11-18).

As a result of the treatment she endured at TWC, Starr became mentally and physically ill, thus requiring leave of absence for psychotherapy beginning in August 2004. (Compl. P 19). TWC's insurance provider, UNUM Provident, paid for Starr's medical care, which involved weekly therapy sessions with Dr. Joerg Bose. (Compl. P 22). Nearly two years later, in March 2006, Dr. Bose approved Starr's return to work. (Compl. P 25).

Starr, however, never returned to TWC as an employee. Starr alleges that on April 7, 2006, "TWC advised Plaintiff that neither her  [*4] job, nor any employment position with the company, was available to her." (Compl. P 28).

#### B. *Procedural History*

Plaintiff's complaint states that on October 4, 2006, she filed a claim with the United States Equal Employment Opportunity Commission (the "EEOC"). (Compl. P 29). The EEOC's letter accompanying its Notice of Dismissal and Right to Sue, however, indicates that Starr's claim was received and filed with the EEOC in November 2006. (Pl. Ex. R). On March 27, 2007, the EEOC found that "[a]fter being out on long-term disability for several months, [TWC] notified you by letter, on January

11, 2005, that the company could no longer hold your position open any longer." (Id.). Consequently, the EEOC determined that it lacked jurisdiction to investigate Starr's charge of discrimination because the charge was not filed within 300 days from the date of the last alleged violation as required by law. (Id.; see also Compl. P 30).

Plaintiff appealed the EEOC's decision on April 3, 2007 (Pl. Ex. S), and filed the instant action on June 21, 2007.

### DISCUSSION

#### A. *Pleading Standards*

[HN2]On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief  [*5] can be granted, the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir. 1996); *see Erickson v. Pardus,* 127 S. Ct. 2197, 2199, 167 L. Ed. 2d 1081 (2007) (per curiam); *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).

[HN3]On a motion to dismiss for failure to state a claim, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp.,* 127 S. Ct. at 1965 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)). In its recent holding in *Bell Atlantic Corp.,* the Supreme Court announced the "retirement" of the oft-quoted "no set of facts" language from *Conley v. Gibson,* 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), adopting in its place a "plausibility" requirement. *Bell Atl. Corp.,* 127 S. Ct. at 1969. As interpreted by the Second Circuit, Bell Atlantic Corp. did not announce a "universal standard of heightened fact pleading, but . . . instead requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where  [*6] such amplification is needed to render the claim

plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir. 2007).

In any event, "bald contentions, unsupported characterizations, and legal conclusions are not well-pleaded allegations" and will not defeat a motion to dismiss. *Gavish v. Revlon, Inc.,* No. 00-7291, 2004 U.S. Dist. LEXIS 19771, 2004 WL 2210269, at *10 (S.D.N.Y. Sept. 30, 2004) (quoting *Citibank, N.A. v. Itochu Int'l, Inc.,* No. 01-6007, 2003 U.S. Dist. LEXIS 5519, 2003 WL 1797847, at *1 (S.D.N.Y. Apr. 4, 2003)).

#### B. *Title VII*

### 1. *Statute of Limitations*

[HN4]Under Title VII, the statute of limitations for filing a charge of discrimination with the EEOC is 300 days in states such as New York and Connecticut that have an agency with the authority to address charges of discriminatory employment practices. 42 U.S.C. § 2000e-5(e)(1). Failure to file a timely charge of discrimination with the EEOC renders that claim time-barred, thereby preventing a claimant from bringing the claim in federal court. *Williams v. Bd. of Educ., 972 F. Supp. 248, 249 (S.D.N.Y. 1997).*

Defendants argue that Starr's Title VII claim is time-barred by disputing April 7, 2006 as the date on which Starr was terminated as an employee of TWC, as she alleges in her complaint. [*7] Defendants claim that "the 300-day window for Starr to file her charge began on January 11, 2005, when Time Warner Cable first notified her of the decision to terminate her employment." (Def. Mem. 8). Because the court must accept the factual allegations of the complaint as true on a motion to dismiss, I use the date of termination as alleged in plaintiff's complaint for purposes of this motion. (*See* Compl. P 28).

Plaintiff's complaint also states that she filed a discrimination charge with the EEOC on October 4, 2006, which is contradicted by the EEOC's letter dismissing her case. But it is not necessary to decide here whether Starr filed her charge on October 4, 2006, as she claims, or on November 24, 2006, as the EEOC's letter indicates, to determine whether her claim was timely filed, for both dates fall within 300 days of April 7, 2007, the date alleged by plaintiff as her date of termination. Accordingly, based on the allegations of the complaint, Starr filed a timely charge of discrimination with the EEOC. Defendants' motion to dismiss the Title VII claim as time-barred is denied, without prejudice to the filing of a summary judgment motion if discovery shows that plaintiff's [*8] employment was actually terminated on January 11, 2005.

### 2. *Elements of a Title VII Claim*

Turning to the merits, [HN5]a prima facie case of discrimination under Title VII requires a plaintiff to show that "(1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination." *Garcia v. New York City Admin. of Children's Servs., 2007 U.S. Dist. LEXIS 71273, 2007 WL 2822153, at *4 (S.D.N.Y. 2007).* In *Swierkiewicz v. Sorema N. A.,* the Supreme Court held that a complaint in an employment discrimination action need not contain specific facts establishing a prima facie case of discrimination to survive a motion to dismiss. *534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).* The Supreme

Court held that because "the prima facie case operates as a flexible evidentiary standard," a complaint need only comply with the pleading standard articulated in Federal Rule of Civil Procedure 8(a) to assert an employment discrimination claim. *Id. at 512.* Thus, the "complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). [*9] "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).* Hence, a plaintiff in a Title VII case need only allege that she was discriminated against in the terms and conditions of her employment on account of national origin or other unlawful factor.

Applying the pleading standard articulated in Rule 8(a), I conclude that Starr's complaint satisfies the Rule's requirements because it gives defendants fair notice of the basis for petitioner's claims. Although plaintiff's complaint does not provide specific facts attributing TWC's treatment of her to a discriminatory motive, she does allege that she was dismissed on account of her national origin in violation of Title VII. (Compl. PP 63-66). The complaint states the events leading to her dismissal (id.), and these allegations give defendants fair notice of what her claims are and the grounds upon which they rest. Because Starr states claims upon which relief could be granted under Title VII, defendants' motion to dismiss the Title VII claim is denied.

### C. *The ADA*

### 1. *Statute of Limitations*

[HN6]The statute of limitations [*10] for filing a claim under the ADA and Title VII are identical. 42 U.S.C. § 12117 (incorporating 42 U.S.C. § 2000e-5(e)). Accordingly, for the reasons set forth above, defendants' motion to dismiss the ADA claim as time-barred is denied.

### 2. *Elements of an ADA Claim*

[HN7]To establish a prima facie ADA case, a plaintiff must show that "(1) plaintiff's employer is subject to the ADA; (2) plaintiff was disabled within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered [an] adverse employment action because of her disability." *Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004).* Although "a plaintiff need not plead 'specific facts establishing a prima facie case of discrimination'" in violation of the ADA to survive a motion to dismiss, *Ridgway v. Metropolitan Museum of Art, No. 06-5055, 2007 U.S. Dist. LEXIS 27007, 2007 WL 1098737, at *3 (S.D.N.Y. Apr. 10, 2007)* (quoting *Swierkiewicz v.*

*Sorema N.A.,* 534 U.S. 506, 508, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)), as discussed below, Starr has failed to plead that she was qualified to perform the essential functions of her job with or without reasonable accommodation or that she [*11] suffered adverse employment action because of her disability.

### a. *Starr Is Not Qualified To Perform Essential Functions of Job, With Or Without Reasonable Accommodation*

Starr alleges that "she was discharged due to her disability" and "during and/or following her medical leave of absence." (Compl. PP 45, 50). But these allegations do not state an ADA claim because [HN8]a nearly two-year leave of absence is not a reasonable accommodation under the ADA.

[HN9]In general, a leave of absence is a reasonable accommodation. *Powers v. Polygram Holding, Inc.,* 40 F. Supp. 2d 195, 201 (S.D.N.Y. 1999). The ADA, however, "does not require an employer to grant an employee an indefinite leave of absence." *Stamey v. NYP Holdings, Inc.,* 358 F. Supp. 2d 317, 324 (S.D.N.Y. 2005) (citing *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 9 (2d Cir. 1999)). An employer cannot be expected to hold a job open for an extended period of time. A medical leave would be unreasonable if, for example, "the request is for a very long leave of absence, such as one year." *Powers,* 40 F. Supp. 2d at 201. Although the *Powers* Court did not "hold that any exact number is the 'red line' that demarcates the reasonable from the [*12] unreasonable," a nineteen-month leave is substantially more than the year that the Court found to be "very long." *Id.* As a matter of law, a two-year leave is too long an absence from work to be reasonable. Plaintiff, therefore, has not sufficiently pled that she was qualified to perform her job with or without reasonable accommodations.

### b. *Starr Did Not Suffer Adverse Employment Action Because of Her Disability*

In support of her ADA claim, Starr makes numerous allegations that TWC discriminated against her because of her Iranian origin, but not because of her disability. (*See, e.g.,* Compl. PP 49, 51, 52, 53). The ADA protects employees only from discrimination on the basis of a disability, and so these allegations do not support a claim under the ADA.

Because Starr has failed to plead that she could perform the essential functions of her job with or without reasonable accommodations or that she suffered adverse employment action because of her disability, her ADA claim is dismissed.

### D. *The FMLA*

Plaintiff does not state a claim under the FMLA for at least two reasons. First, she does not qualify for benefits under the Act.[HN10] Section 2611 defines an "eligible employee" as one "who has been [*13] employed for at least 12 months by the employer with respect to whom leave is requested." 29 U.S.C. § 2611. As alleged in the complaint, Starr had only worked eleven months, from September 2003 to August 2004, before going on medical leave. (*See* Compl. PP 10, 19). Thus, plaintiff is not an eligible employee qualified for FMLA benefits.

Second, [HN11]the FMLA provides eligible employees with the right to "a total of 12 workweeks of leave during any 12-month period" for a serious medical condition as defined by the Act. 29 U.S.C. § 2612(a)(1). Starr was on uninterrupted medical leave from August 27, 2004 to April 7, 2006 -- a total of nineteen months. The FMLA does not protect employees from adverse employment action as a result of a medical leave that lasts for a period longer than twelve weeks per year. Consequently, Starr was not denied any benefits under the FMLA. Because plaintiff was not an eligible employee and, furthermore, did not suffer a violation of a right that is protected under the FMLA, defendants' motion to dismiss the FMLA claim is granted.

### E. *City Human Rights Law*

Starr brings a claim [HN12]under New York City Code § 8-107, which prohibits discharge from employment on the basis [*14] of national origin and disability. To state a claim under the City Human Rights Law, however, "a plaintiff must allege that he was discriminated against by the defendant within New York City." *Duffy v. Drake Beam Morin,* No. 96-5606, 1998 U.S. Dist. LEXIS 7215, 1998 WL 252063, at *11 (S.D.N.Y. May 19, 1998)* (finding that "both New York State law and the New York City Administrative Code limit the applicability of the City Human Rights Law to acts occurring within the boundaries of New York City") (citing N.Y. Gen. Mun. Law § 239-s and N.Y.C. Admin. Code § 2-201). Because Starr does not allege any discriminatory conduct occurring in New York City, her City Human Rights Law claim is dismissed.

### F. *State Human Rights Law*

[HN13]The State Human Rights Law, unlike the City Human Rights Law, may apply to discriminatory acts committed outside New York State if they are "committed outside this state against a resident of this state . . . [and] such act would constitute an unlawful discriminatory practice if committed within this state." N.Y. Exec. Law § 298-a. Because Starr is a New York State resident, she may bring a claim against a non-resident employer for acts committed outside New York State.

[HN14]The elements of a prima facie [*15] case for discrimination prohibited by the NYSHRL are the same as a claim under the ADA: "plaintiff must show that (1) her employer was subject to the NYSHRL; (2) she was disabled within the meaning of the NYSHRL; (3) she was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability." *Roberts v. Ground Handling, Inc.,* 499 F. Supp. 2d 340, 357 (S.D.N.Y. 2007). For the reasons given above for dismissing Starr's ADA claim, Starr's claim under the State Human Rights Law is likewise dismissed.

### G. *The CFEPA*

Starr brings a claim [HN15]under section 46a-60 of the CFEPA, which prohibits discriminatory employment practices on the basis of national origin and disability. To bring an action under the CFEPA, a plaintiff must first file a complaint with Connecticut's Commission on Human Rights and Opportunities ("Commission") within 180 days after the alleged act of discrimination. Conn. Gen. Stat. §§ 46a-82, 46a-100.

Starr has not met the two requirements to state a claim under Connecticut's anti-discrimination law. First, she did not file a complaint with the Commission prior to [*16] bringing this action before the EEOC and this Court. Second, more than 180 days had passed before Starr filed a charge with the EEOC. Starr's claim under Connecticut law is time-barred and, therefore, dismissed.

### H. *State Tort Claims*

Starr brings state tort claims for negligent and intentional infliction of emotional distress, but the complaint does not specify which state law--New York or Connecticut--applies to this case. In any event, Starr does not state a claim for either negligent or intentional infliction of emotional distress under both New York and Connecticut laws, so these claims are dismissed.

### 1. *NIED*

### a. *New York Law*

[HN16]In New York, "[a] cause of action for negligent infliction of emotional distress arises only in unique circumstances, when a defendant owes a special duty only to plaintiff" or "where there is proof of a traumatic event that caused the plaintiff to fear for her own safety." *Cucchi v. New York City Off-Track Betting Corp.,* 818 F. Supp. 647, 656 (S.D.N.Y. 1993). Starr alleges that TWC's treatment towards her during her employment as well as the termination of her employment were negligent acts, which "inflicted shock, trauma, mental anguish and emotional distress." [*17] (Compl. P 171). [HN17]The discharge of an employee, however, does not

give rise to a claim for negligent infliction of emotional distress because a corporation owes the same duties to all employees. *Kelly v. Chase Manhattan Bank,* 717 F. Supp. 227, 235 (S.D.N.Y. 1989).

Although Starr also alleges that TWC's conduct towards her during her employment was negligent and caused her emotional distress, the reduction of work responsibilities and exclusion from meetings and work-related activities do not amount to conduct that would unreasonably endanger one's physical safety or cause one to fear for her safety, as required for an NIED claim. *See Perry v. Valley Cottage Animal Hosp.,* 261 A.D.2d 522, 522, 690 N.Y.S.2d 617 (2d Dep't 1999) ([HN18]"to recover damages for negligent infliction of emotional distress, such a cause of action must generally be premised upon conduct that unreasonably endangers a plaintiff's physical safety or causes the plaintiff to fear for his or her own safety"). Because TWC neither owed plaintiff a special duty nor caused her to fear for her safety, Starr fails to state a claim for negligence under New York law.

### b. *Connecticut Law*

[HN19]In Connecticut, claims for negligent infliction of emotional [*18] distress are restricted to conduct occurring during the process of the termination of employment. *Perodeau v. City of Hartford,* 259 Conn. 729, 757-63, 792 A.2d 752 (2002). Accordingly, Starr's allegations of tortious conduct during her employment at TWC do not support a claim for NIED under Connecticut law.

[HN20]For conduct occurring in the context of termination to amount to a negligent infliction of emotional distress, Connecticut courts generally require that termination be done in a way that is "unreasonable, humiliating, or embarrassing." *Almeida v. Athena Health Care Associates, Inc.,* 2007 U.S. Dist. LEXIS 56119, 2007 WL 2221164, at *3 (D. Conn. 2007). The "mere act of terminating the plaintiff's employment is insufficient to establish [an NIED] claim." *Contois v. Carmen Anthony Restaurant Group,* No. 160287, 2001 Conn. Super. LEXIS 333, 2001 WL 195396, at *6 (Conn. Super. Feb. 2, 2001).

Here, Starr alleges only that her discharge was wrongful, and does not allege any other conduct on the part of TWC that humiliated or embarrassed her. Accordingly, plaintiff's allegations do not state a claim for NIED.

### 2. *IIED*

[HN21]To state a claim for IIED under both Connecticut and New York laws, a plaintiff must plead the following four elements: "(1) extreme and outrageous [*19] conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and

the injury, and (4) severe emotional distress." *Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 121, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993)); *see also Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986).

Both Connecticut and New York courts treat the first element as a threshold issue when analyzing an IIED claim because the "requirement of extreme and outrageous conduct is rigorous, and has been met only 'where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency.'" *Tadros v. Public Employees Federation,* No. 94-6893, 1996 U.S. Dist. LEXIS 16140, 1996 WL 631705, at *5 (S.D.N.Y. 1996) (citing *Fischer v. Maloney,* 43 N.Y.2d 553, 373 N.E.2d 1215, 402 N.Y.S.2d 991, 993 (1978)); *see also Rodican v. Heartcare Assocs. of Conn.,* No. 75008889S, 2007 Conn. Super. LEXIS 1969, 2007 WL 2363878, at *4 (Conn. Super. Aug. 2, 2007) ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."). Starr alleges only that she was [*20] isolated and excluded in the workplace; this alleged behavior does not rise to that level of outrageous conduct required to state an IIED claim. Accordingly, Starr's intentional tort claims are dismissed under both Connecticut and New York laws.

### J. *TW as a Party*

TW argues that plaintiff's claims against it must be dismissed because "Starr has failed to plead any facts that Time Warner was ever involved in any aspect of her employment or termination." (Def. Mem. 6). The Second Circuit has held that [HN22]"parent companies may be considered employers of a subsidiary's employees" for the purposes of Title VII when evidence shows that the two companies have "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1240-1 (2d Cir. 1995).

Plaintiff has not alleged any such facts in her complaint. Accordingly, the Title VII claim against TW is dismissed. Because there are no remaining claims against TW, it is dismissed as a party in this case.

### CONCLUSION

For the reasons set forth above, the motion to dismiss is denied in part and granted in part. It is denied [*21] as to Starr's claim of employment discrimination under Title VII against TWC. All other claims in the complaint are dismissed, and all claims against TW are dismissed.

A pretrial conference will be held on December 7, 2007, at 11:30 a.m. at 500 Pearl Street, New York, New York 10007, Courtroom 11A.

SO ORDERED.

Dated: New York, New York

November 21, 2007

DENNY CHIN

United States District Judge