UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LINDA RYLOTT-ROONEY,

          Plaintiff,

          -against-

ALITALIA–LINEE AEREE ITALIANE SpA,

          Defendant.

Case No. 07-CV-11091 (JSR)

## DECLARATION OF ALAN M. KORAL

    ALAN M. KORAL hereby declares under penalties of perjury pursuant to 28 U.S.C. §1746 as follows:

    1.    I am a member of the Bar of this Court and am a shareholder of Vedder Price P.C., attorneys for defendant Alitalia–Linee Aeree Italiane SpA ("Defendant" or "Alitalia"). I submit this Declaration in support of Defendant's motion for summary judgment dismissing the Amended Complaint by Linda Rylott-Rooney in the above captioned action. I am fully familiar with the facts and circumstances set forth herein.

    2.    The points and authorities in support of Defendant's motion for summary judgment dismissing the Complaint are set forth in full in the accompanying Memorandum of Law and will not be repeated here. The purpose of this Declaration is to place before the Court documents that are referred to in that Memorandum of Law and in the accompanying Statement of Uncontested Material Facts supporting this motion.

    3.    Annexed as Exhibit A hereto are copies in minuscript form of all pages of the May 8, 2008 deposition of Linda Rylott-Rooney referenced in the accompanying filings in support of Defendant's motion for summary judgment.

4.    Attached as Exhibit B hereto is a true and accurate copy of a letter from the Minneapolis office of the Equal Employment Opportunity Commission dated July 14, 2005 informing Linda Rylott-Rooney of its decision to dismiss her charge and of her right to sue Alitalia under federal law.

5.    Annexed as Exhibit C hereto are copies of all pages of the May 13, 2008 deposition of Marco D'Ilario referenced in the accompanying filings in support of Defendant's motion for summary judgment.

6.    Annexed as Exhibit D hereto are copies of all pages of the July 22, 2008 deposition of Francesco Gallo in this matter referenced in the accompanying filings in support of Defendant's motion for summary judgment.

7.    Attached as Exhibit E hereto are copies in minuscript form of all pages of the March 12, 2008 deposition of Francesco Gallo in the matter captioned *Lorusso v. Alitalia-Linee Aeree Italiane, SpA*, and bearing the index number 07-CV-03583 (LBS)(RLE), referenced in the accompanying filings in support of Defendant's motion for summary judgment.

8.    Attached as Exhibit F hereto is a copy of the Early Retirement Plan offered by Alitalia in 2004 and its accompanying General Announcement.

9.    I declare under penalty of perjury that the foregoing is true and correct.


Dated:  New York, New York
        August 26, 2008


                                    s/ Alan M. Koral
                                    Alan M. Koral (AK-1503)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINDA RYLOTT-ROONEY, | |
| Plaintiff, | Case No. 07-CV-11091 (JSR) |
| -against- | |
| ALITALIA–LINEE AEREE ITALIANE SpA, | **CERTIFICATE OF SERVICE** |
| Defendant. | |

I, Michael Goettig, hereby declare, pursuant to 28 U.S.C. 1746, under penalty of perjury, that on August 26, 2008, I caused a copy of the **DECLARATION OF ALAN M. KORAL** to be served upon Plaintiff by electronically filing same, thereby ensuring that Plaintiff's attorney, Fausto E. Zapata, Jr., Esq. of The Law Offices of Fausto E. Zapata, Jr., P.C., received same because he is a registered e-filer and registered to receive e-notices in this case.

DATED:  August 26, 2008                    s/  Michael J. Goettig
                                           Michael J. Goettig

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                        )
LINDA RYLOTT-ROONEY,                    )
                                        )
                    Plaintiff,          )
                                        )
        -against-                       )
                                        )
ALITALIA-LINEE AEREE ITALIANE-SOCIETA   )
PER AZIONI,                             )
                                        )
                    Defendant.          )
                                        )
Index No.: 07 CV 11091 (JSR)            )
_____)


            Deposition of LINDA RYLOTT-ROONEY held

    at the offices of Vedder Price, 1633 Broadway,

    New York, New York, on Thursday, May 8, 2008,

    commencing at 10:05 a.m., before James W.

    Johnson, Registered Professional Reporter and

    a Notary Public of the State of New York.

Page 18

```
           Rooney
1
2    AlitaliaMN, Bates Stamped P18-19, marked for
3    identification.)
4        Q.    Ms. Rooney, would you glance at this and
5    tell me if this is the newspaper article you
6    referred to earlier.
7        A.    Yes.
8        Q.    Yes?
9        A.    Yes.
10       Q.    All right, now, if you'll notice, Tim
11   O'Neill sent it to Ken Futterman with the subject
12   line "wanna laugh."  Do you see that?
13       A.    Yes.
14       Q.    Do you know why, do you have any idea
15   why Mr. O'Neill would send this to Futterman with
16   the subject line "wanna laugh?"
17       A.    There was no love lost between Ken
18   Futterman and Gallo.  I mean --
19       Q.    They disliked each other?
20       A.    They disliked each other.
21       Q.    And did Ken believe that Gallo had
22   arranged to have him fired because Gallo disliked
23   him?
24       A.    I can't speak for Ken.  I, I don't know
25   what he thought.
```

Page 19

```
           Rooney
1
2        Q.    And is "AlitaliaMN" your e-mail address?
3        A.    Yes, it is.
4        Q.    Is it one that you still use?
5        A.    Right.
6        Q.    Okay.  And Ken forwarded it to you with
7    the comment "Can you believe this," with about
8    seven or eight exclamation points.
9            Do you see that?
10       A.    Yes.
11       Q.    Okay.  Do you have a belief as to why
12   he said to you, "Can you believe this?"
13       A.    Because it says that he, finally it's in
14   print that he was letting people go because of
15   their age or their sexual preferences or --
16       Q.    Or?
17       A.    That's basically -- age and sexual
18   preferences.
19       Q.    Did you talk about this with Ken
20   Futterman after he sent it to you?
21       A.    I don't remember.
22       Q.    Did you talk about it with Tim O'Neill
23   after Ken sent this on to you?
24       A.    I don't think -- I don't know.  I don't
25   remember.
```

Page 20

```
           Rooney
1
2        Q.    Have you ever discussed it with, Gallo's
3    lawsuit or the revelations in this newspaper
4    article with Tim O'Neill?
5        A.    Would you repeat the question.
6            (Record read.)
7            MR. ZAPATA:  Objection as to form,
8    compound.
9            MR. KORAL:  That's okay.
10       Q.    Go ahead and answer.
11       A.    Not that I remember.
12       Q.    And have you ever discussed Mr. Gallo's
13   lawsuit with Ken Futterman?
14       A.    Not the lawsuit.  That it would be --
15   Ken knew I was proceeding.  It -- I don't recall
16   Ken caring about Mr. Gallo's lawsuit.
17       Q.    Could you explain that to me a little, a
18   little, when you say you don't recall Ken caring.
19       A.    That he had any interest in it.
20       Q.    Mm hmm.  He didn't -- do you know if he
21   ever saw a copy of the lawsuit?
22       A.    No, I do not.
23       Q.    Or the complaint?  You never sent it to
24   him?
25       A.    Absolutely not.
```

Page 21

```
           Rooney
1
2        Q.    You never sent it to anybody --
3        A.    No.
4        Q.    -- after you received it from
5    Mr. Zapata?
6        A.    No, sir.
7        Q.    Have you found any other articles about
8    Mr. Gallo in the course of getting ready for this
9    lawsuit, let's say?
10       A.    No.
11       Q.    All right, what's your date of birth?
12       A.    May 8, 1951.
13       Q.    Oh.  Happy birthday.
14       A.    Thank you very much.  Where's the cake?
15       Q.    Well, now that I know, Mr. Zapata should
16   have told me this.  I hope you're going to do
17   something wonderful in New York to celebrate your
18   birthday.
19       A.    Thank you.
20       Q.    And are you a US citizen?
21       A.    Yes, I am.
22       Q.    Are you presently employed?
23       A.    Yes, I am.
24       Q.    Where are you employed?
25       A.    Trinity World Trading.
```

Page 66

Rooney

1              Rooney
2  organizations you can think that you belong to?
3      A.  I belonged to at that time Minnesota
4  Executive Women in Travel.
5      Q.  Executive Women in Travel?
6      A.  In Travel.  That has since disbanded.
7  The global -- it was a local chapter of a global
8  organization that disbanded.
9      Q.  When did it disband, roughly?
10     A.  I'm trying to think if there was snow on
11  the ground.
12     Q.  Well, why don't we try to think whether
13  you were still employed by Alitalia.
14         Were you still employed at Alitalia when
15  it disbanded?
16     A.  I believe it disbanded before then.
17     Q.  Before you left Alitalia?
18     A.  Correct.
19     Q.  So you couldn't very well network there?
20     A.  No.
21     Q.  Any other organizations where you
22  networked?
23     A.  Not that I recall.
24     Q.  Okay, let's go back, then, to your
25  resume.  Well, actually, we'll mark this, which is

Page 67

Rooney

1              Rooney
2  your resume, as Defendant's Exhibit 11.  It's Bates
3  stamped P56 and 57.
4         (Defendant's Exhibit 11, Resume, Bates
5         Stamped P56-57, marked for identification.)
6      Q.  Is this a copy of the resume that you
7  sent to Susan Franson at Northwest?
8      A.  Yes.
9      Q.  Have you revised this resume since April
10  of 2005?
11     A.  No.
12     Q.  Did you receive any assistance in
13  developing this resume?
14     A.  No.
15     Q.  You did it yourself?
16     A.  Yes.
17     Q.  Now, as sales manager of the Minneapolis
18  district office did you have responsibility to hire
19  people?
20     A.  Yes.
21     Q.  And you were able to do that without any
22  input from US headquarters in New York?
23     A.  No.  I had input.
24     Q.  You had input?
25     A.  I had input.  New York made the

Page 68

Rooney

1              Rooney
2  decision.
3      Q.  New York made the decision?
4      A.  Correct.
5      Q.  Let's take, let's take certain, from
6  1991 to 2001.  Why don't we take the last couple of
7  years.  Can you recall who in New York was making
8  the decisions with you?
9      A.  I don't recall which person in personnel
10  was involved in the hiring.
11     Q.  So it was HR?
12     A.  Yes.
13     Q.  Okay.  It wasn't somebody in the sales
14  organization who was approving it?
15     A.  No, HR came and interviewed.
16     Q.  HR came out to Minnesota to interview?
17     A.  Correct.
18     Q.  You didn't send the candidates to New
19  York?
20     A.  Not -- no.
21     Q.  Back at least when you were sales
22  manager for the Minneapolis district office?
23     A.  Right.
24     Q.  Did HR ever reject any of the candidates
25  you presented to them?

Page 69

Rooney

1              Rooney
2      A.  I would say we mutually rejected the
3  candidates.
4      Q.  I see.
5      A.  It was a discussion between the manager
6  and personnel after the interview.
7      Q.  Okay, so you didn't vet the candidates
8  first and then HR came out to see if the person you
9  wanted to hire was somebody they would approve?
10     A.  Not as a rule.  The resumes were sent to
11  New York, and --
12     Q.  I see.  Did you ever disagree with any
13  decision regarding hiring that HR made?
14     A.  Not in Minneapolis.
15     Q.  Not in Minneapolis.  Earlier, in
16  Cleveland?
17     A.  Yes.
18     Q.  Did you have any hiring authority as
19  manager of national accounts from 2001 to 2004?
20     A.  I'm sorry, repeat the question.
21     Q.  The question is, did you have any hiring
22  authority when you were manager of national
23  accounts from 2001 to 2004?
24     A.  No.
25     Q.  You didn't hire anybody?

Page 70

Rooney

1          Rooney
2    A.  No.  I was national accounts North
3  America.  I did it.
4    Q.  And that happened in 2001?
5    A.  Yes.
6    Q.  When did they close the Minneapolis
7  sales office?
8    A.  I believe in, I believe that the final
9  staff was gone in spring of 2003 and the office was
10  closed in, I believe, August.
11    Q.  Was there a district sales manager
12  between 2001 and the spring of 2003?
13    A.  Yes.
14    Q.  Who was that?
15    A.  Me.
16    Q.  So you were in fact still --
17    A.  I was doing --
18    Q.  -- district --
19    A.  I was doing both functions.
20    Q.  Okay, but you weren't hiring anybody
21  after 2001?
22    A.  No.  In -- Alitalia has an off-line
23  company, and I don't know when they took over the
24  actual sales in that territory, and I just did
25  strictly national accounts.

Page 71

1          Rooney
2    Q.  But it was before you were terminated?
3    A.  Oh, yes.  Absolutely.
4    Q.  And "off-line company" means what?
5    A.  A company that is not a company that
6  Alitalia hires to do sales for them and they pay
7  them for the sales functions.
8    Q.  Okay, do you know who was in charge of
9  that while you were still at Alitalia?
10    A.  It was Discover The World.
11    Q.  "Discover The World" is the name of the
12  company?
13    A.  Correct.
14    Q.  Was any Alitalia employee involved with
15  Discover The World?
16    A.  Yes.
17    Q.  Who was that?
18    A.  It was.  I don't know if it still is.
19  It's James Prano.
20    Q.  And Mr. Prano is located in Arizona?
21    A.  Correct.
22    Q.  And he is the liaison between Alitalia
23  and the off-line company?
24    A.  He was at the time.
25    Q.  I'm sorry, he was.  Do you know for a

Page 72

Rooney

1          Rooney
2  fact that he isn't any longer?
3    A.  No, I do not.
4    Q.  You don't know if he still is or not?
5    A.  No.
6    Q.  Do you know where Discover The World is
7  located?
8    A.  In Arizona.
9    Q.  Okay.  Does Discover The World have
10  other clients besides Alitalia, do you know?
11    A.  I am not aware.  I, I would, I, I don't
12  know.  I believe that when they represented
13  Alitalia when I was there they had other clients,
14  but the people that worked for them only worked for
15  Alitalia, was my belief.
16    Q.  Okay, but they were not Alitalia
17  employees; they were Discover The World employees?
18    A.  Correct.
19    Q.  Except Prano, who was an Alitalia
20  employee?
21    A.  Right.  They were not paid by Alitalia.
22  They had Alitalia IDs.  They had -- but their
23  paycheck came from Discover The World.
24    Q.  And was Mr. Prano essentially their
25  boss?  Or did they have their own management

Page 73

1          Rooney
2  hierarchy, if you recall?
3    A.  There was a manager.
4    Q.  There was a manager?
5    A.  There was a manager.
6    Q.  Who was, at least officially, not an
7  Alitalia employee?
8    A.  Correct.
9    Q.  Do you know who that was?
10    A.  Jerry -- no, I don't remember his name.
11  I don't recall his name.
12    Q.  Okay.  Do you know if he's been with
13  Discover The World a long time?
14    A.  The person who I don't remember his
15  name?
16    Q.  Yeah, the one whose name you don't
17  remember.
18    A.  No, I don't.
19    Q.  In the course of your role as manager
20  doing hiring, did anybody ever instruct you not to
21  hire people because of age?
22    A.  Yes.
23    Q.  Yes?
24    A.  Yes.
25    Q.  Who did that?

Page 74

Rooney

1            Rooney
2    A.  I don't remember the name.  I -- we
3  needed someone in Boston and there was a woman that
4  previously worked for Alitalia, and I was told she
5  was too old, and I don't remember who told me that,
6  but I was told that she's too old.
7    Q.  When did this occur?
8    A.  I believe late 2003 or early 2004.
9  The --
10    Q.  Wasn't the district manager in Boston a
11  woman named Lucianna White?
12    A.  Yes.
13    Q.  And Lucianna White was over 50, wasn't
14  she?
15    A.  Correct.
16    Q.  In fact, do you know how Lucianna White
17  left the company?
18    A.  She was given a package, a retirement
19  severance package.
20    Q.  She elected the ERP, didn't she?
21    A.  Correct.
22    Q.  The early retirement program?
23    A.  Yes.
24    Q.  But you can't remember the name of this
25  woman?

Page 75

Rooney

1            Rooney
2    A.  This woman?
3    Q.  The one that they didn't hire.
4    A.  Marie Nappi, N-A-P-P-I.
5    Q.  So Lucianna White was still there in
6  charge in Boston at that time?
7    A.  She wasn't -- no, they had divided the
8  sales organization into corporate sales people that
9  I was responsible for in all of the offices that
10  were on-line Alitalia, and leisure sales.
11    Q.  And this was a corporate sales job?
12    A.  Correct.
13    Q.  And what had Marie Nappi done before
14  this?
15    A.  She was an Alitalia sales representative
16  in the area and at that time did both corporate and
17  leisure.
18    Q.  How did she happen to leave Alitalia?
19  Do you know?
20    A.  She left because she wanted to leave.  I
21  don't remember if she was old enough to retire
22  or -- but she, she chose to leave the company.
23    Q.  And then she wanted to come back?
24    A.  Correct.
25    Q.  How did you find that out?

Page 76

Rooney

1            Rooney
2    A.  I believe she called me and told me
3  that.
4    Q.  And then you talked to somebody else who
5  said, oh, she's too old?
6    A.  Yes.
7    Q.  Did you report that to anybody?
8    A.  Not that I recall.
9    Q.  Was it Franco Gallo who told you that
10  this woman was too old?
11    A.  I don't recall.
12    Q.  You just don't recall?
13    A.  I really don't recall.
14    Q.  Did anybody ever tell you not to hire
15  somebody because they were a US citizen?
16    A.  No.
17    Q.  In your role as manager at Alitalia at
18  any time did you have occasion to recommend people
19  for promotions?
20    A.  Yes.
21    Q.  And were those recommendations accepted?
22    A.  I had recommended somebody in the
23  Minneapolis office to be promoted to sales manager
24  in San Francisco, and she -- excuse me -- elected
25  not to move.

Page 77

Rooney

1            Rooney
2    Q.  But Alitalia didn't veto that?  She --
3    A.  No.
4    Q.  Was there any promotion that you
5  recommended that Alitalia, that somebody at
6  Alitalia did veto?
7    A.  No.
8    Q.  Were you ever instructed to fire anybody
9  by Alitalia?
10    A.  I was instructed to, the Minneapolis
11  office, offer packages to all of the employees
12  that, because they were closing the office, so that
13  they were given -- what did you call it? -- ER,
14  early retirement planning, whether they were, no
15  matter their age.
16    Q.  Well, they were given a severance
17  package?
18    A.  They were given a severance package,
19  yes.
20    Q.  And this was, the closing of the
21  Minneapolis office occurred in 2002 into 2003?
22    A.  Correct.
23    Q.  The last ones left in 2003?
24    A.  Three.
25    Q.  In the spring of 2003?

Page 78

Rooney

1          Rooney
2     A.   In the spring of 2003, yes.
3     Q.   And when did it start?
4     A.   I don't remember.  It, I --
5     Q.   Sometime in 2002?
6     A.   In -- yes, exactly.
7     Q.   About how many people did you have to
8  let go as a result of the closing of the
9  Minneapolis sales office?
10    A.   Three, I believe.
11    Q.   There were only three employees in the
12 Minneapolis sales office?
13    A.   Mm hmm, at that time, yes.
14    Q.   At that time?
15    A.   That was considered a big staff.
16    Q.   Okay.  Do you remember who they were?
17    A.   Kathy Adams.  Giovanni Caroni.  Wait one
18 moment, please.  I believe Giovanni was offered
19 another job in the company.  I'm afraid you'd have
20 to look at his personnel file, but I believe that
21 he was given another job within the organization.
22    Q.   In Minneapolis?
23    A.   No, in New York or Chicago.
24    Q.   How old was Giovanni, approximately?
25    A.   In his twenties.

Page 79

Rooney

1          Rooney
2     Q.   Twenties, okay.  And Kathy?
3     A.   In her -- she was in her fifties.
4     Q.   And there were those two.
5          Who's the third?
6     A.   Kathy Sidla, S-I-D-L-A, a woman in her
7  fifties.
8     Q.   Did you hire Giovanni?
9     A.   Giovanni was a transfer in from Chicago.
10    Q.   Do you know why he transferred?
11    A.   He wanted to be in sales.
12    Q.   How long was he in the Minneapolis
13 office?
14    A.   A couple of years, I believe.
15    Q.   Did you approve his transfer?
16    A.   Yes.
17    Q.   Okay, and there were only these three in
18 the Minneapolis sales office?
19    A.   At that time, yes.
20    Q.   Well, you say at the time.  Did --
21    A.   Well, the Minneapolis sales office was
22 comprised of many different areas over the time,
23 so, I mean, from when I first got there it was
24 eight states, and there were offices in other
25 places that reported to me.

Page 80

Rooney

1          Rooney
2     Q.   Okay, around when did it whittle itself
3  down to three?
4     A.   This is a, a guess on my part.  I
5  would -- 2000 -- 2000.  1999.
6     Q.   Look at your resume.  Maybe that will
7  help.  Your resume says that until 2001 you were
8  sales manager of the Minneapolis district office.
9  It says you were responsible for eight states and
10 sales offices in Minneapolis, Kansas and Colorado.
11    A.   Right.
12    Q.   "Successfully managed and trained a
13 diversified staff, assisting sales, customer
14 service and ticket office operations."
15         And all that is true, of course?
16    A.   Yes, it is.
17    Q.   When did you stop having eight states
18 and offices in Minneapolis, Kansas and Colorado?
19    A.   Kansas and Colorado closed before 2001.
20 I don't recall the exact time.
21    Q.   Did you have to let people go then?
22    A.   I believe they were terminated by the
23 regional manager.  I wasn't the one to terminate
24 them.
25    Q.   But everybody was terminated, as far as

Page 81

Rooney

1          Rooney
2  you know, in those offices?
3     A.   There was an office in Kansas and an
4  office in Denver, and they were let go.
5     Q.   Okay, and the regional manager was based
6  where?
7     A.   In Chicago.
8     Q.   And you reported to that regional
9  manager as well?
10    A.   I reported to the regional manager while
11 I was sales manager, and also when I was playing a
12 dual role of sales manager and manager of national
13 accounts.  I reported to the national manager in
14 New York.
15    Q.   Okay, and that was who?
16    A.   There were many different people in New
17 York at the time, and one was Frances Antolino, and
18 I reported to her.  They restructured the United
19 States.  That's why I'm a little confused.  They
20 turned it into CRMCs and then had the client
21 relationship manager centers report to New York,
22 and it got off of a regional basis, and I'm
23 hesitant to discuss the dates because, quite
24 frankly, I don't remember them.
25    Q.   Okay.  Well, if you don't remember you

Page 86

```
 1              Rooney
 2      A.  May be okay.  May be okay.  They were
 3  very rigid about having people with a degree.
 4      Q.  But in fact it never came to that,
 5  because somebody else bid on it --
 6      A.  Correct.
 7      Q.  -- from within?  Okay.
 8          Let's go back to the interrogatories,
 9  Defendant's Exhibit 9.  Interrogatory number four
10  asks you to identify any doctor, psychiatrist,
11  psychologist, counselor or other medical or
12  healthcare professional whom you have seen or
13  consulted since January 1, 2004 concerning any
14  matter, including but not limited to any matter
15  related to or affected by your employment at
16  Alitalia.
17          And the answer or response is,
18  "Plaintiff did not seek any medical, psychological
19  or healthcare professional concerning this matter."
20  Is that correct?
21      A.  That's correct.
22      Q.  You didn't see any doctor, any counselor
23  or anything like that, did you?
24      A.  No.
25      Q.  Did you speak with your pastor at all
```

Page 87

```
 1              Rooney
 2  about -- I'm assuming you have one.
 3      A.  Right.
 4      Q.  About the loss of the job at Alitalia?
 5      A.  No.
 6      Q.  Do you want to take a break?
 7      A.  I didn't admit to anyone that I'd lost
 8  my job.  I was devastated.  I didn't understand it.
 9  I didn't want to see people.  I didn't want to talk
10  to people.  And I was beating my brain trying to
11  figure out what could have possibly, why this could
12  possibly have been.
13          The first six months of the year I
14  doubled my sales from $5 million to $10 million,
15  and with an increase of $5 million in sales you
16  kind of think you're doing a good job.  I'd always
17  gotten outstanding performance reviews, always
18  above standard.  I was -- it still bothers me.
19      Q.  I see that.  The question, though, was,
20  did you see any -- is this an accurate answer, you
21  saw no healthcare professionals in connection with
22  your termination from Alitalia?
23      A.  No.
24      Q.  Correct?
25      A.  Correct.
```

Page 88

```
 1              Rooney
 2      Q.  And you didn't seek any kind of
 3  counseling at all in connection with your emotional
 4  distress as a result of your termination?
 5      A.  No.
 6      Q.  Okay.  The response number five asks
 7  about any, asks you to identify any person whom you
 8  believe, know or believe, has knowledge regarding
 9  your emotional pain and distress and so on.
10          Do you want to take a break?  Do you
11  want me to go on?
12      A.  Just a moment.  My husband was aware of
13  it.  Very aware of it.
14      Q.  And the name given here is Mary
15  Cokonosky (ph).  I think it should be Pokonosky?
16      A.  It should be Pokonosky.
17      Q.  Can you spell it for us.
18      A.  P-O-K-O-N-O-S-K-Y.
19      Q.  Okay, Pokonosky.
20          She's a friend of yours?
21      A.  Yes.  And I didn't say anything to her
22  for months and months and months.
23      Q.  So on the surface everybody thought you
24  were retired and eventual -- except your husband,
25  who knew?
```

Page 89

```
 1              Rooney
 2      A.  Correct.
 3      Q.  Not your stepson?
 4      A.  No.
 5      Q.  I mean, he didn't know?
 6      A.  He thought I was retired.
 7      Q.  He thought you were retired too, and
 8  then eventually you told Mary Pokonosky, who was a
 9  close friend; is that right?
10      A.  Right.
11      Q.  And that was only after some months,
12  correct?
13      A.  Yes.
14      Q.  Did Mary ever work for Alitalia?
15      A.  No.
16      Q.  Did Mary ever work in the travel
17  industry in any way?
18      A.  Yes.
19      Q.  What did she do?
20      A.  Her and her husband owned a, it was
21  called teleticketing, at the airport.  And they --
22      Q.  Teleticketing?
23      A.  Teleticketing.  They did the currency
24  exchange.  They did -- it was before e-tickets, and
25  people could pick up their airline tickets from
```

Page 94

Rooney

1           Rooney
2  hearsay, because it may lead me to a witness.  If
3  somebody said to you, hey, Franco Gallo is going
4  around saying that Alitalia discriminates against
5  people based on age?
6      A.   No.
7      Q.   Or citizenship?
8      A.   No.
9      Q.   What's the basis for believing that
10 Francesco Mengozzi can address Alitalia's internal
11 policy of discriminating against employees on the
12 basis of age?
13     A.   The information I read in the complaint
14 of Franco Gallo.
15     Q.   And that's the only source of it?
16     A.   Correct.
17     Q.   You've never discussed that with Franco
18 Gallo at any time?
19     A.   No.
20     Q.   And nobody else has told you at any time
21 that Mr. Mengozzi knows about a policy of
22 discriminating based on age?
23     A.   No.
24     Q.   And citizenship, the same thing?
25     A.   Right.

Page 95

1           Rooney
2      Q.   Giulio Libutti is said to be able to
3  address defendant's internal policy of
4  discriminating based on age.  How do you know that?
5      A.   Again, the complaint.
6      Q.   Just Franco Gallo's court complaint?
7      A.   I, I recall Mr. Libutti stating we need
8  young people in this place, but just as a passing.
9      Q.   You heard Libutti say that once?
10     A.   Yes.
11     Q.   Okay.  Do you recall the circumstances?
12     A.   No.  I, I just --
13     Q.   You were in New York?
14     A.   Yes.
15     Q.   He didn't come to Minneapolis to say
16 that?
17     A.   No.
18     Q.   Did he say it to you personally?
19     A.   No, it was a general statement.
20     Q.   To a group?
21     A.   I don't remember.  I --
22     Q.   Okay.
23     A.   It was a --
24     Q.   And you don't remember when?
25     A.   No.

Page 96

1           Rooney
2      Q.   Do you recall Mr. Libutti saying
3  anything about citizenship?
4      A.   No.
5      Q.   Paolo Fabiani, do you know who he is?
6      A.   I know the name.  And I recognize it
7  from the complaint.  I don't recall his position.
8      Q.   Have you ever met him?
9      A.   I don't know.
10     Q.   You don't know if you met him?
11     A.   Correct.
12     Q.   So you certainly don't know whether you
13 ever heard him say anything about age?
14     A.   No.
15     Q.   Or about citizenship?
16     A.   Correct.
17     Q.   And the only reason his name is here, so
18 far as you know, is because of Mr. Gallo's
19 complaint, correct?
20     A.   Correct.
21     Q.   Marco Zanichelli, do you know who he is?
22     A.   I know the name.  I don't know him.
23 Again, it's from the complaint, Zanichelli.
24     Q.   You met, you never met, you don't recall
25 if you ever met Zanichelli; is that correct?

Page 97

1           Rooney
2      A.   No.
3      Q.   And the only basis for your listing him
4  as somebody who knows about age discrimination
5  policies and citizenship discrimination policies is
6  from Franco Gallo's complaint?
7      A.   Yes.
8      Q.   Do you know who Mario D'Angelo is?
9      A.   No.  Again, the complaint.
10     Q.   The only basis, reason that
11 Mr. D'Angelo's name is here is because of Franco
12 Gallo's complaint?
13     A.   Correct.
14     Q.   And you don't know if you ever met Mario
15 D'Angelo, correct?
16     A.   Correct.
17     Q.   Antonio Pola, do you know who he is?
18     A.   No.
19     Q.   Did you ever hear his name outside of
20 Mr. Gallo's complaint?
21     A.   No.
22     Q.   Do you believe that he is named in
23 Mr. Gallo's complaint?
24     A.   I believe so.
25 DI Q.   Okay.  Now, did you give these names to

## Page 102

Rooney

2    A.   I believe being non-Italian, if that's
3 what you mean by citizenship, yes.
4    Q.   You think that your American citizenship
5 was a factor?
6    A.   Non-Italian American citizen.
7    Q.   Marco D'Ilario.  Now, he was the senior
8 director of sales --
9    A.   Correct.
10    Q.   -- for North America and Mexico,
11 correct?
12    A.   Correct.
13    Q.   And did you report to him during your
14 last year or so with Alitalia?
15    A.   I reported to Lucia Alla, A-L-L-A.
16    Q.   And Lucia Alla reported to Marco?
17    A.   Correct.
18    Q.   Now, Marco was present when Mr. Gallo
19 told you of your termination, corroborate?
20    A.   Right.
21    Q.   Did Marco say anything at that meeting,
22 that you recall?
23    A.   No.
24    Q.   Is the only reason he's here because of
25 what you read in Mr. Gallo's complaint?

## Page 103

Rooney

2    A.   And the newspaper article.  He was
3 present when I was terminated, so --
4    Q.   Okay, when you said "and the newspaper
5 article" you mean what you read in Gallo's
6 complaint?
7    A.   Right.
8    Q.   And what you read in the newspaper
9 article and the fact that he was present when you
10 were terminated?
11    A.   Right.
12    Q.   But he didn't say anything to you when
13 you were terminated?
14    A.   No.
15    Q.   Did he ever say anything to you that you
16 regarded as discriminatory because of age?
17    A.   No.
18    Q.   Did he ever say anything to you that you
19 regarded as discriminatory because of citizenship?
20    A.   No.
21    Q.   Did you ever hear of his saying anything
22 that was discriminatory based on age?
23    A.   No.
24    Q.   The same for citizenship?  You never
25 heard of his saying anything about American

## Page 104

Rooney

2 citizens in a negative way?
3    A.   No.
4    Q.   Would you say you got along well with
5 Mr. D'Ilario?
6    A.   Yes, we got along fine.
7    Q.   Mr. D'Ilario actually praised your work,
8 didn't he?
9    A.   Yes.
10    Q.   He told you you were an excellent
11 employee, correct?
12    A.   Correct.
13    Q.   He told you you were an excellent
14 employee, correct?
15    A.   Correct.
16    Q.   Gabriele Mariotti, you have not talked
17 with Mr. Mariotti since you left Alitalia?
18    A.   He called me quite a while ago.
19    Q.   Did he tell you why -- well, do you
20 recall why he was calling?
21    A.   He said to say hello, but --
22    Q.   Is that what he said?
23    A.   He's a very private person.  He just
24 said he called to say hello.
25    Q.   Did he tell you that he's suing

## Page 105

Rooney

2 Alitalia?
3    A.   No.
4    Q.   Are you aware that he's suing Alitalia?
5    A.   Yes.  Now I am.
6    Q.   When did you find that out?
7    A.   In the complaint.
8    Q.   In the complaint of Mr. Gallo?
9 Mr. Gallo's complaint?
10    A.   Yes.
11    Q.   Do you know the basis on which he's
12 suing?
13    A.   I think it's sexual --
14    Q.   Sexual orientation?
15    A.   -- orientation, yes.
16    Q.   Did you know that Gabriele Mariotti was
17 gay when you worked at Alitalia?
18    A.   I did not know it.  I suspected, but I
19 didn't know.
20    Q.   Did you suspect it because of gossip?
21 Or it was just a private thought?
22    A.   No, it's just a feeling, but I didn't,
23 did not know.
24    Q.   Did you ever hear anybody make comments
25 about Mariotti being gay?

Page 106

Rooney

1          Rooney
2    A.   Not to me.
3    Q.   Not to you, so you didn't hear any
4 comments about Mariotti being gay?
5    A.   No.
6    Q.   Did you hear comments about Gallo being
7 gay?
8    A.   No.
9    Q.   No?
10   A.   No.
11   Q.   Okay.  Did you hear comments about
12 Futterman being gay?
13   A.   Yes.
14   Q.   Did you hear comments?  Or did you just
15 know it for a fact?
16   A.   He never told me.  I just --
17   Q.   You just sort of knew it?
18   A.   -- knew it.
19   Q.   Did you ever hear anybody ridiculing
20 Futterman because he was gay?
21   A.   No.
22   Q.   How about Tim O'Neill?  Did you know
23 that he was gay?
24   A.   I did not know.  I suspected, but I
25 don't --

Page 107

Rooney

1          Rooney
2    Q.   Again --
3    A.   Did not know.  Did not care.
4    Q.   Tim O'Neill was a very popular guy,
5 wasn't he?
6    A.   Yes.
7    Q.   People didn't make fun of him because of
8 his sexual orientation?
9    A.   No.
10   Q.   In fact, did you ever hear any ridicule
11 from anybody about gay men?
12   A.   Over the years, yes.  It wasn't, if it,
13 if there was "finocchio" (ph), and it wasn't a word
14 that I read; it was something else, some other
15 word, just different times over the years, earlier
16 in the years.
17   Q.   Earlier in the years?
18   A.   Yes.
19   Q.   So not toward the end?
20   A.   No.
21   Q.   And you didn't hear Libutti, for
22 example, talking like that?
23   A.   No.
24   Q.   Or Mr. D'Ilario?
25   A.   No.

Page 108

Rooney

1          Rooney
2    Q.   This is one of the few addresses that
3 you seem to have known.  How do you come to know
4 Mr. Mariotti's address up in Rhinebeck?
5    A.   He's on my Christmas card list.
6    Q.   Does he send you Christmas cards too?
7    A.   No.  Many people are on my Christmas
8 card list that don't send back.
9    Q.   That's what it means to be in sales.
10        Do you know when he moved to Rhinebeck?
11   A.   No, I don't.  I -- I believe at one time
12 he had a place in the City and in Rhinebeck, and I
13 can't remember.
14   Q.   Okay.  In that phone conversation he
15 literally said, "I called to say hello?"
16   A.   Yes.
17   Q.   And that was essentially the
18 conversation?
19   A.   Yes.
20   Q.   Okay.  Esther Lorusso, when you were --
21 were you friendly with Esther Lorusso when you were
22 at Alitalia?
23   A.   I wouldn't say "friendly."  She was an
24 acquaintance and we discussed things, but not
25 friendly.

Page 109

Rooney

1          Rooney
2    Q.   She wasn't somebody you would go out to
3 dinner with, say, when you were in New York?
4    A.   Not -- rarely.  On occasion, but rarely.
5    Q.   One-on-one on occasion?  Or just --
6    A.   No, more than that.
7    Q.   Is your statement here that Esther
8 Lorusso can testify about discriminatory and
9 retaliatory motivating factors based entirely on
10 Mr. Gallo's complaint?
11   A.   And listening to Esther.  You know, she
12 was very vocal.
13   Q.   When she was still employed she was very
14 vocal?
15   A.   She was, yes, she was upset because she
16 was transferred out of marketing.
17   Q.   And into GA 2000?
18   A.   Into GA 2000, and --
19   Q.   Were you aware that her, quote, transfer
20 to GA 2000 involved a promotion to managing
21 director?
22   A.   No.
23   Q.   She never mentioned that?
24   A.   No.
25   Q.   And nobody else did?

Page 110

Rooney
1
2    A.   No.
3    Q.   Now, Esther was still at GA 2000 when
4  you left Alitalia?
5    A.   Correct.
6    Q.   Do you know what happened to her after
7  that?
8    A.   She's no longer with the company.  That
9  I know.
10   Q.   Have you read her complaint?
11   A.   Yes.
12   Q.   You've read Esther Lorusso's complaint
13 as well?  How did you get that complaint?
14   A.   Through my attorney.
15   Q.   Mr. Zapata sent it to you?
16   A.   Correct.
17   Q.   Okay, so you've read Esther's complaint
18 and you've read Gallo's complaint.  I probably
19 asked this, and I'm sorry.
20        Did you read Mariotti's complaint?
21   A.   Yes.
22   Q.   You did.  Also Mr. Zapata sent that to
23 you?
24   A.   Right.
25   Q.   Do you recall whether you agreed with

Page 111

Rooney
1
2  everything Esther had to say in her complaint?
3    A.   I, I don't recall.
4    Q.   Do you recall whether you agreed with
5  everything Mr. Gallo had to say in his complaint?
6    A.   I believed his complaint.
7    Q.   All of it?
8    A.   The parts I can remember.
9    Q.   Which have to do with Mr. Mengozzi and a
10 policy of firing older people, correct?
11   A.   Right.
12   Q.   The stuff about Mr. Gallo being
13 discriminated against because he was perceived to
14 be gay, you wouldn't know anything about that,
15 right?
16   A.   I -- I'm trying to think if I heard
17 rumors.  There was always, it was a rumor mill at
18 Alitalia.
19   Q.   There were rumors about his relationship
20 with Gino Ferraro (ph).
21        Did you ever hear any rumors about that?
22   A.   Not that I'm aware of.
23   Q.   Do you know who Gino is?
24   A.   I know the name.
25   Q.   Okay.  Did you ever hear anybody make

Page 112

Rooney
1
2  disparaging remarks about Esther Lorusso because
3  she was a woman?
4    A.   No.
5    Q.   Did you ever hear anybody make
6  disparaging remarks about Ms. Lorusso because of
7  her age?
8    A.   No.
9    Q.   She's a little younger than you?
10   A.   Right.
11   Q.   Would you say -- what, five years, three
12 years?
13   A.   Five.
14   Q.   And Lucia Alla, she's younger than you?
15   A.   She's younger than me.
16   Q.   About four, five years younger?
17   A.   I think more.  I'm not positive.  Ten,
18 maybe.
19   Q.   Do you think she's as much as 10 years
20 younger than you?
21   A.   I, I believe so.
22   Q.   Khursheed Palkhiwala, do you know
23 Ms. Palkhiwala?
24   A.   Palkhiwala.  Yes.
25   Q.   Did you ever see Khursheed Palkhiwala's

Page 113

Rooney
1
2  lawsuit against Alitalia?
3    A.   No.
4    Q.   You haven't seen a copy of that?
5    A.   No.
6    Q.   Have you ever had any conversation with
7  Ms. Palkhiwala about alleged discrimination?
8    A.   Yes.
9    Q.   You did?
10   A.   Yes.
11   Q.   When was that?
12   A.   Right about the time that she left.  She
13 was upset that a younger Italian male was brought
14 in and given a job that she was qualified for.
15   Q.   She was already a vice president, wasn't
16 she?
17   A.   Right, but she -- this, I believe, would
18 have been a promotion, and she told me that she was
19 told that they wanted younger Italian men in these
20 positions.
21   Q.   Did she tell you who told her that?
22   A.   I believe it was Nils Wulf.
23   Q.   And this younger Italian man came in as
24 a vice president?
25   A.   I'm not certain of his title.

Page 122

Rooney

1          Rooney
2     Q.   You haven't discussed this case with
3   Concetta Corso, have you?
4     A.   No.
5     Q.   Did you talk to her since she left?
6     A.   No.
7     Q.   Did you talk with her at all when you
8   were still there?
9     A.   Not.
10    Q.   No?  Okay.  Finally, Betty Santella.
11         Her real name is "Elizabeth," correct?
12    A.   Correct.
13    Q.   Did you ever hear any gossip that Betty
14  Santella is a lesbian?
15    A.   No.
16    Q.   Is her name here entirely because of
17  what you read in Mr. Gallo's complaint?
18    A.   Yes.
19    Q.   And do you know how old she is?
20    A.   I would, I don't know how old she is,
21  no.
22    Q.   She's around Esther Lorusso's age,
23  perhaps?
24    A.   A little -- no.  I don't know.
25    Q.   Would you say that Betty Santella by now

Page 123

1   is in her fifties?  Do you know that much?
2     A.   I would believe so.  I'm not sure, but I
3   believe so.
4     Q.   Okay.  Now, this was a long list of
5   names.  My next question to you, though, is, is
6   there anybody else who you think has information
7   that relates to your claims against Alitalia who's
8   not on this list, that you can think of now?
9     A.   No.
10    Q.   Okay, let's turn to the next page of
11  this document, and number B, or letter B, asks for
12  copies of documents and so on that are in your
13  possession, custody or control that you may use to
14  support your claims in this case, and Mr. Zapata
15  has given us a fair number of documents, but I want
16  to ask you a few questions, since the answer here
17  is that you were in the process of assembling
18  documents.
19         Do you have a lot of paper left from the
20  time that you were employed by Alitalia?
21    A.   No.
22    Q.   You don't?
23    A.   No.  I had one thing that I gave
24  Mr. Zapata.  That was my performance results

Page 124

1          Rooney
2   January to June.
3          MR. KORAL:  We haven't seen this,
4     counsel.
5          MR. ZAPATA:  Yesterday.
6          MR. KORAL:  Oh, okay.
7     Q.   You found those when you were preparing
8   to come here --
9     A.   Right.
10    Q.   -- and realized that you should send
11  those to Mr. Zapata?
12    A.   Right.
13    Q.   You were working from home during the
14  last period of your employment by Alitalia,
15  correct?
16    A.   Correct.
17    Q.   Were you using a PC?  Or a laptop?
18    A.   Yes, both.
19    Q.   Both?
20    A.   Both.
21    Q.   Did you own both?
22    A.   No, I sent them back to the company.
23    Q.   Both the PC and the laptop belonged to
24  Alitalia?
25    A.   Yes.

Page 125

1          Rooney
2     Q.   And you returned those to Alitalia?
3     A.   Yes, I boxed them up and shipped them.
4     Q.   Is there any reason to think that your
5   personal computer -- and I'm assuming you have
6   one -- would have any documents that are relevant
7   to this case?
8     A.   No.
9     Q.   Okay, when you, for example, were
10  communicating with your AOL name, AlitaliaMN --
11    A.   I -- I'll explain that.
12    Q.   Okay, go ahead, and then I'll finish my
13  question.
14    A.   Okay.  I paid for AOL before Alitalia
15  was computerized, so hence the "AlitaliaMN,"
16  because most of the rest of the world was
17  computerized at the time or had Internet
18  capabilities, and I had it since before Alitalia,
19  before Alitalia gave us Alitalia names, so I just,
20  I kept it, because I, people know me that way, and
21  I don't want to lose touch with people.
22         I don't know how to turn it into
23  anything else.
24    Q.   Ask your stepson.  Those kids know
25  everything.

Page 134

Rooney

1        Rooney
2    Q.   Skimming through this, is all the
3  handwriting on it your own handwriting?
4    A.   Yes.
5    Q.   Let's look at the fourth page, which has
6  a lot of handwriting.
7        Is this based, are the notes that you're
8  making here based upon something that was told to
9  you by somebody at Alitalia?
10   A.   Correct.
11   Q.   Do you know who it was?
12   A.   Human resources.  I don't recall the
13  exact person I spoke with.
14   Q.   Did somebody come out from human
15  resources and talk to you about it?  Or was this by
16  telephone, if you recall?
17   A.   I believe it was by telephone, the
18  notes, so when I spoke with the people that I felt
19  that I was giving them the proper information.
20   Q.   Now, when did you receive this?  Do you
21  recall?
22   A.   It would be when they closed the
23  offices.
24   Q.   Well, is this the closing of the Kansas
25  City and Denver offices?

Page 135

1        Rooney
2    A.   No, I'm sorry, this is the closing of
3  the Minneapolis office.
4    Q.   Which took place in 2002 and then 2003?
5    A.   2002.  Correct, and then --
6    Q.   Finished up in 2003; is that right?
7    A.   Correct.
8    Q.   Let's take a look at the page that's
9  Bates stamped P42.  That's the one with all the
10  writing on it.
11   A.   Correct.
12   Q.   It says, "HR Rep communicates separation
13  information."  Now, did you have an HR rep come out
14  to communicate this?  Or did you have to do it
15  yourself?
16   A.   I had to do it myself.
17   Q.   Okay, HR did not come?
18   A.   No.
19   Q.   Okay.  Go two pages further, to page 44.
20  The question is "Why is this happening?"  And the
21  answer is "Because the revenue projections for 2002
22  do not justify the current level of staff.  We have
23  all heard about the large numbers of employees let
24  go in Italy.  We've been asked to make a reduction
25  in the US."

Page 136

1        Rooney
2        Had you heard about the large numbers of
3  employees let go by Alitalia in Italy?  Were you
4  aware of that?
5    A.   I don't recall.
6    Q.   Are you aware that Alitalia has had a
7  series of downsizings in the last five or six
8  years?
9    A.   I'm aware that they are financially in
10  trouble, but I don't know about the downsizing.
11   Q.   You don't?  Okay.
12   A.   This particular downsizing was closing
13  all off-line offices.
14   Q.   Which meant Minneapolis and Houston?
15   A.   Sales offices.
16   Q.   Yes.  That's Minneapolis, Houston, Los
17  Angeles?
18   A.   Correct, where they didn't have a
19  flight.
20   Q.   San Francisco?
21   A.   I don't recall which offices were open
22  at the time.  I believe so, but I don't remember.
23   Q.   Okay, but they were all closed, all of
24  those that didn't have a flight?
25   A.   I can't say.  I don't know.  It's -- I

Page 137

1        Rooney
2  don't recall.
3    Q.   Okay, is it true that Houston didn't
4  have a flight?
5    A.   Correct.
6    Q.   And at that time LA didn't?
7    A.   Correct.
8    Q.   And at that point San Francisco didn't?
9    A.   Correct.
10   Q.   But Miami did?
11   A.   Yes.
12   Q.   And Chicago did?
13   A.   Yes.
14   Q.   And New York did?
15   A.   Yes.
16   Q.   And Washington did?
17   A.   I don't recall exactly when Washington
18  service was initiated, but I don't think there was
19  a plane there then.
20   Q.   And Boston had a flight?
21   A.   Yes.
22   Q.   If you'll notice, the first line under
23  this part that we're looking at, "Because the
24  revenue projections for 2002 do not justify the
25  current level of staff," does that suggest to you

Page 138

Rooney
2 that this document was created in 2001 or early
3 2002?
4     A.   That would suggest that.
5     Q.   Do you believe that it was given to you
6 maybe as early as 2001 or early 2002?
7     A.   I would believe it would have been in
8 probably March, somewhere around there, of 2002.
9     Q.   Okay, and that's when the process of
10 closing the off-line offices began?
11     A.   Correct.
12     Q.   Was this sent to you electronically?  Or
13 did it come in hard copy, if you recall?
14     A.   I don't recall.
15     Q.   Did you discuss this document with
16 anybody from HR at any time after 2002?
17     A.   Not that I recall.
18     Q.   And when you were terminated by
19 Mr. Gallo and Mr. D'Ilario did you bring up the
20 subject of this document at that time?
21     A.   I brought up the subject of severance.
22     Q.   Not specifically this document, but what
23 you knew about severance in the past?
24     A.   What -- not this document, but what the
25 severance program had been at that time.

Page 139

Rooney
2     Q.   What did Mister -- well, what did they
3 say when you brought up this severance program?
4     A.   They would look into it for me.
5     Q.   Who said that, Gallo?
6     A.   Yes.
7     Q.   Did he ever get back to you?
8     A.   No.
9     Q.   Did you get back to him?
10     A.   No.
11     Q.   So you didn't get back to him and say,
12 Gallo, there's a lot of money at stake here,
13 where's my severance?  No?
14     A.   No.
15     Q.   Did you have an attorney write to him
16 about that?
17     A.   I went to the EEOC.
18     Q.   Okay, didn't you retain an attorney
19 before you went to the EEOC?
20     A.   Yes.
21     Q.   And he wrote, I think, to Alitalia?
22     A.   Correct.
23     Q.   And do you recall what response he got?
24     A.   I don't remember the response, but it
25 was negative.

Page 140

Rooney
2     Q.   You never got any severance?
3     A.   Correct.
4     Q.   Except this two weeks, correct?
5     A.   Correct.
6     Q.   You did get the two weeks' severance?
7     A.   Yes.
8     Q.   And they didn't make you sign anything
9 like a release in return for the two weeks,
10 correct?
11     A.   No.
12     Q.   Next is a document which will be
13 Defendant's 16.
14         (Defendant's Exhibit 16, ATWOnline.com
15     News Article, Bates Stamped P0020-0022, marked
16     for identification.)
17     Q.   It's Bates stamped P20 through P22.  I
18 think it's two separate reports, one from ATWOnline
19 and one from Bloomberg, about Alitalia's financial
20 problems in 2004 and plans for cutting staff.  Do
21 you agree that that's what these are about?
22     A.   Correct.
23     Q.   Are these the only news reports that you
24 have in your possession about Alitalia's financial
25 troubles?

Page 141

Rooney
2     A.   That's all I can recall.  I get -- I
3 still get a Google alert every day since Air France
4 is buying Alitalia.  Other than that, no one.
5     Q.   So is it fair to say that you're well
6 aware that Alitalia has been in very severe
7 financial trouble for the last number of years?
8     A.   Yes.
9     Q.   And, in fact, it was put up for sale and
10 Air France nearly bought it?
11     A.   Yes.
12     Q.   Do you recall why it didn't go through?
13     A.   I'm not positive, but I believe it's
14 because Berlusconi came back and the unions didn't
15 want the terms and conditions of the new, the
16 proposed buyout.
17     Q.   What explanation did Mr. Gallo give you
18 for terminating your employment?
19     A.   I, I was so shocked when I went in there
20 and it was me that I -- it's, I can't, don't
21 remember.
22     Q.   You weren't expecting it, though?
23     A.   No.  Why would I expect to be let go?  I
24 increased my sales from $5 million to $10 million
25 in six months.  I had always gotten good

Page 142

Rooney

1              Rooney
2   performance appraisals.
3      Q.   Well, nobody ever said anything about
4   your performance being bad, did they?
5      A.   No, but I couldn't understand why a
6   company would get rid of a very productive
7   employee.
8      Q.   So you don't recall saying to Mr. Gallo
9   and Mr. D'Ilario, so now it's my turn, I knew this
10  was coming, or something like that?
11     A.   I think I said, oh, my God, not me, or
12  something like that.
13     Q.   You were aware that the Miami and Boston
14  and Chicago offices had been closed?
15     A.   It was a different circumstance, but
16  yes.
17     Q.   But you were aware of that?
18     A.   Yes.
19     Q.   And you knew that Mr. Futterman --
20     A.   Yes.
21     Q.   -- and Ms. Moriarity had been let go?
22     A.   Correct.
23     Q.   And that Ms. White had taken an early
24  retirement package?
25     A.   Yes.

Page 143

1              Rooney
2      Q.   And you didn't see yourself as being in
3   the same organizational place that they were?
4      A.   I wasn't in the same organizational
5   place that they were in.
6      Q.   You were really --
7      A.   I reported to New York. I was the
8   national accounts. I was the head of the sales
9   people in corporate sales. I wasn't, I wasn't
10  local. I wasn't -- they were local people. I
11  wasn't a local person. I was --
12     Q.   Well, you were based in Minnesota,
13  correct?
14     A.   I lived in Minnesota, but I reported
15  into New York.
16     Q.   But they reported to New York too,
17  didn't they, Futterman and Moriarity and White?
18     A.   Yes, they reported to the sales manager.
19     Q.   To D'Ilario?
20     A.   Yes.
21     Q.   And you reported to somebody who
22  reported to D'Ilario, to Lucia Alla, correct?
23     A.   Correct.
24     Q.   Didn't Mr. Gallo or Mr. D'Ilario explain
25  that they were centralizing all sales in New York

Page 144

1              Rooney
2   and that that's why they were closing Miami and
3   they were closing Boston and they were closing
4   Chicago and they were also closing your function,
5   to bring it into New York?
6      A.   I do not recall that at all.
7      Q.   Do you know whether that's what
8   happened?
9      A.   I know they closed the sales offices and
10  in those areas they had flights, and they, my
11  office had nothing to do with that sort of sales
12  function.
13     Q.   Well, let's go back a year.
14          You were reporting to Lucia Alla, and at
15  the time you were terminated in 2004 you reported
16  to Lucia Alla?
17     A.   Yes.
18     Q.   When did Lucia Alla get the position
19  that she held then, which I believe was called
20  manager of the corporate unit?
21     A.   Correct. I'm not exactly sure of the
22  dates. It was --
23     Q.   The end of 2003, roughly?
24     A.   Yes.
25     Q.   Okay. Give or take a month or two?

Page 145

1              Rooney
2      A.   Yes.
3      Q.   Wasn't that job offered to you
4   initially?
5      A.   The company presented me with an option.
6      Q.   Didn't they want to promote you to be
7   the head of the corporate unit nationally?
8      A.   It was an option, yes.
9      Q.   And you declined it, correct?
10     A.   Correct.
11     Q.   Because you didn't want to commute to
12  New York?
13     A.   I was perfectly content doing what I was
14  doing.
15     Q.   Okay, and so the position went to the
16  first runner-up, Lucia Alla?
17     A.   Right.
18     Q.   Correct?
19     A.   Correct.
20     Q.   And then you reported to her?
21     A.   Correct.
22     Q.   Do you know who took over your
23  responsibilities after you were terminated? Or do
24  you not know?
25     A.   I'm not positive. I believe it was John

Page 146

```
1              Rooney
2    DiRienzo, though, for part of it.  It was a job
3    that really more than one person would have done.
4        Q.   Didn't Lucia Alla take over those
5    responsibilities, at least for a while --
6        A.   I don't know.
7        Q.   -- in addition to her own?
8             You just don't know?
9        A.   I don't know.
10       Q.   Okay, and John DiRienzo at some point
11   became an assistant to her?
12       A.   I don't know.
13       Q.   Was John DiRienzo based in New York?
14       A.   Yes.
15       Q.   Was Lucia Alla based in New York?
16       A.   Yes.
17       Q.   Let's take a look at another document,
18   which we'll mark as Defendant's 17.
19            (Defendant's Exhibit 17, General
20        Announcement to Eligible Employees Issued on
21        August 2, 2004, Alitalia USA 2004 Voluntary
22        Early Retirement Plan, Bates Stamped
23        P0023-0038, marked for identification.)
24        MR. ZAPATA:  Before we go to this
25   document, do you want to -- I'd like to take a
```

Page 147

```
1              Rooney
2    break.
3        MR. KORAL:  Sure.  I'll tell you what.
4    This is going to be really quick, and then we
5    can take our lunch break.  I was just about to
6    get to her EEOC charge, and that would be a
7    good spot to break, okay?
8        MR. ZAPATA:  Fair enough.
9        Q.   Are you aware that Alitalia offered two
10   early retirement plans in the course of 2004?
11       A.   Yes.
12       Q.   One in roughly March 2004 and then the
13   second one in August 2004?
14       A.   I, I don't know the dates, but I
15   remember there being severance payments.
16       Q.   How did you come to have a copy of this
17   document, which is the August 2004 document?
18       A.   I do not remember how I got this.
19       Q.   Okay.  But you kept it?
20       A.   Yes.
21       Q.   All right.  And you were not eligible
22   for the early retirement?
23       A.   No, I was a year and a half too young.
24       Q.   And you know of many people who did take
25   the early retirement plan?
```

Page 148

```
1              Rooney
2        A.   There were a number of them, yes.
3        Q.   And a number did and others did not?
4        A.   I did not follow it with people, who did
5    not.
6        Q.   The one person whom you know was offered
7    the plan was eligible for it --
8        A.   Right.
9        Q.   -- and who did not take it was Ana
10   Mariano?
11       A.   Ana Mariani.
12       Q.   And you don't know any others who were
13   eligible and did not take it?
14       A.   No.
15       Q.   Are you aware that in 2005 another plan
16   was offered?
17       A.   No.
18       Q.   Early retirement?  You're not, okay.
19   All right, well, I think we can take our lunch
20   break now.
21       A.   Okay.
22            (Luncheon recess taken:  1:14 p.m.)
23
24
25
```

Page 149

```
1              Rooney
2         A F T E R N O O N   S E S S I O N
3             (Time noted:  1:14 p.m.)
4    L I N D A   R Y L O T T - R O O N E Y,
5        resumed as a witness, having been previously
6        sworn by a Notary Public, was examined and
7        testified under oath as follows:
8    EXAMINATION BY MR. KORAL:
9        Q.   Ms. Rooney, you contacted the EEOC after
10   you were terminated, correct?
11       A.   Correct.
12       Q.   The Minneapolis district office?
13       A.   Correct.
14       Q.   Did anybody advise you to do that?  Or
15   was it something that you knew that you could do?
16       A.   I felt I'd been discriminated against,
17   and that was the avenue that I thought I should
18   take.
19       Q.   Did you go first to the EEOC or to the
20   Minnesota Department of Civil Rights?
21       A.   The EEOC.
22       Q.   Okay, and you spoke to somebody over the
23   phone initially?
24       A.   Yes.
25       Q.   And did you speak to people on the phone
```

Page 150

Rooney

1               Rooney
2    more than once, if you recall?
3        A.   To set up the initial interview, and
4    then I called one other time to see if they'd made
5    any decision.
6            MR. KORAL:  Let's mark as 18 some
7        handwritten notes that we obtained through a
8        Freedom of Information Act Request from the
9        EEOC.
10           (Defendant's Exhibit 18, Handwritten
11       Notes, marked for identification.)
12       Q.   This is not your handwriting, is it?
13       A.   No, it's not.
14       Q.   And you see up at the top the date is
15   3/10/04?
16       A.   Correct.
17       Q.   Is that correct?  You were terminated in
18   December of '04, so do you think that the date on
19   this is incorrect?  You didn't go to them in March
20   of 2004, did you?
21       A.   No.
22       Q.   No, you went in 2005?
23       A.   That was in March.  I was more concerned
24   about the March than the year.
25       Q.   But it was certainly not '04?

Page 151

1               Rooney
2        A.   No.
3        Q.   So we have, so your taxes are at work
4    here and the EEOC investigator in March has still
5    not converted from '04 to '05?
6        A.   Exactly.
7        Q.   It says, "Intake with AC."
8            Do you know what "AC" means?
9        A.   I could conjecture that it's actual
10   client.  I don't know what it means.
11       Q.   Okay, I don't either.  It may be the
12   initials of the investigator, of the intake person,
13   and I'm sure you don't remember that person's name?
14       A.   No, I don't.
15       Q.   The first notation, and my question is
16   going to be do you remember saying this to
17   somebody, and then my second question is going to
18   be is it true.  "Position eliminated.  Others have
19   cases - Chicago, Kansas, Florida."
20           At this point did you know that Ken
21   Futterman had filed a discrimination claim against
22   Alitalia in Florida?
23       A.   Yes.
24       Q.   All right, did you know, or do you know,
25   whether Kathy Moriarity had filed a discrimination

Page 152

1               Rooney
2    claim against Alitalia in Chicago?
3        A.   I don't recall if she had done so or
4    not.
5        Q.   Do you know if she ever did so?
6        A.   No, I don't.
7        Q.   And do you know of any cases against
8    Alitalia in Kansas?
9        A.   I have no recollection at all where
10   Kansas comes from.
11       Q.   In the next entry it talks about your
12   being told on December 8 about your termination.
13   "No reason given as to why her."
14           Is that something that you would have
15   said to EEOC?
16       A.   Yes.
17       Q.   And your position is that Mr. Gallo and
18   Mr. D'Ilario did not give you a reason as to why
19   you were being selected for job elimination --
20       A.   Correct.
21       Q.   -- and therefore termination?
22       A.   Correct.
23       Q.   "Excellent - sales increased from March
24   of '04 by 7 million."  Is that essentially correct?
25       A.   Correct.

Page 153

1               Rooney
2        Q.   So that's something you would have said
3    to the EEOC also?
4        A.   I would have been aware of my increase
5    in sales.  That's very important for me, to create
6    money for the company.
7        Q.   It's something that you thought the EEOC
8    should know?
9        A.   Yes.
10       Q.   "Other younger and Italian employees are
11   transferred."  Do you believe you said to the EEOC?
12       A.   Yes.
13       Q.   Can you think of any younger Italian
14   employees who had been transferred by around
15   December of 2004?
16       A.   Yes.
17       Q.   Who?
18       A.   Nick DiBari.
19       Q.   Okay.  Now, Nick DiBari was the district
20   sales manager in Washington, DC, correct?
21       A.   Washington, DC, correct.
22       Q.   When did he become district sales
23   manager in Washington, DC?
24       A.   I don't recall the date.
25       Q.   Well, was it in 2004?

Page 154

```
         Rooney
1
2    A.   I --
3    Q.   You don't know?
4    A.   I don't know.  I don't recall.
5    Q.   But he was transferred from Boston to
6   Washington, DC, correct?
7    A.   Correct.
8    Q.   In Boston do you know what his position
9   was?
10   A.   Sales representative.
11   Q.   Which is lower?
12   A.   Yes.
13   Q.   As we discussed earlier?
14   A.   Correct.
15   Q.   So he was promoted to the position of
16  manager, of sales manager --
17   A.   Correct.
18   Q.   -- in DC, and transferred?
19   A.   Correct.
20   Q.   Well, did you feel that they should have
21  given you Washington, DC instead?
22   A.   No.
23   Q.   You were happy in Minnesota at the time
24  that he got transferred?
25   A.   I was happy with my job as manager of
```

Page 155

```
         Rooney
1
2   national accounts, yes.
3    Q.   And you had no interest in being
4   district sales manager in DC?
5    A.   No.  I would say, though, that he was,
6   they got rid of the sales managers in the different
7   cities and the only sales manager that they didn't
8   get rid of was Nick DiBari, a younger Italian male.
9    Q.   Well, wasn't there a reason for keeping
10  the sales office open in Washington, DC?
11   A.   Not that I'm aware of.
12   Q.   Weren't they just initiating Washington-
13  to-Milan flights at this time?
14   A.   It had been going on for a while.  The
15  corporate sales person in Washington, DC reported
16  to me.
17   Q.   And that person stayed on?
18   A.   Yes.
19   Q.   All right, and reported now to New York?
20   A.   Correct.
21   Q.   To Lucia Alla?
22   A.   I have no idea who they ended up
23  reporting to.
24   Q.   So Nick DiBari was the only sales office
25  manager that you're aware of who was kept on?
```

Page 156

```
         Rooney
1
2    A.   Yes.
3    Q.   And you think that's because he was
4   younger and Italian?
5    A.   Yes, I do.
6    Q.   Do you know how old he was?
7    A.   I would -- I don't know his age, but I
8   would say he was in his thirties.
9    Q.   If I told you he was born in 1962 would
10  you say that's not possible?
11   A.   No, that's possible.  So --
12   Q.   Early forties?
13   A.   So '62, 38, early forties, so --
14   Q.   Okay, so he was early forties.
15       When you say he's Italian do you mean
16  he's Italian-American?  Or he was from Italy?
17   A.   I know he has family in Italy.  I know
18  he's visited them, but I don't think he was born in
19  Italy.
20   Q.   Do you know what citizenship he has?
21   A.   No.
22   Q.   As manager of national accounts you were
23  negotiating contracts with American Express and et
24  cetera?
25   A.   Correct.
```

Page 157

```
         Rooney
1
2    Q.   When you said that you increased sales
3   by seven million, is that you yourself or you and
4   your team?
5    A.   That was myself, my personal portfolio.
6   My personal portfolio.
7    Q.   Of national accounts?
8    A.   Of national -- well, yes, of national
9   accounts.  Some of the accounts were given over to
10  other sales reps.  My personal portfolio of
11  accounts January to June of 2004, again, increased
12  from five to ten million.
13       I don't have the figures, but I know
14  they increased July through December, and I already
15  had the figures, I'm sure, for '03 when I talked to
16  this man, so I know that they increased
17  considerably in '03.
18   Q.   You probably had the figures for '04 at
19  this point, didn't you?  It's March of '05 that you
20  were talking to this intake person.
21   A.   Well, I had figures probably through --
22  I, I don't know why I would -- it says figures
23  didn't come out immediately.  You didn't have --
24   Q.   Did you ever communicate with anybody
25  back at Alitalia in the first part of '05 to find
```

Page 174

```
            Rooney
1
2    Q.   Did you fill this form out?
3    A.   Yes.
4    Q.   This is your writing?
5    A.   Yes, it is.
6    Q.   Okay, so Denis is spelled with one "N?"
7    A.   Yes.
8    Q.   It goes on with two "Ns" all over the
9  place.
10   A.   Oh, he's Irish.
11   Q.   But Denis is "Denis" with one "N," is
12 the correct way?
13   A.   One "N."
14   Q.   You've given the name of your supervisor
15 as Lucia Alla, and you've already testified to
16 that.  I'm on the second page, page P5.
17        Do you know whether Lucia Alla had any
18 input into the decision to eliminate your job?
19   A.   My instincts would say no.  She was
20 crying.
21   Q.   She was what?
22   A.   She was crying.
23   Q.   What do you mean she was crying?
24   A.   Apparently -- and, again, the decision
25 was made.  I came into New York for a meeting with
```

Page 175

```
            Rooney
1
2  the sales representatives that reported to me, and
3  apparently at noon they made the decision.  When I
4  came back from lunch she was crying, and she said,
5  I can't talk about it.  They had me stay for the
6  rest of the evening and brought me in and fired me,
7  and then I got --
8    Q.   She was crying when you came back from
9  lunch?
10   A.   Yes.
11   Q.   But she said, "I can't talk about it?"
12   A.   She said, "I can't talk about it."
13   Q.   And did you ever speak -- I think you
14 answered this.  You never spoke to her again after
15 you were given word about your termination, but you
16 surmised that she --
17   A.   Was informed.
18   Q.   -- knew about the decision?  Okay.
19        This gives your date of hire as
20 January 4, 1982.  I've seen it mostly as 1981.
21        Do you have a recollection?
22   A.   I believe it was like '82.  I, I believe
23 what it was is that I was hired in December of '81
24 but told not to start until the first working day
25 of January of '82.
```

Page 176

```
            Rooney
1
2    Q.   And that was as passenger sales rep in
3  the Detroit district sales office?
4    A.   Correct.
5    Q.   Your resume says 1982.
6        Okay, it asks you to identify in
7  numbered paragraph three on page P5 the individuals
8  you believe discriminated against you, and you list
9  Franco Gallo and Giulio Libutti?
10   A.   Yes.
11   Q.   Why did you list Mr. Libutti?
12   A.   He was the head of Alitalia North
13 America.
14   Q.   Well, do you know whether he had input
15 into the decision to eliminate your job and
16 terminate you?
17   A.   I would figure that Mr. Libutti was
18 aware of everything that was going on as far as
19 personnel were going in North America.
20   Q.   Did Mr. Gallo tell you that?
21   A.   No.
22   Q.   How do you know it wasn't Marco
23 D'Ilario, your boss' boss, who made the decision?
24   A.   I don't believe it was.  I don't know,
25 but I don't believe that it was.
```

Page 177

```
            Rooney
1
2    Q.   What is your basis for believing that it
3  was Libutti?
4    A.   Because Libutti was the head of Alitalia
5  North America.
6    Q.   No one gave you that information?  Is
7  what I'm getting at.
8    A.   No.
9    Q.   Do you know whether the decision could
10 have been made in Rome?
11   A.   No, I do not.  A Rome decision was
12 always, from my understanding, discussed vocal with
13 the head of North America.
14   Q.   A Rome decision was always discussed?
15   A.   If it was a Rome decision they would
16 have discussed it with Mr. Libutti.
17   Q.   Well, who would have the final word
18 between Mr. Libutti and the people in Rome?
19   A.   I don't know.  I don't know that Rome
20 was -- I don't know who made the decision, so I
21 can't tell you.
22   Q.   Do you know to whom Mr. Libutti was
23 reporting at this time?
24   A.   No, I don't.
25   Q.   Do you know the name "Pierandrea Galli?"
```

Rooney

1 layoff." What --
2     A.    I was terminated.  You can't be recalled
3 from laying off if you're terminated.
4     Q.    Who told you that?
5     A.    I don't know.  I don't know.  I knew it
6 was Alitalia's policy when you're terminated they
7 wouldn't rehire you or --
8     Q.    You're sure of that?
9     A.    That was their policy.  They had a
10 couple of people that they did bring back into the
11 company, but the policy was not to rehire somebody
12 once they were let go.
13     Q.    Who told you that?  Or I'll rephrase
14 that.  How do you know that?
15     A.    Personnel.
16     Q.    Somebody in personnel once told you
17 that?
18     A.    Correct.
19     Q.    The day that you were terminated they
20 told you that?
21     A.    No.
22     Q.    Some other time somebody from personnel
23 or human resources actually said, we don't ever
24 rehire people after we've let them go?

Rooney

1     A.    Yes.
2     Q.    Now, "State the specific reasons you
3 believe the actions taken against you were the
4 result of discrimination," and the answer is,
5 "persons in same positions were retained."
6         Who are those persons?  One of them was
7 Nick DiBari, correct?
8     A.    Correct.
9     Q.    Well, this is plural, so who else are we
10 thinking of?
11     A.    Jim Prano was retained.
12     Q.    Would you say his position was similar
13 to yours?
14     A.    It was -- no, the job description was
15 different.
16     Q.    It wasn't the -- you testified earlier,
17 I think, that Jim Prano was the, is the man in
18 Arizona --
19     A.    For Alitalia.
20     Q.    -- for Alitalia who is the connection
21 with -- what is it?  Discover The World?
22     A.    Correct.
23     Q.    Which is the -- I'm going to say it
24 wrong -- which handles Alitalia's ticketing?  What

Rooney

1 does Discover The World do, really?
2     A.    They handle Alitalia's offline sales.
3     Q.    Offline sales.  Do you know, by the way,
4 how old Jim Prano is?
5     A.    Now?  Or --
6     Q.    Well, then.
7     A.    In his forties.
8     Q.    Forties?
9     A.    Yes.
10     Q.    If I told you he was born in '57 does
11 that sound about right to you?
12     A.    Yes.  That would have meant he was in
13 his forties then.
14     Q.    He would have been in his late forties
15 then.
16     A.    Not late.
17     Q.    Forty-seven is all -- it's getting late.
18         Anybody else besides Jim Prano and Nick
19 DiBari who you were thinking of when you said that
20 persons in similar positions were retained?
21     A.    No.
22     Q.    Now, the next thing says "or position
23 eliminated, transferred to another position."
24         Who were you thinking of there?

Rooney

1     A.    Nick DiBari.  The manager position, the
2 manager positions were eliminated, and the sales
3 representatives reported to the, the leisure sales
4 people reported to somebody in New York, and the
5 corporate sales people reported to me.
6     Q.    That was before your termination.
7 You're saying to EEOC around March of 2005 that if
8 a position was eliminated the person was
9 transferred to another position.
10         Was Nick DiBari's position eliminated
11 between the time you were terminated and March of
12 2005?
13     A.    His position would have been eliminated
14 at the time they eliminated Moriarity's and
15 Futterman's positions.
16     Q.    Do you know that it was?
17     A.    No, I don't know exactly what happened.
18     Q.    Actually, I thought your testimony
19 earlier was that his wasn't, that he alone of the
20 district sales managers kept his position.
21         Is that not right?
22     A.    Well, yes, I don't know exactly what
23 happened in that office.  I just know that the
24 sales offices were, the managers were supposedly

Page 186

```
 1            Rooney
 2  being closed and people reporting to non -- not a
 3  manager in the offices, yet Nick, I believe, also,
 4  I don't, I, I don't know exactly what he did, but I
 5  know he was retained.
 6     Q.  He may have kept his old, his job as
 7  district sales manager, or he may have been given
 8  some other title and stayed in the Washington
 9  office at this period?
10     A.  I don't know exactly, but he was kept
11  on.
12     Q.  He was kept on?
13     A.  Yes.
14     Q.  But you don't know what happened?
15     A.  No.
16     Q.  Whether he was transferred or not,
17  correct?
18     A.  No.
19     Q.  Can you think of anybody else whose job
20  was eliminated who was transferred to another
21  position?
22     A.  I don't know the timing on this.  I
23  believe that marketing functions were changed, and
24  I believe Elizabeth Santella was retained and put
25  in a different position.  I believe Esther Lorusso
```

Page 187

```
 1            Rooney
 2  was retained and put in a different position.
 3     Q.  Do you know when Esther Lorusso started
 4  her different position?
 5     A.  No, I do not.
 6     Q.  You're aware that her position as
 7  director of marketing in the passenger division was
 8  eliminated?
 9     A.  I would assume, looking at these things,
10  but I can't remember exactly.  It seems that they
11  were doing something to the marketing department.
12     Q.  And Elizabeth Santella had reported to
13  Esther Lorusso, correct?
14     A.  Correct.
15     Q.  In marketing?
16     A.  Correct.
17     Q.  And didn't she then get a job as a
18  marketing manager in ticketing?
19     A.  Yes.
20     Q.  When her job was eliminated?
21     A.  Correct.
22     Q.  Can you think of anybody else besides
23  Esther Lorussor and Elizabeth Santella?
24     A.  Not that I recall.
25         MR. KORAL:  By the way, Fausto, I think
```

Page 188

```
 1            Rooney
 2  we are missing the last page of this document.
 3  I don't believe it was produced to us,
 4  although I'll check.  Will you please check
 5  and make sure.
 6         MR. ZAPATA:  Sure.
 7         MR. KORAL:  And possibly either, you
 8  know, your mail room or mine may have
 9  forgotten to copy it, but if your client has
10  the original and can get us page 8, what would
11  be page 8 of this document, that would be
12  good.
13     Q.  Okay, let's continue with as much as we
14  can with this document.  At the bottom of this page
15  you're asked to list persons who were treated the
16  same, more favorably, less favorably.  You list
17  Nick DiBari, James Prano and Elizabeth Santella as
18  being treated more favorably.
19         Do you have anything to add to what
20  you've already said about those three?
21     A.  No.
22     Q.  Do you have anything to add about what's
23  already been said about Kathy Moriarity and Ken
24  Futterman as being treated the same?
25     A.  Explain -- I'm sorry.
```

Page 189

```
 1            Rooney
 2     Q.  Do you have anything to add to what
 3  you've already said about why you think that Kathy
 4  and Ken were treated the same way that you were?
 5     A.  They were not treated exactly the same
 6  as I was, but it was the same.
 7     Q.  Why do you say they were not treated
 8  exactly the same?
 9     A.  They weren't treated exactly the same
10  way, because their positions were eliminated.
11     Q.  Yes?  And the functions were taken up in
12  New York, weren't they?
13     A.  To the best of my knowledge.
14     Q.  Do you know what happened -- on the next
15  page you mentioned Kathy and Ken both have cases
16  pending with the EEOC.
17         My first question is, do you know what
18  happened with Kathy's case with the EEOC?
19     A.  No, I do not.
20     Q.  Do you know what happened with Ken's
21  case with the EEOC?
22     A.  I know he's settled his case, but that's
23  all the knowledge I have.
24     Q.  He settled with Alitalia?
25     A.  Correct.
```

Page 190

Rooney

1           Rooney
2     Q.   Do you have any idea how much money he
3  got, if any?
4     A.   I have no idea.
5     Q.   He didn't get his job back, though, did
6  he?
7     A.   No.
8     Q.   And you don't know what happened with
9  Kathy?
10    A.   No, I don't.
11    Q.   All right, well, let's move on.
12         After the intake you ultimately filed a
13 charge of discrimination with the EEOC, correct?
14    A.   This is what I filed with the EEOC.
15    Q.   Well, that is the intake questionnaire.
16 We're now going to look at the charge itself.
17    A.   Okay.
18    Q.   Which we will mark Defendant's
19 Exhibit 21.
20         (Defendant's Exhibit 21, Charge of
21         Discrimination, Minnesota Department of Human
22         Rights, Bates Stamped P001, marked for
23         identification.)
24    Q.   And let me ask first, Ms. Rooney, is
25 that your signature at the bottom?

Page 191

1           Rooney
2     A.   Yes, it is.
3     Q.   And you understood that you were signing
4  this under oath, correct?
5     A.   Correct.
6     Q.   The end of the first paragraph says, "I
7  was not offered a transfer to any other position,"
8  which we've discussed, and it then says, "nor would
9  I be recalled."
10         My only question to you is, was that
11 something that Mr. Gallo or Mr. D'Ilario said to
12 you?  Or is this just something you knew?
13    A.   I don't recall.  I -- I, I don't recall
14 the day.
15    Q.   Paragraph two says, "The Respondent
16 stated that my layoff was due to financial
17 difficulties the Respondent was having."
18         Do you recall now that that's what they
19 told you?
20    A.   I don't recall it, but I would question
21 that if you're a highly successful person in
22 generating funds to a company that was having
23 financial difficulty, I don't understand why you
24 would let someone go that generated --
25    Q.   You've said that.

Page 192

1           Rooney
2     A.   -- extraordinary revenue.
3     Q.   But you're not answering my question.
4  You've said this many times.
5     A.   Yes.
6     Q.   I understand that you don't understand
7  why a company in financial difficulties would fire
8  a producer like yourself.
9     A.   Right.
10    Q.   But that wasn't the question.  The
11 question was did they say to you your layoff was
12 due to financial difficulties that the company was
13 having.  That's the question.
14    A.   If I put this here, it must have been
15 said to me.  I do not remember it.
16    Q.   Okay, because you understood that it was
17 under oath?
18    A.   Yes, I did.
19    Q.   And you weren't going to say something
20 that you didn't remember?
21    A.   Exactly.
22    Q.   All right.  Well, I think we've
23 discussed most of paragraph three already, except
24 let me ask you this.  "While selecting for position
25 elimination older American employees."  We've

Page 193

1           Rooney
2  talked about Ken Futterman.  We've talked about
3  Kathy Moriarity.
4         Are there any other older American
5  employees that you can think of who were selected
6  for position elimination?
7     A.   That was selected for elimination?  Yes,
8  anybody that was over 55 that took the early
9  retirement package.  It was offered to people that
10 were older.
11    Q.   Are you aware that the early retirement
12 package was offered to people who qualified for
13 retirement under the company's retirement plan?
14    A.   I qualified for retirement under the
15 company's retirement benefits.  At 50 years old you
16 were qualified to retire from that company.
17    Q.   But the company offered the ER, the
18 voluntary ERP only to --
19    A.   Fifty-five and older.
20    Q.   -- people 55, and that tells you that
21 they were selecting people for early retirement?
22    A.   That tells me they were giving people
23 over the age of 55 --
24    Q.   The opportunity?
25    A.   I don't know whether I'd call it an

Page 206

                    Rooney
1
2    action in 2007 was because you felt that Gallo's
3    allegations in his complaint supported your claim
4    of discrimination?
5        A.   I believed it by reading the
6    newspaper -- the newspaper or the e-mail article,
7    and Mr. Smith pointedly asked Mr. Gallo if he had
8    let me go because of my age, and he said yes.
9        Q.   Mr. Smith said that, correct?
10       A.   Yes.
11       Q.   You never heard, you have not spoken
12   with Gallo, so you don't know?
13       A.   No, I have not.
14       Q.   You don't know what Gallo said, but
15   Smith told you Gallo said that?
16       A.   Correct.
17       Q.   Okay, let's take a look at the
18   complaint.  I'm just going to try to cover, touch
19   on stuff we haven't covered already.
20       A.   Okay.
21       Q.   In paragraph six of the complaint it
22   says that you are a resident of the State of
23   Minnesota.  That is true now, correct?
24       A.   Yes, it is.
25       Q.   How long have you lived there?

Page 207

1                    Rooney
2        A.   I moved to Minnesota in 1991.
3        Q.   Okay, which is also when you became
4    district sales manager for the Minneapolis office
5    of Alitalia?
6        A.   Right, correct.
7        Q.   Ah.  This is where I got it.  Paragraph
8    nine.  "Plaintiff began working for Alitalia on or
9    about December 28, 1981 as a sales rep."
10            As you testified earlier, actually it
11   didn't start until --
12       A.   Until January 4, '82.
13       Q.   Paragraph 15 speaks about Mr. Mengozzi
14   coming to the New York office of Alitalia in
15   December 2003.
16            Is this paragraph totally derived from
17   Mr. Gallo's complaint?
18       A.   This is derived from Mr. Gallo's
19   complaint, yes.
20       Q.   You don't have any independent knowledge
21   of this?
22       A.   No.
23       Q.   Now, you point out in paragraph 16 that
24   you were over age 50 at the time Mr. Mengozzi came
25   to the office in 2003, correct?

Page 208

1                    Rooney
2        A.   Right.
3        Q.   But you weren't terminated then?
4        A.   No.
5        Q.   In fact, you were offered what you'd
6    call, I think, the option of taking the job as
7    manager of corporate, of the corporate unit,
8    correct?
9        A.   Yes, that's what it was.
10       Q.   Do you know of anybody who was fired as
11   a result of anything Mr. Mengozzi supposedly said
12   to Mr. Gallo?
13       A.   I don't recall who was and who was not
14   fired.  I do know that they started with the early
15   retirement plan at that time.
16       Q.   Okay, but those people weren't fired;
17   those people voluntarily retired?
18       A.   They were terminated voluntarily.
19       Q.   Do you know, looking back at paragraph
20   15 again, do you know of any people who were hired
21   by Alitalia in 2004, people of any age?  And by
22   "hired" I mean in the outside.
23       A.   I understand.  What year, again?
24       Q.   2004.  This is, Mengozzi comes in 2003,
25   allegedly tells Mr. Gallo to get rid of half the

Page 209

1                    Rooney
2    people over 50 and replace them with younger
3    people, 30 or 32 years of age, in fact, and I'm
4    asking, do you know of anybody at all who was hired
5    by Alitalia during the year 2004 following
6    Mengozzi's supposed directive?
7        A.   I believe Elio Lopez was hired.
8        Q.   Elio?
9        A.   Elio, E-L-I-O, Lopez, L-O-P-E-Z.
10       Q.   Who is that?
11       A.   He was a sales representative in Boston.
12       Q.   Did he replace anybody there?
13       A.   Nick DiBari.
14       Q.   He took the spot that Nick had vacated
15   to move to Washington?
16       A.   Correct.
17       Q.   Okay, so he wasn't replacing an older
18   person who was fired or terminated?
19       A.   No.
20       Q.   Okay.  Do you know --
21       A.   But --
22       Q.   -- approximately -- I'm sorry.
23       A.   -- when that position was open I had
24   inquired of the company about hiring an older woman
25   for that position.

Page 210

Rooney

1           Rooney
2    Q.   Is this the same person that used to be
3  with Alitalia?
4    A.   Right.
5    Q.   Okay, and if you told me I don't recall.
6        Who is it that told you that Alitalia
7  doesn't hire -- pardon me -- that she was too old?
8    A.   I, I can't recall.  I would believe
9  human resources.
10    Q.   You just don't recall?
11    A.   HR.  I just don't recall.
12    Q.   Okay, and was this a, this was a sales,
13  a corporate sales rep?
14    A.   Yes.
15    Q.   So Nick had been a corporate sales rep?
16    A.   Nick -- it was at the time where they
17  were splitting up the responsibilities.  At one
18  time sales reps were corporate and leisure.  Then
19  they were defining responsibilities.
20    Q.   Now, how old was Elio, if you know?
21    A.   Elio was in, I believe, his twenties.
22    Q.   Did you have any input into hiring him?
23    A.   No.
24    Q.   None?
25    A.   Not that I recall.

Page 211

1           Rooney
2    Q.   Who hired him, then?
3    A.   I believe he came from South America,
4  and I believe Mr. Libutti hired him.  I'm not
5  positive, but I believe so.
6    Q.   I'm sorry, who?
7    A.   I believe Mr. Libutti hired him.  I
8  believe he worked --
9    Q.   Well, he was an Alitalia employee in
10  Buenos Aires when Mr. Libutti was there?
11    A.   No, in Venezuela, and he left Venezuela
12  because of the political situation down there, and
13  he did not leave -- he just, he left Alitalia and
14  came to North America.  He didn't transfer to North
15  America.
16    Q.   Can you think of anybody else who was
17  hired during the year 2004?
18    A.   Possibly.  I cannot, I can't remember
19  the exact date he was hired, but it was Alton
20  Watts.
21    Q.   Alton Watts was hired in Washington, DC?
22    A.   Correct.
23    Q.   And what was his position?
24    A.   Corporate sales representative.
25    Q.   So he was also reporting to you?

Page 212

1           Rooney
2    A.   Correct.
3    Q.   Did you hire him?
4    A.   No.  Personnel did.
5    Q.   Would that have been Mr. Sciarresi?
6    A.   I don't know.
7    Q.   You don't know if it was Andrea
8  Sciarresi?
9    A.   No, I don't know.
10    Q.   Is Alton Watts African-American?
11    A.   Yes, he is.
12    Q.   Were you satisfied with his job
13  performance?
14    A.   He was adequate.
15    Q.   He was adequate?
16    A.   He wasn't a superstar, but he did a fine
17  job.
18    Q.   And was he still there when you left?
19    A.   Yes.
20    Q.   Do you know what his sexual orientation
21  is?
22    A.   No, I do not.  I thought he was married,
23  but I'm not sure.
24    Q.   Okay.  Paragraph 19 of the complaint
25  says -- oh, I'm sorry.  Before I do that, going

Page 213

1           Rooney
2  back to the hirings in 2004, you've mentioned Elio
3  Lopez and Alton Watts.
4        Do you know Alton Watts' age?
5    A.   Alton?  I would believe was in his
6  thirties.  I don't -- obviously I'm not good with
7  ages.
8    Q.   Thirties maybe?
9    A.   Yes.
10    Q.   Under 40, you would say?
11    A.   I believe so.
12    Q.   Can you think of anybody else hired in
13  2004?
14    A.   Not that I recall.
15    Q.   Was Alton Watts replacing somebody?
16    A.   No.
17    Q.   This was a new position?
18    A.   It was a new office that was opening.
19    Q.   The new office in Washington?
20    A.   Correct.
21    Q.   That was opening in connection with --
22    A.   The inaugural of the Washington flight.
23    Q.   -- the inauguration of the Washington
24  flight?
25    A.   Yes.

Page 214

```
                   Rooney
 1
 2     Q.   Washington to Rome?  Washington to
 3  Milan?  Or --
 4     A.   Milan.
 5     Q.   Paragraph 19 states that "Plaintiff
 6  asked Mr. D'Ilario and Mr. Gallo if there were any
 7  other positions available that she could fill, and
 8  Plaintiff was told that there were none."
 9          Do you recall this?
10     A.   I -- the day is a blur.  I can't imagine
11  not asking.
12     Q.   But you don't recall?
13     A.   I don't recall.
14     Q.   I didn't ask you this, actually.  Have
15  you read this complaint before?  Or the amended
16  complaint, actually?
17     A.   Yes.
18     Q.   Looking at paragraphs 21 and 22, are you
19  aware of anybody from the Miami, Chicago or Boston
20  offices that were closed in 2004 who got the
21  severance benefits that were outlined in the "How
22  to Conduct Layoff Discussions" brochure?
23     A.   I don't know.
24     Q.   Paragraph 28 says, "As a result of the
25  Defendant's discriminatory and intolerable
```

Page 215

```
                   Rooney
 1
 2  treatment of Plaintiff, Plaintiff suffered
 3  emotional distress and physical ailments."
 4          What physical ailments are being
 5  referred to there?
 6     A.   I was tired.  I was crying.  I was --
 7     Q.   None of this you saw a doctor for,
 8  however?
 9     A.   No.
10     Q.   Anything besides feeling tired and
11  crying?
12     A.   I couldn't sleep.  I didn't want --
13     Q.   You had insomnia?
14     A.   Yes, I guess that's what you'd call it.
15     Q.   Well, okay, you couldn't sleep at all?
16     A.   No, I could sleep, and then I'd wake up.
17  I'd sleep and then wake up.
18     Q.   You didn't see any medical professional
19  about that?
20     A.   No.
21     Q.   And you'd never had that problem before?
22     A.   Not like that before.
23     Q.   "Not like that" meaning?
24     A.   I mean, everybody wakes up every once in
25  a while in the middle of the night, so --
```

Page 216

```
                   Rooney
 1
 2     Q.   Okay, how long did that continue?
 3     A.   It was quite a while.
 4     Q.   Months, weeks, months?
 5     A.   Months.
 6     Q.   And did it end before the summer, say?
 7     A.   Well, it was basically -- I didn't tell
 8  anybody I was fired until 2007, so I was always a
 9  little embarrassed and anxious and --
10     Q.   I'm speaking specifically, though, about
11  this falling asleep and waking up and falling
12  asleep and waking up.
13     A.   Oh.
14     Q.   Did that stop by the summer of 2005?
15     A.   Yes.  Summer of 2005?  Maybe a little
16  later than that.
17     Q.   So it went on, maybe, into the summer?
18     A.   It -- I don't recall.  I --
19     Q.   Was your husband aware of this?  Or were
20  you able to wake up and fall asleep without
21  disturbing him?
22     A.   I didn't disturb him, no.  I was --
23     Q.   So he wasn't aware that you were waking
24  up and falling back to sleep?
25     A.   No.
```

Page 217

```
                   Rooney
 1
 2     Q.   How many times in a night would this
 3  happen?  Was it like every hour on the hour, or a
 4  couple of times in the night?
 5     A.   A few.
 6     Q.   A few.  This is every night?  Or just --
 7     A.   Most, yes.
 8     Q.   Every night from the time you were
 9  terminated until sometime in the summer of '05 you
10  found yourself waking up in the middle of the night
11  and then falling back to sleep?
12     A.   Yes.
13     Q.   Let's take a look at paragraph 33.  Oh,
14  let me just -- sorry.
15          Any other physical ailments that you
16  attribute to your termination besides this sleeping
17  and waking up?
18     A.   And being depressed and despondent.
19     Q.   That's the emotional side.  I'm not
20  asking about that.  I was just asking about the
21  physical now.
22     A.   Not that I recall.
23     Q.   Okay.  Well, let's speak about the
24  depressed and despondent.
25          Did you have any suicidal ideations?
```

Page 226

```
 1           Rooney
 2  the company?  You saw their lawyer letter?
 3     A.   Yes.  I would have thought that the
 4  company would have looked at it.
 5     Q.   Maybe Gallo looked at it and didn't know
 6  the details.
 7     A.   Still, they're wrong.
 8     Q.   Yes.  Certainly you never were district
 9  sales manager in Chicago.
10     A.   I certainly was not.
11     Q.   Let's just look at the second page of
12  this.  I think we've gone over this enough with
13  DiBari and Prano, but Esther Lorusso, do you know
14  when she became head of Alitalia's GA 2000
15  position?
16     A.   No, I don't.
17     Q.   Do you know that it's a division, do you
18  know that GA was a subsidiary actually, rather than
19  a division, of Alitalia?
20     A.   I don't know the technicalities.  There
21  was a relationship.  That's --
22     Q.   I guess we've discussed their ages.
23          Who's Lucia Ragno?
24     A.   Lucia Ragno?
25     Q.   Ragno.  Sorry.  It says she was promoted
```

Page 227

```
 1           Rooney
 2  to commercial channel manager of retail sales.
 3          Do you know when that was?
 4     A.   I don't know exactly.
 5     Q.   Well, was it before your termination?
 6     A.   No.
 7     Q.   It was after your termination?
 8     A.   I believe so.
 9     Q.   Who had been the previous commercial
10  channel manager of retail sales?
11     A.   I'm not positive.  I, it might have been
12  Mr. D'Ilario, because it was at a --
13     Q.   You just, you're not sure?
14     A.   I'm not sure.
15     Q.   So you don't know whether she replaced
16  somebody who was older than yourself?
17     A.   No.
18     Q.   Do you know what her age was?
19     A.   No.
20     Q.   I mean, is she a, is she in her
21  twenties?  Is she in her thirties, forties?
22     A.   Thirties.
23     Q.   Thirties, you'd say, okay.
24     A.   If she's younger, please don't tell her
25  I said that.
```

Page 228

```
 1           Rooney
 2     Q.   Well, if she's older I will tell her you
 3  said that.
 4          It says that John DiRienzo was promoted
 5  from commercial manager, became assistant to the
 6  national sales manager.  Is it, would that be as an
 7  assistant to Mr. D'Ilario?  Is that who the
 8  national sales manager is?
 9     A.   I don't know who the national sales
10  manager was at that time.
11     Q.   But how do you know that DiRienzo was
12  promoted?
13     A.   Ken Futterman.
14     Q.   Do you know DiRienzo's age?
15     A.   DiRienzo is probably forties.  Early
16  forties.
17     Q.   Do you know what happened to the
18  position of commercial manager?
19     A.   No, I didn't know.
20     Q.   And do you know if it's a promotion,
21  actually, to go from commercial manager to
22  assistant to the national sales manager?
23     A.   Commercial manager is assistant to -- I
24  don't know.
25     Q.   The letter ends with, "I am qualified
```

Page 229

```
 1           Rooney
 2  for both of these positions."  Now, one of those
 3  positions is DiRienzo's position.
 4          Did you feel that you should have been
 5  offered that rather than DiRienzo?
 6     A.   This was after I was terminated.
 7     Q.   Oh.  Okay.  So the vacancy wasn't there
 8  at the time that you were terminated?
 9     A.   No.
10     Q.   And Lucia Ragno's promotion was, also
11  occurred after your termination?
12     A.   I don't know if there was a manager of
13  retail.  I don't recall.
14     Q.   Okay, let's look at the next page, and
15  I'll ask you -- this is a letter dated July 22nd.
16  It's page P13.
17     A.   Ah.
18     Q.   And does that refresh your
19  recollection --
20     A.   Yes.
21     Q.   -- about writing to --
22     A.   Yes.  I'm very sorry.
23     Q.   -- the Minnesota --
24     A.   I did not recall that.
25     Q.   Did you get a response from Peg Exley of
```

Exhibit B

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Minneapolis Area Office**

330 South Second Avenue, Suite 430
Minneapolis, MN 55401-2224
(612) 335-4040
TTY (612) 335-4045
FAX (612) 335-4044

Ms. Linda Rooney
6000 Leslee Lane
Edina, MN 55436

RE:    Charge No. 265-2005-00946
Linda Rooney v. Alitalia Airlines

Dear Ms. Rooney:

The District Director has dismissed the above referenced charge of discrimination and issues you a Notice of Right to Sue. You now have the right to pursue this matter in U.S. District Court. Please see the attached information sheet explaining this right.

In your charge, you assert that you were laid off from your position because of your age/53 and national origin/American. Respondent has provided a legitimate, non-discriminatory reason for its decision to eliminate your position. The evidence is not sufficient to substantiate a finding of pretext in regard to this decision. Although you argue that younger Italian employees received more favorable treatment, the record does not indicate that you were actually similarly situated to any of the employees you identify as having received more favorable treatment. None of the identified employees hold the same position title as you or work in the same location as you. In addition, it is not likely that Respondent would have chosen to continue your employment when it closed its Minneapolis office a few years ago if it had a bias against you due to your age and/or national origin. As for your allegation that you should have been transferred in lieu of lay-off, the record does not show that you requested such a transfer or that Respondent's policy is to offer such transfers.

For these reasons, the totality of the evidence is insufficient to support your charge of discrimination. If you have questions or concerns regarding your charge, you can reach me in writing at the address or fax number found in the letterhead.

Sincerely,

_7/14/05_
Date

Wendy Reiner
Federal Investigator

Enclosures: Dismissal Forms, Information Sheet

Exhibit C

# ORIGINAL

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ----------------------------------------X
   LINDA RYLOTT-ROONEY,
4
                              PLAINTIFF,
5

6           -against-

7

8  ALITALIA-LINEE AEREE ITALIANE, SpA,

9                         DEFENDANT.
   ----------------------------------------X
10

11                DATE: May 13, 2008

12                TIME: 10:08 A.M

13

14

15           EXAMINATION BEFORE TRIAL of

16  Defendant, by MARCO D'ILARIO, taken by the

17  Plaintiff, pursuant to Notice and to the

18  Federal Rules of Civil Procedure, held at

19  the offices of Fausto E. Zapata, Jr., Esq.,

20  305 Broadway, Suite 1101, New York, New

21  York 10007, before Robert X. Shaw, CSR, a

22  Notary Public of the State of New York.

23

24

25

1                    M. D'Ilario

2    States; I did not know, the dynamics of the

3    traffic going from the States towards

4    Italy.

5         Q.    Did you receive an increase in

6    salary?

7         A.    It was a different kind of

8    salary you get, being an ex-patriot, you

9    have some benefits.

10        Q.    Can you describe those

11   benefits.

12        A.    At the time I was moved to New

13   York, I get an allowance for my house, and

14   the health coverage package, every local

15   employee received in the States, the health

16   insurance.

17        Q.    What was your title?

18        A.    I was manager for sales

19   development coordination, North and Latin

20   America, something like this.

21        Q.    Who did you work with?

22        A.    I reported to Mr. Pierandrea

23   Galli, who was the managing director of the

24   Americas.

25        Q.    Who else did you work with?

```
 1                    M. D'Ilario

 2         Q.    What about with regards to the

 3   U.S., can you narrow that down for me?

 4         A.    For the U.S., I was dealing

 5   especially with Giulio Libutti, who was the

 6   senior vice president of North America, and

 7   Marcello Grimaldi was the senior director

 8   of sales, U.S.A. and Mexico.

 9         Q.    Do you know Linda Rooney?

10         A.    Yes.

11         Q.    What was her role?

12              MR. KORAL:  At what time?

13         Q.    What was her role in 2003.

14         A.    In 2003 -- I arrived at the end

15   of 2003.  When I arrived in the

16   organization, and I don't remember exactly

17   if it was then, 2003, or the beginning of

18   2004, she was in charge of the national

19   account, and she was supervising the sales

20   consultants of the corporate unit.

21         Q.    Were you familiar with her work

22   performance?

23              MR. KORAL:  At what time?

24              MR. ZAPATA:  In that time,

25        during that time, 2003.
```

```
 1                     M. D'Ilario
 2          A.     Actually, I did not manage
 3   Linda Rooney, so -- I was the manager of
 4   Linda Rooney, from summer 2004 until
 5   December, 2004, yes.  Yes, sir.
 6          Q.     During that time frame, summer
 7   2004 through December 2004, were you
 8   familiar with her work performance?
 9          A.     Yes.
10          Q.     How did you become familiar
11   with her work performance?
12          A.     I was working with her closely,
13   because I was, at the time I was senior
14   director of sales of U.S.A. and Mexico, so
15   I was working close with her manager, Lucia
16   Alla, the corporate director of  -- the
17   senior director of sales for U.S.A. and
18   Mexico, and was working closely with Lucia
19   Alla, the manager of the corporate unit,
20   and with Linda Rooney, because we were
21   working at the renewed contracts for the
22   national accounts.
23          Q.     How would you describe
24   Ms. Rooney's work performance?
25          A.     I was very satisfied about
```

1                    M. D'Ilario

2    Linda Rooney, I think she is a very good

3    employee.

4         Q.    What's the basis of that

5    opinion?

6              MR. KORAL:  Objection.

7         A.    Because I had the opportunity

8    to see her dealing with the clients,

9    renewing the contracts, and I saw how she

10   created the basis for the negotiation.

11              She was very open to listen in,

12   and if it was the case, to modify an

13   approach or a, her opinion.

14              The feeling from the clients

15   was a positive one.  Her manager, Lucia

16   Alla, was satisfied with her.

17        Q.    Did you work with Mr. Gallo?

18        A.    Yes.

19        Q.    And in what capacity?

20        A.    Mr. Gallo was the senior vice

21   president of corporate, corporate and

22   regulatory affairs.  And he was also

23   overlooking the HR department, because we

24   had a vacancy.

25              So, I was working with Gallo,

1                           GALLO

2       I had to face to terminate employees that

3       stood near me in the most difficult time

4       and did a great job for this company,

5       including the September 11th issue, those

6       people not going back home and working

7       during the night as well, and taking care

8       of passengers stranded all over the city

9       and all over the United States.

10          Q.    Mr. Gallo, you have a current

11      case against Alitalia, a lawsuit?

12          A.    Oh, yes; unfortunately, yes.

13          Q.    I am going to show you this

14      document I would like to have marked.

15              MR. SKLIAR:  Let me speak to

16          you for a second.

17              (Whereupon, counsel left the

18          room.)

19              MR. SKLIAR:  Mr. Gallo, let me

20          speak to you for a second.

21              (Whereupon, counsel and the

22          witness left the room.)

23          Q.    Mr. Gallo, did you ever, during

24      the time period of 2002 all the way through

25      2006, did you ever experience any hostility

```
 1                    M. D'Ilario
 2        off, that's what he asked.
 3             MR. ZAPATA:   Okay.
 4        Q.     All right.
 5             Were you involved in the
 6   decision-making process with regards to
 7   whom Alitalia was going to sever the
 8   employment relationship with?
 9        A.     Um, yes, I was involved in, in
10   the decision-making related to a commercial
11   reorganization of my structure, and I was
12   involved in reorganizing the sales for the
13   United States and Mexico.
14        Q.     How was it going to be
15   reorganized?
16        A.     In 200' -- the end of 2004, we
17   changed the approach, the trade in the
18   States, so we decided to move from a
19   geographical sales organization to a
20   channel management sales organization.
21             So instead of regional sales,
22   we went to sales unit focusing on the
23   corporate business travel, focusing on the
24   tour operation segment, focusing on the
25   consolidation segment, and focusing on the
```

```
 1                    M. D'Ilario
 2   retail segment, focusing the dot com
 3   segment.
 4              It was an ongoing process of
 5   reorganization, many steps, because it was
 6   a dramatic change in the approach.
 7              The introduction of the channel
 8   management was something very new in the
 9   States.
10              And I was personally involved
11   in design the project and set the sales
12   policy for each channel, and the new
13   approach to the market.
14        Q.    How many people --
15              Withdrawn.
16              Now you stated that you were
17   involved in the decision-making process
18   with respect to whom Alitalia was going to
19   sever its employment relationship with;
20   correct?
21        A.    No.  I was involved in
22   designing the new sales organization, so
23   let's say that the person, the people
24   involved in this process, were a
25   consequence of the reorganization, so it
```

```
 1                M. D'Ilario
 2  was not a decision by person or by the
 3  name, but it was a new organization design.
 4        Q.    Is it your testimony that you
 5  did not look at the actual individuals in
 6  making these business decisions?
 7              MR. KORAL:  Objection.
 8        A.    I say that I designed the new
 9  organization, so -- we -- we weren't
10  focusing the individual, we were focusing
11  the set up of the organization.
12        Q.    So, whom was involved in the
13  decision-making process as to who was going
14  to be let go?
15              MR. KORAL:  Objection.
16        A.    As I said, we sit down and we
17  discuss the project.
18        Q.    Who is we?
19        A.    Myself and Mr. Libutti, mainly,
20  and then the project was presented to Rome,
21  and Gallo was also involved with the HR
22  part of the United States.
23              And we presented the project to
24  Rome, to our boss in Galli, to the HR
25  manager, at the time it was Staffaguidi, if
```

```
 1                    M. D'Ilario
 2    I remember correctly -- and I think this
 3    was the main actors.
 4              So, we presented the project,
 5    the project was approved, because in that
 6    time frame there was a constant pressure
 7    from Italy, in order to reduce cost as well
 8    as salary costs.
 9              So, the project was approved,
10    and with the project done as a consequence
11    of the new organization, there were
12    positions eliminated.
13         Q.    As far as you know, who was
14    laid off?
15              MR. KORAL:  He already asked
16         you to define laid off.
17              MR. ZAPATA:  I apologize, I
18         will withdraw that question.
19         Q.    As far as you know, whose
20    employment was terminated with Alitalia, as
21    a result of the reorganization that was
22    approved in Italy?
23         A.    Um, from what I remember,
24    Mr. Brtalik, George Brtalik, he was a
25    manager for the tour operation and
```

```
 1                      M. D'Ilario
 2     consolidation, and the sales development,
 3     his position was canceled.
 4                  Kathy Moriarity --
 5          Q.      Moriarity?
 6          A.      Moriarity.
 7                  MR. KORAL:  M-O-R-I-A-R-I-T-Y,
 8     I am not sure of that spelling.
 9          A.      She was district sales manager,
10     Chicago.  Her position was terminated.
11                  Ken Futterman, district sales
12     manager, Miami.  His position was
13     eliminated.
14                  If you define the time frame,
15     because as I said, the reorganization was
16     an ongoing process, so we had -- do you
17     have a particular time frame, because
18     otherwise I have to remember --
19          Q.      All right.
20                  I understand your point.
21                  Can you estimate how many
22     individuals were -- how many individuals'
23     employment was terminated as a result of
24     the organization, reorganization I should
25     say?
```

```
 1                    M. D'Ilario
 2   Alitalia ever target older individuals for
 3   termination?
 4        A.    No.
 5        Q.    Did Alitalia ever have a
 6   preference, as far as you know, for people
 7   of Italian national origin?
 8        A.    No.
 9        Q.    Have you ever been to any
10   meetings where American employees and their
11   age was discussed?
12        A.    Absolutely not.
13        Q.    As far as you know, with
14   regards to your jurisdiction in the United
15   States, within the organization, has
16   Alitalia settled any age discrimination
17   cases?
18        A.    Settled?
19        Q.    Settled any age discrimination
20   lawsuits.
21             MR. KORAL:  Within his
22        jurisdiction?
23             MR. ZAPATA:  Within your
24        jurisdiction, in the United States.
25             MR. KORAL:  Age discrimination
```

```
 1                      M. D'Ilario
 2          lawsuits you asked?
 3                 MR. ZAPATA:  Yes.
 4          A.     As I said, I had no cases in
 5     the States except for this one with Linda
 6     Rooney, and with Ken Futterman, and I don't
 7     know how they end up.
 8          Q.    Do you know why Linda Rooney
 9     was terminated?
10          A.    As a consequence of the
11     reorganization.
12          Q.    Can you elaborate on that?
13          A.    The position was eliminated.
14          Q.    Were there any individuals
15     whose positions were eliminated, but they
16     were retained anyway?
17          A.    Ah, not to my knowledge.
18          Q.    The two sales individuals,
19     salespeople that were transferred to, you
20     said Chicago, I believe --
21          A.    They were in Chicago.
22          Q.    Why were they transferred?
23                 MR. KORAL:  They did not
24          transfer.  You misunderstood.
25                 MR. ZAPATA:  They were already
```

```
 1                    M. D'Ilario
 2         in Chicago.
 3              MR. KORAL:   They were sales
 4         reps that were already in Chicago.
 5              MR. ZAPATA:   Okay.
 6              MR. KORAL:   You better get him
 7         to say that, I am not under oath.
 8         A.     They were in Chicago, they
 9    never moved from Chicago.
10         Q.     Did anybody assume Linda
11    Rooney's function within the organization?
12         A.     Her function substantially was
13    absorbed by her manager, Lucia Alla, see
14    Lucia Alla started to supervise directly
15    the sales rep, and the renewal of the
16    national account contract was, with
17    staffing, was done by Lucia Alla with
18    myself, and of course the help of the
19    analyst who, the basis for the targets.
20         Q.     Do you know an individual named
21    John DiRianzo?
22         A.     Yes.
23              MR. KORAL:   DiRianzo.
24              THE WITNESS:   Yes.
25         Q.     Who is he?
```

46

```
 1                    M. D'Ilario
 2         Q.     Did he assume any of Linda
 3    Rooney's functions when her employment was
 4    terminated?
 5         A.     No.
 6         Q.     Do you remember terminating
 7    Linda Rooney?
 8         A.     A little bit.
 9         Q.     Can you please tell us what you
10    remember.
11                MR. KORAL:   Objection.
12         A.     Can you elaborate a little bit
13    more the question; what do you want to
14    know?
15         Q.     What happened on that day?
16         A.     I had a meeting with Linda and
17    Francesco Gallo.
18         Q.     Who called the meeting?
19         A.     I think I told Linda that we
20    need to talk with Gallo.
21                And Linda entered into the
22    office where we had the meeting, and she
23    saw Gallo, and she told us, okay, today is
24    my turn, today is, I have to be terminated.
25                She seen Gallo was in charge of
```

```
 1                    M. D'Ilario
 2    HR, and she said, okay.  Today is my turn.
 3              And then Gallo spoke to her,
 4    and explained to her, explained to her the
 5    reorganization process, the downsizing of
 6    the organization, and the fact that her
 7    position was eliminated.
 8        Q.    How did she respond?
 9        A.    She was very calm, very polite.
10              And they had a very brief
11    discussion about the shipment, the shipping
12    stuff from Minneapolis, laptop or whatever,
13    and I don't remember, the printer, the
14    company belongings, and it was a very quick
15    meeting.
16        Q.    Did she ask for any other
17    available positions?
18        A.    Not to -- not from what I
19    remember.
20        Q.    Was she offered any other
21    available positions at the time that she
22    was terminated?
23        A.    Um, she was not, she was
24    offered a promotion --
25        Q.    At the time that she was
```

```
 1                    M. D'Ilario
 2   terminated.
 3        A.    No.  I don't think so.
 4        Q.    Why did --
 5        A.    There were not available
 6   positions at manager level.
 7        Q.    There is no question.  Okay.
 8              There were no management
 9   positions available in Alitalia in the
10   United States at the time that she was
11   terminated?
12        A.    Available?
13        Q.    When you say available, what
14   did you mean?
15        A.    Vacant.
16        Q.    Vacant.
17              Was Linda offered severance?
18        A.    No.
19        Q.    Why not?
20        A.    I don't know, I was not in
21   charge of deciding this kind of stuff.
22              So, I was, as I said, what to
23   do was to define the sales organization,
24   and give the plan to the person responsible
25   for the HR, was Francesco Gallo, and making
```

```
 1                    M. D'Ilario
 2    the position, discussing with the
 3    headquarters.
 4        Q.    Who was in charge of the
 5    decision of who gets severance and who does
 6    not?
 7        A.    I think it is a kind of tricky
 8    question, meaning that there is an HR
 9    department that was in charge of the policy
10    related to the employees.
11        Q.    Which HR, which HR?
12        A.    There is the HR department
13    based in New York, was in any case to
14    coordinate with the headquarters.
15        Q.    Why were you at the meeting?
16        A.    Sorry.
17        Q.    Why were you at the meeting
18    when Linda was terminated?
19        A.    Because I was the director of
20    sales, so -- she was the one of the people
21    that I was supervising.
22        Q.    Did you make any effort to find
23    a place for Linda Rooney after her position
24    was eliminated?
25        A.    At the time there were no
```

M. D'Ilario

1   manager positions available.

2       Plus, as I said -- I think, one

3   year before, she was offered a promotion in

4   New York as manager of a corporate unit,

5   and she refused the promotion because she

6   told the company that she was not willing

7   to commute, and her life was going to be

8   very difficult commuting between

9   Minneapolis and New York.

10      Q.    Was she told that if she did

11  not accept that position she would be

12  fired?

13      A.    No.  She was absolutely not --

14      Q.    Was it presented to her as an

15  option?

16      MR. KORAL:   Objection.

17      A.    I was not in charge of the

18  sales in the United States.

19      So, to my knowledge, she was

20  offered this position, and she refused the

21  position, and then I -- and how the

22  discussion went, or how went the

23  discussion, I don't know.

24      Q.    So you are not really familiar

53

```
 1                    M. D'Ilario
 2        ever?
 3                 MR. ZAPATA:   Between 2004 and
 4           2005.
 5        A.    I think we end up with at least
 6    10 people.
 7        Q.    What are the names of those 10
 8    people?
 9        A.    Anna Batovaz, Yvette Skilling,
10    Kate Moriarity, Linda Rooney, George
11    Brtalik, and Marino Voli.
12                 Luciana White.  Who else?
13                 Ramona Manzi was another one, I
14    don't remember exactly when she left.
15    Donetella Beschoss.
16        Q.    Is that everybody?
17        A.    No.  I don't remember.  There
18    were for sure other names.
19        Q.    Is it fair to say that the
20    people that were let go were older on
21    average than the people that were retained?
22                 MR. KORAL:   Objection.
23        A.    As I said, before I never asked
24    for the age of my employees, so --
25        Q.    Did you know any of these
```

1                         M. D'Ilario

2     compared to the target assignment, target

3     assigned.

4          Q.     Did her results, as indicated

5     on Plaintiff's Exhibit 1, were they taken

6     into account when she was terminated?

7                  MR. KORAL:  Objection.

8          A.     As I said before, we launched a

9     new organization, and as a consequence,

10    there were positions eliminated, so, it was

11    not a decision made on the individual, it

12    was a new organization set up.

13                 As I said before, I --

14         Q.     So, it was not taken into

15    account was your answer?

16                 MR. KORAL:  Objection.

17         A.     As I said, it was a new

18    organization set up, and there was a

19    consequence, which was the elimination of

20    certain jobs, period.

21                 And then the results were

22    excellent, but there were excellent for the

23    entire United States organization.

24                 Excellent in 2004, were

25    excellent in 2005, and were excellent in

Exhibit D

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      ------------------------------------------X
       LINDA RYLOTT-ROONEY,
4
                                    PLAINTIFF,
5

6              -against-     Case No: 07 CV 11091

7

       ALITALIA-LINEE AEREE ITALIANE SpA,
8
                                    DEFENDANT.
9      ------------------------------------------X

10

11                          DATE: July 22, 2008

12                          TIME: 10:10 a.m.

13

14             DEPOSITION of a Non-Party

15     Witness, FRANCESCO GALLO, taken by the

16     Respective Parties, pursuant to a Subpoena,

17     held at the Law Offices of Fausto E.

18     Zapata, Jr., PC, 305 Broadway, New York,

19     New York 10007, before a Notary Public of

20     the State of New York.

21

22

23

24

25

1                           GALLO

2    senior vice-president corporate affairs

3    North America.

4         Q.     Do you still work for Alitalia?

5         A.     No, I don't, because I was

6    fired.

7         Q.     What was the last position you

8    held at Alitalia?

9         A.     Senior vice-president corporate

10   affairs.

11        Q.     When did you stop working with

12   Alitalia?

13        A.     When did I stop?

14        Q.     Yes, when did you stop working

15   with Alitalia?

16        A.     May 2006.

17        Q.     What title did you hold before

18   the senior vice-president of corporate

19   affairs?

20        A.     Managing director North

21   America.

22        Q.     Do you know when you were

23   appointed to managing director of North

24   America?

25        A.     Yes.  I believe in the year

```
 1                      GALLO
 2   this desire of upper management?
 3        A.    Well, at a certain point, if I
 4   did use the word desired I made a mistake,
 5   because it an imposition, a request that
 6   had to be done.
 7        Q.    A directive?
 8        A.    Right.  And in one occasion it
 9   was made clear to me by the CEO of the
10   corporation.
11        Q.    Whom are you referring to?
12        A.    Mr. Mengozzi, M-E-N-G-O-Z-Z-I,
13   Francesco.
14        Q.    Can you please describe, first
15   of all, when did that first happen?
16        A.    Well, it started 2002, 2003 --
17   actually, 2003 was the year that I felt
18   there was, you know, before it was an
19   orientation, senior management were trying
20   to transfer this idea to terminate people
21   and to change the way we did manage
22   Alitalia.  That started 2002, actually.  In
23   2003 it became even more heavy.
24              As a matter of fact, in 2003 I
25   believe that, if I recall well, that was
```

```
 1                      GALLO
 2   put part of an incentive program promoted
 3   by Alitalia that would recognize on a
 4   yearly basis a bonus if we could carry, not
 5   we, them, carry successfully the
 6   elimination, reduction of cost and
 7   elimination of senior people -- senior
 8   employees, I'm sorry.
 9        Q.    When you say them in this
10   context, whom are you referring to?
11        A.    Senior management in Rome.
12        Q.    Do you know who in senior
13   management?
14        A.    Mengozzi, Galli and other.
15        Q.    At that time, 2003, 2002, the
16   time frame you are referring to, what was
17   Mr. Galli's title, job title?
18        A.    In 2002 I believe that
19   Mr. Galli was in Rome, and he was space
20   manager or something like that.
21        Q.    When were you first issued the
22   directive to terminate older workers?
23             MR. SKLIAR:  Note my objection
24        to form.  Could you rephrase that.
25             Off the record.
```

1                           GALLO

2   remember the first name.  I don't.

3       Q.      What was his title?

4       A.      He was executive vice-president

5   HR worldwide for Alitalia.

6       Q.      When did you give him the memo?

7       A.      I sent the memo to him and I

8   brought a copy to him the very first time

9   that he was appointed to that position

10  while I was in Rome.

11      Q.      Do you know what year this was?

12      A.      It could be the end of 2002,

13  beginning of 2003, something like that.

14              But in the same -- during the

15  same visit I spoke about this issue to

16  Mr. Conforti, C-O-N-F-O-R-T-I, who was

17  general counsel for Alitalia and secretary

18  of the board of the company and to whom I

19  was reporting for all the legal aspects,

20  the legal function in North America.

21      Q.      How did Mr. Chieli respond to

22  your memo?

23      A.      He did not respond to the memo

24  in writing.  He took it out and went

25  through it when I was present in his

1                          GALLO

2      office.  And he was in a certain way

3      frustrated.  He had his own problem, just

4      being nominated in that position.  And he

5      invited me to try to do the best possible,

6      keeping in mind that Alitalia was in a

7      situation whereby could go into bankruptcy

8      at any given time.

9           Q.    When did that meeting take

10     place?

11               MR. SKLIAR:   The meeting

12          between?

13          Q.    The meeting between Mr. Chieli

14     and Mr. Gallo.

15          A.    There have been several.

16          Q.    The meeting where he told you

17     specifically to do the best you can.

18          A.    2002, 2003.  It was the very --

19     the first official meeting, because I knew

20     Mr. Chieli for a long time.  It was the

21     very first meeting after he was appointed

22     to that position.

23          Q.    How did Mr. Conforti respond to

24     your memo?

25          A.    Agreed, and that he had told

                              GALLO
1
2        Q.      What are you referring to?
3                MR. SKLIAR:   You mean what form
4          specifically?
5                MR. ZAPATA:   Yes.
6        Q.      What form are you referring to?
7        A.      A list, a tabulation of names
8    of employees.
9        Q.      Can you be more specific than
10   that?
11       A.      At any given time that survey
12   or names, list, information were requested
13   about our employees, there was this kind of
14   information requested.  I'm sure if you
15   request Alitalia, you will see yourself
16   what I am talking about.
17       Q.      What was done with this
18   information, if you know?
19       A.      Sent to Rome, or given to
20   Mr. Libutti.
21       Q.      I am focusing again from 2002
22   to 2006, were any employment decisions ever
23   made based on citizenship?
24       A.      No, not in particular, no.
25       Q.      Were you ever at a meeting

1                          GALLO

2       where Mr. Mengozzi directed Alitalia senior

3       management to terminate 50 percent of the

4       older workers in North America?

5              A.     Yes, I was, of course.

6              Q.     Could you please elaborate what

7       happened at that meeting.

8              A.     Well, the meeting itself very

9       little, because I was going in and out, but

10      I knew exactly what he was going to discuss

11      in the meeting because before going there

12      we were behind the doors, myself, Mengozzi,

13      Mr. Wulf, and another gentleman I don't

14      remember from HR Rome.

15             Q.     When did this meeting occur?

16             A.     I'd say 2003 sometime.

17             Q.     Is it Mr. Neils Wulf?

18             A.     Neils Wulf, an officer of

19      Alitalia.  Or he is a former officer of

20      Alitalia.

21                    MR. SKLIAR:  Off the record.

22                    (Whereupon, an off-the-record

23             discussion was held.)

24             Q.     What title did Mr. Wulf hold

25      during that meeting in 2003?

```
 1                      GALLO
 2        A.     Senior vice-president sales
 3   North America.
 4        Q.     Who was present at that meeting
 5   where Mr. Mengozzi stated he wanted to
 6   terminate 50 percent of the older workers
 7   in North America?
 8        A.     Wulf definitely, myself in and
 9   out, I believe it was the HR manager before
10   he was terminated.  What was his name?  I
11   don't remember.
12        Q.     Was it Howard Tigel?
13        A.     Howard Tigel, right.  Wait a
14   minute.  The other gentleman from Rome
15   was-- I don't remember.  Oh, Mr. Pola was
16   there, P-O-L-A.
17        Q.     What was his title?
18        A.     He was -- I don't recall his
19   title, but he was administration Rome.  Who
20   else?  Paolo Pausini, P-A-O-L-O,
21   P-A-U-S-I-N-I, and he was marketing manager
22   USA -- North America, sorry.  There was
23   someone else, but I don't remember.  I
24   mean, I can visualize, but I don't remember
25   the names.
```

1                          GALLO

2    did report also to other directors in Rome,

3    like Conforti and others.

4         Q.    Who did you report to in 2004?

5         A.    Galli, and other directors in

6    Rome, central directors.

7         Q.    What was Mr. Galli's title in

8    2004?

9         A.    2004, he was vice-president

10   sales worldwide.

11        Q.    Did Mr. Galli ever tell you

12   that he wanted you to hire individuals who

13   were in their thirties?

14        A.    Yes.

15        Q.    When did he tell you that?

16        A.    More than one occasion when he

17   was transferred to New York.

18        Q.    When was he transferred to

19   New York?

20        A.    I believe in 2003 sometime.

21        Q.    How many times, if you had to

22   take a guess, did he give you those

23   instructions in 2003?

24             MR. CARANICAS:   Objection.

25        A.    More than one occasion, when

1                        GALLO

2    Mr. Galli was transferred to Rome, he

3    choose to come, he choose to come and work

4    in the office that I had at Rockefeller

5    Center, instead to be at 666 Fifth Avenue,

6    where all the employees were, so it was a

7    daily, you know, we used to meet at the

8    office.  The space was about 5000 square

9    feet, so we used to have coffee every

10   morning, at any given time.

11        Q.    So he would tell you this on an

12   ongoing basis?

13        A.    Right.

14        Q.    I am going to show you this

15   document.

16             MR. ZAPATA:  Could you please

17        mark it.

18             (Whereupon, the aforementioned

19        Bringing Bad News - How to Conduct

20        Layoff Discussions document was

21        marked as Plaintiff's Exhibit 1 for

22        identification as of this date by the

23        Reporter.)

24        Q.    Are you familiar with this

25   document?

1                          GALLO

2    pay in 2004?

3          A.    No.   There was no severance pay

4    in 2004.

5                MR. SKLIAR:   Off the record.

6                (Whereupon, an off-the-record

7          discussion was held.)

8          Q.    Do you know why there was no

9    severance pay in 2004?

10                MR. SKLIAR:   He didn't say

11          there was no severance.   Maybe you

12          can rephrase that.

13                MR. CARANICAS:   I think he did.

14                MR. SKLIAR:   He said that

15          wasn't the policy.

16          A.    It was not the policy.   We were

17    paying severance every day when we agreed

18    to send them out, because they were old, so

19    there was a severance.   But there was no

20    policy of a severance.

21                This policy terminated --

22                MR. SKLIAR:   Wait for a

23          question.

24          Q.    How was it determined who

25    received severance pay and who did not

1                           GALLO

2    preparation and the quarterly progress

3    report I was present to the analysis and

4    discussion of a result reached by the

5    various managers.

6         Q.    What was your opinion of her

7    work product?

8         A.    Good.

9         Q.    Do you know why Miss Rooney was

10   terminated?

11        A.    Because she was part of the

12   group of people that had to be terminated.

13        Q.    What do you mean by that?

14        A.    I mean that Miss Rooney, like

15   others, she unfortunately was not -- she

16   could not be part of the early retirement,

17   I believe none of the three, because of her

18   present age at that time, present age at

19   that time.  Yes, if I don't make mistake,

20   that was the case.

21        Q.    Do you know the reason why she

22   was selected for termination?

23        A.    Because she was close to 50 or

24   50 or whatever.

25        Q.    How did you come to learn this,

1                           GALLO

2              Reporter.)

3         A.    I believe the very first time

4    was when we closed the office in

5    Minneapolis.

6         Q.    What year was that?

7         A.    I don't recall.  2003 probably.

8    Yes, probably 2002, 2003.

9         Q.    Was she terminated at that

10   time?

11        A.    Was she terminated, no, she was

12   not.

13        Q.    Did her role change within the

14   organization at that time, and I am

15   referring to when the Minneapolis office

16   closed?

17        A.    When the office was closed for

18   a period of time she continued to work from

19   her home, from her apartment.  And in the

20   second stage we gave her the responsibility

21   to administer the mega agencies in North

22   America.

23        Q.    Was she successful in managing

24   the mega agencies?

25        A.    Yes.  As a matter of fact, if I

1                          GALLO

2    relationship with Linda as well as a few

3    others extending them the early retirement

4    or some sort of severance pay and having

5    them sign a release.

6          Q.    Did you think Linda's

7    termination was in violation of the United

8    States Equal Employment Opportunity laws?

9               MR. SKLIAR:  Note my objection

10         to form.

11              You can answer.

12         A.    Not just Linda, all of them.

13         Q.    But with respect to Linda, did

14    you?

15         A.    Yes, sure.

16         Q.    Who did you voice your

17    objections to with respect to the

18    termination of Linda Rooney in 2004?

19         A.    To Libutti, to Galli, and I

20    asked help to Mr. DiLario, with whom I had,

21    or I believed I had a good relationship, to

22    try and help to conclude Rooney and another

23    three, four employees, managers with a

24    severance package.

25              He promised that he would have

```
 1                       GALLO
 2   mistake, Linda happened to be in New York
 3   on her routine one day, two days a month
 4   job in New York, and if I recall well,
 5   Mr. -- what's his name -- Marco DiLario,
 6   came to my office and said, Franco, this is
 7   the good opportunity to tell -- to
 8   terminate Linda.  And I believe he called
 9   her and they both came to my office.  And I
10   told her she was terminated.
11        Q.    Did Linda ask if there were any
12   other positions available within Alitalia,
13   if you remember?
14        A.    Could very well be, but I don't
15   remember, could be.
16        Q.    Why was Linda not offered
17   severance pay?
18             MR. CARANICAS:  Objection.
19        Q.    Do you know why Linda was not
20   offered severance pay?
21             MR. CARANICAS:  Objection.
22             MR. SKLIAR:  Off the record.
23             (Whereupon, an off-the-record
24         discussion was held.)
25        Q.    Was Linda offered severance
```

<pre>
                            GALLO
  1
  2    pay?
  3          A.     No, she was not.
  4          Q.     Do you know why she was not
  5    offered severance pay?
  6          A.     Because she could not
  7    participate to the early retirement plan
  8    or-- and because Mr. Libutti thought that
  9    he could play with closing of the office
 10    business whereby he closed the office, you
 11    discontinue to do the job, the work, and
 12    you laid off the employee.
 13               MR. ZAPATA:  I have no further
 14          questions.
 15               MR. SKLIAR:  Off the record.
 16               (Whereupon, an off-the-record
 17          discussion was held.)
 18               (Whereupon, a lunch recess was
 19          taken, 12:15 p.m. to 12:45 p.m.)
 20    EXAMINATION BY
 21    MR. CARANICAS:
 22          Q.     Good afternoon, Mr. Gallo.
 23          A.     Good afternoon.
 24          Q.     My name is Charlie Caranicas.
 25    I am with Vedder Price.  I represent
</pre>

53

```
 1                     GALLO
 2            Is that something you said
 3    earlier today, in substance?
 4            MR. SKLIAR:  Note my objection
 5         to the characterization of the
 6         testimony.
 7            You can answer.
 8    A.     What I said and what I meant is
 9    that coming aboard, Mr. Mengozzi thought to
10    change things at Alitalia, this his heart
11    probably making good for Alitalia, but he
12    was completely out of the reality, as facts
13    are shown today, Alitalia's paying
14    consequences for it.
15            Yes, he departed from a very
16    wrong point, especially for markets that
17    were very remunerative for Alitalia, very
18    healthy for Alitalia.
19    Q.     Is 2002 about the time he came
20    in as CEO, Mr. Mengozzi?
21    A.     2001, 2002, but, you know, at
22    the beginning.
23    Q.     Were there economic problems
24    for the company back then?
25    A.     No, no.  It was an economic
```

1                        GALLO

2    problem for the industry, as you know.

3    Don't forget what took place in 2001.

4         Q.    Sure.  We all remember it well.

5         A.    So I know we had eight 747s

6    that money could not handle in the United

7    States.  Like Alitalia, so do the rest of

8    the airlines.  We did go through other

9    period of time where the airline did not do

10   well.

11        Q.    The economic problems started

12   roughly in 2001.

13             Did they continue through 2002,

14   2003?

15        A.    Actually, I would say they

16   deteriorated even more because of the new

17   management.

18        Q.    And these economic problems are

19   one of the reasons that they decided cuts

20   were necessary, Alitalia senior management?

21             MR. SKLIAR:  Objection.  He is

22        not in the mind of senior management.

23             If you want to rephrase it.

24             MR. CARANICAS:  Fair enough.

25        Q.    You mentioned earlier there was

1                        GALLO

2       an effort to cut costs by cutting

3       personnel.

4                 Did senior management tell you

5       that this was because of the economic

6       problems?

7           A.    As I stated before, I've been

8       CFO for Alitalia North America for at least

9       eight, nine years.  For Alitalia, to

10      control and be vigilant on cost, it's bad

11      and bother of every day.  As a matter of

12      fact, in the golden days, you do think to

13      be even more attent (sic) to spend money.

14                So the focus of this new

15      management invoked the economic reasons,

16      which were there, but within the industry.

17      It was not an Alitalia phenomena.

18                As a matter of fact, probably

19      Alitalia was not that bad as other carriers

20      at that time.

21          Q.    But they were all suffering

22      economically?

23          A.    This -- yes.  And they revived,

24      they came back, as I'm sure that Alitalia

25      would have done even better to come back,

1                           GALLO

2       and even earlier.  And we had meetings and

3       meetings on these issues.

4           Q.     By the time you left in 2006,

5       was Alitalia still having economic

6       problems?

7           A.     That I know from the media and

8       from other people, of course.  Alitalia

9       just got other money from the taxpayer in

10      Italy.

11          Q.     If you know, were there

12      significant cuts of employees in Alitalia

13      North America in 2003?

14          A.     In 2003?   Well, the cut was

15      done through the early retirement plan.

16          Q.     But the number of employees in

17      Alitalia North America in 2003 decreased;

18      is that fair to say?

19          A.     The number of employees

20      decreased, yes.

21          Q.     And again in 2004?

22               MR. SKLIAR:  Is that a

23          question, did it increase?

24               MR. CARANICAS:  Yes.

25          A.     Yes, because so decreased the

1                          GALLO

2      operations to this continent, making

3      Alitalia losing money, believe it or not.

4                  If you talk to someone in the

5      airline industry, it is clear picture that

6      it's very easy to cut costs and cut

7      employees, but whenever you do that, you

8      lose money.  Because in order to cut, you

9      end up on cut services to points of service

10     very remunerative.

11                 Look, I give you example.  Los

12     Angeles, Mr. Mengozzi insisted and fought

13     to close Los Angeles line, Rome, Los

14     Angeles.  Crazy, the most, sorry, stupid

15     thing that could have happened.

16                 Los Angeles is reopened because

17     they came in and said, Mr. Mengozzi, what

18     the heck, you didn't know what air

19     transportation is all about.  So it's

20     mistake after mistake.

21                 MR. SKLIAR:  Off the record.

22                 (Whereupon, an off-the-record

23            discussion was held.)

24            Q.    Is Mr. Mengozzi still the CEO

25     of Alitalia?

1                          GALLO

2          A.     Oh, no, sir.

3          Q.     When did he leave?

4          A.     I believe 2004 sometime.

5          Q.     Would you --

6          A.     I don't remember.  I just

7    remember that I got drunk.  And because I

8    took some medication, I had problems.

9              MR. SKLIAR:  Off the record.

10             (Whereupon, an off-the-record

11         discussion was held.)

12         Q.     But Mr. Mengozzi left before

13   Miss Rooney was terminated, if you

14   remember?

15         A.     I believe so.

16             MR. SKLIAR:  Off the record.

17             (Whereupon, an off-the-record

18         discussion was held.)

19         Q.     Mr. Gallo, are you aware that

20   Miss Rooney filed a charge against Alitalia

21   with the EEOC?

22         A.     I think so, yes, I think so.

23         Q.     Did you deal with that charge

24   as HR person?

25         A.     I usually do.  I usually did.

                                GALLO

1

2       whom, to me?

3              Q.     Or to Marco.

4              A.     Miss Rooney came with Marco to

5       my office.  She said hello.  She kissed me,

6       hugged me.  And inside of me, I said, here

7       we go again.  Sit.

8              Q.     And what did you tell her?

9              A.     What did I tell her?  That

10      unfortunately due to -- I told her what

11      they told me to say, unfortunately due to

12      the economic conditions of Alitalia, your

13      job is not there anymore.

14             Q.     Who is they, who told you to

15      say that?

16             A.     As I, oh, okay, I didn't tell

17      you, I told him, Mr. Libutti, Mr. DiLario,

18      Mr. Galli.

19             Q.     What did she say in response,

20      Miss Rooney?

21             A.     Well, counsel, more than what

22      she replied, I remember, it's not easy to

23      forget, was a look, her face that I

24      remember.

25             Q.     Did she say anything?

1                          GALLO

2          Rephrase it.

3                  Off the record.

4                  (Whereupon, an off-the-record

5          discussion was held.)

6          Q.    You stated you had no choice

7      but to tell people if they were asking you

8      that her job was terminated because it was

9      centralized to New York?

10         A.    Right.

11         Q.    I assume you had no choice up

12     until the time you were yourself terminated

13     by Alitalia?

14         A.    Yes.

15         Q.    But after that you had a

16     choice?

17         A.    Yes.  If someone would have

18     asked after that I left Alitalia, yes,

19     finally, yes, sure.

20         Q.    You may have already said this.

21     There may be some repetition here.

22                Who directed you to fire

23     Miss Rooney?

24                MR. SKLIAR:  This has been

25          asked and answered.  With all due

```
 1                    GALLO
 2        respect, I think he said this several
 3        times.
 4        A.    Galli, Libutti and Marco
 5   DiLario.
 6              MR. CARANICAS:   I am going to
 7        get into some details.   That's why I
 8        revisited the issue.
 9        Q.    Did they sit down with you and
10   tell you together, was there a meeting, did
11   they ask you in a letter, email; how did
12   they direct it?
13        A.    Galli said it in an encounter
14   that I had with him with Libutti and with
15   someone else when he was here in New York
16   during one of the visits.
17        Q.    Do you remember when?
18        A.    No.  It was not just Linda
19   Rooney, but was also someone else, not only
20   but he made sure to tell me to try to save
21   one from the group, not to terminate
22   someone in the same condition.  Then
23   Mr. Libutti --
24        Q.    I'm sorry, I don't like to
25   interrupt, but I want to take it one at a
```

```
 1                    GALLO

 2   time.

 3              Let's take what Galli said to

 4   you.  During a visit to New York?

 5        A.    Right.

 6        Q.    In roughly what year might this

 7   have been?

 8        A.    2004.

 9        Q.    He said to terminate Rooney and

10   one other person?

11        A.    And other people.

12        Q.    Oh, and other people?

13        A.    Yes.

14        Q.    How many?

15              MR. SKLIAR:  How many other

16        people?

17        Q.    How many other people?

18        A.    As soon as possible, I think

19   four, five.

20        Q.    Did he name these other people?

21        A.    Yes.

22        Q.    Who were the people?

23              MR. SKLIAR:  Note my objection

24        to form.

25        A.    Moriarty, Cathy Moriarty.  The
```

1                         GALLO

2    name of the guy in Florida.  Luciana, I

3    don't remember her last name, but was the

4    district sales manager in Boston.  Luckily

5    enough, though, we were able to conclude a

6    letter to participate to the early

7    retirement.  Then there was a gentleman in

8    Florida, Miami.  I don't remember his name.

9    I can picture him.

10        Q.    In Florida, was it possibly

11   Futterman?

12        A.    Yes, Futterman, right.

13        Q.    Is that when the Miami office

14   was closed?

15        A.    Excuse me?

16        Q.    Did you say the Miami office

17   was closed?

18        A.    Not yet, not at that time, but

19   he wanted to.

20        Q.    Could that have been Luciana

21   White?

22        A.    Luciana White, right.

23        Q.    So they asked you to fire, they

24   directed, Mr. Galli directed you to fire

25   Miss Rooney, Miss Moriarty, Mr. Futterman

1                           GALLO
2     and White all at one meeting?
3          A.    Right.
4          Q.    What did you say to him?
5          A.    What did I tell Galli?
6                MR. SKLIAR:  Don't think out
7          loud.  Just answer.
8          Q.    If you don't remember --
9          A.    Are you sure.  That's what I
10    remember.
11         Q.    And what did he say?
12         A.    Come on, come on (indicating).
13    I'm saying, come on, come on (indicating).
14               MR. SKLIAR:  Off the record.
15               (Whereupon, an off-the-record
16         discussion was held.)
17         Q.    Did you say anything after that
18    or was that pretty much the extent of the
19    conversation?
20         A.    No.  Then he went away.  He
21    flew back to Rome.  And I approached Julio.
22         Q.    You mean Julio Libutti?
23         A.    Right.
24         Q.    What did you say to
25    Mr. Libutti?

1                          GALLO

2          A.    To try to calm down and to get

3    some time and think of alternatives.  And I

4    think, you know, another three, four,

5    five months passed by before then, you

6    know, Galli said, Franco, come on, hurry

7    up.

8          Q.    So, in other words, three or

9    four months passed and nothing happened?

10         A.    Right.

11         Q.    What did Mr. Libutti say when

12   you went to him and said consider

13   alternatives and so on?

14         A.    He said, no, but we cannot do

15   this.  The fact that I talked to Luciana

16   White, it's because she has been -- she was

17   almost born with Alitalia.  I said, but you

18   are treating people differently.  It does

19   not make any sense, you know.  Just

20   because-- so I was trying to say that they

21   were doing miserable maneuvering, you know.

22         Q.    And he said something about

23   helping Luciana White because she was with

24   the company a long time?

25         A.    Yes.  And we did.

1                          GALLO

2        Q.     Meaning she took --

3        A.     The early retirement, which I

4  told him could not be done because when you

5  promote an early retirement and you

6  publish, it has to be the same for

7  everyone.

8        Q.     So --

9        A.     But he insisted I had to do it.

10       Q.     How old was Miss white?

11       A.     I am not talking about -- she

12 was eligible for the package, for the

13 benefit.  The content of the package was

14 different from the others.

15       Q.     You are saying --

16       A.     She got more benefits.

17       Q.     She got a larger retirement

18 package than others?

19       A.     Yes.

20       Q.     Under the eligibility rule, she

21 got more than she was entitled to?

22             MR. SKLIAR:  Objection to under

23        the rules.  I don't know what you

24        mean by that.

25       A.     According to what the early

1                              GALLO

2       retirement published to everyone who want

3       to participate.

4            Q.    Right.

5            A.    Luciana White got extra.

6            Q.    Was Miss Rooney eligible for

7       the early retirement?

8            A.    I don't think so.  I don't

9       think so.  I don't think so because I told

10      him, as we did for the others, let's make

11      an exception, and we prolonged whatever,

12      you know, the months or a year.  I don't

13      remember what was the difference for her to

14      be part of the early retirement.

15           Q.    Let's pick up with your

16      conversation with Mr. Libutti.

17                 MR. SKLIAR:  Which one?

18                 MR. CARANICAS:  The one we were

19           just discussing.

20           Q.    You said after talking with

21      Mr. Galli, Mr. Galli went back to Rome, you

22      said to Mr. Libutti, can we consider

23      alternatives, something to that effect.

24      And he said no, we have to do this.

25           A.    He didn't say no at that time.

```
 1                        GALLO
 2        Q.    What did he say?
 3              MR. SKLIAR:  If anything.
 4        A.    If anything, right.  I'm busy
 5   or a phone call came in and he did not --
 6        Q.    So he basically didn't respond?
 7        A.    Right.
 8        Q.    And then you said three or four
 9   months passed and Galli came back --
10        A.    No, no, I didn't say that.
11   Libutti after three, four months, he said,
12   Franco, you know.
13        Q.    What did he say?
14        A.    That we had to terminate her.
15        Q.    Miss Rooney?
16        A.    Right.  And two, three days
17   after, Marco DiLario came to my office and
18   said, Franco, you know, we better, I don't
19   know, he came up and said in Italian, it's
20   better to pull a bad tooth now from the
21   mouth.
22              MR. SKLIAR:  He said that in
23         Italian?
24              THE WITNESS:  In Italian,
25         right.
```

1                              GALLO

2           A.    As a matter of fact, he was not

3      furious, but he was really, I don't know,

4      in retrospective, unfortunately, I don't

5      know if it was a game or it was the truth

6      that he felt bad about it, because he, it

7      appeared to me that he did he not agree

8      with the decision of Libutti at that time

9      saying, you know, Franco, I tried, nothing

10     to do, let's pull.  I don't know.  Probably

11     was just a game like the rest.

12          Q.    Was this the day she was

13     terminated, does this go back to that

14     meeting?

15          A.    No, no, it was a few weeks

16     before, a few weeks before.

17          Q.    So a few weeks before she was

18     terminated was when Mr. --

19          A.    Because I was thinking to buy

20     more time.

21          Q.    Let me finish the questions.

22          A.    Go ahead.

23          Q.    So Mr. DiLario, a few weeks

24     before she was terminated Mr. DiLario made

25     this comment about pulling the tooth?

1                          GALLO

2          A.      Pulling the tooth.

3          Q.      And he appeared to disagree

4    with the decision?

5          A.      Right, a few weeks, a few days

6    after.   Then he brought Linda Rooney to my

7    office to be terminated.

8          Q.      Going back to when Mr. Galli

9    instructed you to fire Miss Rooney several

10   months earlier, did he tell you why she

11   needed to be fired?

12         A.      No.

13         Q.    Did Mr. Libutti, when he later

14   said that Miss Rooney had to be fired, did

15   he tell you why?

16         A.      Counsel, it was the same

17   reason, 50, old people, we have to

18   rejuvenate Alitalia.

19               MR. SKLIAR:  Just answer the

20         question.

21         Q.    Did he say that, when he told

22   you to fire Miss Rooney, did Mr. Libutti

23   say that?

24         A.      I don't remember.  I don't

25   remember if he repeated.

1                          GALLO

2        Q.    Do you have possession of any

3   such memo --

4        A.    No.

5        Q.    -- that was written along those

6   lines?

7              MR. ZAPATA:  Objection to the

8        form.

9              MR. SKLIAR:  Note my objection.

10       Q.    Back to the meeting you

11   testified about with Mr. Mengozzi and five

12   or six other people where you say that he

13   gave the general directive to fire people

14   over 50, you said you were in and out at

15   that meeting.

16             Were you in the meeting when

17   Mr. Mengozzi said that?

18       A.    Yes.

19       Q.    What did he say exactly; do you

20   remember the phrase?

21       A.    I don't remember, counsel.

22       Q.    Did anybody else repeat it or

23   support it or object to it, did anybody --

24       A.    No, not that I remember.

25       Q.    You testified that Miss Rooney

```
 1                      GALLO
 2    been fired?
 3         A.    Miss Rooney and others, sure,
 4    of course.
 5         Q.    We are just asking about
 6    Miss Rooney now.
 7         A.    Yes, well.
 8         Q.    I am going to finish the list.
 9               Miss LoRusso, you refused to
10    fire Miss LoRusso.  Was she fired?
11         A.    No, because I found a solution
12    for her, another job.
13         Q.    Mr. Mariotti, after you refused
14    to fire Mr. Mariotti, was he fired?
15         A.    I believe that Mr. Mariotti
16    left Alitalia because he couldn't take it
17    anymore, at least that's what he said.
18         Q.    So he left by his own choice?
19         A.    Yes.  And I believe he left
20    after that I left Alitalia.
21         Q.    And the pregnant lady,
22    Concetta, whose last name you can't
23    remember, you don't know what happened to
24    her?
25         A.    I don't know.  And also the
```

# Exhibit E

Francesco Gallo                                                    3/13/2008

147

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------x

ESTER LORUSSO,

                        Plaintiff,

        -against-

                        1:07 CV 03583-LBS


ALITALIA-LINEE AEREE ITALIANE, SpA,

                        Defendant.

--------------------------------x



            CONTINUED DEPOSITION OF FRANCESCO GALLO

                Thursday,  March 13, 2008

                    New York, New York



REPORTED BY:

Holly Hough

Page 160

```
 1              GALLO           160
 2  terminated?
 3      A.  I don't remember.
 4      Q.  Was she in her 20s?
 5      A.  No, no, no, probably in her 50s.
 6      Q.  Probably in her 50s?
 7      A.  Late 40s, 50s, probably late 40s.
 8      Q.  Who is Linda Rooney?
 9      A.  Linda Rooney, again, District Sales
10  Manager based in Minneapolis, if I'm not mistaken.
11      Q.  And was Ms. Rooney terminated?
12      A.  Yes.
13      Q.  Do you recall how long she worked for
14  Alitalia?
15      A.  No.
16      Q.  What were the circumstances of
17  Ms. Rooney's termination?
18      A.  I cannot say closed the office because the
19  office was closed already.  She was working from her
20  apartment.
21      Q.  Do you recall why Ms. Rooney was
22  terminated?
23      A.  Centralized the activity in New York, I
24  think.
25      Q.  Was her position eliminated or transferred
```

Page 161

```
 1              GALLO           161
 2  to New York?
 3      A.  Her activities were transferred to New
 4  York.
 5      Q.  Okay.  Was she offered the opportunity to
 6  transfer to New York?
 7      A.  I don't remember.
 8      Q.  Do you recall when Ms. Rooney was
 9  terminated?
10      A.  Same period of time of the previous
11  employees.
12      Q.  Which is around when?
13      A.  I believe 2005.
14      Q.  Do you recall how old Ms. Rooney was when
15  she was terminated?
16      A.  Repeat the question.
17      Q.  Do you recall how old Ms. Rooney was when
18  she was terminated?
19      A.  50s. I'm sorry, you know, this
20  admonition, this termination, I'm really not sure
21  about the dates, could be even beginning of 2006.
22      Q.  Okay.  On January 11th you testified in
23  response to questions by Mr. Koral that Anna Mariani
24  was offered an early retirement package; do you
25  recall that?
```

Page 162

```
 1              GALLO           162
 2      A.  Yes.
 3      Q.  And Ms. Mariani refused this package?
 4      A.  Yes.
 5      Q.  Was Ms. Mariani subsequently terminated?
 6      A.  Yes.
 7      Q.  Do you recall when approximately?
 8      A.  No.
 9      Q.  Why was Ms. Mariani terminated?
10      A.  Because she would not accept the package.
11      Q.  Why was she offered the package?
12      A.  Hoping that she would accept it and leave
13  Alitalia.
14      Q.  Did management want Ms. Mariani to leave
15  Alitalia?
16      A.  Yes.
17      Q.  Why did management want Ms. Mariani to
18  leave Alitalia?
19      A.  It was part of the same project, people at
20  a certain age had to be replaced at due time by a
21  younger individual.
22      Q.  People of what age?
23      A.  In their 50s.
24      Q.  And how old was Ms. Mariani when she was
25  terminated?
```

Page 163

```
 1              GALLO           163
 2      A.  I don't remember.  In her 50s, yes,
 3  otherwise, she could not participate to the
 4  retirement plan.
 5      Q.  Who is George Brtalik?  That's
 6  B-r-t-a-l-i-k.
 7      A.  George Brtalik was a former employee of
 8  Alitalia.
 9      Q.  Do you recall his title?
10      A.  Manager, sales manager.
11      Q.  And was Ms. Brtalik terminated?
12          MR. KORAL:  Ms. Brtalik?
13      Q.  I'm sorry.  Was Mr. Brtalik terminated?
14          MS. HORAN:  Thank you.
15      A.  Yes.
16      Q.  Do you recall when?
17      A.  No.
18      Q.  Do you recall why Mr. Brtalik was
19  terminated?
20      A.  I don't remember.
21      Q.  Do you recall how old Mr. Brtalik was when
22  he was terminated?
23      A.  In his 50s, late 50s.
24      Q.  Who is Carmine Tedesco?
25      A.  Former employee, former manager of
```

5 (Pages 160 to 163)

Exhibit F

# 2004 ALITALIA USA
# VOLUNTARY
# EARLY RETIREMENT PLAN
# PLAN DOCUMENT
# AND
# SUMMARY PLAN DESCRIPTION

### Effective March 1, 2004/Amended and Restated Effective August 2, 2004

## PURPOSE OF THE PLAN

The purpose of the 2004 Alitalia USA Voluntary Early Retirement Plan (the "Plan") is to provide special severance benefits to eligible employees who voluntarily elect to resign their employment under the conditions described below.

This document contains the official text of the Plan. This document also constitutes the "Summary Plan Description" for the Plan under the Employee Retirement Income Security Act ("ERISA").

## DEFINITIONS

*Company* means Alitalia Linee Aeree Italiane SpA.

*Plan Administrator* means the Company or such other person or committee appointed from time to time by the Company to administer the Plan.

## ELIGIBLE EMPLOYEES

An employee will be eligible to participate in this Plan if he or she meets the following eligibility requirements on **December 31, 2004** or any future date designated by the Company in its sole discretion.

- He or she is at least 55 years old as of **December 31, 2004** and he or she has at least 15 full years of service as of **December 31, 2004**; and

- He or she is an <u>active employee</u> of the Company in a division, department or unit of the Company to which the Company in its sole discretion has decided to offer participation in this Plan; and

- He or she is at Director level or below.

## EMPLOYEES NOT ELIGIBLE TO PARTICIPATE

An employee will not be eligible to participate in this Plan if:

- The terms and conditions of the employee's employment with the Company (or the termination thereof) are governed by an individual written employment or separation agreement between the employee and the Company;

- The employee is a payroll service or staffing agency employee who is paid by an entity other than the Company, or who is paid by the Company by any means other than the Company's internal corporate payroll system (e.g., through purchase order accounts);

- The employee is designated by the Company as an independent contractor or consultant;

- The employee is receiving any severance-type benefits from the Company from any source other than this Plan.

## CONDITIONS FOR PARTICIPATION

In order to receive the severance benefits under this Plan, the Company must determine that the employee has satisfied all of the following conditions:

### Offer to Resign

The employee must take an offer to resign under this Plan in the form, manner and time frame prescribed by the Plan Administrator. After such date, the opportunity to participate in the Program will automatically expire and no further offers to resign under this Plan will be considered.

### Company Acceptance of Offer

The employee will only be eligible to terminate his or her employment with the Company and receive benefits under this Plan if the Company, in its sole discretion, determines to accept the employee's offer to resign under the Plan.

### No Termination for Cause

The employee will not be eligible for voluntary severance benefits under this Plan if the Company terminates his or her employment at any time for cause or for behavior prejudicial to the Company, as determined by the Company in its sole discretion.

### Last Day of Employment

The employee's voluntary resignation from the Company must take effect on a date designated by the Company after September 15, 2004 (the "Resignation Date"). The employee must continue to be actively at work through the last day of work designated by the Company, unless the employee is absent due to vacation or an approved absence from work (including leave under the Family and Medical Leave Act). Any employee who voluntarily resigns or otherwise voluntarily terminates employment prior to the Resignation Date established for him or her by the Company will not be eligible for any benefits under this Plan.

■ **Execution and Non-Revocation of Release**

The employee

- must execute a Separation Agreement and General Release in the form, and within the time period, prescribed by the Company, and

- must not revoke such Separation Agreement and General Release before it becomes effective (if applicable).

■ **Return of Company Property and Settlement of Expenses**

The employee must return all Company property and have settled satisfactorily all monies owed to the Company, if any.

## SEVERANCE BENEFITS

An employee who meets the conditions described above will receive the following severance benefits:

■ **Severance Benefits**

**If the employee is age 65 or over as of December 31, 2004**

**Manager or Supervisor**

If the employee is a manager or supervisor, as designated by the Company in its sole discretion, the employee will receive the following benefits:

- Severance pay equal to 3 weeks of the employee's regular base pay (as in effect on his/her last day of employment) multiplied by his/her full years of service with the Company and

- Continued medical insurance coverage under the Company's medical insurance plan on the same basis as active employees from the employee's date of separation until the earlier of: the end of the 6-month period following the employee's last day of employment, or the date the employee obtains new employment with available medical insurance.

**Other Employees**

If the employee is not a manager or supervisor, as designated by the Company in its sole discretion, the employee will receive the following benefits:

- Severance pay equal to 2 weeks of the employee's regular base pay (as in effect on his/her last day of employment) multiplied by his/her full years of service with the Company and

- Continued medical insurance coverage under the Company's medical insurance plan on the same basis as active employees until the earlier of: the end of the 6-month period following the employee's last day of employment, or the date the employee obtains new employment with available medical insurance.



**If you are between age 55 and age 65 as of December 31, 2004**

### Manager or Supervisor

If the employee is a manager or supervisor, as designated by the Company in its sole discretion, the employee can choose either of the following severance benefit options:

#### OPTION A

- Severance pay equal to 50% of <u>3 weeks of the employee's regular base pay</u> (as in effect on his/her last day of employment) <u>multiplied by his/her full years of service</u> with the Company <u>**and**</u>

- Continued medical insurance coverage under the Company's medical insurance plan on the same basis as active employees until the earlier of: the end of the 5-year period following the employee's last day of employment, the date the employee obtains new employment with available medical insurance, or the date the employee reaches age 65.

#### OPTION B

- Severance pay equal to <u>3 weeks of the employee's regular base pay</u> (as in effect on his/her last day of employment) <u>multiplied by his/her full years of service</u> with the Company <u>**and**</u>

- Continued medical insurance coverage under the Company's medical insurance plan on the same basis as active employees until the earlier of: the end of the 6-month period following the employee's last day of employment or the date the employee obtains new employment with available medical insurance.

### Other Employees

If the employee is not a manager or supervisor, as designated by the Company in its sole discretion, the employee can choose either of the following severance benefit options:

#### OPTION A

- Severance pay equal to 50% of <u>2 weeks of the employee's regular base pay</u> (as in effect on his/her last day of employment) <u>multiplied by his/her full years of service</u> with the Company <u>**and**</u>

- Continued medical insurance coverage under the Company's medical insurance plan until the earlier of: the end of the 5-year period following the employee's last day of employment, the date the employee obtains new employment with available medical insurance, or the date the employee reaches age 65.

4

2004 Alitalia USA Voluntary Early Retirement Plan

- P. 0033 -

**OPTION B**

- Severance pay equal to <u>2 weeks of the employee's regular base pay</u> (as in effect on his/her last day of employment) <u>multiplied by his/her full years of service</u> with the Company <u>and</u>

- Continued medical insurance coverage under the Company's medical insurance plan until the <u>earlier of:</u> the end of the 6-month period following the employee's last day of employment or the date the employee obtains new employment with available medical insurance.

For purposes of determining the amount of the severance pay —

- *Base Pay* means the employee's regular rate of salary (determined on a weekly basis) payable immediately preceding his or her date of termination. Base Pay does not include discretionary bonuses, other variable compensation, or extra pay.

- *Years of Service* means an employee's completed years of employment from his or her most recent date of hire by the Company until his or her date of termination.

The Company will pay the severance benefit in a single lump sum as soon as practicable after the later of the employee's Separation Date or the date on which the employee's Separation Agreement and Release becomes effective.

### ■ Unemployment Compensation

The Company will not contest applications for unemployment compensation filed by employees participating in the Plan. However, eligibility for such benefits shall be determined by the appropriate government authorities.

The severance benefits provided under this Plan are generally determined in accordance with the above guidelines. However, the Company, in its sole discretion, and on a case-by-case basis, may increase or decrease the severance benefits provided to an eligible employee.

The severance benefit calculated and paid in accordance with this Section is intended to include and encompass any severance, unemployment, workers' compensation, disability or other income replacement benefit to which an employee may be entitled by virtue of his or her employment with the Company. Accordingly, the Company may, in its sole discretion, reduce or offset, in whole or in part, any severance benefit payable under this Plan, in any manner and to any extent it deems consistent with the preceding sentence.

In the event of the employee's death after his or her termination date, any unpaid severance benefits shall be paid to the employee's surviving spouse or, if there is no surviving spouse, to the employee's estate.

While an employee is receiving severance benefits, the employee shall be ineligible to accrue service, vacation time or to participate in any employee benefit plan, program or arrangement provided by the Company for the benefit of employees, except as otherwise specifically provided herein, or except as expressly agreed upon by the Company.

The Company may cause such amounts to be withheld from payments under this Plan as it determines necessary to recoup any outstanding monies owed to the Company, fulfill any wage or

compensation withholding requirements, wage garnishments, income executions or any other federal, state or local law.

## NO OTHER SEVERANCE BENEFITS

An employee of the Company whose employment is terminated in connection with the Plan will not be entitled to receive severance benefits under any other plan, practice, or policy maintained by the Company.

## GENERAL RULES

### ■ Right to Withhold Taxes

The Company shall withhold such amounts from payments under this Plan as it determines necessary to fulfill any federal, state, or local wage or compensation withholding requirements.

### ■ Right to Continued Employment

Neither the Plan nor any action taken with respect to it shall confer upon any person the right to continue in the employ of the Company or any of its affiliates.

### ■ Benefits Non-Assignable

Benefits under the Plan may not be anticipated, assigned or alienated.

### ■ Unfunded Plan

The Company will make all payments under the Plan, and pay all expenses of the Plan, from its general assets. Nothing contained in this Plan shall give any eligible employee any right, title or interest in any property of the Company or any of its affiliates.

### ■ Governing Laws

The provisions of the Plan shall be construed, administered and enforced according to applicable federal law and, where appropriate, the laws of the State of New York without reference to its conflict of laws rules and without regard to any rule of any jurisdiction that would result in the application of the law of another jurisdiction. **The parties expressly consent that: (a) any action or proceeding relating to this Plan or any release, termination certificate or other agreement entered into with respect to this Plan, will only be brought in the federal courts located in the City of New York; and (b) any such action or proceeding will be heard without a jury or advisory jury. The parties expressly waive the right to bring any such action or proceeding in any other jurisdiction and to have such action or proceeding heard before a jury or advisory jury.** No action or proceeding relating to this Plan or any Separation Agreement and General Release or other agreement entered into with respect to this Plan may be brought (i) before the exhaustion of the Claims procedure set forth below and (ii) more than 1 year after the employee's termination date.

### ■ Severability

The provisions of the Plan are severable. If any provision of the Plan is deemed legally or factually invalid or unenforceable to any extent or in any application, then the remainder of

6
2004 Alitalia USA Voluntary Early Retirement Plan

the provisions of the Plan, except to such extent or in such application, shall not be affected, and each and every provision of the Plan shall be valid and enforceable to the fullest extent and in the broadest application permitted by law.

■ **Section Headings**

Section headings are used herein for convenience of reference only and shall not affect the meaning of any provision of this Plan.

# AMENDMENT AND TERMINATION

The Company may modify, amend, or terminate this Plan at any time with respect to any employee at any time prior to such employee's termination of employment.

# ADMINISTRATION OF THE PLAN

The Plan Administrator shall have sole authority and discretion to administer and construe the terms of this Plan, subject to applicable requirements of law. Without limiting the generality of the foregoing, the Plan Administrator shall have the following powers and duties:

> ➤ To interpret the Plan, its interpretation thereof to be final and conclusive on all persons claiming benefits under the Plan; and

> ➤ To decide all questions concerning the Plan, including the eligibility of any person to participate in, and receive benefits under, the Plan.

# CLAIMS PROCEDURE

Alitalia's Senior VP Corporate & Regulatory Affairs North America and Mexico, reviews and authorizes payment of severance benefits for those employees who qualify under the provisions of the Plan. No claim forms need to be submitted. Questions regarding payment of the severance benefits should be directed to the Director of Human Resources North America & Mexico.

If an employee feels he or she is not receiving severance benefits which are due, the employee should file a written claim for the benefits with the Senior VP Corporate & Regulatory Affairs North America and Mexico.    A decision on whether to grant or deny the claim will be made within 90 days following receipt of the claim.  If more than 90 days is required to render a decision, the employee will be notified in writing of the reasons for the delay.  In any event, however, a decision to grant or deny a claim will be made no later than 180 days following the initial receipt of the claim.

If the claim is denied in whole or in part, the employee will receive a written explanation of the specific reasons for the denial, including a reference to the Plan provisions on which the denial is based.

If the employee wishes to appeal this denial, the employee may write within 60 days after receipt of the notification of denial.  The claim will then be reviewed by the Senior VP Corporate & Regulatory Affairs North America and Mexico, and the employee will receive written notice of the final decision within 60 days after the request for review. If more than 60 days is required to render a decision, the employee will be notified in writing of the reasons for the delay.  In any

7

2004 Alitalia USA Voluntary Early Retirement Plan

event, however, the employee will receive a written notice of the final decision within 120 days after the request for review.

## STATEMENT OF ERISA RIGHTS

As a participant in this Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA provides that all plan participants shall be entitled to:

### ■ Receive Information About Your Plan and Benefits

Examine, without charge, at the Plan Administrator's office and at other specified locations all documents governing the Plan and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan and copies of the latest annual report (Form 5500 Series) and updated Summary Plan Description. The administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

### ■ Prudent Actions by Plan Fiduciaries

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

### ■ Enforce Your Rights

If your claim for a severance benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within thirty (30) days, you may file suit in a Federal Court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a State or Federal Court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in Federal Court. If it should happen that plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to



pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

### ■ Assistance with Your Questions

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## ADDITIONAL INFORMATION

**Plan Sponsor:**              Alitalia Linee Aeree Italiane SPA
                              350 Fifth Avenue
                              New York, New York 10118


**Employer Identification      13-1621359
Number (EIN):**

**Plan Name:**                 2004 Alitalia USA Voluntary Early Retirement Plan


**Type of Plan:**              Welfare benefit plan - severance pay


**Plan Year**                  Calendar year


**Plan Number**                555


**Plan Administrator**         Alitalia Linee Aeree Italiane SPA
                              350 Fifth Avenue
                              New York, New York 10118
                              212-903-3439
                              Attention: Senior VP Corporate & Regulatory Affairs North
                              America and Mexico


**Agent for Service of Legal   Plan Administrator
Process**

9

**GENERAL ANNOUNCEMENT TO ELIGIBLE EMPLOYEES ISSUED ON**
**AUGUST 2, 2004**

**ALITALIA USA**
**2004 VOLUNTARY EARLY RETIREMENT PLAN**

The following questions and answers describe the basic features of the Alitalia USA 2004 Voluntary Early Retirement Plan (the "Plan") and how it operates. The questions and answers are intended only to provide you with a summary of the key parts of the Plan. It is not part of the official plan document. If there is any conflict between the plan document and this description, the plan document will apply:

1.    **What is the Plan?**

Alitalia (the "Company") has adopted the Plan to provide enhanced benefits to eligible employees of the Company in eligible divisions, departments and/or units of the Company who voluntarily resign under the Plan.

The enhanced benefits that are provided to eligible employees in eligible divisions, departments and/or units who voluntary elect to participate in the Plan and resign their employment under the Plan (and have their election accepted by the Company) include:

- A severance benefit from the Company; and

- Continued medical insurance coverage for a period of time.

2.    **Why is the Plan being offered?**

Alitalia has decided that it needs to restructure its United States operations and reduce staff as part of this restructuring. Before having to make any involuntary terminations, the Company wanted to offer voluntary termination to eligible employees so as to, hopefully, reduce (if not eliminate) the need for involuntary terminations.

3.    **What happens if not enough eligible employees elect to voluntarily resign and take the benefits of the Plan?**

If the Company remains overstaffed after the Plan election period closes and the Company chooses which elections to accept, the Company may offer this Plan to eligible employees in other Company divisions or involuntarily terminate certain employees. The Company expects to take into account length of service, qualifications, and experience in performing the functions that will remain, in making decisions regarding involuntary terminations. Employees who are involuntarily terminated likely will not be provided with severance and medical benefits at the same level, and under comparable conditions, as those being offered under this Plan.

4.    **How long is the Plan being offered?**

At this time, the Plan is being offered for a limited period of time beginning **August 2, 2004** and ending **September 15, 2004** to employees in certain divisions, departments and/or units of the Company selected by the Company in its sole discretion. In order to participate, an eligible employee in an eligible division, department and/or unit must:

- During this period, make a request to resign on the enclosed Request Form; and

- Be accepted for the Plan by the Company; and

- Sign a Separation Agreement and General Release on or after the date the eligible employee actually resigns under the Program (your "Resignation Date").

5.    **When is my last date of scheduled employment if I request to resign under the Plan and I am accepted for the Plan by the Company?**

Your last day of scheduled employment will be a date designated by the Company after **September 15, 2004.**

6.    **Who is eligible for the Plan?**

You are eligible for the Plan if you are in an eligible division, department and/or unit and meet all of the following requirements as of **December 31, 2004**:

- You are at least 55 years old as of **December 31, 2004** and you have at least 15 full years of service as of **December 31, 2004** and

- You are an <u>active employee</u> of the Company <u>and</u>

- <u>You are at Director level or below.</u>

7.    **Who is <u>not</u> eligible for the Plan?**

You are <u>not</u> eligible for the Plan, even if you meet the requirements in Question 6 above, if you fall into any of the following categories as of **December 31, 2004**:

- You are paid for services rendered to the Company directly by any outside entity or staffing agency;

- You have a written employment or separation agreement with the Company;

2

- You are classified by the Company as an independent contractor or consultant; or

- You are paid for services rendered to the Company directly by the Company through any means other than an internal payroll system.

**8.    How do I request to participate in and receive benefits under the Plan?**

To request to participate in and receive benefits under the Plan, you must offer to voluntarily resign from your employment with the Company by signing and returning to the Company the 2004 Alitalia Voluntary Early Retirement Plan Request Form, attached hereto as Exhibit "I." The Voluntary Early Retirement Plan Request Form must be signed and returned to Francesco Gallo, Senior VP Corporate & Regulatory Affairs North America and Mexico <u>no later than September 15, 2004</u>. Once you submit the form, you will have 7 days to revoke your request to participate.

**9.    What happens after I submit a signed Voluntary Early Retirement Plan Request Form?**

After you submit your signed Voluntary Early Retirement Plan Request Form, the Company will determine (in its sole discretion) whether or not to accept your offer to resign under the Plan. The Company intends to make these determinations after it receives all Request Forms.

If your offer to resign is accepted by the Company, you are eligible to resign and receive benefits under the Plan.

If your offer to resign is <u>not</u> accepted by the Company, you will <u>not</u> be eligible to receive benefits under the Plan.

**10.    What <u>severance benefits</u> are provided under the Plan?**

If your offer to voluntarily resign is accepted, and you resign in accordance with the terms and conditions of the Plan, you will receive the following severance benefits:

<u>If you are age 65 or over as of December 31, 2004</u>:

<u>Manager or Supervisor</u>

If you are a manager or supervisor, as designated by the Company in its sole discretion, you will be entitled to receive the following benefits:

- Severance pay equal to <u>3 weeks of your regular base pay</u> (as in effect on your last day of employment) <u>multiplied by your full years of service</u> with the Company <u>and</u>

3

- Continued medical insurance coverage under the Company's medical insurance plan on the same basis as active employees from your date of separation until the earlier of the end of the 6-month period following your last day of employment, or the date you obtain new employment with available medical insurance.

### Other Employees

If you are not a manager or supervisor, as designated by the Company in its sole discretion, you will be entitled to receive the following benefits:

- Severance pay equal to 2 weeks of your regular base pay (as in effect on your last day of employment) multiplied by your full years of service with the Company and

- Continued medical insurance coverage under the Company's medical insurance plan on the same basis as active employees until the earlier of the end of the 6-month period following your last day of employment, or the date you obtain new employment with available medical insurance.

## If you are between age 55 and age 65 as of December 31, 2004

### Manager or Supervisor

If you are a manager or supervisor, as designated by the Company in its sole discretion, you can choose either of the following severance benefit options:

### OPTION A

- Severance pay equal to 50% of 3 weeks of your regular base pay (as in effect on your last day of employment) multiplied by your full years of service with the Company and

- Continued medical insurance coverage under the Company's medical insurance plan on the same basis as active employees until the earlier of the end of the 5-year period following your last day of employment, the date you obtain new employment with available medical insurance, or the date you reach age 65.

### OPTION B

- Severance pay equal to 3 weeks of your regular base pay (as in effect on your last day of employment) multiplied by your full years of service with the Company and

4



- Continued medical insurance coverage under the Company's medical insurance plan on the same basis as active employees until the earlier of: the end of the 6-month period following your last day of employment or the date you obtain new employment with available medical insurance.

### Other Employees

If you are not a manager or supervisor, as designated by the Company in its sole discretion, you can choose either of the following severance benefit options:

### OPTION A

- Severance pay equal to 50% of 2 weeks of your regular base pay (as in effect on your last day of employment) multiplied by your full years of service with the Company and

- Continued medical insurance coverage under the Company's medical insurance plan until the earlier of: the end of the 5-year period following your last day of employment, the date you obtain new employment with available medical insurance, or the date you reach age 65.

### OPTION B

- Severance pay equal to 2 weeks of your regular base pay (as in effect on your last day of employment) multiplied by your full years of service with the Company and

- Continued medical insurance coverage under the Company's medical insurance plan until the earlier of: the end of the 6-month period following your last day of employment or the date you obtain new employment with available medical insurance.

**CONTINUATION OF DENTAL INSURANCE IS NOT BEING OFFERED.**

### Rules Applicable to Severance Benefits

The following rules apply to the severance benefits provided under this Plan:

- Severance pay will be paid to eligible employees, less applicable withholding taxes and other lawful deductions.

- Continued medical insurance coverage will be treated as part of the COBRA continuation coverage period. At the end of the continued coverage provided under this Plan, the employee may elect to continue

5

coverage at his or her own expense for the remainder of the COBRA coverage period.

- The benefits provided under this Plan replace any other severance or income replacement benefits to which eligible employees may be entitled. Therefore, if an eligible employee elects to resign under the Plan, the eligible employee will not be entitled to receive any severance benefits other than those provided under the Plan.

**11.    How do I resign and receive benefits under the Plan?**

To receive the benefits provided under this Plan, you must satisfy <u>all</u> of the following conditions:

- You must <u>offer to voluntarily resign</u> from your employment with the Company by signing and returning to Francesco Gallo, Senior VP Corporate & Regulatory Affairs North America and Mexico the Voluntary Early Retirement Plan Request Form <u>no later than September 15, 2004</u>; and

- The Company must <u>accept your offer</u> to voluntarily resign; and

- On *or after* your <u>Resignation Date</u> you must sign a <u>Separation Agreement and General Release</u> (the "Agreement") attached hereto as Exhibit "2," and any other forms the Company may request, and return them to Andrea Sciarresi, Director of Human Resources North America & Mexico; and

- You must <u>continue to be employed</u> by the Company until your Resignation Date; and

- You must <u>actually cease employment</u> on your Resignation Date.

**12.    How will resigning under the Plan affect <u>other Company-provided benefit plans, programs and arrangements</u> in which I currently participate?**

If you resign under the Plan, your participation in any other Company benefit plans will cease on your Resignation Date. Any benefits to which you may be entitled will be paid to you in accordance with all of the terms and subject to all of the conditions of the benefit plans. As this voluntary early retirement package does not affect the retirement levels, all normal retirement plan details remain the same.

**13.    Will I be entitled to unemployment compensation benefits if I resign under the Plan?**

6

Unemployment compensation benefits are determined and paid by the applicable government agency in your state. They are not determined by the Company. However, the Company will not contest applications for unemployment.

**14.    Is this Plan mandatory?**

Absolutely not. This Plan is entirely voluntary. However, involuntary terminations with lesser benefits will be necessary if not enough employees choose to resign under this Plan.

**15.    What other documents describe the terms and conditions of the Plan?**

This Announcement is a general summary and description of the Plan. However, if there is ever any discrepancy between this Announcement and the official Plan documents, the official Plan documents will control. Alitalia reserves the right to modify, amend, suspend or terminate the Plan in whole or in part at any time and from time to time, for any reason, by action of the Company.

**16.    Am I eligible for accrued vacation pay?**

You will be paid for any accrued but unused vacation time on your Resignation Date. You will not accrue any additional vacation time after your Resignation Date.

## END OF GENERAL ANNOUNCEMENT

7