UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

LINDA RYLOTT-ROONEY,

                Plaintiff,

            -against-

ALITALIA–LINEE AEREE ITALIANE SpA,

              Defendant.

---------------------------------------------------------

Case No. 07-CV-11091 (JSR)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
ALITALIA–LINEE AEREE ITALIANE SPA'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Alan M. Koral, Esq.
Michael Goettig, Esq.
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York  10019
(212) 407-7700

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ...................................................................... 2

RELEVANT LEGAL STANDARDS ........................................................ 8

ARGUMENT .......................................................................................... 11

POINT ONE    PLAINTIFF CANNOT ESTABLISH A CLAIM OF
DISCRIMINATION  ON THE BASIS OF CITIZENSHIP ...................... 11

   A.    The NYCHRL Does Not Protect U.S. Citizens from Discrimination on the
Basis of Citizenship ........................................................................ 11

   B.    The Record Is Devoid of Any Evidence Giving Rise to an Inference of
Citizenship Discrimination .............................................................. 12

POINT TWO    PLAINTIFF CANNOT ESTABLISH HER CLAIM OF
DISCRIMINATION ON THE BASIS OF AGE .................................... 12

   A.    Plaintiff Cannot Establish a Prima Facie Case of Age Discrimination .............. 12

   B.    Alitalia Has Set Forth A Legitimate Non-Discriminatory Reason for
Terminating Plaintiff's Employment ................................................ 17

   C.    Plaintiff Cannot Show that Alitalia's Reason for Eliminating Her Position
is Pretextual .................................................................................... 17

CONCLUSION ...................................................................................... 20

i

# TABLE OF AUTHORITIES

**Cases**

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456(2d Cir. 2001) ............................................... 8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ............. 8

*Campbell v. Alliance Nat'l Inc.*, 107 F.Supp. 2d 234(S.D.N.Y. 2000)........................................ 16

*Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)................................... 8

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir. 1992) ................................ 16

*Fagan v. New York State Elec. & Gas Corp.*, 186 F.3d 127 (2d Cir. 1999)................................. 18

*Ferrand v. Credit Lyonnais*, 2003 U.S. Dist. LEXIS 17202 (S.D.N.Y. 2003)............................ 18

*Ferrante v. American Lung Ass'n.*,
   90 N.Y.2d 623, 665 N.Y.S.2d 25, 687 N.E.2d 1308 (1997).................................................... 17

*Forrest v. Jewish Guild for the Blind*,
   309 A.D.2d 546, 765 N.Y.S.2d 326 (1st Dept. 2003)..................................................... 10, 17

*Gillentine v. McKeand*, 426 F.2d 717 (1st Cir. 1970) .................................................................. 15

*Hester v. BIC Corp.*, 225 F.3d 178 (2d Cir. 2000) ....................................................................... 14

*In re Laverack & Haines, Inc. v. NY State Div. of Human Rights*,
   88 N.Y.2d 734, 650 N.Y.S.2d 76, 673 N.E.2d 586 (1996)...................................................... 20

*James v. New York Racing Ass'n.*, 233 F.3d 149 (2d Cir. 2000).................................................. 17

*Knight v. New York City Housing Authority*,
   2007 U.S. Dist. LEXIS 9148 (S.D.N.Y. 2007)................................................................. 10, 11

*Landwehr v. Gray Adver. Inc.*, 211 A.D.2d 583, 622 N.Y.S.2d 17 (1st Dept. 1995)................... 9

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973)............................................................ 10

*Mitroff v. Xomox Corp.*, 797 F.2d 271 (6th Cir. 1986) ................................................................ 14

*Peer Int'l. Corp. v. Luna Records, Inc.*, 887 F.Supp. 560 (S.D.N.Y. 1995)................................. 8

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 227, 104 L. Ed. 2d 268, 109 S.Ct. 1775 (1998).... 18

*Recalde v. Bae Cleaners, Inc.*, 2008 N.Y. Slip Op. 28266 (N.Y. Sup. Ct. July 15, 2008)........... 11

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed. 2d 105 (2000)........................................................ 10

*Ricks v. Conde Nast Publications, Inc.*, 92 F.Supp. 2d 338 (S.D.N.Y. 2000) ............................... 8

*Roberts v. Ground Handling, Inc.*, 499 F.Supp.2d 3340 (S.D.N.Y. 2007)................................... 16

*Rubens v. Mason*, 387 F.3d 183 (2d Cir. 2004),
    *vacated and remanded on other grounds*, 527 F.3d 252 (2d Cir. 2008).................................... 8

*Scotto v. Almenas*, 143 F. 3d 105 (2d Cir. 1998) ........................................................................ 8

*Seltzer v. Dresdner Kleinwort Wassterstein, Inc.*, 356 F.Supp. 2d 288 (S.D.N.Y. 2005) ........ 9, 16

*Stetson v. Nynex Service Co.*, 995 F.2d 355 (2d Cir. 1993)........................................................ 10

*Stratton v. Dept. for the Aging*, 132 F.3d 869 (2d Cir. 1993) ..................................................... 10

*Sullivan v. Newburgh Enlarged School Dist.*,
    281 F.Supp.2d 689 (S.D.N.Y. 2003)........................................................................................ 9

*U.S. v. Rea*, 958 F.2d 1206 (2d Cir. 1992)................................................................................. 15

*U.S. v. Sage*, 412 F.Supp.2d 406 (S.D.N.Y. 2006) ..................................................................... 8

*Weinstock v. Columbia Univ.*, 224 F.3d 33 (2d Cir. 2000)............................................................ 9

*Windham v. Time Warner, Inc.*, 275 F.3d 179 (2d Cir. 2001) ...................................................... 13

Defendant Alitalia–Linee Aeree Italiane SpA ("Defendant" or "Alitalia"), by its attorneys, Vedder Price P.C., submits this memorandum of law in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment dismissing the Amended Complaint of Linda Rylott-Rooney ("Plaintiff" or "Rylott-Rooney") in its entirety because, based on undisputed facts in the record, Plaintiff cannot establish the requisite elements of any of her claims against Defendant.

## PRELIMINARY STATEMENT

Rylott-Rooney has asserted two claims against Alitalia under the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code §8-107(1)(a) *et seq.*, and one claim under the New York State Human Rights Law ("NYSHRL"), N.Y. State Exec. L. §296 *et seq.*: 1) citizenship discrimination under the NYCHRL (Second Cause of Action); 2) age discrimination under the NYCHRL (First Cause of Action); and 3) age discrimination under the NYSHRL (Second Cause of Action).  Her claims of age discrimination are addressed together because their elements and their deficiencies are identical.

Plaintiff asserts no federal claims, because her charge alleging age discrimination was dismissed by the United States Equal Employment Opportunity Commission ("EEOC") and she failed to file a suit within 90 days of receiving that determination (Accompanying Statement of Uncontested Material Facts in Support of Defendant Alitalia's Motion for Summary Judgment, hereinafter, "Facts," ¶4).  She filed the instant litigation under the State and City laws on December 7, 2007, one day shy of the expiration of the three year statute of limitations applicable to those claims.

Summary judgment should be awarded to Alitalia on all claims. First, Plaintiff's claim of discrimination on the basis of citizenship fails because the New York City law protects only aliens or those suspected of being aliens on the basis of their citizenship, and does not extend this protection to United States citizens who sue on the grounds that they were discriminated against because they are U.S. citizens (*see* Point 1(A)). Additionally, even if such a cause of action were recognized in New York, the record is devoid of any facts that create an inference of discrimination on the basis of Plaintiff's citizenship (*see* Point 1(B)).

Second, Plaintiff has no admissible evidence sufficient to support a *prima facie* claim of age discrimination, but instead has elicited only speculation, legal conclusion and opinion testimony in support of her claim (*see* Point 2(A)). Even assuming, *arguendo*, that Plaintiff could establish a *prima facie* case of discrimination on the basis of age, however, her claim would nevertheless fail because Alitalia has set forth a legitimate, nondiscriminatory reason for her termination after her position was eliminated in a reorganization (*see* Point 2(B)). As demonstrated in detail below, following the events of September 11, 2001, a period in which, as Plaintiff concedes, Alitalia (along with the rest of the airline industry) was in financial crisis, Alitalia's North America operations took a series of steps to close regional offices and consolidate personnel in New York in an attempt to avoid bankruptcy. As a result of this broad reorganization, Alitalia eliminated a number of management positions throughout the United States, including Plaintiff's. Plaintiff cannot create a triable question that this reorganization was a pretext for age discrimination (*see* Point 2(C)).

## **STATEMENT OF FACTS**

Alitalia is headquartered in Rome, Italy, and is an Italian corporation licensed to do business in New York (Accompanying Statement of Uncontested Material Facts in Support of

Defendant Alitalia's Motion for Summary Judgment, hereinafter "Facts," ¶1). Beginning in 1982, Plaintiff was employed by Alitalia in various capacities until her position was eliminated as part of a reorganization of Alitalia's North American sales organization on December 8, 2004 (Facts ¶¶2, 16-18). From 1991 to 2004, Plaintiff was based in Minneapolis, Minnesota (Facts ¶5, 14). From 1991 to 2003, Plaintiff held the position of Sales Manager of Alitalia's office in Minneapolis (Facts ¶5), which was closed in 2003 (Facts ¶13) Beginning in 2001, as her responsibilities as Sales Manager decreased, she was given additional responsibilities as Manager, National and Corporate Accounts (Facts ¶7).

### Alitalia's North American Sales Reorganization

In 2003, in response to widely-reported financial difficulties in Alitalia and in the airline industry as a whole, Alitalia took a number of cost-saving initiatives including, *inter alia*, the introduction of voluntary early retirement plans ("ERPs") and reductions in force throughout its North American offices (Facts ¶¶12, 22).

Beginning in 2002 and extending into 2003, Alitalia closed its "offline" offices (i.e., offices in cities not directly serviced by Alitalia flights) (Facts ¶13). Prior to this closure, Alitalia had maintained a sales presence in cities throughout the United States, and had divided sales responsibilities in North America by geographic region (Facts ¶16). Upon the Minneapolis office's closure in 2003, Plaintiff, unlike every other employee in the Minneapolis office, was not terminated, but continued performing some responsibilities as Sales Manager, along with the corporate accounts duties (Facts ¶13-14). Plaintiff performed well in each of these capacities (Facts ¶7, 9).

As Manager of National and Corporate accounts Plaintiff was the direct supervisor of the commercial sales representatives located in Alitalia's regional offices (Facts ¶7).  In 2004, three other Sales Managers located in the field supervised sales representatives whose responsibilities were directed at leisure travelers and travel agencies in geographic regions where Alitalia continued to have sales offices: Ken Futterman ("Futterman"), Sales Manager of the Miami District Office; Kathy Moriarity ("Moriarity"), Sales Manager of the Chicago District Office; and Lucianna White "(White"), Sales Manager of the Boston District Office (Facts ¶10).  In addition, Alitalia opened a sales office in Washington, D.C., to support new service it was instituting between Milan and Washington (Facts ¶11).

After August, 2003, following the closure of the Minneapolis office and the termination of the other employees who worked there, Plaintiff worked out of her home, with regular telephone calls and monthly or semi-monthly trips to New York (Facts ¶¶13-14).

### Alitalia's Offer to Promote Plaintiff

Toward the end of 2003, Plaintiff was offered a promotion to the position of Manager of the Corporate Unit.  This promotion would have entailed a relocation or weekly commute to New York.  Plaintiff declined this position because she liked the job she had and did not want to commute to New York.  The position was then filled by Alitalia's second choice, Lucia Alla ("Alla"), who is a number of years younger than Plaintiff.  Upon Alla's promotion, she became Plaintiff's supervisor and Plaintiff reported to her until the elimination of Plaintiff's position in December 2004 (Facts ¶15).

### 2004 Reorganization and Elimination of Plaintiff's Position

In 2004, in further response to the financial pressures that Alitalia and the airline industry were facing, the sales force in North America was reorganized by Marco D'Ilario ("D'Ilario"), then Senior Director of Sales for North America, Giulio Libutti ("Libutti"), Vice President of Sales for North America, and Pierandrea Galli ("Galli"), Head of Worldwide Sales, based in Rome (Facts ¶17).  Rather than allocate sales responsibilities by geographic region, as Alitalia had been doing, the three executives decided to allocate responsibilities according to "channel," or area of responsibility.  Under this model, for example, one sales unit would focus on tour operations, another would focus on dot-com sales, and another would focus on corporate travel. (Facts ¶16)  The effect of this change would be to eliminate a layer of management between sales representatives—whether commercial or leisure—and management at Alitalia's New York office (Facts ¶17).

As a result of this reorganization, in mid-to-late 2004, Libutti, D'Ilario and Galli decided to eliminate the positions held by Futterman, Moriarity, White and Plaintiff (Facts ¶18). Francesco Gallo ("Gallo"), then Senior Vice President of Corporate Affairs in North America, was instructed to inform Plaintiff of the elimination of her position but waited "three, four [or] five months" before doing so (Facts ¶19).  Gallo, who testified that he played no role in the decision to eliminate Plaintiff's position, was instructed by Libutti, D'Ilario and Galli to cite economic pressures as the reason for the elimination of Plaintiff's position (Facts ¶19).

On December 8, 2004, during a business trip to New York, Plaintiff was informed by Gallo that, due to financial pressures, her position was being eliminated and her employment terminated.  D'Ilario attended the meeting (Facts ¶30).  The Amended Complaint alleges that Plaintiff asked about placement in other positions at this meeting, but Plaintiff now cannot recall having done so.  Neither Gallo nor D'Ilario have any memory of Plaintiff making such an

inquiry.  (Facts ¶30)  There were no positions available comparable to that which Plaintiff held in Minnesota (Facts ¶31).

Upon the elimination of Plaintiff's position, her responsibilities as Manager, National and Corporate Accounts were assumed by Alla, and her responsibilities as Sales Manager were assumed by Alla and D'Ilario.  The commercial sales representatives who had previously reported to Plaintiff now reported directly to Alla.  (Facts ¶17)

### Plaintiff's Allegations of Discrimination

Plaintiff claims that proof of Alitalia's discrimination can be found in the fact that, while she was terminated, employees Nicholas DiBari ("DiBari"), James Prano ("Prano"), Elizabeth Santella ("Santella") and Ester Lorusso ("Lorusso") were not (Facts ¶25).

DiBari was in his forties at the time of his promotion from Sales Representative in Boston to Sales Manager in Alitalia's new Washington, D.C. office.  Plaintiff evinced no interest in working in that office, and does not allege that Alitalia should have offered her the position that DiBari assumed.  (Facts ¶26)  Because of the launch of the new Milan-to-Washington service, Alitalia did not immediately eliminate DiBari's position when it eliminated the positions of the other Sales Managers and Plaintiff (Facts ¶11).

Prano was in his late forties and held a job that was not comparable to Plaintiff's, as Rylott-Rooney admitted at deposition (Facts ¶27).

Lorusso is approximately five years younger than Plaintiff and, at the time of Plaintiff's termination, had recently been promoted from Director of Marketing to General Manager of an

Alitalia subsidiary, GA 2000. Neither Plaintiff nor, for that matter, her manager was at the Director level. Lorusso was based in New York (Facts ¶28).

Santella is in her fifties and was also based in New York (Facts ¶29).

Plaintiff also alleges that she was qualified for a position ultimately filled by John DiRienzo, a man in his forties, but admits that the job was unavailable at the time that her position was eliminated (Facts ¶32).

Plaintiff further alleges that, in 2003 or 2004, when she suggested that Alitalia hire Marie Nappi, she was told that Nappi was too old. Plaintiff did not report this comment to anyone within Alitalia and does not recall who made this alleged comment. (Facts ¶46)

## Gallo's Deposition Testimony

At the time that Gallo testified, he was no longer employed by Alitalia. Since his departure from Alitalia, he has filed his own lawsuit against Alitalia, Libutti and Galli. (Facts ¶21)

In late 2003, Gallo claims to have attended a meeting in which Francesco Mengozzi, then the Chief Executive Officer of Alitalia, allegedly stated that Alitalia needed to rejuvenate itself, and should get rid of people over the age of fifty. Nobody repeated or supported this alleged directive, and Mengozzi left Alitalia prior to the time that Plaintiff was terminated. (Facts ¶41)

Gallo further testified to his belief that Plaintiff was terminated due to her age (Facts ¶39) and in violation of relevant antidiscrimination laws (Facts ¶40). To support this opinion, he referred to the supposed policy that Mengozzi allegedly articulated in 2003 (Facts ¶41, 43), as well as to occasional comments that Galli allegedly made about hiring younger employees (Facts

¶42).  Nobody other than Gallo, a non-decision-maker, expressed an age-related rationale for the elimination of Plaintiff's position (Facts ¶38, 43-45).

## RELEVANT LEGAL STANDARDS

### Summary Judgment

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56 (c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact, *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), but once such a showing has been made, the non-moving party must present "*specific* facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e) (emphasis added). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F. 3d 105, 114 (2d Cir. 1998).  "Mere speculation or conjecture as to the true nature of facts cannot overcome the motion." *Ricks v. Conde Nast Publications, Inc.*, 92 F.Supp. 2d 338, 343 (S.D.N.Y. 2000).  Instead, the responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l. Corp. v. Luna Records, Inc.*, 887 F.Supp. 560, 564 (S.D.N.Y. 1995).  Furthermore, a court may not consider evidence on a summary judgment motion that would be inadmissible at trial. *U.S. v. Sage*, 412 F.Supp.2d 406, 415 (S.D.N.Y. 2006); *Rubens v. Mason*, 387 F.3d 183, 188 (2d Cir. 2004), *vacated and remanded on other grounds*, 527 F.3d 252 (2d Cir. 2008).

## Citizenship Discrimination Claim

The NYCHRL makes it an unlawful employment practice:

> For an employer or an employee or agent thereof, because of the actual or perceived . . . alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

NYC Administrative Code § 8-107(1)(a) (2008).

## Age Discrimination Claims

Age discrimination claims brought under the NYSHRL and NYCHRL are governed by the same standards as those brought under the Age Discrimination in Employment Act. *Seltzer v. Dresdner Kleinwort Wassterstein, Inc.*, 356 F.Supp.2d 288, 296 (S.D.N.Y. 2005) ("[c]laims made pursuant to the New York State Human Rights Law and the New York City Human Rights Law are subject to the same analysis as claims brought pursuant to the ADEA" (citations omitted); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *Sullivan v. Newburgh Enlarged School Dist.*, 281 F.Supp.2d 689, 707 (S.D.N.Y. 2003); *Landwehr v. Gray Adver. Inc.*, 211 A.D.2d 583, 622 N.Y.S.2d 17, 18 (1st Dept. 1995).

## *Prima Facie* Case of Discrimination

To establish a *prima facie* case of employment discrimination, the plaintiff must show that: 1) she was a member of a protected class; 2) she was qualified for the job; 3) she was subjected to an adverse employment action; and 4) the action occurred under circumstances giving rise to an inference of discrimination. *Forrest v. Jewish Guild for the Blind*, 309 A.D.2d

546, 765 N.Y.S.2d 326 (1st Dept. 2003); *Stetson v. Nynex Service Co.*, 995 F.2d 355, 359 (2d Cir. 1993).

### *McDonnell Douglas* Burden Shifting

In assessing a claim of discrimination based upon age, a court uses the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973).  Under this framework, once the plaintiff makes out a *prima facie* case of discrimination, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the employment decision." *See, e.g., Stratton v. Dept. for the Aging*, 132 F.3d 869, 879 (2d Cir. 1993).   Once a nondiscriminatory reason has been proffered, the burden shifts to the plaintiff to prove: 1) that the nondiscriminatory reason was pretextual; and 2) that the actual reason for the adverse employment action was either discriminatory or retaliatory.  However, even if a plaintiff presents a *prima facie* case of discrimination and some evidence of pretext, summary judgment may nonetheless be appropriate "where, for instance, the record conclusively reveals a nondiscriminatory reason for the employer's action, or where the plaintiff creates 'only a weak issue of fact' on the issue of pretext and there exists 'abundant and uncontroverted independent evidence that no discrimination [has] occurred.'"  *Knight v. New York City Housing Authority*, 2007 U.S. Dist. LEXIS 9148, *16 (S.D.N.Y. 2007) (attached hereto as Exhibit A), *quoting Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed. 2d 105 (2000).

To prevail on a motion for summary judgment in the context of a discrimination case, the plaintiff must show that "the evidence, taken as a whole, supports a rational inference of discrimination.  To get to the jury, it is not enough . . . to disbelieve the employer; the fact finder

must [also] believe the plaintiff's explanation of intentional discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000), *quoted in Knight v. New York City Hous. Auth.*, 2007 U.S. Dist. LEXIS 9148, *17.

## ARGUMENT

### POINT ONE

### PLAINTIFF CANNOT ESTABLISH A CLAIM OF DISCRIMINATION ON THE BASIS OF CITIZENSHIP

**A.    The NYCHRL Does Not Protect U.S. Citizens from Discrimination on the Basis of Citizenship**

As an initial matter, Plaintiff's claims for discrimination based on her American citizenship must be dismissed on a purely legal basis.  New York City's Administrative Code prohibits discrimination based upon "alienage or citizenship *status*," not upon United States citizenship itself.  *N.Y.C. Admin. Code*, § 8-107(1)(a)(emphasis added).  The NYCHRL's legislative history states, "It is the intent of the Council to prevent *aliens* from being treated unfairly in housing, employment and other areas of life.  This law prohibits discrimination against *aliens* unless such prohibition is contrary to Federal, State or City law."  LL 52/1989 § 1 (emphasis added).  A survey of relevant case law indicates that plaintiffs have been afforded relief for a violation of this passage of Section 8-107 only when they were discriminated against on the basis of their alienage or status as a non-citizen.  *See, e.g., Recalde v. Bae Cleaners, Inc.*, 2008 N.Y. Slip Op. 28266 (N.Y. Sup. Ct. July 15, 2008) (attached hereto as Exhibit B) (granting preliminary injunction to plaintiff who had been evicted due to the landlord's suspicions regarding immigration status).  Consequently, in accordance with the relevant case law and legislative history of the Administrative Code, this part of Plaintiff's Second Cause of Action must be dismissed.

**B.**     **The Record Is Devoid of Any Evidence Giving Rise to an Inference of Citizenship Discrimination**

Even if Plaintiff's cause of action were not invalid as a matter of law, summary judgment in favor of Alitalia is nevertheless appropriate because Plaintiff cannot produce any evidence that her United States citizenship played any role in Alitalia's decision to terminate her employment. In fact, all deposition testimony indicates precisely the contrary.   Gallo and D'Ilario both testified that they were aware of no employment decisions made on the basis of citizenship, and Plaintiff herself testified that she was never instructed as a manager to make any employment decision on the basis of an applicant's citizenship.   Nothing in the record of this case constitutes evidence sufficient to sustain a claim that Plaintiff was terminated under circumstances that suggest that her citizenship was a factor and, accordingly, Plaintiff cannot establish a *prima facie* case of citizenship discrimination. The facts compel entry of summary judgment in favor of Alitalia on this claim.[1]

**POINT TWO**

**PLAINTIFF CANNOT ESTABLISH HER CLAIM OF DISCRIMINATION ON THE BASIS OF AGE**

**A.**     **Plaintiff Cannot Establish a *Prima Facie* Case of Age Discrimination**

For the purposes of this motion, Alitalia concedes that Plaintiff has satisfied the first three elements of a *prima facie* case of age discrimination: she was fifty three years old at the time of her termination; she was qualified for the job that she held; and she suffered an adverse

---

[1] In addition, the non-discriminatory business justification offered by Alitalia for the elimination of Plaintiff's job, discussed below in connection with Plaintiff's age discrimination claim, applies equally to her citizenship claim and compels summary judgment even if Plaintiff could establish a *prima facie* case.   There is no evidence whatsoever that the elimination of Plaintiff's job along with those of other field managers was a pretext for citizenship discrimination.

employment action.  However, Plaintiff cannot establish the fourth prong of her *prima facie* case: that her termination occurred under circumstances giving rise to an inference of discrimination. In fact, Plaintiff's employment history with Alitalia indicates that it made serious efforts to retain her as an employee.  In the year leading up to the elimination of Plaintiff's position, Alitalia retained her when every other employee in Minneapolis had been terminated, allowed her to work almost exclusively out of her home office, and then offered her a promotion—which she refused.  It was only when the position she occupied was eliminated (some months after Plaintiff refused the offered promotion) as a result of the restructuring of Alitalia's sales force that her employment ended.

Plaintiff's apparent attempts to raise an inference of discrimination by alleging that Alitalia refused to transfer her to another position are flawed as well.  First, there is no indication that Plaintiff even requested such a transfer.  Second, the fact that there were no comparable positions available fatally undermines the validity of this allegation.  *Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir. 2001) (to successfully plead that a reduction in force was administered in a discriminatory manner, a plaintiff must demonstrate that she was qualified for other existing jobs, and that she was denied those jobs for discriminatory reasons).  Finally, Alitalia had no reason to believe that Plaintiff would accept a transfer even if a position were available.  Plaintiff alleges that DiBari's promotion and relocation to Washington, D.C. is proof of Alitalia's discrimination against her, but admitted that she would not have taken that position even if it had been offered to her.  As Plaintiff had recently refused a promotion that involved relocation to New York, there was nothing further available for her in the reorganized sales department.  Moreover, with the introduction of the new Milan-to-Washington, D.C. service,

Alitalia had a business reason for not terminating DiBari's position when Plaintiff's position was terminated.

The only testimony in the record that could even suggest that age discrimination played a part in Alitalia's decision to consolidate its sales forces in New York and consequently terminate Plaintiff and the others comes from Gallo. Much of Gallo's testimony consists of nothing more than conclusory assertions, legal conclusions and unfounded opinions. When these elements of his testimony are taken away—as they must be—the record that remains is simply insufficient to sustain Plaintiff's *prima facie* claim of discrimination based on age, especially in view of Alitalia's retention of Plaintiff when it closed the Minneapolis office, its recent offer of a promotion, and the fact that Plaintiff was not replaced (rather, her duties were assumed by her manager, Alla, and by D'Ilario).

Because Gallo was not an employee of Alitalia at the time of his deposition, his deposition testimony is only that of a fact witness and not of an Alitalia representative.[2] Consequently, Gallo's testimony that he believes that Plaintiff's age was a factor in Alitalia's decision to terminate her cannot be imputed in any way to Alitalia, and instead its admissibility must be determined in accordance with the relevant Federal Rules of Evidence. "Although testimony which embraces an ultimate issue is not objectionable (Fed. R. Evid. 704), *seldom* will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact[.]" *Hester v. BIC Corp.*, 225 F.3d 178, 184 (2d Cir. 2000), *quoting Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986), *emphasis added by Hester court*. In the context of a

---

[2] Indeed, given the fact that he has commenced his own lawsuit against Alitalia, Libutti and Galli, Gallo's testimony may be viewed as that of a witness hostile to the interests of Alitalia.

claim of employment discrimination, "'the witness's opinion as to the defendant's [ultimate motivations] will often not be helpful . . . because the [trier of fact] will be in as good a position as the witness to draw the inference as to whether or not the defendant' was motivated by an impermissible animus." *Hester*, 225 F.3d at 185, *quoting U.S. v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992). Finally, opinion testimony at the summary judgment stage cannot rebut facts reflected in the record. *Gillentine v. McKeand*, 426 F.2d 717 (1st Cir. 1970).

In alleging that Plaintiff was terminated for discriminatory reasons based upon her age, Gallo offered his lay opinion on an ultimate issue in this case, and consequently those statements of opinion are inadmissible. *Hester*, 225 F.3d at 185 (lay opinion testimony about an employer's alleged discriminatory motivation inadmissible because it "merely tells the jury what result to reach"). Instead, Gallo's testimony is admissible only to the extent that he testified to that which he had firsthand knowledge through direct experience.

When asked to explain the basis for his belief that Plaintiff had been terminated because of her age, Gallo said that it was because of the alleged policy set forth by Mengozzi a year earlier. (Gallo Dep. 100). However, Mengozzi was not responsible for the decision to centralize sales functions in New York, and he had already left Alitalia by the time that Plaintiff was terminated. The decision to centralize sales functions was made by D'Ilario, Galli and Libutti, none of whom articulated any age-related rationale for Plaintiff's termination at the time. Moreover, Gallo testified that he did not take part in the decision to reorganize the sales force that resulted in the elimination of Plaintiff's job. He claimed only that he was instructed to terminate Plaintiff when she visited the New York office on December 8, 2004.

Gallo offered testimony that, of the three decision-makers responsible for the reorganization that resulted in Plaintiff's termination, only Galli made any comments that could remotely be construed as demonstrating an age-related bias, and his alleged comment involved hiring, not termination. The record contains nothing to indicate that the alleged remarks that Mengozzi made in 2003 or that Galli made about hiring younger people bore any relation to the decision to eliminate Plaintiff's position in the December 2004 reorganization.

> Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff. . . Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.

*Seltzer v. Dresdner Kleinwort Wassterstein, Inc.*, 356 F.Supp. 2d 288, 295 (S.D.N.Y. 2005), *quoting Campbell v. Alliance Nat'l Inc.*, 107 F.Supp. 2d 234, 247 (S.D.N.Y. 2000) *and Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

Gallo further asserted that, in his view, Plaintiff's termination was in violation of United States law. This is nothing more than legal conclusion, and it must be disregarded as well. *Roberts v. Ground Handling, Inc.*, 499 F.Supp.2d 3340 (S.D.N.Y. 2007) (supervisor's affidavit asserting legal conclusion regarding plaintiff's FMLA claim was stricken from the record as legal conclusion). Accordingly, because Plaintiff has failed to establish any age related motivation whatsoever behind the decision to eliminate her position, she has failed to set forth a *prima facie* case of discrimination, and summary judgment in favor of Alitalia is warranted.

**B.**    **Alitalia Has Set Forth A Legitimate Non-Discriminatory Reason for Terminating Plaintiff's Employment**

Plaintiff's position working out of a home office in Minnesota was eliminated, not—as Plaintiff speculates—as part of a campaign to terminate older employees or U.S. citizens, but as part of a restructuring geared toward cutting costs.  Courts have recognized consistently that reductions in force implemented in an effort to minimize expenses are legitimate and non-discriminatory.  *See, e.g., James v. New York Racing Ass'n.*, 233 F.3d 149, 152 (2d Cir. 2000) (entering summary judgment on the employer's non-discriminatory termination of plaintiff, noting, "The evidence that NYRA was engaged in a *bona fide* reduction in force, motivated by the need to save large amounts of operating costs so as to avoid bankruptcy, was overwhelming").  Alitalia has provided ample evidence that the reorganization of its sales force throughout North America in New York was the result of a legitimate business decision made in an attempt to reestablish the company's financial stability and avoid bankruptcy at a time when it and the industry were scrambling to recover from the devastating economic effects that the events of September 11, 2001 had on airlines throughout the United States.

**C.**    **Plaintiff Cannot Show that Alitalia's Reason for Eliminating Her Position is Pretextual**

Alitalia having established a legitimate and non-discriminatory reason for the elimination of Plaintiff's position, it falls to Plaintiff to show that this reduction in force was pretextual, and that Alitalia was actually motivated by discriminatory or retaliatory reasons.  *Forrest v. Jewish Guild for the Blind*, 309 A.D.2d 546, 765 N.Y.S.2d 326 (1st Dept. 2003), *quoting Ferrante v. American Lung Ass'n.*, 90 N.Y.2d 623, 629, 665 N.Y.S.2d 25, 687 N.E.2d 1308 (1997) (summary judgment appropriate on an employment discrimination claim "if plaintiff had been unable to raise a question of fact concerning either the falsity of defendant's proffered basis for

the termination or that discrimination was more likely the real reason"). Plaintiff cannot offer any evidence or testimony sufficient to make such a showing.

Any attempt on the part of Plaintiff to characterize the voluntary ERP that was in place at the time of Plaintiff's termination as an invidious form of age-related discrimination must fail. Such programs are explicitly authorized by law. The law "creates a safe harbor for voluntary early retirement plans" that are consistent with its "relevant purpose or purposes . . . and the implementation of such a plan by an employer cannot serve as evidence of unlawful age discrimination." *Fagan v. New York State Elec. & Gas Corp.*, 186 F.3d 127, 133 (2d Cir. 1999).

To succeed on the theory that Mengozzi's alleged discriminatory policy is what led to Plaintiff's termination, Plaintiff must establish a nexus between Mengozzi's remark and her termination, which she cannot do. *See Seltzer v. Dresdner Kleinwort Wassterstein, Inc.*, 356 F.Supp. 2d at 295 ("[v]erbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff"); *Ferrand v. Credit Lyonnais*, 2003 U.S. Dist. LEXIS 17202, *29 (S.D.N.Y. 2003) (attached hereto as Exhibit C) (alleged discriminatory remarks only actionable if plaintiff can demonstrate with sufficient evidence that discrimination motivated employer's adverse employment action). Aside from Gallo's unsubstantiated and highly speculative testimony about a reorganization decision in which he did not take part, there is no evidence in the record to indicate that any employee was subjected to an adverse employment decision based upon an age-based policy at Alitalia. *See id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 227, 104 L. Ed. 2d 268, 109 S.Ct. 1775 (1998) for the proposition that proof of pretext cannot rest upon "statements by decisionmakers unrelated to the decision process itself").

Indeed, even if Mengozzi's comments about wanting to "rejuvenate" Alitalia are taken as anything more than stray remarks, it is entirely lawful in New York for an employer to introduce a voluntary ERP pursuant to that goal. Faced with far more age-related facts than those in this case, the Second Circuit Court of Appeals held:

> [I]n the context of the precarious financial position of [defendant] NYRA, the remarks [plaintiff] James proffered about saving NYRA for younger employees and about the need for older supervisors to retire clearly represented the hope that over time the older personnel would retire, and thereby reduce the high costs associated with more senior supervisory employees. Such concern with the elevated costs of senior employees does not constitute age discrimination. Indeed, we have specifically recognized a safe harbor for employer intent to cause early retirement.

*James v. New York Racing Ass'n.*, 233 F.3d at 153 (citations omitted). Given the financial difficulties that Alitalia has faced throughout this decade, it was entirely reasonable—and lawful—for it to introduce a voluntary ERP to encourage senior employees to enter into early retirement.

Plaintiff's claims of age discrimination are further undermined by the fact that those of her duties that remained were redistributed to her manager Lucia Alla, an individual who was only a few years younger than Plaintiff at the time of the elimination of her job, and to Alla's manager, D'Ilario. Moreover, all of the employees to whom Plaintiff compares herself are within approximately five years of Plaintiff's own age. This, coupled with the facts that Alitalia had kept Plaintiff on when it closed the Minneapolis office, and then had offered a promotion to Plaintiff less than a year before her termination (an offer that she rebuffed), fundamentally undermine any argument that Plaintiff's termination was motivated by discriminatory animus. *See, e.g., id.* at 149 (finding "very substantial uncontradicted evidence that [defendant] NYRA

did not discriminate against older workers, including . . . its recent promotion of [plaintiff] James with a 30 percent raise").

Finally, Gallo's own deposition testimony indicates that, far from engaging in an invidious form of age- or citizenship-based discrimination, Alitalia was motivated by financial and business-related interests in its determination to eliminate Plaintiff's position. Gallo testified that he played no role whatsoever in the decision to eliminate Plaintiff's position. Instead, he was charged by Galli, D'Ilario and Libutti, the three Alitalia employees responsible for the elimination of Plaintiff's position, to inform Plaintiff of that decision, along with their reason for doing so. Gallo testified that he "told [Plaintiff] what they [Libutti, D'Ilario and Galli] told me to say, [which was that] unfortunately due to the economic conditions of Alitalia, your job is not there anymore" (Facts ¶20; Gallo Dep. 79). The sole reason articulated by the parties responsible for the elimination of Plaintiff's job is that it was done for legitimate and non-discriminatory economic reasons. Consequently, the facts and law compel entry of summary judgment in favor of the defendant Alitalia in this matter. *In re Laverack & Haines, Inc. v. NY State Div. of Human Rights*, 88 N.Y.2d 734, 738, 650 N.Y.S.2d 76, 78, 673 N.E.2d 586 (1996) ("[t]he downsizing of a company's employment rolls, due to business failings and economic setbacks, constitutes a sustainable rebuttal and explanation for the decision to terminate a particular employee").

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests an Order, pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting Defendant's motion for summary judgment and

dismissing the Amended Complaint of Linda Rylott-Rooney as against Defendant, along with

such other and further relief as to the Court may seem just and proper.

Dated: New York, New York
       August 26, 2008

VEDDER PRICE P.C.

By:   s/ Alan M. Koral  
    Alan M. Koral (AK-1503)
    Michael J. Goettig (MG 3771)
    1633 Broadway, 47th Floor
    New York, New York  10019
    (212) 407-7700

    *Attorneys for Defendant*
    *Alitalia–Linee Aeree Italiane SpA*

Exhibit A

LEXSEE

AQUILA KNIGHT, Plaintiff, - against - NEW YORK CITY HOUSING
AUTHORITY, Defendant.

03 Civ. 2746 (DAB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2007 U.S. Dist. LEXIS 9148

January 31, 2007, Decided
February 2, 2007, Filed

**CORE TERMS:** summary judgment, hiring, employment application, genuine, hire, prima facie case, sex, processing, borough, motive, issues of material fact, discriminatory, partial, staff, mixed, employment discrimination, community center, recommendation, impermissible, housing, email, Pl Mem of Law, employment decision, citations omitted, moving party, decision maker, reasonable cause, controvert, opposing, delayed

**COUNSEL:** [*1] For Aquila Knight, Plaintiff: Jeffrey C. Slade, LEAD ATTORNEY, Slade & Associates, P.C., New York, NY; Chinyere Y Okoronkwo, Law Firm of Chinyere Okoronkwo, Esq, New York, NY.

For New York City Housing Authority, Defendant: Jeffrey Niederhoffer, LEAD ATTORNEY, Jeffrey Schanback, General Counsel, New York, NY; Jeffrey Marc Niederhoffer, LEAD ATTORNEY, New York City Housing Authority Law Department, New York, NY.

**JUDGES:** Deborah A. Batts, United States District Judge.

**OPINION BY:** Deborah A. Batts

**OPINION**

*MEMORANDUM & ORDER*

DEBORAH A. BATTS, United States District Judge.

Aquila Knight ("Plaintiff") brings this action for back pay and related benefits pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., the New York State Human Rights Law, Executive Law § 296 and New York City Administrative Code § 8-502. Plaintiff alleges that the New York City Housing Author-ity ("Defendant") unlawfully discriminated against her on the basis of her sex. She specifically alleges that Defendant offered her employment as a "Community Coordinator" at the Butler Community Center ("Butler"), located in the Bronx, on May 10, 2001. Defendant, however, [*2] allegedly deliberately delayed completing the processing of her employment application for eighteen months because she is a woman. Plaintiff became aware of the alleged sex-based animus behind the delay in completing her employment application when one of Defendant's employees involved in the hiring process allegedly told her in June, 2001 that a man was needed to fill the Community Coordinator position at Butler.

Defendant moves for summary judgment and Plaintiff cross-moves for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth, Defendant's Motion for Summary Judgment is GRANTED with respect to each of the Plaintiff's claims and Plaintiff's Cross-motion for Partial Summary Judgment is DENIED.

I. BACKGROUND

In response to Defendant's Motion for Summary Judgment, Plaintiff submitted her Statement of Facts pursuant to Local Civil Rule 56.1 ("Statement of Facts"). With few exceptions, Plaintiff's Statement of Facts fails to comply with the requirements of Local Civil Rule 56.1. [1] Most of Plaintiff's responses to the paragraphs in Defendant's Statement of Facts either do not controvert [*3] the statements made by the Defendant or they state that Plaintiff lacks the knowledge to admit or deny the truth of Defendant's statements. Additionally where Plaintiff's responses do not directly controvert Defendant's statements, Plaintiff nevertheless attempts to rebut Defendant's statements by offering either non-responsive statements or responsive statements that are unsupported

by citations to the record. Pursuant to Local Civil Rule 56.1 Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record.

    1   Local Civil Rule 56.1 provides that a party opposing summary judgment must submit a statement of facts that "shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." The rule further provides that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(b) - (c). Each statement made by the opposing party in the statement of facts must be followed by a citation to evidence which would be admissible. Local Civil Rule 56.1(d).

[*4] Defendant is a public corporation formed pursuant to the New York State Public Housing Law for the purpose of furnishing housing to low-income residents in New York City. (Def. Local Civil Rule 56.1 Stmt. P 1.) The Department of Community Operations ("DCO") is one of several departments within the Defendant's organization, providing cultural, educational and recreational services to residents living in housing developments managed by the Defendant. (Id. P 2.) Within each of New York City's five boroughs, Defendant maintains a borough office headed by a Director and a Deputy Director. (Id.)

Plaintiff states that in 1999 she submitted an application to Defendant for a "Community Coordinator" position. (Pl. Local Rule 56.1 Stmt. P 8.) Defendant claims that no "Community Coordinator" positions were available at the time of the application and that Plaintiff had turned down a "Director" position because she wanted to be a Coordinator. (Def. Reply Local Rule 56.1 Stmt. P 8; Pl. Compl. P 9.)

On August 23, 2000, Ernesto Lozano, Director of the Bronx borough office, sent a memo to his superior, Kevin Kearney, the Senior Director of DCO, requesting that Plaintiff be hired for the Community [*5] Coordinator position at Butler, a housing development managed by Defendant. (Aff. of Okoronkwo at Ex. 4.) In March of 2001, the DCO was engaged in a reorganization involving the transferring of staff from the Bronx borough office to positions in the field. (Id. Local Rule 56.1 Stmt. P 5.) During the reorganization Lozano met with staff members to determine their preferences for transfer. Following these discussions, Lozano sent an email to his supervisor stating in part that staff member Israel Rivera

could be considered for potential reassignment to Butler. (Id.; Aff. of Okoronkwo at Ex. 20.)

On March 22, 2001, after these preferences were revealed, the Deputy General Manager for Community Operations Hugh Spence requested that the Director of Human Resources Madelyn Oliva process the transfers, including the transfer of Rivera to Butler. (Def. Local Rule 56.1 Stmt. P 6.) Spence was wholly unaware of Plaintiff's interest in being employed as Community Coordinator at Butler at the time of his request. (Spence Decl. P 6.)

Rivera was sent to Butler to fill the position of "Community Coordinator," but his functional role was to serve as a community center support staff member with [*6] the job duties of overseeing work required to make the center operational and to maintain compliance with New York City health regulations. Rivera's duties included activities such as clearing debris, fixing holes in walls and installing appliances and telephone lines. Local Rule 56.1 Stmt. P 7; Pl. Local Rule 56.1 Stmt. P 7.)

The Parties, however, disagree as to the precise scope of Rivera's responsibilities. Plaintiff offers the testimony of Gary Coleman, President of the Butler Houses Residents Association, who claims to have observed Rivera supervising staff persons and claims to have observed that Rivera had referred to himself as "Director" of Butler. (Aff. of Okoronkwo at Ex. 23.) Rivera himself states that he went unsupervised for about a month, but that he was supervised thereafter and that he was sent to Butler to facilitate repairs. He denies that he had staff persons reporting to him during his time at Butler. (Id. at Ex. 27.) Prior to his transfer to Butler, Rivera had held the title of Community Coordinator since 1998. (Id. at Ex. 27, Rivera Aff. of Changes.) In December 2001, Rivera was re-transferred from Butler to Soundview Senior Center. (Rivera Decl. [*7] P 2.)

Around late March 2001, Plaintiff was interviewed by Ilia Figueroa, the Deputy Director of the Bronx borough office for the position of Director of Butler Houses Community Center which had the underlying civil service title of "Community Coordinator." (Def. Local Rule 56.1 Stmt. P 8.) Defendant alleges that no other candidates were interviewed or considered for the Community Coordinator position at Butler subsequent to Plaintiff's interview. (Id. P 17.) Figueroa prepared a request to hire Plaintiff which she submitted to Lozano and then to Kearney for review and approval shortly after the interview. (Id.)

A letter dated May 10, 2001 was sent to Plaintiff stating: "Congratulations, You have been selected for a position as a Community Coordinator at Butler Community Center." (Aff. of Okoronkwo at Ex. 5.) Plaintiff al-

leges, however, that on or about June 25, 2001, Figueroa told her during a telephone conversation that a man was placed at Butler because Defendants needed someone there with strength. (Pl. Local Rule 56.1 Stmt. P 8(f); Aff. of Okoronkwo at Ex. 30.) No other evidence in the record aside from Plaintiff's testimony regarding this alleged statement is offered [*8] to support the claim that the processing of Plaintiff's employment application was delayed because of her sex. Figueroa denies having made any such statement. (Decl. of Figueroa P 12.) Even after Figueroa's alleged statement Defendant continued to process Plaintiff's application for the Community Coordinator position at Butler.

In August 2001, Defendant discovered that when Rivera was transferred to Butler from the Bronx borough office in March 2001, the budgetary "line" formerly occupied by Rivera at the borough office, Line 37895, did not transfer to the Butler facility. As a result, Rivera occupied the only Community Coordinator budget line at Butler, Line 42068. (Def. Local Rule 56.1 Stmt. PP 12-13.) Since there was thus no funding available for Plaintiff to fill a position at Butler, Kearney was required to approve the use of another line, Line 37805, for use at Butler so that Plaintiff's hiring could proceed. (Id. P15.) In October 2001, Kearney approved the request, submitted by Lozano and prepared by Figueroa, to hire Plaintiff as a Community Coordinator at Butler and approved the use of budget line number 37805 to effectuate the hiring. (Id. P 16.) After the request [*9] to hire Plaintiff had been approved by Kearney, it was submitted to Defendant's Human Resources Department in November 2001. (Id. P 18.)

The parties dispute the source of sole hiring authority within Defendant's organization. Defendant alleges that the Human Resources department has sole authority to hire individuals for employment and that other departments within the Defendant's organization must submit requests to the Human Resources department to hire staff. (Id. P 19.) Plaintiff has not offered evidence to controvert this allegation. Defendant offers the declaration of Oliva in support of its claim that the Human Resources department has sole hiring authority.

The processing of employment applications clearly takes place within the Human Resources department. Within the Human Resources department, Donna Williams, a Placement Coordinator, undertook primary responsibility for processing the request to hire Plaintiff. (Id. P 20.) In March and April of 2002, Williams met with Plaintiff on two different occasions in the course of completing the processing of Plaintiff's employment application. (Id.) Subsequent to the second meeting Williams forwarded Plaintiff's employment [*10] application for verification; partial verification of the application

was completed by the end of May 2002. (Id. PP 21 & 23.)

While Plaintiff's application was being processed, Plaintiff timely filed a claim of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on April 18, 2002. (Id. P 22.) In August 2002, the EEOC issued a probable cause determination that Defendant had unreasonably delayed the processing of Plaintiff's application on the basis of her sex. (Aff. of Okoronkwo at Exs. 18 & 19.) Plaintiff received a right to sue letter in January 2003. (Decl. of Niederhoffer at Ex. B.)

By the end of May 2002, Deidra Gilliard had replaced Lozano as Director of the Bronx borough office. (Pl. Local Rule 56.1 Stmt. P 24(c).) Gilliard had stated that upon starting her employment with Defendant that she decided to not proceed automatically with the hiring recommendations made by her predecessor, Lozano, including his recommendation to hire Plaintiff. (Decl. of Deidra Gilliard P 2.) Plaintiff alleges that Gilliard decided "to post William Rivera's position" by email and to "not hire" Plaintiff, despite her understanding that Plaintiff would likely [*11] sue Defendant. (Id.; Aff. of Okoronkwo at Ex. 12.) Defendant replies that the email sent by Gilliard refers to an individual named "William Rivera," who is not the same person as "Israel Rivera" and that the position held by William Rivera which Gilliard posted was entirely different from that held by Israel Rivera. (Def. Reply Local Rule 56.1 Stmt. P 24(c); Aff. of Okoronkwo at Ex. 12.)

On May 31, 2002, Defendant sent Plaintiff a letter rejecting her job application. (Pl. Local Rule 56.1 Stmt. P 24(d).) On June 5, 2002, Gilliard reversed course and requested that the Human Resources department proceed with the processing of Plaintiff's application. (Id. P 25.) In the early part of June 2002, Williams had forwarded Plaintiff's employment application materials to Donay Queenan, Deputy Director of Human Resources and to Oliva. (Def. Local Rule 56.1 Stmt. P24.) On June 5, 2002, Queenan and Oliva approved Plaintiff's employment application. (Id. P 25.) On June 19, 2002, Williams notified Plaintiff that her employment was approved by the Human Resources department and asked her when she would be able to start. (Id. P 27.)

During 2001, Plaintiff had worked at Eagle Group [*12] Family Daycare, but was forced to cease that employment in December of 2001 because of problems with her knee. (Id. P 9.) At the time that Williams contacted Plaintiff in June 2002 to determine a start date, Defendant claims that Plaintiff advised that she would not be able to commence work because of continuing problems with her knee. (Id. PP 28-29.) Plaintiff claims, however, that despite her knee condition, she could have per-

formed the Community Coordinator job, because the majority of the job involves "paperwork and programming." (Knight Dep. at 44-45.) Plaintiff ultimately began work at Butler in the position of Director of Butler Houses Community Center on September 9, 2002. (Def. Local Rule 56.1 Stmt. P 30.)

Defendant notes that during the period between January 1, 2001 and September 9, 2002, it hired thirty one individuals as "Community Coordinators", fifteen of whom were women. (*Id.* P 31.) Defendant also notes that over the same period of time it promoted fifty six individuals to Community Coordinator positions; women filled thirty seven of those positions. (*Id.*)

## II. DISCUSSION

Defendant moves for summary judgment, arguing specifically that Plaintiff has [*13] not established a prima facie case of discrimination and that even if a prima facie case has been established, that Plaintiff cannot show that Defendant's proffered reasons for its actions were pretextual. (Def. Mem. of Law at 1.) Furthermore, Defendant argues that the alternative approach to establishing a claim under Title VII, the mixed-motive theory, has not been established by the Plaintiff. (Def. Mem. of Law in Further Support at 2.) Plaintiff argues that numerous genuine issues of material fact exist which should preclude the granting of Defendants' Motion for Summary Judgment. (Pl. Mem. of Law in Opposition at 10.) Plaintiff has also filed a Cross-motion for Partial Summary Judgment seeking to estop Defendant from disavowing statements and representations made by it in two documents submitted to the EEOC pursuant to 28 U.S.C. § 1746. (Pl. Mem of Law in Support at 1.)

### A. The Summary Judgment Standard

The Court's role on a motion for summary judgment is not to resolve disputed issues of fact but to determine whether there are any genuine issues for trial. Summary judgment may be granted only when there are no genuine issues of material fact requiring [*14] a trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Corselli v. Coughlin*, 842 F.2d 23, 25 (2d Cir. 1988). Under Fed. R. Civ. P. 56(c) "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has held that Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the exis-

tence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

As a general rule "the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing [*15] the factual assertions . . . in the light most favorable to the party opposing the motion." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995); *see also Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir. 1993). As is often stated "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir. 1991). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

Whether summary judgment is appropriate in a discrimination case depends upon "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." [2] *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148-49, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *see also Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) [*16] (holding that "*Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff'"). However, where a plaintiff establishes a prima facie case and presents some evidence of pretext, summary judgment may still be appropriate where, for instance, the record conclusively reveals a nondiscriminatory reason for the employer's action, or where the plaintiff creates "only a weak issue of fact" on the issue of pretext and there exists "abundant and uncontroverted independent evidence that no discrimination [has] occurred." *Schnabel*, 232 F.3d at 90 (quoting *Reeves*, 530 U.S. at 148) (internal quotations omitted).

> 2  *Reeves* was decided under Fed. R. Civ. P. 50 (not Rule 56 as in the instant case), however "the inquiry under each is the same." *Reeves*, 530 U.S. at 150.

[*17] The question on a summary judgment motion in a discrimination case is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough . . . to disbelieve the employer; the fact finder must [also] believe the plaintiff's explanation of intentional discrimina-

tion." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir. 2000) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

### B. Sex Discrimination Under Title VII

Title VII of the Civil Rights Act of 1964 provides, in relevant part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex, . . .; or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex.

42 U.S.C. § 2000e-2(a) [*18]  . A court's analysis of an unlawful employment discrimination allegation proceeds either according to the familiar burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), or under the so-called mixed motive theory approach.

#### 1. The "Mixed Motive" Theory

In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (plurality opinion), the Supreme Court outlined a burden-shifting framework applicable to mixed motive cases. If the Plaintiff establishes that a prohibited discriminatory factor played a "motivating part" in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway. The Plaintiff must be able to produce a "smoking gun" or at least a "thick cloud of smoke" to support her allegations of discriminatory treatment in order for the burden to shift to the Defendant. *Raskin v. The Wyatt Company* 125 F.3d 55, 61 (2d Cir. 1997) (quoting *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 124 (2d Cir. 1997). Evidence that calls for [*19]  a shift in burden under the *Price Waterhouse* analysis includes policy documents and evidence of statements or actions by decision-makers "that may be viewed as directly reflecting the alleged discriminatory attitude." *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir. 1992).

#### 2. The *McDonnell Douglas* Disparate Treatment Theory

Most claims of unlawful employment discrimination under Title VII are analyzed according to the familiar burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under *McDonnell Douglas,* the plaintiff bears the initial burden of establishing a prima facie case of discrimination through direct or circumstantial evidence. *Windham v. Time Warner, Inc.,* 275 F.3d 179, 187 (2d Cir. 2001). The plaintiff's burden at this stage is *de minimis,* and the requirement of meeting this burden "is neither onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir. 2001) (internal quotations and citations omitted). To make out a prima facie discrimination claim, a plaintiff [*20]  must demonstrate: (1) that he or she is a member of a protected class; (2) that he or she is qualified for the position in question; (3) that he or she suffered an adverse employment action; and that (4) the circumstances surrounding the adverse action give "rise to an inference of discrimination." *Windham,* 275 F.3d at 187 (citation omitted).

A plaintiff who is able to make out a prima facie case establishes a presumption of discrimination and the burden of production shifts to the defendant. *See Woodman,* 411 F.3d at 76. The defendant must meet this burden by articulating a reason for the challenged conduct that "*taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (emphasis in original).

If the defendant is able to present a nondiscriminatory explanation for the challenged conduct "the presumption of discrimination drops out" and the burden of proof shifts back to the plaintiff. *Woodman,* 411 F.3d at 76 (citation omitted). The plaintiff must then prove "that the legitimate reasons offered by [*21]  the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quotations and citations omitted). In showing that the employer's explanation was pretextual, the plaintiff need not prove that the explanation offered by the employer was entirely false "but only that its stated reason was not the only reason" and that consideration of an impermissible factor "did make a difference." *Montana v. First Federal Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 105 (2d Cir. 1989).

### C. Plaintiff's Sex Discrimination Claim Under Title VII

#### 1. No genuine issues of material fact

Plaintiff argues that she has brought forth evidence of multiple genuine issues of material fact which would preclude granting Defendant's Motion for Summary Judgment. Furthermore, Plaintiff argues that the facts in the record support a claim under both the mixed motive and the disparate treatment theories of employment discrimination. Having carefully considered the Parties' arguments and their supporting affidavits, declarations and exhibits, the Court finds that there are no genuine issues of material [*22] fact which would justify a trial of Plaintiff's claims.

The dispute over whether the Human Resources department had sole authority to make hiring decisions is not material because Plaintiff need not show that the *ultimate* decision maker based the adverse decision on an impermissible basis. The courts have recognized that "the impermissible bias of a single individual at any stage . . . may taint the ultimate employment decision . . . This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role . . . ." *Bickerstaff v. Vassar College,* 196 F.3d 435, 450 (2d Cir. 1999) (citing *Lam v. Univ. of Hawaii,* 40 F.3d 1551, 1560 (9th Cir. 1994)).

The parties also dispute whether the initial "letter of congratulations" sent to Plaintiff constitutes an employment action. This too is immaterial because there is evidence of other actions against Plaintiff that could constitute an "adverse employment action." An "adverse employment action" under Title VII is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. [*23] *Feingold v. New York,* 366 F.3d 138 (2d Cir. 2004). Either the initial rejection letter sent to Plaintiff in May 2002 or the delayed hiring of Plaintiff could constitute "adverse employment actions" since both were more than a mere inconvenience or alteration of job responsibilities. At the least, they were outright denials of employment for a limited period of time. Either could satisfy the "adverse employment action" requirement of the *McDonnell Douglas* prima facie case. It is therefore unnecessary to resolve the dispute over whether the congratulatory letter is an adverse action.

A third contested issue deals with Rivera and whether he was selected over Plaintiff for the position of Community Coordinator. Plaintiff argues that Rivera was placed in the position that was "earmarked" for Plaintiff. Defendant concedes that Rivera was sent to Butler and did occupy the only "Community Coordinator" budgetary line that was available at that facility during the time period relevant to this dispute. Evidence that a person who is not in the plaintiff's protected class was selected to receive some employment benefit over the plaintiff would provide an inference of discrimination [*24] un-

der the fourth prong of the prima facie case. *See Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir. 1996) (citing *Washington v. Garrett,* 10 F.3d 1421, 1434 (9th Cir. 1993)). However, it is clear from the record that Rivera was not actually selected over Plaintiff and so there is no genuine issue of material fact in this regard.

Despite holding the title of "Community Coordinator," Rivera apparently did not supervise employees or conduct any of the type of work that would be required of an employee that held the functional position sought by Plaintiff. Moreover, Rivera's own declarations and testimony supports the claim that he was placed at Butler on a temporary basis to oversee repair work at the facility. That Rivera was subsequently transferred to Soundview Senior Center in December 2001 provides further support that his assignment to Butler was temporary and was not meant to be a permanent selection of Rivera over Plaintiff.

Finally, the parties dispute the role of Figueroa in the hiring process. Although Figueroa is a lower level employee, it is clear from the record that she did participate in the decision making process. She [*25] interviewed Plaintiff and made recommendations to her superiors supporting Plaintiff's employment application. Although Figueroa's was not the last word in the decision to hire Plaintiff, as noted above, impermissible bias can come from any party involved in the decision making process. And it is undisputed that Figueroa played a role in the selection process.

2. Defendant is entitled to a judgment as a matter of law

The facts on the record conclusively establish that Plaintiff will be unable to carry her burden under either the mixed motive or the disparate treatment theories of employment discrimination.

Plaintiff's testimony is the only evidence on the record directly ascribing discriminatory intent to Figueroa and Defendant and it consists largely of her uncorroborated accounts of what Figueroa allegedly said on one occasion. The alleged statement could raise a genuine issue of fact as to defendant's intent. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 78 (2d Cir. 2001). Courts have held that "the discriminatory animus of intermediate supervisors who have input in the decision making process will not give rise to liability if the supervisor with final authority [*26] bases an adverse employment action exclusively on an independent evaluation. But the employer will be liable 'where the decision maker 'rubber stamps' the . . . recommendation of the subordinates; in such cases . . . the decision maker acts as a conduit of the subordinates' improper motive.'" *Fullard v. City of New*

*York,* 274 F. Supp.2d 347, 357 (S.D.N.Y. 2003) (quoting *Mato v. Baldauf,* 267 F.3d 444, 450 (5th Cir. 2001)).

The record clearly shows that Lozano had made an employment decision regarding Plaintiff for the position as early as August 23, 2000, well before Plaintiff's interview with Figueroa in March 2001. Gilliard's decision initially to not pursue Lozano's recommendations also appears to be clearly independent of Figueroa's allegedly discriminatory intent, since she took over nearly a year after the statements were allegedly made and there was no evidence at all in the record that Gilliard interacted with Figueroa in making her decision. The fact that Gilliard mentioned in an email she sent to Queenan the possibility that Plaintiff might sue if she was not ultimately hired does not on its face indicate any sort of discriminatory intent. [*27]  Furthermore, Plaintiff had filed her complaint with the EEOC on April 18, 2002. (Aff. of Okoronkwo at Ex. 8.) Gilliard's May 29, 2002 email to Queenan was an eminently reasonable inquiry in light of the fact that Plaintiff had already clearly indicated that she might file a lawsuit. The record simply contains no evidence that Lozano or Gilliard served as mere conduits of Figueroa's allegedly improper motive.

There is no evidence that the alleged statements made by Figueroa actually tainted the employment decision ultimately reached nor is there any persuasive evidence that Rivera was selected over Plaintiff for the Community Coordinator position. Plaintiff has therefore failed to establish an inference of discrimination that would support the fourth prong of a prima facie discrimination case under the *McDonnell Douglas* framework. Even if Figueroa's stray remark - allegedly evidencing animus against Plaintiff's sex - could support an inference of discrimination, Defendant has brought forth evidence of legitimate, non-discriminatory reason for its actions that have not been rebutted by Plaintiff. Defendant has amply demonstrated that the delay in hiring Plaintiff was due to the [*28]  lack of an additional budget line for the Community Coordinator position at Butler. Moreover, it is apparent from the record that the initial decision by Gilliard to not immediately approve Plaintiff's employment application was based on her legitimate, non-discriminatory judgment to not automatically adopt her predecessor's hiring decisions. Plaintiff has not brought forth any evidence that the foregoing reasons offered by Defendant to explain the delay in hiring her were merely pretextual. Beyond mere speculation and conclusory allegations, Plaintiff has failed to establish that her sex was a substantial factor in the delay in processing her employment application. Finally, Defendant's evidence, undisputed by Plaintiff, that it has generally hired women at favorable rates in comparison with men during the period relevant to this dispute demonstrates that Plaintiff would not be able to prevail on a

"mixed motive" theory of discrimination either. Even if true, Figueroa's alleged remark is insufficient to constitute a "smoking gun" or a "thick cloud of smoke". *See Raskin,* 125 F.3d at 61.

Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's Title VII [*29]  claim is GRANTED.

D. State and Local Claims

The same standards that apply to Title VII employment discrimination claims are applicable to claims brought under the New York Human Rights Law and New York City Administrative Code. *See Mark v. The Mount Sinai Hospital,* 85 F. Supp.2d 252 (S.D.N.Y. 2000); *James v. New York Racing Ass'n,* 233 F.3d 149, 153 (2d Cir. 2000). Since Defendant is entitled to summary judgment on Plaintiff's Title VII claim, it is likewise entitled to summary judgment on the state and local claims. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's state and local claims is GRANTED.

E. Plaintiff's Cross-Motion Regarding the EEOC's Investigation

Plaintiff has cross-filed for Partial Summary Judgment seeking to estop the Defendant from denying statements it made during the course of an investigation by the EEOC and that it submitted to the EEOC pursuant to 28 U.S.C. § 1746. It is well settled that EEOC findings in a particular matter are not binding on the courts. An EEOC "probable cause" determination is not a final judgment. Indeed, in *McDonnell Douglas* the court noted that where the commission [*30]  has *not* found reasonable cause a district court is not prevented from reviewing the lawsuit in its entirety:

> The Commission itself does not consider the absence of a "reasonable cause" determination as providing employer immunity from similar charges in a federal court . . . and the courts of appeal have held that, in view of the large volume of complaints before the Commission and the non-adversary character of many of its proceedings, court actions under Title VII are de novo proceedings and . . . a Commission "no reasonable cause" finding does not bar a lawsuit in the case.

*McDonnell Douglas,* 411 U.S. at 799. The same holds true if the EEOC has issued a reasonable cause determination, as it did in this case. Since this Court reviews Title VII proceedings *de novo,* neither the EEOC's find-

ings nor the underlying facts supporting such findings are binding on it. Therefore, Plaintiff may not estop Defendant from denying statements made during the course of EEOC investigations. Accordingly, Plaintiff's Cross-motion for Partial Summary Judgment is DENIED.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED [*31] in its entirety. Plaintiff's Cross-motion for Partial Summary Judgment is DENIED. The Clerk of Court is directed to close the docket for this case.

SO ORDERED.

Dated: New York, New York

January 31, 2007

Deborah A. Batts

United States District Judge

Exhibit B

LEXSEE 2008 NY SLIP OP 28266

**[\*1]  Oswaldo Recalde, Plaintiff, against Bae Cleaners, Inc. and Henry Bae, Defendants.**

**115789/07**

**SUPREME COURT OF NEW YORK, NEW YORK COUNTY**

*2008 NY Slip Op 28266*; *2008 N.Y. Misc. LEXIS 4397*; *240 N.Y.L.J. 20*

**July 15, 2008, Decided**

**NOTICE:**

THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING RELEASE OF THE FINAL PUBLISHED VERSION. THIS OPINION IS UNCORRECTED AND SUBJECT TO REVISION BEFORE PUBLICATION IN THE PRINTED OFFICIAL REPORTS.

**COUNSEL:** [\*\*1] For Plaintiff: Jose Perez, Associate General Counsel, Puerto Rican Legal Defense & Education Fund, NY, NY.

For Defendants: Jason S. Deutschmeister, Brier Deutschmeister Urban & Fromme, P.C., NY, NY.

**JUDGES:** Joan A. Madden, J.

**OPINION BY:** Joan A. Madden

**OPINION**

Joan A. Madden, J.

In this action for declaratory and injunctive relief, and damages, plaintiff moves for an order pursuant to *CPLR 6301* and *6311*, preliminarily enjoining defendants from initiating eviction proceedings to remove him from his rent stabilized apartment.

The following facts are not disputed unless otherwise noted. Since 2002, plaintiff has been the tenant of a rent stabilized apartment located at 248 East 111th Street, Apt. 4C, in Manhattan. In 2006, defendant Bae Cleaners, Inc. ("Bae Cleaners") purchased the building. In May 2007, plaintiff received a letter from Bae Cleaners advising that his lease was due to expire on August 31, 2007, and enclosing a renewal lease form and an "apartment application." The letter advised that if plaintiff wanted to renew his lease, he needed to "complete

the apartment application in its entirety. We must have complete and updated information from all of our tenants." Plaintiff states that he filled out the application, [\*\*2] signed the renewal lease and mailed both to the landlord.

On or about August 1, 2007, plaintiff submitted his monthly rent to the landlord. By letter dated August 8, 2007, Bae Cleaners informed plaintiff that it could not accept his rent and would not be renewing his lease, explaining as follows:

In light of the discovery of your questionable immigration status in the U.S., please be advised that we are unable to accept any rental payments from you, nor are we able to offer you a renewal lease at this time. Please understand that we must first seek legal advice from expert attorneys as well as from the Federal Immigration Authorities to ascertain the legality of our landlord tenant relationship and ensure that we not in violation of any city, state and federal laws.

[\*2]  If we find that it is absolutely legal to rent to you, we will be more than happy to extend your lease as well as request that you remit payment for your tenancy.

On or about September 1 and October 1, 2007, plaintiff again submitted his monthly rent payments to the landlord. On September 14 and October 10, 2007, Bae Cleaners wrote letters to plaintiff that were identical to the August 8, 2007 letter quoted above.

On or about [\*\*3] November 17, 2007, plaintiff received a "Seven (7) Day Notice of Termination" from counsel for Bae Cleaners. The notice stated that plaintiff's tenancy would be terminated as of November 27, 2007, pursuant to *Rent Stabilization Code § 2524.3(c)*, on the "grounds that the occupancy of the subject premises by you is illegal because of the requirements of law and the owner is subject to civil or criminal penalties." The notice the listed the following as the "facts necessary to establish the existence of such ground":(1) That you

2008 NY Slip Op 28266, *; 2008 N.Y. Misc. LEXIS 4397, **;
240 N.Y.L.J. 20

have admitted to the landlord and/or landlord's agent that you are illegally in this country, when requested to provide some documentation regarding a potential renewal lease.

(2) That your occupancy in the subject premises is in violation of Federal Statute, specifically, the Federal Immigration and Nationality Act (*Section 8 United States Code 1324(a)(1)(A)(iv)(b)(iii)*) placing the landlord/owner in violation of Federal Statute(s). To date you have failed to deny that you are in this country illegally, or provide the landlord with documentation to establish that you are legally in this country.

(3) That the landlord and/or owner of the subject building in which [**4] you reside is subject to both civil and criminal penalties (including a jail sentence of up to five years) by reason of knowingly permitting you to reside in the building, now that you have informed him of your illegal status of being in this country.

(4) That because the landlord has actual knowledge which remains undisputed that you are illegally in this country any act wherein the petitioner would be providing shelter to you in this country is in violation of Federal Statute(s).

The notice further stated that "[y]our continued occupancy of the subject premises/apartment places the landlord in violation of Federal Statute(s) and places petitioner in a position where they may be liable for severe civil penalties and fines, criminal prosecution and jail time."

Plaintiff commenced the instant action by securing an order to show cause dated December 3, 2007, which included a temporary restraining order restraining and enjoining defendants from initiating or filing eviction proceedings against plaintiff or taking any other action to evict him from his apartment. In issuing the order to show cause, the court directed plaintiff to pay use and occupancy in the amount of rent provided in his [**5] prior lease, commencing December 5, 2007 and by the fifth day of each month, until further order of the court.

In the complaint, plaintiff seeks damages, as well as declaratory and injunctive relief, including an order directing defendants to provide him with a renewal lease, and an order permanently enjoining defendants from initiating eviction proceedings against him in New York City Housing Court. The complaint asserts four causes of action for violation of *Rent Stabilization Code § 2523.5*, violation of New York City Human Rights Law, breach of contract, and violation of *General Business Law § 349*.

Plaintiff is now moving for a preliminary injunction enjoining defendants from initiating eviction proceedings against him. Plaintiff asserts that defendants "are engaged in an elaborate [*3] scheme to deceptively evict Latino tenants. Preying on some of the most vulnerable members of our community, Defendants have threatened to contact the federal immigration authorities about Plaintiffs' tenancy in an attempt to harass him into vacating his apartment. . . . Unless Defendants are temporarily enjoined from such deceptive and illegal practices, they will continue to threaten and harass Latino [**6] tenants like Plaintiff into surrendering their rent regulated apartment."

To be entitled to a preliminary injunction, plaintiff must demonstrate a likelihood of ultimate success on the merits, a danger of irreparable harm in the absence of an injunction, and a balance of the equities in his favor. *See Aetna Insurance Co. v. Capasso, 75 NY2d 860, 862, 552 N.E.2d 166, 552 N.Y.S.2d 918 (1990); Doe v. Axelrod, 73 NY2d 748, 750, 532 N.E.2d 1272, 536 N.Y.S.2d 44 (1988); W.T. Grant Co. v. Srogi, 52 NY2d 496, 420 N.E.2d 953, 438 N.Y.S.2d 761 (1981); Asness v. Nelson, 273 AD2d 165, 711 N.Y.S.2d 717 (1st Dept 2000)*. The decision whether to grant a preliminary injunction is committed to the sound discretion of the court. *Doe v. Axelrod, supra at 750*.

Plaintiff has established that he is entitled a preliminary injunction pending determination of the underlying action by demonstrating the irreparable harm of a possible eviction if the relief sought is not granted, and that the balance of the equities is in his favor so as to maintain the status quo while awaiting a final determination of the underlying claims. *See Jiggetts v. Perales, 202 AD2d 341, 342, 609 N.Y.S.2d 222 (1st Dept 1994)*. Plaintiff has likewise established a strong likelihood of success on the merits of his claims that the landlord's refusal to offer him a renewal lease [**7] violates the rent stabilization law and the human rights law.

As a rent stabilized tenant, plaintiff is entitled to the full range of benefits and protections conferred by the State's rent stabilization law, specifically the automatic right to a renewal lease "on the same terms and conditions as the expired lease." *RSC § 2522.5(g)(1); Rosario v. Diagonal Realty, 8 NY3d 755, 761, 872 N.E.2d 860, 840 N.Y.S.2d 748 (2007)*. The undisputed record establishes that defendant violated this provision by requiring plaintiff to complete a so-called "apartment application" as a condition to his receiving a renewal lease. Rather than simply sending plaintiff the renewal lease to which he was statutorily entitled, the landlord also included an "apartment application" and advised that plaintiff was required to complete the application should he choose to renew his lease. The landlord subsequently used plaintiff's response as the basis for terminating his lease on the ground of illegal occupancy pursuant to *Rent Stabilization Code § 2524.3(c)*.

2008 NY Slip Op 28266, *; 2008 N.Y. Misc. LEXIS 4397, **;
240 N.Y.L.J. 20

Under *section 2524.3(c)*, a landlord may commence an eviction proceeding against a rent stabilized tenant without the approval of the Division of Housing and Community Renewal ("DHCR"), if the "[o]ccupancy [**8] of the housing accommodation by the tenant is illegal because of the requirements of law and the owner is subject to civil or criminal penalties therefor." Courts interpreting and applying this provision have consistently held that a landlord seeking to terminate a rent stabilized tenancy based on illegal occupancy, is obligated to show an *actual* violation of the law, or that the owner is *actually* subject to civil or criminal penalties. *See 210 West 94 LLC v. Concepcion, 2003 N.Y. Misc. LEXIS 179, 2003 NY Slip Op 50612(U), 2003 WL 1873768 [App Term 1st Dept 2003]; Arrow Linen Supply Co., Inc. v. Cardona, 15 Misc 3d 1143(A), 841 N.Y.S.2d 818, 2007 NY Slip Op 51128(U) [Civ Ct, NY Co 2007]; 75 Monroe St. LLC v. Moy, 12 Misc 3d 1175(A), 2006 NY Slip Op 51238(U) [Civ Ct, NY Co 2006]; Porto v. Watts, 11 Misc 3d 1069(A), 816 N.Y.S.2d 700, 2006 NY Slip Op 50436(U) [Civ Ct, NY Co 2006]; 508 West 149th St. Corp. v. Bodie, 12 Misc 3d 347, 348, 813 N.Y.S.2d 286 (Civ Ct, NY Co 2005); Prana 3750 Broadway LLC v. Alvarez,* NYLJ, May 19, 2004, p 19, col 1 (Civ Ct, NY Co); *338 West 17th St. Assocs. v. Katehis,* NYLJ, October 5, 1994, p 22, col 2 (Civ Ct, NY Co); Andrew [*4] Scherer and Hon. Fern Fisher, *Residential Landlord-Tenant Law in New York,* § 8:155 (2007). Here, defendant merely asserts that it faces potential prosecution under the Federal Immigration and Nationality Act, *8 U.S.C. § 1324,* [**9] for "knowingly permitting [plaintiff] to reside in the building," and admits that it has not been actually charged with any violation of federal immigration law. Thus, until defendant is actually charged with violating federal immigration law, or is actually subject to civil or criminal penalties, it cannot maintain an eviction proceeding for illegal occupancy pursuant to *RSC § 2523.5. See 210 West 94 LLC v. Concepcion, supra; 508 West 149th St. Corp. v. Bodie, supra.*

Plaintiff additionally claims that defendant has violated the New York City Human Rights Law, which makes it an unlawful discriminatory practice for the owner . . . of a housing accommodation . . . [t]o refuse to sell, rent, lease, approve the sale, rental or lease or otherwise deny to or withhold from any person or group of persons such a housing accommodation or an interest therein because of the actual or perceived . . . alienage or citizenship status of such person . . . [and to] discriminate against any person because of such person's actual or perceived . . . alienage or citizenship status . . . in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation.

*NYC Admin Code § 8-107(5)(a)(1),* [**10] *(2).* The undisputed record demonstrates discrimination based on

plaintiff's "actual or perceived . . . alienage or citizenship status" in violation of this provision. Defendant's August, September and October letters, expressly state that plaintiff's rent cannot be accepted and his lease cannot be renewed because of his "questionable immigration status in the U.S." Moreover, defendant's Notice of Termination could not be any more explicit in stating that plaintiff's tenancy is being terminated because of his "illegal" immigration status.

The Human Rights Law includes a limited exception permitting discrimination on the ground of alienage or citizenship status, when such discrimination "is required or when such preference is expressly permitted by any law or regulations of the United States." *8 NYC Admin Code § 8-107 (14).* Presumably relying on this exception, defendant argues that "the only reason and motivation behind the termination notices were compliance with Federal Statute and to avoid civil and criminal penalties." To support this argument, defendant cites solely to the federal statute, *8 U.S.C. § 1324(a)(1)(A)(iii),* which subjects a person to criminal penalties if he or she "knowing [**11] or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation." *8 U.S.C. § 1324(a)(1)(A)(iii).* Defendant, however, cites no federal or New York legal precedent holding that the federal statute either requires a landlord to verify a tenant's immigration status, or prohibits a landlord from renting an apartment to a tenant who lacks legal immigration status.¹ [*5]

1    Notably, the declaration of legislative intent and findings accompanying the 1989 amendments to the Human Rights Law, specifically addresses the issue of discrimination based on immigration status, as it relates to housing:

New York City is currently home to more than one million aliens. These individuals make a unique contribution to the stimulating economic and cultural diversity which is one of the City's primary features. As a city of immigrants, New York City has a special obligation to assist those who, like most of our ancestors, have come to our country seeking a better way of [**12] life. Even under the best of circumstances, newcomers to this country find it difficult to obtain housing, employment and other necessities. However, this difficulty is compounded when landlords, employers or other persons practice discrimination against aliens. Aliens are also especially vulnerable to exploitation by unscrupulous entrepre-

Case 1:07-cv-11091-JSR    Document 25-3    Filed 08/26/2008    Page 5 of 5

Page 4

2008 NY Slip Op 28266, *; 2008 N.Y. Misc. LEXIS 4397, **;
240 N.Y.L.J. 20

neurs in many areas of life. The entire City suffers when a substantial part of its population lacks adequate housing, insurance coverage, heath care or education.

Recent changes in federal immigration law, intended in part to discourage the entry of undocumented aliens into the United States, have aroused fears among immigrants of a growing bias within the community against those who may look or sound foreign. It has come to the City's attention that such people have been asked to document their citizenship status when such documentation was not required by law. Inquiries of this nature indicate that not only aliens, but those suspected of being aliens, face the threat of discrimination. Such intolerance harms the City and aggravates the difficult adjustment to American life which every newcomer must make.

It is the intent of the Council to prevent [**13] aliens from being treated unfairly in housing, employment and other areas of life. This law prohibits discrimination against aliens unless such prohibition is contrary to Federal, State or City law. . . . Unless otherwise mandated by law, all aliens are entitled to and will be guaranteed equal treatment. Nothing in this local law is intended to or shall have the effect of contradicting the requirements of federal law concerning the employment and provision of benefits to aliens. Local Law 52 of 1989, § 1.

Based on the foregoing analyses, it cannot be reasonably disputed that defendant's refusal to renew plaintiff's lease based on his immigration status, violates the protections afforded by both the Rent Stabilization Law and the New York City Human Rights Law, and, as such, it is highly likely that plaintiff will ultimately prevail on those claims. [2] Under these circumstances, plaintiff has met his burden of establishing that he is entitled to a preliminary injunction. *See Aetna Insurance Co. v. Capasso, supra; Doe v. Axelrod, supra; W.T. Grant Co. v. Srogi, supra; Asness v. Nelson, supra.*

---

2   In view of this determination, the court need not resolve the question whether plaintiff is also [**14] likely to succeed on his additional claim for deceptive business practices pursuant to *section 349 of the General Business Law.*

---

Finally, it must be noted that this action presents issues of first impression for New York courts, which are indicative of a disturbing trend involving the private use of immigration laws to deny housing and other benefits based on immigration status. *See* Huyen Pham, "The Private Enforcement of Immigration Laws," *96 Geo. L.J. 777 (March 2008)*; Kristina M. Campbell, [*6] "Local Illegal Immigration Relief Act ordinances: A Legal, Policy and Litigation Analysis," *84 Denv. U.L. Rev. 1041 (2007).* In 2006, for example, the City of Hazelton, Pennsylvania enacted a "Tenant Registration Ordinance" requiring landlords to verify the immigration status of prospective tenants, and to deny housing to those with illegal immigration status; a federal court struck down the ordinance as violating plaintiffs' rights under the *Supremacy* and *Due Process clauses of the United States Constitution. Lozano v. City of Hazleton, 496 F.Supp.2d 477 (M. D. Pa. 2007); see also Villas at Parkside Partners v. City of Farmers Branch, 2008 U.S. Dist. LEXIS 42452, 2008 WL 2201980 (U.S. Dist. Ct., N.D. Texas)* (holding that a local [**15] ordinance requiring landlords to review immigration documents to determine if a tenant or prospective tenant has an "eligible immigration" status, and subjecting landlords to fines and criminal penalties, is preempted by federal law and violates the *Due Process clause); Garrett v. City of Escondido, 465 F. Supp. 2d 1043 (S.D. Ca. 2006)* (in granting a TRO against the enforcement of an ordinance sanctioning landlords who rent to illegal immigrants, the court found "serious questions" as to its constitutionality under the *Supremacy* and *Due Process clauses).* While the cases discussed above involve local ordinances which impact on or deny housing or other benefits based on immigration status, New York City has strong anti-discrimination laws expressly designed to protect its residents against such abuses.

Accordingly, it is hereby

ORDERED that plaintiff's motion for a preliminary injunction is granted and defendants are preliminarily enjoined and restrained from initiating eviction proceedings to remove plaintiff from his rent stabilized apartment; and it is further

ORDERED that plaintiff shall continuing paying use and occupancy to defendants during the pendency of this action or until further [**16] order of this court; and it is further

ORDERED that the parties are directed to appear for a conference on July 31, 2008 at 9:30 a.m., Part 11, Room 351, 60 Centre Street.

DATED: July 15, 2008

Exhibit C

LEXSEE 2003 U.S. DIST. LEXIS 17202

**MAIA FERRAND, Plaintiff, - against - CREDIT LYONNAIS, Defendant.**

**02 Civ. 5191 (VM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 17202*

**September 30, 2003, Decided**
**September 30, 2003, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by *Ferrand v. Credit Lyonnais, 292 F. Supp. 2d 518, 2003 U.S. Dist. LEXIS 20877 (S.D.N.Y., 2003)*
Affirmed by *Ferrand v. Credit Lyonnais, 2004 U.S. App. LEXIS 19086 (2d Cir. N.Y., Sept. 10, 2004)*

**DISPOSITION:**    [*1] Defendant's motion for summary judgment was granted in its entirety. Defendant's Motion to Strike Inadmissible Matter was dismissed.

**COUNSEL:** For Maia Ferrand, PLAINTIFF: Jeffrey L Liddle, Liddle & Robinson, LLP, New York, NY USA.

For Credit Lyonnais, DEFENDANT: Barbara M Roth, Torys, New York, NY USA.

**JUDGES:** VICTOR MARRERO, United States District Judge.

**OPINION BY:** VICTOR MARRERO

**OPINION**

*DECISION AND ORDER*

VICTOR MARRERO, United States District Judge.

Plaintiff Maia Ferrand ("Ferrand") brings this action alleging gender discrimination in violation of federal, state and city anti-discrimination laws, breach of implied contract, *quantum meruit,* and violations of the New York Labor Law and the *Employee Retirement Income Security Act* ("ERISA"). Defendant Credit Lyonnais ("Credit Lyonnais" or the "Bank") moves for summary judgment, pursuant to *Fed. R. Civ. P. 56,* dismissing all the claims alleged in Ferrand's First Amended Complaint ("Complaint" or "Compl."), dated July 16, 2002. For the reasons set forth below, Credit Lyonnais's motion is GRANTED in [*2] its entirety.

**I. BACKGROUND** [1]

> 1   The factual summary that follows derives primarily from Credit Lyonnais's Statement Pursuant to *Local Civil Rule 56.1,* dated April 7, 2003; Credit Lyonnais's Memorandum of Law in Support of its Motion for Summary Judgment, dated April 7, 2003; Ferrand's Statement Pursuant to *Local Civil Rule 56.1,* dated May 28, 2001 and Ferrand's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated May 28, 2003. Except where specifically referenced, no further citation to these sources will be made.

Ferrand was hired by Credit Lyonnais in July 1997 as the Global Head of Foreign Exchange Options ("FX Options"). At the time she was hired, Ferrand reported to Marc Poli, the Global Head of Fixed Income at Credit Lyonnais, with whom she had worked previously at another bank and who recruited her for the position, and Allan Rosenberg, the Head of Treasury in New York. Ferrand worked alternately in Paris and New York City, spending about half of her time in each [*3] city.

Ferrand's offer letter, dated April 9, 1997, confirmed an annual salary of $ 150,000 and a minimum guaranteed bonus of $ 250,000 for her first year of employment. In accordance with the Employee Handbook, which was given to Ferrand when she commenced her employment at Credit Lyonnais, the Bank has a discretionary bonus policy: "Management ... may, in its discretion, grant a bonus to any or all of its employees ... Payment of a bonus is not guaranteed; management may choose to grant or not grant a bonus at year-end to any or all of its employees." Besides the original bonus guarantee fulfilled

during her first year at the Bank, Ferrand had no other guaranteed bonuses.

Ferrand received bonus compensation, on top of her base salary, totaling $ 875,000 for 1998 and $ 750,000 for 1999. In those years, the FX Options division she managed generated $ 14.8 million and $ 14.5 million in revenue, respectively. In 1998 and 1999 her performance, as judged by the profitability of her department and her performance reviews, exceeded expectations.

In September 2000, Graham Whitehair ("Whitehair"), whose job title was Global Head of Foreign Exchange, became head of Ferrand's FX Option's division [*4] as well, thereby becoming Ferrand's immediate superior. Ferrand alleges that prior to this time Whitehair had expressed animus towards her and was resolute on making sure that she be required to report to him. This animus was allegedly expressed to Ferrand directly and to Alex Ladouceur ("Ladouceur"), the Head of New York Foreign Exchange. Ladouceur asserts that in conversation, Whitehair would frequently refer to Ferrand as a "bitch," "whore," or "slut." (Affidavit of Ladouceur ("Ladouceur Aff."), dated May 28, 2003 P 5.) Although the parties disagree as to what caused the problems between Whitehair and Ferrand, both parties acknowledge that the business relationship between the two was turbulent. The Bank alleges that Ferrand constantly tried to bypass Whitehair's authority and Ferrand alleges that Whitehair excluded her from important decisions and was generally "incapable of working" with her.

In January 2001, Joel Jeuvell ("Jeuvell") became the Global Head of Capital Markets and Whitehair's direct superior. Whitehair and Jeuvell met in London in January 2001 and discussed two important matters at issue here: (1) the allocation of the 2000 bonus pool to members of [*5] Ferrand's department, and (2) Jeuvell's plan to centralize all foreign exchange activities in London, where Whitehair and Jeuvell were situated, and Ferrand's resulting need to relocate. Ferrand alleges that both of these decisions were made with the input of Whitehair who harbored sexually driven animus against her.

For the year 2000, Ferrand received a bonus of $ 50,000. The Bank alleges that this reduced amount of discretionary bonus was based on the poor performance of Ferrand's desk that year; and therefore, the decreased funds allocated to bonus compensation for the members of her desk. The highest bonuses in the FX Options group went to two male salespersons ($ 150,000 and $ 200,000, respectively). Ferrand alleges that their higher bonuses raise an inference of discrimination, while the Bank explains that the individual salespersons received bonuses based on their own substantial contributions to the FX Options desk, while Ferrand's bonus reflected the overall underperformance of her group in 2000. The Bank also points to two other male desk heads who, based on the low profitability of their departments, received no bonuses in 2000. Ferrand argues that the comparison is invalid [*6] because one of the departments pointed to had a negative performance as opposed to lower than expected profitability, which was the case in FX Options, and because the other male desk head received additional compensation through an arbitration proceeding.

Ferrand also alleges that the Bank's decision to relocate her to London was intended to lead to her termination and was discriminatory. Ferrand argues that the terms of the relocation package, which Whitehair allegedly influenced, were inferior to Ferrand's terms of employment in New York and were below her expectations. On the other hand, Credit Lyonnais argues that each part of the relocation package offered was at least equal if not better than the terms of her employment in New York.

Ultimately, Ferrand refused the Bank's offer to relocate her to London. John Quinn ("Quinn"), the Head of Human Resources at the Bank, then sent Ferrand a letter explaining that her job in New York no longer existed, and that if she refused to go to London she would be terminated. She was offered $ 50,000 severance in exchange for signing a release, but Ferrand did not sign the release or accept the severance payment.

After Ferrand left the Bank, [*7] her duties were handled in part by Whitehair and in part by a new male hire retained months later, Xin He, who was hired in Paris but with the intent to move to China to open a Shanghai desk. All managerial, reporting and budget aspects of Ferrand's position were assumed by Whitehair.

## II. DISCUSSION

### A. STANDARD OF REVIEW

To grant summary judgment, the Court must determine that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). The court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Summary judgment is inappropriate if, the Court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a verdict for the non-moving party." Id. at 248-49 (citing Adickes v. SH. Kress & Co., 398 U.S. 144, 159, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)). [*8]

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matters that "it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548.* The nonmoving party "must support with specific evidence his assertion that a genuine dispute as to material fact does exist," *id., 477 U.S. at 324*, and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).* The opposing party's showing of a genuine dispute must be grounded in concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. *See Anderson v. Liberty Lobby, 477 U.S. 242, 248, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* All ambiguities and reasonable inferences drawn from the underlying facts must be resolved in the light [*9] most favorable to the party opposing the motion. *See United States v. One Tintoretto Painting Entitled "The Holy Family With Saint Catherine and Honored Donor", 691 F.2d 603, 606 (2d Cir. 1982)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)).*

### B. *GENDER DISCRIMINATION*

Ferrand alleges that Credit Lyonnais discriminated against her on the basis of her sex by paying her less than her male subordinates, drastically reducing her bonus compensation, removing her job responsibilities, requiring her to transfer to London with inferior terms of employment, and ultimately terminating her employment in violation of Title VII, *42 U.S.C. § 2000e* ("Title VII"), *§ 296* of the *New York State Human Rights Law, and § 8-107* of the New York City Human Rights Law.

The focus of a Title VII sex discrimination case is whether the employer is treating "some people less favorably than others because of their ... sex." *International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n.15, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977).* To survive summary judgment on her [*10] gender discrimination claims, Ferrand must either produce "direct evidence" of discrimination, or establish discrimination by inference through the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* Since Ferrand has not provided direct evidence of discrimination, her claims must be established by inference. These standards apply equally to gender discrimination claims under Title VII and claims brought under New York State and New York City Human Rights Laws. *See Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Douglas v. Dist. Council 37 Mun. Employees' Edu. Fund Trust, 207 F. Supp. 2d 282, 288 (S.D.N.Y. 2002).*

Under the *McDonnell Douglas* burden-shifting test, Ferrand must first establish a *prima facie* case of discrimination by showing: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action and (4) the circumstances surrounding that action give rise to an inference of gender discrimination. *See 411 U.S. at 802; Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).* [*11]  If Ferrand sufficiently states a *prima facie* case, Credit Lyonnais is required to present a legitimate, nondiscriminatory business reason for its actions. *McDonnell Douglas, 411 U.S. at 802.* Finally, Ferrand must then rebut the legitimate reasons proffered by the Bank by demonstrating that its reasons are pretextual and that gender discrimination was the true reason for the adverse employment action at issue. *Id.; Austin v. Ford Models, Inc., 149 F.3d 148, 153 (2d Cir. 1998).* Moreover, "within this procedural framework, plaintiff bears, at all times, the ultimate burden of proving that he was the victim of discrimination." *De La Cruz v. New York City Human Resources Admin. Dep't of Social Servs., 884 F. Supp. 112, 115 (S.D.N.Y. 1995)* (citing *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)).*

The first two elements of Ferrand's *prima facie* case are sufficiently stated and are not contested by the Bank. However, Credit Lyonnais argues that since Ferrand was not terminated, but rather offered continuing employment at equal or better terms in a different locale, which she refused,  [*12]  an adverse employment action did not occur. The Court accepts Ferrand's assertion that her much decreased bonus compensation in 2000 and a mandatory transfer to a foreign country, on terms she was disappointed with and concerning which she generally expressed strong antipathy, constitute adverse employment actions. *See Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999)* (an employment action is adverse when it constitutes a materially adverse change in the plaintiff's terms and conditions of employment). The relocation to London, although not necessarily a termination, may reasonably be considered adverse in light of Ferrand's testimony concerning her young child and the need for finding school and child-care in a foreign country. Accordingly, this case is easily distinguished from *Ofori-Awuku v. EPIC Security and Rosy Blue Jewelry Store, 2001 U.S. Dist. LEXIS 1820, No. 00 Civ. 1548, 2001 WL 180054, at *4 (S.D.N.Y. Feb. 23, 2001)*, cited by Defendants for the proposition that a transfer is not an adverse employment action, because in that case the plaintiff was removed from a security posting at a particular locale, but was not asked to move to  [*13]  another country; rather, had he not left his employment, he presumably would have been placed at a different security position in a similar geographic area. Therefore, Ferrand has satisfied the first three elements

of a *prima facie* case for sexual discrimination under Title VII.

In any event, the Bank's challenge relates primarily to the fourth prong of the *prima facie* test outlined above. It is common for the fourth element to be disputed: the "heart of a *prima facie* case lies in the determination of whether the complained of personnel action occurred under circumstances giving rise to an inference of discrimination." *O'Connor v. Viacom Inc./Viacom Int'l Inc., 1996 U.S. Dist. LEXIS 5289, No. 93 Civ. 2399, 1996 WL 194299, at *3 (S.D.N.Y. April 23, 1996)* (citing *Spence v. Maryland Casualty Co., 995 F.2d 1147, 1155 (2d Cir. 1993)*). A plaintiff can establish an inference of discrimination by demonstrating disparate treatment based on sex or by proffering evidence of "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group." *Tramble v. Columbia Univ., 1999 U.S. Dist. LEXIS 1274, No. 97 Civ. 1271, 1999 WL 61826, at *5 (S.D.N.Y. Feb. 10, 1999)* [*14] (citing *Taylor v. Runyon, 1997 U.S. Dist. LEXIS 18484, No. 97 Civ. 2425, 1997 WL 727488, at *5 (S.D.N.Y. Nov. 20, 1997)* and *Chojar v. Levitt, 773 F. Supp. 645, 653 (S.D.N.Y. 1991)*).

The Second Circuit has repeatedly held that the burden of proving a *prima facie* case is de minimus. *See Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1225 (2d Cir. 1994)* ("Because plaintiff's burden of proof ... under the *McDonnell Douglas/Burdine* analysis is de minimis at this stage, ... we conclude, contrary to the district court, that plaintiff met her burden of establishing a prima facie showing of age discrimination."); *Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)* ("Plaintiff's first burden under *McDonnell Douglas* is to establish a prima facie case of unlawful termination under Title VII. The nature of the plaintiff's burden of proof at the prima facie stage is de minimus.") In *Sweeney v. Research Foundation of State Univ. of New York*, the Second Circuit further elaborated on the negligible nature of this burden: "where the defendant has done everything that [*15] would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether 'the defendant intentionally discriminated against the plaintiff.'" *711 F.2d 1179, 1184 (2d Cir. 1983)* (quoting *United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 75 L. Ed. 2d 403, 103 S. Ct. 1478 (1983)*). In *Aikens*, the Supreme Court reiterated that the complainant's initial burden of establishing a *prima facie* case is not onerous and indicated that reviewing courts should not be preoccupied with whether a prima facie case has been established.

In this case, Ferrand alleges both disparate treatment as compared to other employees of the Bank and invidious comments by Whitehair in conversations with Ladouceur. Ferrand argues that because her bonus was less than her male subordinates in 2000, and because she was coercively asked to relocate to London with unacceptable terms and was ultimately replaced by men, as well as the allegedly anti-female comments made by Whitehair to Ladouceur, she has presented an inference [*16] of discrimination. However, the facts alleged do not create a marked inference of discrimination given: (1) the minimal evidence of sexually based animus by Whitehair - gender-related name calling in certain conversations not specifically connected to the adverse employment actions alleged; (2) that Whitehair admittedly had only limited input into the decisions at issue because Jeuvell was the ultimate decisionmaker, and there is no sexually based animus alleged against Jeuvell; and (3) Ferrand does not point to co-workers in equivalent positions to hers that received higher bonuses or better terms of employment; rather, the unequal treatment alleged must be extracted from various inexact comparisons and subjective assessments of adverse employment actions.

Although the Court is not convinced that, based on the facts presented, the inference of discrimination here is strong, it will assume the existence of the fourth element, and therefore the sufficiency of Ferrand's *prima facie* case, by reason of the low threshold for satisfying the burden facing Ferrand, and because Credit Lyonnais has presented sufficient evidence for the Court to determine whether an issue of material fact [*17] exists as to Ferrand's sexual discrimination case to allow the claim to go to trial. *See Viacom, 1996 U.S. Dist. LEXIS 5289, 1996 WL 194299, at *4.*

Credit Lyonnais presents legitimate business reasons for each of the alleged adverse employment actions asserted by Ferrand. First, with regard to her 2000 bonus, the Bank provides a detailed explanation as to why Ferrand received a $ 50,000 discretionary bonus, which was both considerably less than the bonus she received in her previous two years of employment and less than the bonuses received by two salespersons she supervised, both of whom are men. Credit Lyonnais explains, first, that discretionary bonuses are just that, discretionary as a matter of policy, at least with regard to individuals -- even if there are policies withregard to allocations of bonuses to departments. Second, the Bank asserts that bonuses are allotted each year by the amount of net profit generated by a desk and that, in 2000, Ferrand's desk produced a net profit that was less than expected. Specifically, Credit Lyonnais claims that the bonus pool for the year 2000 decreased substantially from the bonus allocated to Ferrand's desk for 1999 because the net income of FX [*18] Options decreased from $ 11.698

million in 1999 to $ 6.79 million in 2000, below the expectations set for Ferrand's department. [2] Therefore, the total pool for bonuses for FX Options shrank accordingly.

> 2 Ferrand disputes the amount of revenue generated by the FX Options product line, indicating that the relevant number is $ 12 million, which exceeded the projected budget. However, as the employer, the Bank has the discretion to determine upon which numbers to base bonus pools, particularly when satisfying its burden of providing a legitimate business reason for allegedly discriminatory actions. Here, the Bank indicates that it based its bonus pool on an official Management Report Systems "MRS" report. (*See* Defendant's Reply Statement Pursuant to *Local Civil Rule 56.1*, dated July 2, 2003, P 36.) Ferrand does concede that revenues were generally lower in 2000. Moreover, as the Bank points out, the pool itself was not alleged to be discriminatory, only Ferrand's share in the pool, which is not based on a particular formula.

[*19] Moreover, the Bank decided that a greater proportion of the bonus funds should be awarded to two key salespersons who had done particularly well that year and who the Bank did not want to lose. Finally, the Bank explained its policy of rewarding managers in good years with high bonuses but decreasing bonuses substantially during low performance years as a reflection of the overall satisfaction with the department. The overall discretionary policy of bonus awards expressed to employees and practiced at Credit Lyonnais makes such bonus allocations lie within the discretion of the Bank's managers. *See, e.g., Bickerstaff v. Vassar College, 196 F.3d 435, 455 (2d Cir. 1999)* ("Vassar alone has the right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them.") Although Ferrand alleges that the pool was allocated differently than in previous years, such allocation is discretionary and justified by the business reasons provided by the Bank. Moreover, Jeuvell, who allegedly was the supervisor to mandate the new policy for bonuses, was new to this task and is entitled to set his own policy. *See Gambello v. Time Warner Comm., Inc., 186 F. Supp. 2d 209, 222 (E.D.N.Y. 2002)* [*20] ("an inference of discrimination is even less permissible when a new supervisor is appointed, who is entitled to set his own standards and agenda.") Therefore, the legitimate business reasons justifying Ferrand's decreased bonus award of $ 50,000 are facially reasonable.

Credit Lyonnais also alleges that the bonus decision was made entirely by Jeuvell and that Whitehair had no input into the decision. Since Ferrand does not allege that Jeuvell harbored any discriminatory animus towards her, the Bank argues that the any inference of discrimination is inapplicable here. However, the record raises a dispute as to whether Whitehair was involved in the decision to allocate a $ 50,000 bonus to Ferrand for the year 2000. Jeuvell explicitly indicated that Ferrand's bonus decision was made jointly by him and Whitehair. (*See* Deposition of Joel Jeuvell ("Jeuvell Dep."), dated January 8, 2003, attached as "Jeuvell Tr." to the Affirmation of Lauren Krasnow ("Krasnow Aff."), dated April 7, 2003, at 23.) Jeuvell further testified that Whitehair asked for Jeuvell's input with regard to Ferrand's bonus for 2000, implying that although the $ 50,000 bonus recommendation was ultimately Jeuvell's, [*21] Whitehair was certainly involved in the decision-making process. (*See Id.* at 24.)

Credit Lyonnais also provides a legitimate business reason for transferring Ferrand to London, for the relocation package she was offered and for her termination following her refusal to relocate. Jeuvell, as he had done before with regard to global heads of derivatives, decided to centralize the global product line heads, including Ferrand as the head of FX Options, in London. (*See Id.* at 43-45.) Jeuvell explains that he did this to improve communication and collective decision-making. (*See Id.* at 120, 129-140, 142-143.) As Jeuvell and Whitehair were both in London, it is not irrational for Jeuvell to insist on London as the locale for the desired centralization.

Ferrand argues that the terms of her relocation package were below her expectations because her salary in London was less than in New York, there was no defined bonus scheme and she remained an at-will employee. Credit Lyonnais counters that her compensation for the transfer to London was based on the compensation paid to employees in London who held positions of responsibility comparable to Ferrand, with a five percent increase. [*22] Furthermore, Ferrand was offered stock options as an additional form of compensation. Although Ferrand says it was less than her salary in New York, the Bank says it was higher. In any event, when Ferrand complained about the salary it was increased and, at that level, Ferrand concedes that her only remaining concerns were about the discretionary bonus policy and job security upon her move to London, aspects of her compensation that were admittedly present in her compensation for her position in New York.

Ferrand alleges in her Declaration ("Ferrand Decl."), dated May 22, 2003, that she was terminated, without pointing to Jeuvell's request that she relocate to London, but rather recalls a statement by Jeuvell that "Whitehair cannot work with you. So I'm sorry, this is what we have decided to do." (PP 63-68.) However, from the entirety of the declaration, as well as her deposition and in her memorandum of law, Ferrand elaborates on the circum-

stances that directly led to her "termination," namely her refusal to relocate to London, which is the legitimate business reason given by the Bank. Therefore, Credit Lyonnais need not set forth a legitimate business reason as to why Ferrand was [*23] terminated, other than its explanations as to why it requested that she relocate to London, since the termination occurred because Ferrand refused to relocate to London.

With regard to the relocation package which Ferrand found unacceptable, the Bank again argues that the decision was Jeuvell's alone and not Whitehair's and that therefore any proof of Whitehair's discriminatory animus toward Ferrand is irrelevant. However, it is a matter of dispute between the parties as to whether Whitehair was involved in the decision. Namely, although the record supports the Bank's claim that Jeuvell made the ultimate determination that Ferrand be relocated to London, Jeuvell testified that Whitehair participated in setting the terms of Ferrand's relocation package. (Jeuvell Dep. at 54.)

Since Credit Lyonnais has set forth legitimate, non-discriminatory reasons for the adverse employment actions alleged by Ferrand, the burden shifts to Ferrand to demonstrate that the Bank's proffered reasons for its employment decisions are pretexts for discrimination. The standard for proving pretext is not negligible: "A reason can not be proved to be a 'pretext for discrimination' unless it is shown both that [*24] the reason was false, and that discrimination was the real reason." *St. Mary's, 509 U.S. 502, 515, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).* To survive summary judgment, a plaintiff must "establish a genuine issue of material fact whether through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely than a discriminatory reason motivated the employer to make the adverse employment decision. *Gallo v. Prudential Residential Serv. Ltd. Partnership, 22 F.3d 1219 (2d Cir. 1994).* The factors to consider in determining whether pretext has been sufficiently demonstrated are: (1) the strength of the plaintiff's *prima facie* case, (2) the probative value of the proof that the employer's explanation is false, (3) other evidence that supports or undermines the employer's case. *See Brown v. Society for Seaman's Children, 194 F. Supp. 2d 182, 190 (E.D.N.Y. 2002)* (citing *Reeves, 530 U.S. at 146-149* and [*25] *James v. New York Racing Ass'n, 233 F.3d 149, 156-157 (2d Cir. 2000)).*

Ferrand does not demonstrate sufficient evidence to satisfy this burden on a motion for summary judgment. Ferrand first attempts to demonstrate pretext by claiming disparate treatment because her male subordinates and

peers were treated more favorably than she was. Ferrand points to the fact that two male members of her subordinate sales-staff received higher bonuses than she did. But, these persons can not be characterized precisely as "similarly situated" as they were not in similar managerial positions, were found to have performed their particular functions well in 1999, and were specifically acknowledged by Ferrand and the Bank as persons who needed to be retained. *See Shumway v. United Parcel Service Inc., 118 F.3d 60, 64 (2d Cir. 1997)* ("To be 'similarly situated,' the individuals with whom [the plaintiff] attempts to compare herself must be similarly situated in all material respects."); *Ponticelli v. Zurich American Ins. Group, 16 F. Supp. 2d 414, 427 (S.D.N.Y. 1998).* Although subordinates, it is reasonable that individual salespersons could be considered [*26] more valuable and less replaceable than a manager whose department as a whole underperforms in a given year.

Moreover, the Bank points to two other department heads, both of whom are male, who received smaller bonuses than Ferrand in 2000 when their profitability was low and whose subordinates similarly received higher bonuses than they. (*See* Affidavit of Robin Moser in Support of Defendant's Motion for Summary Judgment, dated April 7, 2003, P 15; Reply Declaration of Moser, dated June 30, 2003, P 5.) That one was the head of a department that produced no profit and the other received compensation from another source -- an arbitration proceeding -- does not detract from the persuasiveness of this evidence with regard to whether it was discriminatory to pay Ferrand less than her male subordinates. Furthermore, Whitehair also received less of a bonus in 2002 than two of his subordinates and the same as a subordinate in 2001. (*See* Reply Declaration of Jeuvell, dated June 26, 2003, at P 7.)

Similarly, Ferrand's allegations that her transfer to London was discriminatory as compared to her male counterparts is not supported by the evidence. First, the actual decision to transfer [*27] Ferrand to London instead of Paris, as opposed to the terms of her relocation package, was made by Jeuvell, against whom discriminatory animus is not even asserted. [3] Therefore, that Ferrand claims she was the only department head to be asked to be transferred, and that another department head was permitted to remain in Paris, could not have been grounded on discrimination as alleged. [4] As to the terms of her relocation package, Ferrand produces no evidence that such terms were less beneficial than those pertaining to other similarly situated employees of the Bank. Similarly, Ferrand fails to demonstrate that the fact that she was terminated after refusing to relocate to London made her worse off than similarly situated male peers at Credit Lyonnais who refused to relocate. Ferrand's overall failure to offer evidence that she was treated worse than

other male employees of the Bank who were similarly situated undermines her claim of discrimination. *See Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 135 (2d Cir. 2003)* ("Sufficient evidence of disparate treatment might have tended to prove pretext.") In sum, Ferrand does not sufficiently establish disparate treatment [*28] to undermine Credit Lyonnais's legitimate business reasons for its actions.

   3   Credit Lyonnais alleges that Whitehair did not take part in the relocation decision, while Ferrand argues that it was part of his overall scheme to eliminate her. Although Ferrand and Ladoueur indicate that the transfer to Europe was part of Whitehair's overall scheme to get rid of her, Ferrand neither disputes that the ultimate decision to relocate her to London was Jeuvell's, nor does she provide any concrete evidence in support of this alleged scheme. (*See* Ladoueur Aff. P 8; Ferrand Decl. PP 57, 59.) In fact, she testified in her deposition that Whitehair did not object to Ferrand relocating to Paris instead of London. (*See* Deposition of Ferrand ("Ferrand Dep."), dated November 12, 2002, attached as "Ferrand Tr." to the Krasnow. Aff., at 143.) Therefore, even drawing all inferences in her favor, as is required in deciding a motion summary judgment, Ferrand's conclusory allegations can not be credited as evidence at this stage in the proceedings.
   4   Ferrand argues that because Jeuvell hired Xin He who was allowed to remain in Paris, evidence of pretext exists. However Xin He was not hired as a department head with Ferrand's level of responsibility. Ferrand also points to Guy Laffineur ("Laffineur"), a male global head of a product-line who was not required to move to London. The Bank argues that because Laffineur's product-line was very profitable in 2000, he was not required to move to London. While the Bank's explanation undercuts its argument that all global heads were to be centralized in London, the Bank asserts that because Ferrand's FX Options business had been merged into the global Foreign Exchange product line, headed by Whitehair in London, Jeuvell was more insistent that Ferrand join him and Whitehair in London. This distinction is not disputed by Ferrand and undermines her claim that she and Laffineur were similarly situated. Moreover, even assuming that Ferrand and Laffineur were similarly situated, the decision to relocate Ferrand to London was Jeuvell's decision and Ferrand does not allege that Jeuvell sexually discriminated against her.

   [*29] Moreover, Ferrand fails to provide the necessary causal link between her allegations concerning certain allegedly discriminatory remarks made by Whitehair and the adverse employment actions asserted here. While it may have been the case that, as Ferrand alleges, Whitehair wanted her terminated and was responsible for her termination, such conduct is only actionable if Ferrand can demonstrate with sufficient evidence that it was sex discrimination that caused him to carry-out the employment actions at issue. *See Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1988)* (proof of pretext cannot rest upon "statements by decisionmakers unrelated to the decision process itself"); *Smith v. Firestone Tire & Rubber Co., 875 F.2d 1325, 1330 (7th Cir. 1989)* (plaintiff must provide evidence of the "requisite nexus between the statements made by defendant and the demotion of plaintiff to demonstrate that plaintiff's race [or sex] was a 'substantial factor' in the defendant's decision."); *McFadden v. State Univ. of New York College at Brockport, 195 F. Supp. 2d 436, 448 (W.D.N.Y. 2002).*

   Ferrand's proof of pretext [*30] based on discriminatory comments is outlined in the Affidavit of Ladoueur ("Ladoueur Aff."), dated May 28, 2003. Ladoueur states that, when discussing Ferrand with him, Whitehair often expressed open hostility toward Ferrand, and frequently used such epithets as "bitch," "cunt," "whore," "slut" and "tart" when referring to her. (Ladoueur Aff. P 5.) Moreover, Ladoueur indicates that such epithets were also used by Whitehair when referring to another woman at Credit Lyonnais, Chantal Lanchon, who was the Global Head of Capital Markets until the end of 2000. (*Id.* P 6.)

   However, these "stray remarks in the workplace" are not alleged to have been made as part of any adverse discriminatory employment action taken against Ferrand by Whitehair. Therefore, this evidence falls short of making a showing under *McDonnell Douglas*, because proof that sexism "caused the decision" is necessary for a finding of pretext. *Kriss v. Sprint Comm. Co., Ltd. Partnership, 58 F.3d 1276, 1283 (8th Cir. 1995).* As Justice O'Connor explained in *Price Waterhouse,*

      Remarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular [*31] employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision.

*490 U.S. at 251.* Based on this guidance, the Seventh Circuit determined that, in order to suffice as evidence of animus in support of a claim for discrimination, remarks that might convey gender or other impermissible bias must be related to the employment decision in question.

*See McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir. 1991); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1116 (7th Cir. 1992) (remarks made by plaintiff's supervisors, "uttered in unrelated contexts, were not probative of discrimination."); *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (various statements allegedly evidencing anti-female animus raised the 'metaphysical doubt' which the Supreme Court in *Matsushita*, 475 U.S. at 586, found insufficient to create a genuine issue of material fact).

Although not explicitly adopted by the Second Circuit, the Seventh Circuit's doctrine has been readily applied by district courts in this Circuit. *See Smith v. Revival Home Health Care, Inc.*, 2000 U.S. Dist. LEXIS 4105, No. 97 Civ. 4415, 2000 WL 335747, [*32] *at *4 (E.D.N.Y. March 28, 2000)* ("Statements made long before and not in the context of the adverse action cannot support a claim of discriminatory motive for that action."); *Burrell v. Bentsen*, 1993 U.S. Dist. LEXIS 18005, No. 91 Civ. 2654, 1993 WL 535076, at *10 (S.D.N.Y. Dec. 21, 1993); *De La Cruz v. New York City Human Resources Admin. Dep't of Social Servs.*, 884 F. Supp. 112 (S.D.N.Y. 1995) (employer's motion for summary judgment granted where plaintiff's work contained "numerous and critical errors," despite allegations of stray racial remarks."); *see also Turner v. North American Rubber, Inc.*, 979 F.2d 55, 59 (5th Cir. 1992) ("comments [that] are vague and remote in time and administrative hierarchy" can not support a finding of pretext); *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314-316 (6th Cir. 1989) ("single, isolated discriminatory" and possibly "facetious" comment made by plaintiff's supervisor insufficient to avoid summary judgment.)

Here, therefore, Whitehair's stray remarks Ladouceur referred to are insufficient to meet Ferrand's burden of proving that the legitimate reasons provided by Credit Lyonnais for the adverse employment [*33] actions Ferrand alleges are pretextual. Ladouceur offers no specific context for the remarks, nor does he indicate that they were said in reference or leading to the alleged adverse employment actions at issue here and Ferrand does not otherwise sufficiently establish that they were. The one derogatory comment with a contextual reference that Ladouceur reports Whitehair made is: "Credit Lyonnais shouldn't be giving that bitch any fucking options." (Ladouceur Aff. P 10.) However, it is uncontested that Ferrand received stock options and therefore the comment is not linked to an adverse employment action. There is simply insufficient proof that the cause of such allegedly adverse employment actions was gender bias. *See Rush*, 966 F.2d at 1117.

Moreover, the epithets allegedly used by Whitehair do not even necessarily signify gender bias. The epithets were certainly "crude, gender-specific vulgarit[ies]," but, even if used by Whitehair towards two women, do not necessarily indicate that Whitehair had a misogynist attitude which can be deflected to illuminate an intent behind any adverse employment action taken by Credit Lyonnais against a particular woman. *See Kriss, 58 F.3d at 1281.* [*34] The failure of the alleged epithets to demonstrate mysoginistic intent is clarified when compared to instances where stray remarks have been found to be linked to adverse employment actions. For instance, in *Cook v. Arrowsmith*, 69 F.3d 1235, 1239 (2d Cir. 1995), evidence was provided that the defendant employee referred to one woman employee as an "overpaid sour-pussed bitch" and to a second as "another woman who has risen to a level of incompetence." These remarks create the requisite link, missing in this case, between gender bias and work-related performance such that causation between an employer's animosity and a termination could reasonably be found.

The other case cited by Ferrand to support her claim that the link between Whitehair's use of these offensive epithets is sufficiently connected to the alleged adverse employment actions is *Burns v. McGregor Electronic Indus., Inc.*, 989 F.2d 959, 964 (8th Cir. 1993). *Burns*, however, is a sexual harassment hostile work environment claim -- not an disparate treatment discrimination claim as is alleged here -- in which the plaintiff's supervisor, beyond using offensive language toward the plaintiff [*35] in her presence, was alleged to have made sexual advances toward the plaintiff on numerous occasions. *Id.* The district court held that although the employer's conduct was unwelcome and created a hostile work environment, "the plaintiff was not an 'affected' individual" because she had appeared in nude poses in lewd magazines. *Id. at 962.* The Eighth Circuit found this holding to be an incorrect application of federal law. *Id. at 963.* Moreover, the *Burns* court found that given the overall hostile work environment established by the plaintiff, that the plaintiff quit after being called abusive names, such as "bitch," "slut," and "cunt" was sufficient evidence of causation. *Id. at 963-964.* In this case, on the other hand, an overall hostile and abusive work environment based on sex has not been established or even alleged.

Finally, another factor in determining whether so-called "stray" remarks may be considered as causally connected to an adverse employment action is their proximity to the employment events at issue. *See Bagdasarian v. O'Neill*, 2002 U.S. Dist. LEXIS 13328, No. 00 Civ. 0258E, 2002 WL 1628722, at *4 (W.D.N.Y. July 17, 2002)* (stray remarks [*36] made one year before a termination decision not considered evidence of discriminatory intent); *Layaou v. Xerox Corp.*, 999 F. Supp. 426, 433 (W.D.N.Y. 1998); *Geier v. Medtronic, Inc.*, 99 F.3d

238, 242 (7th Cir. 1996) ("To be probative of discrimination, isolated comments must be contemporaneous with the [decision in question] or causally related to the ... decision making process.") Here, Ladouceur does not indicate with any specificity when these allegedly discriminatory remarks occurred, just that Whitehair frequently used such words as "bitch" in referring to Ferrand. (Ladouceur Decl. P 5.) Such testimony does not provide the temporal or causal connection necessary to sustain a finding of pretext in this case.

In sum, the Court is not persuaded that sufficient evidence has been adduced by Ferrand to support a finding by a rational jury that the alleged adverse employment actions taken by the Bank occurred because of Ferrand's gender. *See Jetter v. Knothe Corp., 324 F.3d 73, 76 (2d Cir. 2003); Lapsley v. Columbia Univ. College of Physicians and Surgeons, 999 F. Supp. 506, 514 (S.D.N.Y. 1998).*

C. IMPLIED [*37] CONTRACT FOR BONUS COMPENSATION

New York courts have held that the issue of "whether unpaid compensation constitutes a discretionary bonus or nonforfeitable earned wages is a question of fact." *Kaplan v. Capital Co. of America LLC, 298 A.D.2d 110, 747 N.Y.S.2d 504, 505 (App. Div. 1st Dep't 2002)* (citing *Mirchel v. RMJ Sec. Corp., 205 A.D.2d 388, 613 N.Y.S.2d 876, 878 (1st Dep't 1994)); see also Weiner v. Diebold Group, 173 A.D.2d 166, 568 N.Y.S.2d 959 (App. Div. 1st Dep't)*; (whether bonus plan constitutes a discretionary bonus or earned wages is an issue of fact); *Harden v. Warner Amex Cable Comm., 642 F. Supp. 1080, 1096 (S.D.N.Y. 1986)* (agreement to pay annual bonus enforceable where it constitutes "an integral part of plaintiff's compensation package"). The *Mirchel* court held that "an implied contractual relationship may be established by conduct of the parties, as well as by express agreement." *613 N.Y.S.2d at 878.* Moreover, a bonus that has been established to be compensation as a matter of right cannot be withheld because an employee did not work until the date the bonus was to have been paid. *Id. at 879. [*38]*

The question that arises in this case, therefore, is whether the conduct of the parties or an express agreement between them established that a significant bonus -- at least greater than $ 50,000 as Ferrand's implied-in-fact contract claim relates to the year 2000 as well as the year 2001 -- was to be paid to Ferrand as a matter of course as part of her salary.

New York courts have applied an exception to the factual nature of this determination where "the bonus compensation sought was clearly stated in the company handbook to be purely discretionary." *Kaplan, 747*

*N.Y.S.2d at 505; see also Hall v. United Parcel Serv. of Am., Inc., 76 N.Y.2d 27, 555 N.E.2d 273, 279, 556 N.Y.S.2d 21 (N.Y. 1990)* ("An employee's entitlement to a bonus is governed by the terms of the employer's bonus plan."); *Truelove v. Northeast Capital & Advisory Inc., 95 N.Y.2d 220, 738 N.E.2d 770, 773, 715 N.Y.S.2d 366 (N.Y. 2000)* (same). In this case, the discretionary nature of the bonuses paid to Ferrand is clearly set forth in both the Employee Handbook she was given upon her hiring and from the fact that there are two means of earning bouses at the Bank, through [*39] a guaranteed bonus and an explicitly discretionary bonus. Credit Lyonnais maintains an Employee Handbook, which was issued to Ferrand when she commenced employment at the Bank. The Employee Handbook contains an explicit discretionary bonus policy: "Management ... may, in its discretion, grant a bonus to any or all of its employees ... Payment of a bonus is not guaranteed; management may choose to grant or not grant a bonus at year-end to any or all of its employees." This provision of the Employee Handbook is clear and should have put Ferrand on notice of the possibility that she would receive little or no bonus in a given year.

That in *Kaplan, 747 N.Y.S.2d at 505*, unlike in this case, the court pointed out that the handbook's "terms itself would govern the employment relationship and that no other promises regarding the terms of employment could be made, except by specific individuals and in writing" does not make the holding inapposite here, particularly where Ferrand does not allege that an express promise of a yearly bonus greater than $ 50,000, even if she were terminated before the end of the year, was ever made to her orally. *See Truelove, 738 N.E.2d at 773 [*40]* (where bonus plan explicitly predicated the continuation of bonus payments upon the recipient's continued employment status, vested right to bonus did not exist). Therefore, an established course of dealing entitling Ferrand to a large bonus, as she received during her first two years of employment, can not be established by Ferrand and therefore must be precluded as a matter of law.

Ferrand attempts to rebut this principle of New York law by arguing that because the Bank's Employee Handbook is not contractual in nature, its policies do not bind the employees. Ferrand cites *Lobosco v. New York Telephone Co., 96 N.Y.2d 312, 751 N.E.2d 462, 727 N.Y.S.2d 383 (N.Y. 2001)*, which held that "routinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements." More specifically, because a disclaimer existed in the handbook at issue in *Lobosco,* an employee could not hold an employer to the explicit terms of that handbook. However, the non-contractual nature of a handbook does not render inapplicable an employer's

policy of giving bonuses on a discretionary basis in determining whether it is feasible that an implicit course of conduct of [*41] nondiscretionary, nonforfeitable bonus allotment existed. As the *Kaplan* court explained, even if the policies embodied in the handbook were not intended to be contractual, the provision indicating that bonuses are discretionary should not be read to "render the handbook wholly nugatory." *747 N.Y.S.2d at 505.* Therefore, the legal holding stated in *Kaplan* applies here to preclude raising a claim for an implied contract for a guaranteed bonus where there was an explicit policy in the Bank's Employee Handbook setting forth a policy of discretionary bonuses.

Moreover, Ferrand's claim for an implied contractual right to a larger bonus in 2000 and for a bonus in 2001 is rendered even more specious by her admission that for the year 1998 she did have a contractual right to a guaranteed bonus, but that in 1999 she no longer had a guaranteed bonus. That such a distinction is acknowledged by Ferrand undermines her own claim. (*See* Deposition of Ferrand, attached as "Ferrand Tr." to the Krasnow Aff. at 51-52.)

### D. *QUANTUM MERUIT*

Ferrand also claims that, as an alternative to her breach of implied contract claim, she is entitled to additional payment for the value [*42] of her services for 2000 and 2001 under the doctrine of *quantum meruit.*

To sustain a claim for *quantum meruit,* Ferrand must establish: (1) the performance of services in good faith; (2) the acceptance of the services by the employer; (3) an expectation of compensation for those services; and (4) the reasonable value of the services. *See Lehrer McGovern Bovis v. New York Yankees, 207 A.D.2d 256, 615 N.Y.S.2d 31, 34 (App. Div. 1st Dep't 1994).* In light of the Bank's discretionary bonus policy, and Ferrand's lack of a contractual right to a bonus beyond her salary, of which she was admittedly apprized, Ferrand does not satisfy her burden of establishing an issue of material fact in dispute with regard to the third prong of such a claim. *See Kaplan, 747 N.Y.S.2d at 505.* Therefore, her claim for *quantum meruit* for compensation for services rendered can not survive summary judgment.

### E. *NEW YORK LABOR LAW*

Ferrand next claims that Credit Lyonnais's failure to pay her a large enough bonus in 2000 and any bonus in 2001 violated *New York Labor Law § 193.* By its very terms, including its title, *§ 193* applies to "Deductions [*43] from Wages." [5] Moreover, the New York Court of Appeals has clearly held that *§ 193* applies only to deductions from wages and not to any compensation paid to an employee. *See Huddas v. Frito-Lay, Inc., 90 N.Y.2d 342, 683 N.E.2d 322, 325, 660 N.Y.S.2d 700 (N.Y. 1997).*

Furthermore, in all the cases cited by Ferrand that apply *§ 193,* deductions from wages are the subject matter of the alleged violations. *See, e.g, Tuttle v. Geo. McQuesten Co., Inc., 227 A.D.2d 754, 642 N.Y.S.2d 356, 357-58 (App. Div. 3d Dep't 1996)* ("Plaintiff was granted partial summary judgment by successfully establishing that the withheld moneys constituted "wages" pursuant to *Labor Law § 190* and, thus, under *Labor Law article 6,* defendant was not entitled to withhold these payments as a matter of law.") (citing *Labor Law § 193*); *Klepner v. Codata Corp., 139 Misc. 2d 382, 527 N.Y.S.2d 158, 160 (N.Y. Sup. Ct. 1988); Maggione v. Bero Constr. Corp., 106 Misc. 2d 384, 431 N.Y.S.2d 943, 944 (N.Y. Sup. Ct. 1980)* ("The principal question to be determined is whether *section 193 of Article* 6 of the labor law, which proscribes deductions from wages, applies to persons employed in an executive [*44] capacity. I hold that it does.") The Court is not persuaded that *§ 193* is at all relevant to Ferrand's claim for bonus compensation for the years 2000 and 2001; and therefore, such a claim can not be sustained.

5  *New York Labor Law § 193* states:

> 1. No employer shall make any deduction from the wages of an employee, except deductions which:
>
> a. are made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency; or
>
> b. are expressly authorized in writing by the employee and are for the benefit of the employee; provided that such authorization is kept on file on the employer's premises. Such authorized deductions shall be limited to payments for insurance premiums, pension or health and welfare benefits, contributions to charitable organizations, payments for United States bonds, payments for dues or assessments to a labor organization, and similar payments for the benefit of the employee.
>
> 2. No employer shall make any charge against wages, or require an employee to make any payment by separate transaction unless such charge or payment is permitted as a deduction from

wages under the provisions of subdivision one of this section.

    3. Nothing in this section shall justify noncompliance with article three-A of the personal property law relating to assignment of earnings, nor with any other law applicable to deductions from wages.

[*45] *F. ERISA*

Finally, Ferrand alleges that she is entitled to severance payments under the Employee Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1144 (1974)*. Ferrand argues that the Bank's severance plan is covered by ERISA because it requires an "ongoing administrative program." *See Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 736 (2d cir. 2001)*. Ferrand points to the testimony of John Quinn ("Quinn"), Head of Human Resources at Credit Lyonnais, who indicated that the Bank pays severance on a case-by-case basis. (Deposition of Quinn ("Quinn Dep."), dated March 10, 2003, attached to the Krasnow Aff. at 15.) From this testimony alone, and without having received any promise of severance or alleging that Credit Lyonnais had a severance policy in place, Ferrand urges this Court to assume that it is therefore reasonable that the Bank's severance practices require an ongoing administrative program covered by ERISA.

However, federal case law instructs otherwise. The Supreme Court explained that if an employer has an administrative scheme for paying severance benefits, that scheme is covered by ERISA, but that some severance [*46] obligations do not necessitate an "ongoing administrative scheme." *Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 18, 96 L. Ed. 2d 1, 107 S. Ct. 2211 (1987); see also Schonholz v. Long Island Jewish Medical Ctr., 87 F.3d 72, 75 (2d Cir. 1996)*. Moreover, "those that do not, ... simply do not involve a state law that 'relates to' an employee benefit 'plan,'" and therefore is not covered by ERISA. *Id.* (citing ERISA, *29 U.S.C. § 1144(a)*). In other words, ERISA covers 'plans' not 'benefits': "Only a plan that embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation." *Id. at 11*. Therefore, if a company does not have a plan; but rather, "the employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control," a plan is not established. *Id. at 12*.

In *Fort Halifax*, the Court held that severance benefits payable upon a single-triggering event, in that case a plant closing, as opposed to severance benefits adminis-

tered in accordance with [*47] a set plan, were not covered by ERISA. *Id.* Specifically, because no administrative plan was necessary for such a scheme to be instituted, ERISA preemption was not found. *Id.; see also James v. Fleet/Norstar Fin. Group, Inc., 992 F.2d 463, 465 (2d Cir. 1993)* (promise to pay workers who continued employment until the closing did not constitute an employee welfare benefit plan because "the nature of the payments did not require an ongoing administrative employer program to effectuate them.")

In order to bring an action under ERISA, a plaintiff must demonstrate that the Bank established a benefit plan, not just that a plan was possible. *See Dennis v. RSL COM U.S.A., 1998 U.S. Dist. LEXIS 10961, No. 97 Civ. 5013, 1998 WL 409720, at *1 (S.D.N.Y. July 21, 1998)* ("In order to establish federal jurisdiction under ERISA, [plaintiff] must show that [defendant] established a "plan, fund, or program" of the type covered by ERISA ...") In this case, Ferrand merely extrapolates from Quinn's statement that severance is sometimes awarded on an individual basis, to the likely existence of a severance plan at the Bank, although she provides no evidence that such a plan actually exists. [*48] Credit Lyonnais, in response, indicates that no such severance plan exists. The Bank explains that the Employee Handbook does not indicate the existence of a set severance policy, that it does not have plan documents, plan administrators, plan fiduciaries, procedures or moneys set aside in trust. Although the existence of a plan might be found in spite of the lack of such written policies, *see Scott v. Gulf Oil Corp., 754 F.2d 1499, 1503 (9th Cir. 1985)*, the absence of such indicators and policies "weighs against the finding of an ERISA employee benefit plan." *Dennis, 1998 U.S. Dist. LEXIS 10961, 1998 WL 409720, at *3*. Where the only evidence presented is that in individual cases severance has been awarded, without demonstrating what these benefits consisted of, how such benefits were calculated or how such benefits were administered, there is no evidence that such benefits were administered through a benefit plan to allow such a claim to proceed to trial. *See 1998 U.S. Dist. LEXIS 10961, [WL] at *4*. At this stage in the proceedings, in order to survive summary judgment, Ferrand must provide some evidentiary basis, beyond conjecture, for establishing the existence of an ERISA plan, not just occasional [*49] payments of severance benefits on a case-by-case basis. Therefore, Ferrand's ERISA claim must be dismissed.

*G. MOTION TO STRIKE*

In light of the Court's decision on the Bank's motion for summary judgment, dismissing the Complaint in its entirety, the Court need not consider the Bank's Motion to Strike Inadmissible Matter Contained in the Declaration of Plaintiff Maia Ferrand and the Affidavit of Alex

2003 U.S. Dist. LEXIS 17202, *

Ladouceur, dated July 2, 2003. Therefore, regardless of any merit it may have, the Motion to Strike is dismissed.

III. *ORDER*

For the reasons indicated above, it is hereby

ORDERED that Credit Lyonnais's motion for summary judgment is granted in its entirety.

ORDERED that Credit Lyonnais's Motion to Strike Inadmissible Matter Contained in the Declaration of Plaintiff Maia Ferrand and in the Affidavit of Ladouceur is dismissed.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: 30 September 2003

Victor Marrero

U.S.D.J.